**MILLER NASH LLP**
Bernard J. Kornberg, Bar No. 252006
bernie.kornberg@millernash.com
Nicole M. McLaughlin, Bar No. 272019
nicole.mclaughlin@millernash.com
340 Golden Shore, Suite 450
Long Beach, California 90802
Telephone: (562) 435-8002
Facsimile: (562) 435-7967

Attorneys for Plaintiff Conterra Agricultural
Capital, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONTERRA AGRICULTURAL CAPITAL, LLC, an Iowa limited liability company, <br> Plaintiff, <br><br> v. <br><br> DLP FUNDING, LLC, a New York limited liability company, <br><br> Defendant. | Case No. <br><br> **COMPLAINT FOR** <br><br> **(1) Conversion;** <br> **(2) Intentional Interference with Contract; and** <br> **(3) Unfair Business Practices (Calif. Bus. & Prof. Code §17200, Et. Seq.)** |

Plaintiff Conterra Agricultural Capital, LLC ("Conterra" or "Plaintiff") alleges the following:

**JURISDICTION AND VENUE**

1.     This Court has subject matter jurisdiction based upon 28 U.S.C. § 1332. Complete diversity of citizenship is present because plaintiff Conterra is a citizen of Iowa, while defendant DLP Funding, LLC ("DLP") is a citizen of New York. As described below, Conterra alleges damages of at least $6,000,000 which exceeds the

$75,000.00 threshold for diversity jurisdiction cases.

2.    The Court has personal jurisdiction over DLP, which availed itself of the laws of the State of California by providing lending services to businesses within the State and by taking the assignment of accounts owed within the state to businesses within the State.

3.    This Court is the appropriate venue for this action pursuant to 28 U.S.C. § 1391 because a substantial part of the acts and omissions giving rise to the claims occurred and continue to occur in this judicial district.

## PARTIES

4.    Conterra is a limited liability company formed under the laws and protections of the State of Iowa with its principal place of business located in the State of Iowa. Conterra is engaged in the business of lending to agricultural businesses throughout the United States, including the State of California, County of Kern.

5.    On information and belief, DLP is a limited liability company formed under the laws and protections of the State of New York with its principal place of business located in the State of New York, doing business in the State of California and in this District by, among other things providing lending services to businesses in the State of California, County of Kern.

## FACTUAL ALLEGATIONS

**A.    The First-Position Conterra Loan Agreement**

6.    Conterra Agricultural Capital, LLC is a leading lending institution that focuses exclusively on agricultural lending throughout the United States, including businesses in California's Central Valley.

7.    Non-parties Hronis Capital Assets, LP, Hronis Capital Management, LLC, Hronis Citrus, LLC, Hronis Farming, LP, Hronis, Inc., Hronis Land Company, Hronis Ranch, LLC, and The Hronis Family Limited Partnership (collectively, the "Conterra Borrowers") are affiliated entities that own and/or operate a family-owned

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 2 -

COMPLAINT

business commonly referred to as "Hronis Farms," headquartered in the City of Delano, County of Kern, California. Hronis Farms grows, packs, and ships grapes and other produce to its customers, which include big box retailers like Costco and Walmart.

8. Conterra is the lender on a loan given on October 29, 2024 to the Conterra Borrowers (the "Loan") in which Conterra agreed to provide an operating line of credit to the Conterra Borrowers in the amount of $55,000,000 (which was later extended to $85,850,000 due to the financial distress of the Conterra Borrowers). A true and correct copy of the Loan and Security Agreement dated October 29, 2024 (the "Conterra Loan Agreement") is attached hereto as **Exhibit 1**.

9. Pursuant to section 1.1 of the Conterra Loan Agreement, an "account" is generally defined to include "all present and future right to payment of a monetary obligation, whether or not earned by performance."

10. Pursuant to section 1.1 of the Conterra Loan Agreement, a "general intangible" includes "deposit accounts, customer deposit accounts, deposits, rights related to prepaid expenses, Farm Service Agency payments, USDA payments, negotiable or non-negotiable instruments or securities, chattel paper, causes of action and all other intangible personal property of every kind and nature."

11. Pursuant to section 1.1 of the Conterra Loan Agreement, an "account debtor" is generally defined to include the "party which is obligated on or under an Account or a General Intangible."

12. Pursuant to Section 5.1 of the Conterra Loan Agreement, the Conterra Borrowers granted Conterra a security interest in substantially all personal property assets, including the accounts and general intangibles, of the Conterra Borrowers (the "Personal Property Collateral").

13. A UCC-1 Financing Statement (the "Financing Statement") providing notice of this security interest was recorded with the California Secretary of State on October 29, 2024 as filing number U240083964841. A true and correct copy of the

Financing Statement is attached hereto as **Exhibit 2**.

14.     Pursuant to Section 5.6 of the Conterra Loan Agreement, the Conterra Borrowers are required to require all account debtors to deposit all payments into U.S. Bank National Association Bank Account, last four #1093 (the "U.S. Bank Account"). The U.S. Bank Account is controlled by Conterra under a Deposit Account Control Agreement (the "DACA"). These payments were to be used for payment of the Conterra Loan Agreement.

15.     Pursuant to Section 5.14 of the Conterra Loan Agreement, the Conterra Borrowers "shall not sell, lease, transfer or otherwise dispose of any Collateral unless the purchase price for the full value of the Collateral is paid to the Lender."

16.     Shortly after giving the loan, Conterra learned that Borrowers' representations regarding their financial condition that were provided during underwriting was materially incorrect. These financial misstatements led to an immediate default on the Loan and a request by the Conterra Borrowers to increase the funds available to complete the 2025 harvest.

17.     Conterra and the Conterra Borrowers then entered into several workout agreements, the last of which is a letter agreement dated June 27, 2025 (the "June Letter Agreement"). A copy of the June Letter Agreement is attached to this complaint as **Exhibit 3**.

18.     Relevant to this action, in the June Letter Agreement, the Conterra Borrowers agreed to hire a Chief Restructuring Officer (the "CRO").

19.     Further, the Conterra Borrowers agreed that "[t]he CRO will have full and sole responsibility regarding borrowing of funds by Borrowers."

20.     Further, in the June Letter Agreement, the Conterra Borrowers agreed that "Borrowers shall not enter into any transaction outside the ordinary course of business without (i) receiving prior approval of the CRO for the transaction; and (ii) notifying Lender no earlier than three business days before the transaction."

21.     Relying on these and other promises in the June Letter Agreement,

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 4 -

Conterra agreed to increase the amount available to the Conterra Borrowers under the Loan to $85,850,000.

**B. The DLP Merchant and Security Agreement**

22. DLP, on the one hand, and Hronis Fruit Company, Hronis Ranch, LLC, Hronis Citrus, LLC, California Grape Growers Cooperative, International Fruit Company, Inc., Central California Orange Growers Cooperative, Shamrock Transport, LLC, Hronis, Inc., and the Peter Hronis Company, LLC (collectively, the "DLP Borrowers"), on the other hand, entered into a Merchant and Security Agreement, dated November 14, 2025 (the "MSA"). A true and correct copy of the MSA is attached hereto as **Exhibit 4**.

23. Under the MSA, DLP agreed to fund a total of $13,453,570.20 to the DLP Borrowers, to be paid out under the schedule set forth in the MSA.

24. In exchange for these funds, the DLP Borrowers agreed to sell, assign, and transfer to DLP 19.25% of all of the DLP Borrowers' future receipts, contract rights, and rights to payment from the DLP Borrowers' customers and/or third party payors. Further, in the event of a default, the DLP Borrowers agreed that 100% of future receipts would transfer to DLP.

25. Pursuant to the MSA, the term "Future Receipts" is defined as "all payments made by cash, check, electronic transfer or other form of monetary payment deposited into Merchant Account(s)."

26. In connection with the MSA, the DLP Borrowers granted DLP a security interest in all of the DLP Borrowers' accounts.

27. Three of the DLP Borrowers are also Conterra Borrowers: Hronis Ranch, LLC, Hronis Citrus, LLC, and Hronis, Inc. (collectively, the "Overlap Borrowers").

28. Under the June Letter Agreement, the Overlap Borrowers were prohibited from entering into the MSA without the authorization of the CRO and notice to Conterra. This authorization was not sought or granted. Instead, the Overlap

Borrowers hid the existence of the MSA from the CRO and Conterra.

29.     The CRO only discovered the existence of the MSA in December of 2025. By that time, at least $2,452,229.00 had been advanced by DLP under the MSA.

**C.     DLP's Fraudulent Notices to the Conterra Borrowers' Account Debtors**

30.     Conterra is informed that, shortly after these funds were advanced, the DLP Borrowers defaulted on their obligations under the MSA.

31.     Conterra is informed and thereon alleges that DLP served notices (the "DLP Payover Notices") on certain account debtors of the Conterra Borrowers, including Costco Wholesale ("Costco") and Walmart, Inc. ("Walmart"). These notices assert that DLP is the assignee of the accounts of the DLP Borrowers and that, under sections 9406 and/or 9607 of the California Commercial Code, all payments on accounts owed to the DLP Borrowers must be paid directly to DLP.

32.     DLP had no right to send the DLP Payover Notices. All payments owed by Costco and Walmart were owed to the Overlap Borrowers. Thus Conterra's first in time lien in the accounts of the Overlap Borrowers took priority over any interest of DLP in those accounts.

33.     Further, as the Financing Statement was recorded October 29, 2024, DLP had, at a minimum, constructive notice of the existence of Conterra's lien in the accounts of the Conterra Borrowers. DLP's acts to redirect those accounts to DLP were intentionally wrongful.

34.     Prior to the mailing of the DLP Payover Notices, Costco and Walmart tendered all payments owed to the Conterra Borrowers directly to the US Bank Account controlled by Conterra.

35.     Upon receipt of the DLP Payover Notices, Costco and Walmart have refused to release the funds owed to the Conterra Borrowers to the US Bank Account.

36.     On January 2, 2026, Conterra served its own notices on Costco and Walmart setting forth the superiority of its lien and requiring payment of all owed to

the Conterra Borrowers directly to Conterra (either directly or through the US Bank Account). A copy of each notice is attached as **Exhibit 5** and **Exhibit 6** to this complaint.

37. In response, Costco and Walmart have informed counsel for Hronis Farms and Conterra that all funds will be held pending resolution of the dispute regarding payment.

38. Conterra is informed that Costco is holding $1,175,692.01 in funds owed to the Conterra Borrowers (the "Costco Withheld Funds").

39. Conterra is informed that Walmart is holding approximately $4,700,000.00 of funds owed to the Conterra Borrowers (the "Walmart Withheld Funds").

40. The Costco Withheld Funds and Walmart Withheld Funds were, pursuant to the Conterra Loan Agreement, scheduled to be paid to the U.S. Bank Account controlled by Conterra, and if made would have resulted in payment on the Conterra Loan Agreement.

41. DLP's false notices have therefore directly interfered with Conterra's first position rights in the accounts of the Conterra Borrowers. DLP knew or should have known that its notices would interfere with Conterra's collection on the Conterra Loan and constitute conversion of Conterra's collateral.

42. On January 5, 2026, Conterra sent DLP a cease and desist letter demanding that DLP release all liens and provide an accounting of all funds collected under the MSA. A copy of this letter is attached as **Exhibit 7** to this complaint.

43. After receipt of this letter, counsel for Conterra and DLP held a call to discuss the matter. Since that call, DLP has not yet provided a full accounting. Further, DLP has refused to release the accounts and, further, refused to provide assurances it will not further seek to collect on the accounts of the Conterra Borrowers.

44. To date, there is an outstanding balance owed to Conterra under the

Conterra Loan Agreement in the amount of $68,921,599.97.

45.    Due to the Conterra Borrowers' continued breach of their obligations under the Conterra Loan Agreement, including the entering into the MSA in violation of the June Letter Agreement, on December 4, 2025, Conterra brought suit in the Superior Court of California, County of Kern against the Hronis Borrowers and others to collect on its debt (the "Collection Action"). A copy of the initiating complaint in that action is attached as **Exhibit 8** to this complaint.

## FIRST CLAIM FOR RELIEF: CONVERSION

### (Against DLP)

46.    Conterra re-alleges each and every allegation as set forth above.

47.    Pursuant to the Conterra Loan Agreement, Conterra has first position rights in the accounts of the Conterra Borrowers, including the U.S. Bank Account.

48.    At all relevant times, Conterra's security interest was in first priority due to the Conterra Loan Agreement and the UCC-1 Financing Statement being first recorded in October 2024.

49.    At all relevant times, DLP's security interest was second in priority to Conterra's security interest, as the Conterra Loan Agreement has not been paid in full.

50.    DLP intentionally and substantially interfered with Conterra's security interest in the Conterra Borrowers' accounts by serving notices falsely advising certain account debtors, including Costco and Walmart, to pay over all accounts directly to DLP.

51.    As a result of DLP's conduct, Costco and Walmart have withheld funds owed to the Conterra Borrowers which were scheduled to be paid to a depository account controlled by Conterra, and if made would have resulted in payment on the Conterra Loan Agreement. Further, other account debtors of the Conterra Borrowers are, on information and belief, also withholding funds from Conterra.

52.    Conterra did not consent to DLP sending the notices to the account

debtors or to DLP advising the account debtors to pay over all accounts directly to DLP.

53. DLP's conduct was a substantial factor in causing Conterra's harm.

54. As a result of DLP's conduct, Conterra has been damaged in an amount not less than $6,000,000, constituting the withheld and/or misdirected funds that were scheduled to be used for payment on the Conterra Loan Agreement, and from its loss of the use of funds.

55. Conterra is further entitled to its attorneys' fees and costs under the tort of another doctrine.

## SECOND CLAIM FOR RELIEF: INTENTIONAL INTERFERENCE WITH CONTRACT

**(Against DLP)**

56. Conterra re-alleges each and every allegation as set forth above.

57. Conterra has, and at all relevant times herein mentioned had, valid and existing contractual relationships with the Conterra Borrowers via the Conterra Loan Agreement.

58. At all relevant times, Conterra's security interest was in first position and first in priority due to the Conterra Loan Agreement and the Financing Statement. DLP is aware, and at all relevant times herein mentioned has been aware, of the contractual relationships between Conterra and the Conterra Borrowers.

59. DLP is aware, and at all relevant times herein mentioned has been aware, that DLP's security interest was second in priority to Conterra's security interest, as the Conterra Loan Agreement was not paid in full.

60. DLP is aware, or should have been aware through due diligence, that the Conterra Loan Agreement prohibited the Conterra Borrowers from further encumbering or selling the accounts.

61. DLP is aware, or should have been aware through due diligence, that the June Letter Agreement prohibited the Overlap Borrowers from entering into the MSA

without the authorization of the CRO and notice to Conterra.

62. By engaging in the wrongful acts hereinabove alleged, specifically by taking liens in the accounts of the Overlap Borrowers and providing notices falsely demanding that the Overlap Borrowers' account debtors, including Costco and Walmart, pay over all accounts directly to DLP, DLP engaged in intentional acts designed to disrupt Conterra's contractual relationships by intentionally interfering with and obstructing the Conterra Borrowers' collection of accounts to satisfy the first position Conterra Loan Agreement. DLP intended to interfere in order to divert the funds to itself for its sole benefit. By engaging in the conduct alleged herein, DLP knew that Conterra would suffer harm from the disruption of its contractual relationships with the Conterra Borrowers.

63. As a direct and proximate result of DLP's intentional acts herein alleged, the contractual relationships of Conterra have been, and continue to be actually disrupted. Costco and Walmart have withheld funds owed to the Conterra Borrowers which would have resulted in payment on the Conterra Loan Agreement. DLP's conduct has caused, and will continue to cause, irreparable harm to Conterra's business interests, and has significantly damaged Conterra's contractual relationships described herein.

64. As a result of DLP's conduct, Conterra has been damaged in an amount not less than $6,000,000, constituting the withheld and/or misdirected funds that were scheduled to be used for payment on the Conterra Loan Agreement, and from its loss of the use of funds.

65. Conterra is further entitled to its attorneys' fees and costs under the tort of another doctrine.

**THIRD CLAIM FOR RELIEF: UNFAIR BUSINESS PRACTICES**

**(CALIF. BUS. & PROF. CODE §17200, ET. SEQ.)**

**(Against DLP)**

66. Conterra re-alleges each and every allegation as set forth above.

COMPLAINT

67.    California Business & Professions Code section 17200 provides that unfair competition means and includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

68.    DLP's acts as described above constitute unlawful, unfair, and fraudulent or deceptive business practices in violation of California Business & Professions Code section 17200. DLP's unlawful, unfair, and fraudulent or deceptive business practices specifically include providing false notices advising the Conterra Borrowers' account debtors to pay over all accounts directly to DLP, when DLP knew that Conterra's security interest in the Conterra Borrowers' accounts precedes that of DLP and has first priority. By engaging in the conduct alleged herein, DLP directly interfered with Conterra's first position rights in the accounts of the Conterra Borrowers and interfered with Conterra's collection on the Conterra Loan Agreement.

69.    As a direct and proximate result of DLP's unfair competition, Conterra has been, and will continue to be, seriously and irreparably damaged unless DLP is enjoined from committing acts of unfair competition. In addition, by reason of DLP's actions, it has unlawfully profited, and Conterra has been damaged, in amounts which have not yet been fully determined.

70.    Conterra is further entitled to its attorneys' fees and costs under the tort of another doctrine and under Code of Civil Procedure section 1021.5.

71.    Conterra is further entitled to an injunction against DLP from further purchasing fully encumbered accounts in violation of the California Commercial Code and other law.

## **PRAYER FOR RELIEF**

WHEREFORE, Conterra prays that judgment be entered in its favor in this action as follows:

1.    For damages in the amount of no less than $6,000,000, plus pre-judgment interest and post-judgment interest at the maximum rate permitted by

law;

2.    For a finding that DLP has violated Cal. Bus. & Prof. Code § 17200 et seq.;

3.    For preliminary and permanent injunctive relief ordering DLP to cease its unfair competition, as well as disgorgement of all of DLP's profits associated with this unlawful competition;

4.    For preliminary and permanent injunctive relief (i) requiring DLP to account to Conterra as to all account debtors to whom DLP has made demand for payment on the MSA; (ii) requiring DLP to send notices to each of those account debtors, including Costco and Walmart, in which DLP states that it makes no claim to the accounts; (iii) prohibiting DLP from providing further false notices to any account debtors of the Conterra Borrowers and (iv) requiring DLP to account for and return to Conterra all payments made on the MSA;

5.    For Punitive and other exemplary damages as allowed by law;

6.    For an order compelling DLP to provide an accounting of any profits improperly made as a result of its unlawful conduct as herein alleged, and imposing a constructive trust on any such profits in favor of Conterra, as well as compelling DLP to disgorge all profits accrued as a result of its unlawful conduct as herein alleged in an amount to be determined at trial according to proof;

7.    For reasonable attorneys' fees;

8.    For costs of suit herein incurred; and

9.    For such other and further relief as the Court may deem just and proper.

Dated:  January 8, 2026                    MILLER NASH LLP


                                           By: _/s/ Nicole M. McLaughlin_
                                               Bernie J. Kornberg
                                               Nicole M. McLaughlin
                                               Attorneys for Plaintiff Conterra
                                               Agricultural Capital, LLC

# EXHIBIT 1

# LOAN AND SECURITY AGREEMENT

| | |
|---|---|
| **BORROWERS:** | Hronis Capital Assets, LP |
| | Hronis Capital Management, LLC |
| | Hronis Citrus, LLC |
| | Hronis Farming, LP |
| | Hronis Fruit Company LLC |
| | Hronis, Inc. |
| | Hronis Land Company |
| | Hronis Ranch, LLC |
| | Hronis Resource Management, LLC |
| | The Hronis Family Limited Partnership |
| **LENDER:** | Conterra Agricultural Capital, LLC, Its Successors And/Or Assigns As Their Interest May Appear |
| **GUARANTORS:** | Peter John Hronis |
| | Kosta James Hronis |
| | Demetrius Albert Hronis |
| | The Kosta Hronis Living Trust Dated February 12, 2014 |
| | The Peter John Hronis Living Trust Dated February 28, 2006 |
| | Kosta Hronis and Peter J. Hronis, Trustees of the Sophia Hronis Irrevocable Trust One Dated December 27, 2012 |
| **DATE:** | October 29, 2024 |
| **LOAN AMOUNT:** | $55,000,000 |

Table of Contents

Page

1. DEFINITIONS.................................................................................................................. 2

    1.1 General Definitions ................................................................................ 2

    1.2 Accounting Terms................................................................................. 13

    1.3 Others Defined in California Uniform Commercial Code........................................ 13

    1.4 Interpretation...................................................................................... 13

    1.5 Other Defined Terms .......................................................................... 13

2. LOAN, LOAN ADVANCES, FEES AND SUBORDINATIONS ...................................... 13

    2.1 Loan ................................................................................................... 13

    2.2 Default Rate ........................................................................................ 14

    2.3 Prepayment ........................................................................................ 14

    2.4 Purposes............................................................................................. 14

    2.5 Loan Fees ........................................................................................... 14

    2.6 Loan Account ...................................................................................... 15

    2.7 Statements .......................................................................................... 15

    2.8 Termination of Agreement.................................................................. 15

    2.9 Subordination by Borrower................................................................. 14

    2.10 Lease Subordinations ....................................................................... 15

3.POSITION REPORT ....................................................................................................18

    3.1 Eligible Accounts................................................................................ 18

    3.2 Eligible Growing Crops ...................................................................... 18

    3.3 Delivery of Position Report Certificates............................................. 18

4. CONDITIONS TO ADVANCES ................................................................................... 19

    4.1 The Lender's Execution of Funding Documents ................................ 19

    4.2 Approval of the Lender's Counsel...................................................... 19

    4.3 Compliance ........................................................................................ 19

    4.4 Documentation ................................................................................... 19

    4.5 Other Conditions Precedent .............................................................. 19

    4.6 Line of Credit Position Report............................................................ 19

    4.8 First Lien............................................................................................. 19

    4.9 Inspections ......................................................................................... 19

4.10 Permits ................................................................................................ 19

4.11 Zoning ................................................................................................. 19

4.12 Collateral ............................................................................................ 19

5. SECURITY ............................................................................................... 20

5.1 Security Interests and Liens .................................................................. 20

5.2 Endorsement by the Lender .................................................................. 21

5.3 Delivery of Warehouse Receipts .......................................................... 21

5.4 Preservation of Collateral and Perfection of Security Interests Therein .................... 21

5.5 Loss of Value of Collateral .................................................................. 24

5.6 Collection of Accounts ........................................................................ 24

5.7 Account Covenants .............................................................................. 24

5.8 Account Records and Verification Rights ............................................. 24

5.9 Notice to Account Debtors ................................................................... 25

5.10 Records And Reporting ...................................................................... 25

5.11 Special Collateral .............................................................................. 25

5.12 Remittance of Proceeds to the Lender ................................................ 25

5.13 Safekeeping of Collateral .................................................................. 25

5.14 Sales and Use of Collateral ............................................................... 25

5.15 Real Property Collateral .................................................................... 24

5.16 Title Insurance .................................................................................. 24

5.17 U.S. Bank Account ............................................................................ 26

6. WARRANTIES ......................................................................................... 27

6.1 Binding Effect ...................................................................................... 27

6.2 Correctness of Financial Statements .................................................... 27

6.3 Employee Controversies ...................................................................... 27

6.4 Compliance with Laws and Regulations ............................................... 27

6.5 Collateral ............................................................................................. 27

6.6 Account Warranties ............................................................................. 28

6.7 Location of Assets ............................................................................... 28

6.8 Inventory and Farm Product Warranties .............................................. 28

6.9 Solvency .............................................................................................. 28

6.10 Tax Liabilities ................................................................................... 28

6.11 Pension Reform Act ................................................................................................ 28

6.12 Indebtedness and Producer Payables ..................................................................... 29

6.13 Margin Security ..................................................................................................... 29

6.14 Other Corporate or Fictitious Names ..................................................................... 29

6.15 Affiliates ............................................................................................................... 29

6.16 Survival of Warranties .......................................................................................... 29

6.17 Related Party Transactions .................................................................................... 29

6.18 ERISA Plans and Contracts ................................................................................... 29

6.19 Compliance:  Licenses, Permits ............................................................................ 30

6.20 Hazardous Substances ........................................................................................... 31

6.21 Affiliate Transactions ............................................................................................ 31

6.22 Compliance with Laws and Regulations ................................................................ 32

6.23 USA Patriot Act Notification ................................................................................ 32

6.24 Borrower Existence and Equity Interests Properly Issued ...................................... 32

6.25 Borrower Authority ............................................................................................... 35

6.26 Management and Equity Interests .......................................................................... 36

6.27 Litigation and Proceedings .................................................................................... 39

6.28 Certification .......................................................................................................... 39

6.29 Borrower's Non Reliance Upon Lender ................................................................. 39

6.30 Environmental Questionnaire ................................................................................ 39

6.31 Borrower Lists ....................................................................................................... 40

6.32 Financial Statements ............................................................................................. 40

7. AFFIRMATIVE COVENANTS ................................................................................. 40

7.1 Financial Statements ............................................................................................... 40

7.2 Conduct of Business ................................................................................................ 41

7.3 Maintenance of Properties ....................................................................................... 42

7.4 Notice of Suit, Adverse Change in Business, or Event of Default ............................ 42

7.5 Use of Proceeds ...................................................................................................... 42

7.6 Borrower's Property Insurance ................................................................................ 42

7.7 Pension Plans .......................................................................................................... 43

7.8 Further Actions ....................................................................................................... 43

7.9 Deposit Accounts .................................................................................................... 43

7.10 Workers' Compensation Coverage ................................................................. 43

7.11 Fidelity and Employee Dishonesty Bond ..................................................... 44

7.12 The Lender's Right of Entry and Inspection.................................................. 44

7.13 Actions .......................................................................................................... 44

7.14 Collateral Located Only At Approved Locations ......................................... 44

7.15 Indemnity ...................................................................................................... 44

7.16 Regulation U ................................................................................................. 44

7.17 The Lender's Right of Entry and Inspection.................................................. 44

7.18 Borrower's Collateral Sales .......................................................................... 45

7.19 Further Action ............................................................................................... 45

7.20 No Commitment for New Loans.................................................................... 45

7.21 Consent to Loan Participation, Sale or Transfer........................................... 45

7.22 Deposit Accounts........................................................................................... 45

7.23 Actions ...........................................................................................................42

7.24 Title Insurance ...............................................................................................42

7.25 Financial Covenants........................................................................................ 45

8. NEGATIVE COVENANTS ............................................................................... 46

8.1 Encumbrances ................................................................................................. 46

8.2 Consolidations, Mergers or Acquisitions, Subsidiaries, Public Offering ................. 47

8.3 Deposits, Investments, Advances or Loans .................................................... 47

8.4 Indebtedness.................................................................................................... 47

8.5 Guaranties and Other Contingent Obligations............................................... 47

8.6 Disposition of Property................................................................................... 47

8.7 Capital Investment Limitations...................................................................... 48

8.8 Loans to Affiliates or Others.......................................................................... 48

8.9 Continuity of Management ............................................................................. 48

8.10 Environmental Laws ..................................................................................... 48

8.11 Loans, Acquisitions, Guaranties, Other Businesses.................................... 48

8.12 Payables and Payment of Debt ..................................................................... 48

8.13 Split Financing .............................................................................................. 48

8.14 Managerial Fees, Compensation of Officers or Managers ........................... 48

8.15 Dividends, Redemptions, Debt ..................................................................... 48

8.16 Issuance of Membership Interests ...................................................................... 49

8.17 Amendment of Corporate Governing Documents............................................. 49

8.18 Use of Corporate or Fictitious Names .............................................................. 49

8.19 Continuity of Consent of Management.............................................................. 49

8.20 Environmental Laws .......................................................................................... 49

8.21 Loans, Acquisitions, Guaranties, Other Businesses......................................... 49

9. DEFAULT, RIGHTS AND REMEDIES OF THE LENDER ................................. 49

9.1 Liabilities ............................................................................................................ 49

9.2 Rights and Remedies Generally.......................................................................... 49

9.3 Entry Upon Premises .......................................................................................... 50

9.4 Sale of Other Disposition of Collateral by the Lender ...................................... 50

9.5 Waiver of Demand ............................................................................................... 50

9.6 Waiver of Notice ................................................................................................. 51

10. MISCELLANEOUS ............................................................................................... 51

10.1 Timing of Payments .......................................................................................... 51

10.2 Attorneys' Fees and Costs ................................................................................ 51

10.3 Expenditures by the Lender .............................................................................. 51

10.4 The Lender's Costs and Expenses as Additional Liabilities............................. 52

10.5 Claims and Taxes.............................................................................................. 52

10.6 Custody and Preservation of Collateral ........................................................... 52

10.7 Inspection.......................................................................................................... 52

10.8 Examination of Banking Records ..................................................................... 53

10.9 Governmental Reports ...................................................................................... 53

10.10 Reliance by the Lender ................................................................................... 53

10.11 Parties.............................................................................................................. 53

10.12 Applicable Law Severability........................................................................... 53

10.13 Judicial Reference ........................................................................................... 53

10.14 Application of Payments Waiver ..................................................................... 53

10.15 Marshalling:  Payments Set Aside ................................................................. 54

10.16 Section Titles .................................................................................................. 54

10.17 Continuing Effect............................................................................................ 54

10.18 No Waiver........................................................................................................ 54

10.19 Notices ........................................................................................................ 55

10.20 Maximum Interest.......................................................................................... 57

10.21 Additional Advances....................................................................................... 57

10.22 Right of Setoff................................................................................................ 57

10.23 No Partnership ............................................................................................... 57

10.24 Authority to File Notices .............................................................................. 58

10.25 Exhibits and Schedules ................................................................................. 58

10.26 Counterparts................................................................................................... 58

10.27 Release ........................................................................................................... 58

10.28 No Reliance..................................................................................................... 54

10.29 Agreement to Govern and Control................................................................ 58

## LOAN AND SECURITY AGREEMENT

### I.    PARTIES

This Loan And Security Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, this "Agreement") is made and entered into as of the 29th day of October, 2024, by and among Hronis Capital Assets, LP ("Hronis Capital Assets"), whose address is 10443 Hronis Road, Delano, California 93215, Hronis Capital Management, LLC ("Hronis Capital Management"), whose address is 10443 Hronis Road, Delano, California 93215, Hronis Citrus, LLC ("Hronis Citrus"), whose address is 10443 Hronis Road, Delano, California 93215, Hronis Farming, LP ("Hronis Farming"), whose address is 10443 Hronis Road, Delano, California 93215, Hronis Fruit Company LLC ("Hronis Fruit Company"), whose address is 10443 Hronis Road, Delano California 93215, Hronis, Inc. ("Hronis"), whose address is 10443 Hronis Road, Delano, California 93215, Hronis Land Company ("Hronis Land Company"), whose address is 10443 Hronis Road, Delano, California 93215, Hronis Ranch, LLC ("Hronis Ranch"), whose address is 10443 Hronis Road, Delano, California 93215, Hronis Resource Management, LLC ("Hronis Resource Management"), whose address is 10443 Hronis Road, Delano, California 93215, The Hronis Family Limited Partnership ("The Hronis Family Limited Partnership"), whose address is 10443 Hronis Road, Delano, California 93215 (hereafter, Hronis Capital Assets, Hronis Capital Management, Hronis Citrus, Hronis Farming, Hronis Fruit Company, Hronis, Hronis Land Company, and The Hronis Family Limited Partnership are each a "Borrower" and sometimes collectively referred to as the "Borrower"), Peter John Hronis ("PJHronis"), whose address is 10443 Hronis Road, Delano, California 93215, Kosta James Hronis ("KJHronis"), whose address is 10443 Hronis Road, Delano, California 93215, Demetrius Albert Hronis ("DAHronis"), whose address is 10443 Hronis Road, Delano, California 93215, The Kosta Hronis Living Trust dated February 12, 2014 ("The Kosta Hronis Living Trust"), whose address is 10443 Hronis Road, Delano, California 93215, The Peter John Hronis Living Trust dated February 28, 2006 ("The Peter John Hronis Living Trust"), whose address is 10443 Hronis Road, Delano, California 93215, Kosta Hronis and Peter J. Hronis, Trustees of the Sohpia Hronis Irrevocable Trust One dated December 27, 2012 ("The Sophia Hronis Irrevocable Trust One"), whose address is 10443 Hronis Road, Delano, California 93215 (hereafter, PJHronis, KJHronis, DAHronis, The Kosta Hronis Living Trust, The Peter John Hronis Living Trust, and The Sophia Hronis Irrevocable Trust One are each a "Guarantor" and sometimes collectively referred to as "Guarantor"), and Conterra Agricultural Capital, LLC, its successors and/or assigns as their interest may appear (the "Lender"), whose address is 5465 Mills Civic Parkway, Suite 201, West Des Moines, Iowa 50266 (hereafter, Borrower, Guarantor, and Lender are each a "Party" and sometimes collectively referred to as the "Parties").

### II.    EFFECTIVE DATE

Although this Agreement is dated as of the 29th day of October, 2024, this Agreement will be effective only upon the execution by all Parties and not upon execution by fewer than all Parties (the "Effective Date").

### III.    RECITALS

1

A.      Borrower and Guarantor have requested, and Lender has agreed to make that certain and financial accommodations on the terms and conditions set forth in this Agreement.

IV.      AGREEMENTS

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.      DEFINITIONS

1.1      General Definitions.  When used herein, the following terms shall have the meanings indicated:

"Accounts"  shall mean all present and future right to payment of a monetary obligation, whether or not earned by performance: (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of; (b) for services rendered or to be rendered; (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred; (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract; (g) arising out of the use of a credit or charge card or information contained on or for use with the card; or (h) as winnings in a lottery or other game of chance operated or sponsored by a State, governmental unit of a State, or person licensed or authorized to operate the game by a State of governmental unit of a State.  Accounts shall include the broadest definition permitted under the Code.

"Account Control Agreement" shall collectively mean the Deposit Account Control Agreements in forms and substance satisfactory to Lender and signed by the applicable depository institution qualifying as an Approved Local Bank, the applicable depositor, and the Lender.

"Account Debtor" shall mean the party which is obligated on or under an Account or a General Intangible.

"Affiliate" shall mean any Person: (a) the spouse, parent, child, grandchild, or sibling of any individual person, or any relative who lives in the same house with, or who is a dependent of (under the Internal Revenue Code), such Person; (b) any general or limited partnership or limited liability company in which such Person or any individual identified in clause (a) or entity identified in clauses (c) or (d) or (e) is a partner or member or in which any such Person, individual, or entity owns, beneficially or of record, more than 5% of the outstanding membership interest of Borrower; (c) any corporation in which such Person or any individual identified in clause (a) is a director or officer, or which any such Person, or any individual or entity identified in clause (a) is a director or officer, or in which such Person, or any individual or identity identified in clauses (a), (b), (d), or

2

(e) is the owner, beneficially or of record, of 5% or more of the outstanding voting stock; (d) any trust of which any such Person, or any individual or entity identified in clauses (a), (b), (c), or (e) is a trustee or co-trustee or is the holder, beneficially or of record, of a beneficial interest of 5% or more; or (e) any corporation, partnership, limited liability company, trust, or limited partnership or general or other entity controlled by, controlling under, or under common control with, either directly or indirectly, such Person or of the individuals or entities identified in clauses (a) through (d) above.

"AgAmerica" shall mean Ag REIT Two, LLC, a Florida limited liability company, and its successors and assigns, whose address is 4030 South Pipkin Road, Lakeland, Florida 33811.

"AgAmerica Intercreditor Agreement" shall mean the Intercreditor Agreement of even date herewith between AgAmerica and Lender and consented to by Borrower.

"Agreement" has the meaning set forth in the introductory paragraph of this document.

"Approved Local Bank" shall mean U.S. Bank and any other depository bank approved by Lender and which has delivered to Lender a fully executed Account Control Agreement in form and substance acceptable to Lender, and it shall mean U.S. Bank (or such other depository institution designated by Lender from time to time) with respect to the U.S. Bank Account.

"Borrower" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Borrower Lease" shall mean any lease or other document or agreement, written or oral, now or hereafter in existence, permitting any Borrower to use or occupy any part of the Real Property Collateral.

"Borrower Tenant" shall mean any Borrower now or hereafter using or occupying any part of the Real Property Collateral pursuant to a Borrower Lease.

"Business Day" means any day other than: (a) a Saturday, Sunday or legal holiday or a day on which banks located in Iowa are required or authorized by law to be closed: or (b) a day on which the New York Stock Exchange is closed.

"Chattel Paper" means a record or records that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, a security interest in specific goods and license of software used in the goods, a lease of specific goods, or a lease of specific goods and license of software used in the goods. In this paragraph, "monetary obligation" means a monetary obligation secured by the goods or owed under a lease of the goods and includes a monetary obligation with respect to software used in the goods. The term does not include: (a) charters or other contracts involving the use or hire of a vessel; or (b) records that

3

evidence a right to payment arising out of the use of a credit or charge card or information contained on or for use with the card.  If a transaction is evidenced by records that include an instrument or series of instruments, the group of records taken together constitutes Chattel Paper.  The term shall have the broadest meaning under the Code.

"Code" shall mean the Uniform Commercial Code as adopted in the State of California.

"Collateral" shall mean the Real Property Collateral and any and all assets in which the Lender may now or hereafter have a lien or security interest under or pursuant to Section 5.1 of this Agreement, under other Financing Agreements or otherwise to secure the Liabilities.

"Current Ratio" shall mean, as of any particular date, the ratio of Borrower's consolidated current assets, adjusted by deducting prepaid assets, to Borrower's consolidated current liabilities which shall include current portion of long-term debt, treating all amounts currently owing to Affiliates as current liabilities, and giving no value as current assets to any amounts currently owing from Affiliates, all of which asset values may be adjusted by the Lender in its reasonable discretion.  In determining Current Ratio Intangible Assets shall be treated as having no value.  Except as stated herein, Current Ratio shall be determined in accordance with GAAP.

"DAHronis Guaranty" shall mean the guaranty of even date herewith given by DAHronis to and for the benefit of Lender, and any modification, amendment or supplement thereto.

"Debt" shall mean all of the Liabilities, plus all other debts of Borrower.

"Deed of Trust No. 1" shall mean the Deed of Trust, Security Agreement and Assignment of Rents of even date herewith given by Hronis Ranch, The Hronis Family Limited Partnership, Hronis Land Company, Hronis Capital Assets, PJHronis, and KJHronis for the benefit of Lender concerning the Real Property Collateral No. 1, as such Deed of Trust may be amended, modified, extended or partially re-conveyed from time to time.

"Deed of Trust No. 2" shall mean the Deed of Trust, Security Agreement and Assignment of Rents of even date herewith given by Hronis Ranch, The Hronis Family Limited Partnership, Hronis Land Company, Hronis Capital Assets, PJHronis, and KJHronis for the benefit of Lender concerning the Real Property Collateral No. 2, as such Deed of Trust may be amended, modified, extended or partially re-conveyed from time to time.

"Deeds of Trust" shall collectively mean the Deed of Trust No. 1 and the Deed of Trust No. 2.

4

"Default" shall mean the occurrence or existence of any one or more of the following events:

(a)    any Borrower fails to pay any principal or interest pursuant to the Note or any other Financing Agreements when such principal or interest becomes due or is declared due;

(b)    any Borrower fails to pay any of the Liabilities within ten (10) days of the date when such Liabilities become due or are declared due;

(c)    any Borrower or Guarantor fails or neglects to perform, keep or observe any of the covenants, conditions, representations, promises or agreements contained in this Agreement including but not limited to Section 3, Section 4, Section 5, Section 6, Section 7, Section 8, Section 9, or Section 10 of this Agreement;

(d)    any Borrower or Guarantor fails or neglects to perform, keep or observe any of the covenants, conditions, promises or agreements contained in any of the other Financing Agreements;

(e)    the amount outstanding under the Note is at any time in excess of the "Current Position" stated in any Position Report Certificate; provided, however, that Borrower shall have twenty (20) days to cure such Default, and Lender shall have no obligation to make any Line of Credit Advance while such Default remains uncured;

(f)    any warranty or representation now or hereafter made by or on behalf of any Borrower or Guarantor in connection with this Agreement or any of the other Financing Agreements is untrue or incorrect in any material respect, or any schedule, certificate, statement, report, financial data, notice, or writing furnished at any time by or on behalf of any Borrower to the Lender is untrue or incorrect;

(g)    a judgment in excess of $10,000 is rendered against any Borrower or Guarantor and not satisfied or stayed pending appeal no later than fifteen (15) days after its entry;

(h)    all or any part of any Borrower's or any Guarantor's assets come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Borrower or Guarantor;

(i)    a proceeding under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt or receivership law or statute is filed against any Borrower or Guarantor or a proceeding under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt or

receivership law or statute is filed by any Borrower or Guarantor, or any Borrower or Guarantor makes an assignment for the benefit of creditors;

(j)     any Borrower or Guarantor is enjoined, restrained, or in any way prevented by the order of any court or any administrative or regulatory agency or by the termination or expiration of any permit or license, from conducting all or any material part of any Borrower's or Guarantor's business affairs;

(k)     any Borrower or Guarantor is declared to be or is in default on any other obligation for borrowed money;

(l)     the Lender makes an expenditure under Section 10.3 of this Agreement which is not repaid by Borrower within five (5) Business Days of demand therefore; or

(m)     the Lender in good faith deems itself insecure or that the prospect for repayment of the Liabilities or Borrower's obligations under the Financing Agreements is impaired.

"Documents" shall mean any and all warehouse receipts, bills of lading or similar documents of title relating to goods in which Borrower at any time has an interest, whether now or at any time or times hereafter issued to Borrower or the Lender by any Person, and whether covering Borrower's Inventory or otherwise and shall also mean any Documents as that term is used or defined in the Code.

"Eligible Accounts" shall have the meaning set forth in Section 3.3 of this Agreement.

"Eligible Growing Crops" shall have the meaning set for in Section 3.4 of this Agreement.

"Environmental Claim" means any investigation, notice, violation, demand, allegation, action, suit, injunction, judgment, order, consent decree, penalty, fine, lien, proceeding, or claim (whether administrative, judicial, or private in nature) arising:

(a)     pursuant to, or in connection with, an actual or alleged violation of, any Environmental Law;

(b)     in connection with any Hazardous Material or actual or alleged Hazardous Material Activity;

(c)     from any abatement, removal, remedial, corrective, or other response action in connection with a Hazardous Material, Environmental Law, or other order by any governmental authority; or

(d)      from any actual or alleged damage, injury, threat, or harm to health, safety, natural resources, and/or the environment.

"Environmental Indemnity Agreement" means the Environmental Indemnity Agreement  of even date herewith by and among Borrower, Guarantor, and Lender.

"Environmental Law" means any applicable federal, state or local law, statute, regulation or other requirement of any governmental authority pertaining to:

(a)      the protection of health, safety, and the indoor or outdoor environment;

(b)      the conservation, management, or use of natural resources and wildlife;

(c)      the protection or use of surface water and groundwater;

(d)      the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation or handling of, or exposure to, any Hazardous Material; or

(e)      pollution (including any Release to air, land, surface water, and groundwater).

Environmental Law also includes, without limitation, any requirement or provision contained in the following federal laws: the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 USC 9601 *et seq.*, Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 USC 6901 *et seq.*, Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 USC 1251 *et seq.*, Clean Air Act of 1966, as amended, 42 USC 7401 *et seq.*, Toxic Substances Control Act of 1976, 15 USC 2601 *et seq.*, Hazardous Materials Transportation Act, 49 USC App. 1801 *et seq.*, Occupational Safety and Health Act of 1970, as amended, 29 USC 651 *et seq.*, Oil Pollution Act of 19909, 33 USC 2701 *et seq.*, Emergency Planning and Community Right-to-Know Act of 1986, 42 USC 11001 *et seq.*, National Environmental Policy Act of 1969, 42 USC 4321 *et seq.*, Safe Drinking Water Act of 1974, as amended 42 USC 300(f) *et seq.*, the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§ 136 to 136y, the provisions of California State Law, and any similar, equivalent, implementing or successor federal, state, tribal, or local law, and any amendment, rule, regulation, order, or directive issued thereunder.

"Environmental Permits" shall mean all permits and licenses required by or pursuant to all applicable Environmental Laws.

"Environmental Questionnaire" shall mean the Environmental Questionnaire in the form provided by Lender and completed and signed by Borrower.

"Equipment" shall mean any and all goods, other than Inventory (including, without limitation, equipment, machinery, motor vehicles, implements, tools, parts and accessories) which are now or hereafter owned or acquired by Borrower, together with any and all accessions, parts and appurtenances thereto, and all "Equipment" as that term is used or defined in the Code.

"Event of Default" shall mean the occurrence or existence of a Default, or the occurrence of a default or event of default under any of the Financing Agreements of Borrower or Guarantor in existence or hereafter entered into between Borrower, a Guarantor or an Affiliate and the Lender.

"Farm Products" shall mean all personal property of Borrower used or for use in farming operations, now or hereafter owned by Borrower or now or hereafter purchased by or for the benefit of Borrower. Farm Products shall also include, but shall not be limited to, any other "Farm Products" as that term is used or defined in the Code.

"Financing Agreements" shall mean all agreements, instruments and documents, including, without limitation, this Agreement and all security agreements, loan agreements, promissory notes, letter of credit applications, guaranties, mortgages, deeds of trust, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, notices, leases, financing statements, cash management agreements, deposit account agreements, collateral assignments of insurance policies, assignments of indemnities, and all other written matter whether heretofore, now, or hereafter executed by or on behalf of any Borrower and delivered to the Lender, together with all amendments thereof and all agreements and documents referred to therein or contemplated thereby specifically including but not limited to those documents set forth in Section 5.4.

"GAAP" shall mean Generally Accepted Accounting Principles as consistently applied.

"General Intangibles" shall mean General Intangibles as that term is used or defined in the Code and all of Borrower's right, title and interest in and to any deposit accounts, customer deposit accounts, deposits, rights related to prepaid expenses, Farm Service Agency payments, USDA payments, negotiable or non-negotiable instruments or securities, chattel paper, causes of action and all other intangible personal property of every kind and nature whether presently owned or hereafter acquired or arising, including, without limitation, corporate or other business records, inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, goodwill, registrations, copyrights, licenses, franchises, customer lists, tax refunds, tax refund

8

claims, customs claims, guarantee claims, co-op memberships or patronage benefits, rights to any government subsidy, set aside, diversion, deficiency or disaster payment or payment in kind, water rights which are not or may not be real property (including, without limitation, water stock, ditch rights, well permits, water permits, applications and the like), storage agreements or contracts, leasehold interests in real and personal property, and any security interests or other security held by or granted to Borrower to secure payment by any Account Debtor of any of the Accounts and all contracts and contract rights.

"Guaranties" shall collectively mean the PJHronis Guaranty, the KJHronis Guaranty, the DAHronis Guaranty, The Kosta Hronis Living Trust Guaranty, The Peter John Hronis Living Trust Guaranty, and The Sophia Hronis Irrevocable Trust One Guaranty.

"Guarantor" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Hazardous Material Activity" means any activity, event, or occurrence involving a Hazardous Material, including, without limitation, the manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation, handling of or corrective or response action to any Hazardous Material.

"Hazardous Material" shall mean any substance, chemical, compound, product, solid, gas, liquid, waste, byproduct, pollutant, contaminant, or material which is hazardous, toxic, or subject to regulation under any Environmental Law, all hazardous substances, materials and wastes as defined under any Environmental Law, and includes, without limitation, nitrates, asbestos, polychlorinated biphenyls, flammable explosives, radioactive materials, urea formaldehyde, PCB's, and petroleum products or byproducts.

"Hazardous Waste" shall mean hazardous substance, disposal, release, and threatened release, as used in this Agreement, shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601, et seq., ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. § 1801, et seq., the Resource Conservation and Recovery Act, 49 U.S.C. § 6901, et seq., and the environmental laws or other applicable state or federal laws, rules, or regulations adopted pursuant to any of the foregoing.

"Improvements" shall mean and include without limitation all existing and future buildings, structures, facilities, fixtures, additions, and similar construction on the Real Property Collateral.

"Instrument" shall mean a negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease,

9

and is of a type that in ordinary course of business is transferred delivery with any necessary indorsement or assignment. The term does not include: (i) investment property; (ii) letters of credit; or (iii) writings that evidence a right payment arising out of the use of a credit or charge card or information contained on or for use with the care.

"Intangible Assets" shall mean goodwill, business records, inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, registrations, copyrights, licenses, franchises, customer lists, co-op memberships, guaranty claims, organization costs, loan costs, tax refunds, tax refund, claims, customs claims, brands, leasehold interests and easements contract rights, and similar intangible assets which have no material realizable value.

"Inventory" shall mean Inventory as that term is used or defined in the Code including, without limitation, goods in transit, wheresoever located, whether now owned or hereafter acquired by Borrower, which from time to time are held for sale or lease, furnished under any contract of service or held as raw materials, work in process or supplies, and all packaging or handling materials (including, without limitation, all pallets, containers, bags, cartons, boxes, wrappers and the like) used or consumed in Borrower's business, and shall include all goods which are the subject of Documents, including warehouse receipts.

"Investment Property" shall mean all certificated or uncertificated securities, security entitlements, security accounts, commodity accounts, or commodity contracts.

"KJHronis Guaranty" shall mean the guaranty of even date herewith given by KJHronis to and for the benefit of Lender, and any modification, amendment or supplement thereto.

"Leased Premises" shall mean any portion of the Real Property Collateral occupied by a Borrower Tenant pursuant to a Borrower Lease.

"Lender" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Liabilities" shall mean any and all liabilities, obligations and indebtedness of Borrower to the Lender of any and every kind and nature, whether heretofore, now or hereafter owing, arising, due or payable and howsoever evidenced, created, incurred, acquired or owing, whether primary, secondary, direct, contingent, fixed or otherwise (including obligations of performance) and whether arising or existing under this Agreement or any of the other Financing Agreements, or by operation of law.

"Line of Credit" shall mean the Lender's line of credit to Borrower in the original principal amount not to exceed $55,000,000 evidenced by the Note as limited by the requirements of this Agreement and the Financing Agreements.

10

"Line of Credit Advances" shall mean advances on the Note.

"Loan Account" shall have the meaning set forth in Section 2.6 of this Agreement.

"Loan" shall mean the loan evidenced by the Note.

"Loan-to-Value Ratio" shall mean the percentage relationship of (a) the unpaid principal balance of all of Borrower's Debt, to (b) the most recent appraised value of the Real Property Collateral satisfactory to Lender.

"Monetary Default" shall mean an occurrence or existence of any one or more of (a), (b), (e), (h), (i) or (k) in the definition of "Default".

"New Owner" shall have the meaning stated in Section 2.10.

"Note" means Borrower's promissory note of even date herewith payable to Lender in the original principal amount not to exceed $55,000,000, as it may be modified, amended, restated and extended from time to time.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, entity, party or government (whether national, federal, state, provincial, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"PJHronis Guaranty" shall mean the guaranty of even date herewith given by PJHronis to and for the benefit of Lender, and any modification, amendment or supplement thereto.

"Position Report" shall mean reports in forms satisfactory to the Lender listing all forward sale or purchase contracts and all futures contracts by type, amount and price for all of Borrower's commodities. All values submitted by Borrower on the Position Report Certificate are subject to Lender's adjustments in its sole discretion and Lender's adjustments shall control for purposes of the Position Report.

"Position Report Certificate" shall mean a certificate in the form attached hereto as Exhibit A and made a part hereof, signed as indicated thereon, setting forth the Borrower's Position Report. The Position Report Certificate form shall use values established by Lender or which are in accordance with industry standards, as approved by Lender in its sole discretion. Lender may, in its sole discretion and from time to time, amend the Position Report Certificate or may change the value contained therein. After notice thereof, Borrower must use such amended Position Report Certificate form for the following reporting period.

"Producer Payables" shall mean all amounts now or hereafter payable by Borrower for the purchase of Inventory or Farm Products.

11

"Real Property Collateral No. 1" shall mean the following described real property legally described as follows and all improvements thereon and all privileges and appurtenances: See Schedule 1.1(a) attached hereto and incorporated herein by this reference.

"Real Property Collateral No. 2" shall mean the following described real property legally described as follows and all improvements thereon and all privileges and appurtenances: See Schedule 1.1(b) attached hereto and incorporated herein by this reference.

"Real Property Collateral" shall collectively mean the Real Property No. 1 Collateral and the Real Property No. 2 Collateral.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the indoor or outdoor environment.

"Subordinated Obligations" shall have the meaning stated in Section 2.9 of this Agreement.

"Subordination Termination" shall have the meaning stated in Section 2.9 of this Agreement.

"Supporting Obligations" shall mean a letter-of-credit right or secondary obligation that supports the payment or performance of an account, chattel paper, a document, a general intangible, an instrument, or investment property. Supporting Obligations shall include the broadest definition stated in the Code.

"The Kosta Hronis Living Trust Guaranty" shall mean the guaranty of even date herewith given by The Kosta Hronis Living Trust to and for the benefit of Lender, and any modification, amendment or supplement thereto.

"The Peter John Hronis Living Trust Guaranty" shall mean the guaranty of even date herewith given by The Peter John Hronis Living Trust to and for the benefit of Lender, and any modification, amendment or supplement thereto.

"The Sophia Hronis Irrevocable Trust One Guaranty" shall mean the guaranty of even date herewith given by The Sophia Hronis Irrevocable Trust One to and for the benefit of Lender, and any modification, amendment or supplement thereto.

"Total Assets" shall mean, as of a particular date, Borrower's consolidated total assets as they would normally be shown on the balance sheet of Borrower, adjusted by deducting (a) all values attributable to Intangible Assets, except: Lender deposit accounts; government subsidies; set aside, diversion; deficiency or disaster payments receivable which are properly assigned to the Lender; and storage agreements or contract receivables which are properly assigned to the Lender; and by deducting

12

(b) accounts due from Affiliates if the Lender in its sole discretion determines the collection of such accounts to be doubtful or impaired, and by deducting (c) all accumulated depreciation and amortization on Borrower's assets.

"U.S. Bank" shall mean U.S. Bank National Association and its successors and assigns.

"U.S. Bank Account" shall mean the deposit account number 158200181093 maintained for the benefit of Lender with U.S. Bank, or such other account designated by Lender from time to time.

1.2    Accounting Terms.  Any accounting terms used in this Agreement which are not specifically defined in this Agreement shall have the meanings customarily given them in accordance with generally accepted accounting principles, as consistently applied as of the date of this Agreement.

1.3    Others Defined in California Uniform Commercial Code.  All other terms contained in this Agreement (which are not specifically defined in this Agreement) shall have the meanings set forth in the Code to the extent the same are used or defined therein.

1.4    Interpretation.  Unless the context indicates otherwise, words importing the singular include the plural number, and vice versa.  Words of any gender include the correlative words of the other genders, unless the sense indicates otherwise.

1.5    Other Defined Terms.  Other capitalized terms shall have the meanings stated in the Recitals in this Agreement.

2.    LOAN, LOAN ADVANCES, FEES AND SUBORDINATIONS

2.1    Loan.  Subject to all of the terms and conditions contained in this Agreement, the Lender hereby agrees to make the following loan for the benefit of Borrower:

2.1.1    Line of Credit.  Line of Credit Advances to Borrower from time to time from and after the date of this Agreement, through and including October 29, 2027 (the "Termination Date"), unless extended or renewed, in amounts up to the lesser of: (a) Fifty-Five Million Dollars ($55,000,000); or (b) the cumulative "Current Position" stated in the then current Position Report Certificate and for only the purpose stated in Section 2.4; provided, however, that Lender shall have no obligation to make any Line of Credit Advance in an amount less than $1,000,000. The Line of Credit Advances shall be evidenced by and repayable in accordance with the terms of the Note, all terms of which are incorporated herein by this reference. The Line of Credit is a revolving credit facility and the Lender shall deposit all proceeds of the Loan exclusively in the U.S. Bank Account. Subject to the terms and conditions of this Agreement, Borrowers may obtain Line of Credit Advances, prepay Line of Credit Advances, and reborrow Line of Credit Advances.

13

The Lender shall also have the option, in its sole discretion and without any obligation to do so, to extend the Termination Date for the making of Line of Credit Advances. Notwithstanding any other provision of this Agreement, nothing in this Agreement shall be interpreted as a promise by Lender to make any Line of Credit Advances. Lender may refuse to make a requested Line of Credit Advance at any time and for any reason, whether arising before, on, or after the date of this Agreement, whether or not Borrower is in compliance with the covenants contained in this Agreement, and whether or not an Event of Default has occurred, or for no reason at all. Lender may in its sole discretion elect to make any requested Line of Credit Advances, whether in the requested amount or a lower amount, may reject such request in its entirety, or may condition its willingness to make such requested Line of Credit Advances on one or more conditions, including but not limited to such amendments to this Agreement and the other Financing Agreements, as Lender, in its sole discretion, deems appropriate.

2.2     Default Rate.  Upon and after an Event of Default, and until such Event of Default is cured, Lender may require Borrower to pay, in lieu of the interest rate set forth in the Notes, interest from the date of the Event of Default at a per annum rate which is equal to eighteen percent (18%) per annum (the "Default Rate") calculated on the outstanding principal balance of the Liabilities until either all of the Liabilities are repaid in full or until the date such Event of Default is cured. The triggering of a Default rate shall not cure the Default.

2.3     Prepayment.  Borrower may, at any time and from time to time, prepay all or any portion or the entire balance of the Liabilities; provided, however, that any prepayment of all or any portion of the principal balance of the Liabilities shall be accompanied by interest from the date on which interest was last paid to the date on which such prepayment is received by the Lender.

2.4     Purpose.  The purpose of the Line of Credit is to provide working capital for the Borrower's commercial farming operations. Borrower will use all Line of Credit Advances solely in accordance with this stated purpose.

2.5     Loan Fees.  Borrower agrees to pay the Lender a loan origination fee equal to $275,000, which such loan origination fee shall be fully earned and is due on the date of this Agreement.  Borrower also shall pay Lender a loan exit fee equal to $275,000 upon the earlier to occur of: (a) the Termination Date; (b) the date on which any acceleration of the Loan occurs, including in connection with the filing for bankruptcy, receivership, assignment for the benefit of creditors or any similar restructuring or reorganization proceeding or undertaking (the "Acceleration Date"); and (c) the date on which the Liabilities are paid in full (the "Satisfaction Date"), which such exit fee shall be fully earned on the date of this Agreement and shall be due on the earlier to occur of the Termination Date, the Acceleration Date, and the Satisfaction Date, as the case may be. In addition, Borrower shall be responsible for paying all of the Lender's out-of-pocket expenses incurred in connection with the Note and Financing Agreements specifically including, but not limited to: (a) recording fees and costs; and (b) all other reasonable and necessary loan closing fees and costs including attorneys' fees. The Lender may elect to pay all loan fees and reimbursables by Line of Credit Advances. Borrower has previously paid a

14

nonrefundable deposit of $50,000 to Lender for due diligence costs and other expenses incurred by Lender in connection with the transactions contemplated by this Agreement.

2.6     Loan Account.  The Lender shall maintain a loan account (the "Loan Account") on its books in which shall be recorded: (a) all Line of Credit Advances made by the Lender to Borrower pursuant to this Agreement; (b) all payments made by Borrower on all such  Line of Credit Advances; and (c) all other appropriate debits and credits as provided in this Agreement, including, without limitation, all fees, charges, expenses and interest. All entries in the Loan Account shall be made in accordance with the Lender's customary accounting practices as in effect from time to time. Borrower promises to pay the amount reflected as owing by and under the Loan Account and all other obligations hereunder as such amounts become due or are declared due pursuant to the terms of this Agreement.

2.7     Statements.  All Line of Credit Advances to Borrower, and all other debits and credits provided for in this Agreement, shall be evidenced by entries made by the Lender in its internal data control systems showing the date, amount and reason for each such debit or credit. Until such time as the Lender shall have rendered to Borrower written statements of account as provided herein, the balance in the Loan Account, as set forth on the Lender's most recent printout, shall be rebuttable presumptive evidence of the amounts due and owing the Lender by Borrower. After the last day of each calendar month, the Lender may, at the Lender's option, mail or electronically deliver to Borrower a statement setting forth the balance of the Loan Account.  Each such statement shall be subject to subsequent adjustment by the Lender but shall, absent manifest errors or omissions, be presumed correct and binding upon Borrower and shall constitute an account stated unless, within sixty (60) days after receipt of any statement from the Lender Borrower shall have delivered to the Lender a notice of written objection thereto specifying the error or errors, if any, contained in such statement.

2.8     Termination of Agreement.  The Lender shall have the right to terminate any obligation to make Line of Credit Advances under this Agreement immediately upon an Event of Default constituting a Monetary Default, subject to: (a) any applicable grace or cure period; (b) the cure of any such Monetary Default(s) within any such applicable grace periods; or (b) the payment in full of all of the Liabilities.  In addition, all of the Liabilities shall be due and payable on the Termination Date if the Lender elects not to extend the Termination Date of the Line of Credit. Notwithstanding the foregoing, in the event that a proceeding under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt or receivership law or statute is filed by or against any Borrower, or any Borrower makes an assignment for the benefit of creditors, the Lender shall have no obligation to make Line of Credit Advances, and all the Liabilities shall be due and payable.

2.9     Subordination By Borrower.  Each Borrower and Guarantor hereby agrees and acknowledges that any and all indebtedness, intercompany indebtedness (including any intercompany management fees, premiums or distributions, promissory notes, accounts payable, liabilities or other obligations owed to such Borrower or Guarantor by any other Borrower or Guarantor (regardless of the date of creation the granting of any security interests or any other circumstance) (collectively, the "Subordinated Obligations"), is and shall continue to be expressly subordinate to Liabilities owed to the Lender, whether under this Agreement, any other Financing

15

Agreement or otherwise, until the indefeasible payment in full of all of the Liabilities and any other obligation of a Borrower to the Lender (the "Subordination Termination"). Each Borrower further agrees not to accept any payments from any other Borrower with respect to any Subordination Obligations prior to Subordination Termination and each agrees that if any other Borrower does make a payment with respect to a Subordinated Obligation, to immediately transfer such amount to the Lender and to otherwise hold any such amounts in trust for the Lender until such transfer is complete. The subordination set forth in this Section 2.9 is a subordination of payment and performance, and the Borrower hereby agrees that prior to the Subordination Termination no Borrower shall seek to enforce any rights or remedies it may have against another Borrower.

2.10    Lease Subordinations.  Each Borrower hereby agrees as follows:

2.10.1  Each Borrower Tenant's interest in each Borrower Lease, including any option in favor of any Borrower Tenant to renew any Borrower Lease or to purchase the Real Property Collateral, or any portion of either, shall be subject and subordinate to the Deeds of Trust in all respects.

2.10.2  Notwithstanding any provision in any Borrower Lease to the contrary, upon the occurrence of an Event of Default, Lender may, in its sole discretion, elect to cause any Borrower Lease to be terminated for any reason whatsoever, whether or not the respective Borrower Tenant is in default under its Borrower Lease, by giving written notice of its election to the Borrower Tenant of that Borrower Lease, whereupon that Borrower Lease shall be deemed to be terminated on the date such notice is given, and the Borrower Tenant of that Borrower Lease shall immediately surrender its Leased Premises. If Lender does not exercise its right to terminate a particular Borrower Lease, then after the receipt by the Borrower Tenant of that Borrower Lease of notice that Lender or any other person, party or entity has become the owner of the Leased Premises or the Real Property Collateral (each a ''New Owner,'' which term shall include such entity's successors and assigns) as a result of a foreclosure sale under any Deed of Trust or a conveyance in lieu of foreclosure, that Borrower Tenant will attorn to and recognize Lender, its successors and assigns, or any purchaser at the foreclosure sale, as its substitute lessor under its Borrower Lease, and, having thus attorned, that Borrower Tenant's possession shall not thereafter be disturbed by Lender during the term of that Borrower Lease, as long as that Borrower Tenant shall continue to pay the rental and otherwise observe and perform the covenants, terms and conditions of that Borrower Lease to be observed and performed by that Borrower Tenant thereunder. In that case, Lender and that Borrower Tenant shall execute and deliver, upon request, appropriate agreements of attornment and recognition, but these agreements shall be deemed to be self-operative, and no such separate agreements shall be required to effectuate the foregoing attornment and recognition.

2.10.3  (a) No Borrower Tenant shall have any claim against any New Owner resulting from, and no New Owner shall be liable for, any act, omission and/or breach of a Borrower Lease by any prior or subsequent landlord under that Borrower Lease, including but not limited to any Borrower; (b) no rights of any New Owner in and to the Leased Premises and in, to and under any Borrower Lease shall be subject to any right of setoff or defense which any Borrower Tenant may have against any prior landlord under any Borrower Lease; (c) no New Owner shall be bound by (i) any rent or additional rent or other charges which any Borrower

16

Tenant may have paid for more than one month in advance, or (ii) any amendment or modification of any Borrower Lease made without Lender's written consent, or (iii) any provision of any Borrower Lease relating to the application of insurance or condemnation proceeds or the restoration of the Leased Premises by the landlord in the event of a casualty loss thereto or a taking thereof, or restrictions on the use of other properties owned by the landlord for purposes which compete with a Borrower Tenant; and (d) no New Owner shall be liable for any security deposit that any Borrower Tenant might have paid to any prior landlord, except to the extent such New Owner has actually received said security deposit. A New Owner shall use any insurance or condemnation proceeds received by it in accordance with the Deeds of Trust. Upon any sale or other transfer by a New Owner of its interest in the Leased Premises or the Real Property Collateral after acquiring title to the same, said New Owner shall thereupon automatically be released and discharged from all liability thereafter accruing under the applicable Borrower Lease.

2.10.4  No Borrower Tenant shall, without the written consent of Lender: (a) amend any Borrower Lease; (b) pay the rent or any other sums due under any Borrower Lease more than one month in advance; (c) voluntarily surrender any Leased Premises or terminate any Borrower Lease; (d) accept any Borrower's waiver of or release from the performance of any obligations of any Borrower Tenant under that Borrower Tenant's Borrower Lease; or (e) sublease any Leased Premises or any part thereof, or assign, pledge or encumber any Borrower Tenant's interest under any Borrower Lease or in any Leased Premises or any part thereof.

2.10.5  No Borrower shall permit any Borrower Lease to become subordinate to the lien of any mortgage, deed of trust, or other security instrument, other than the Deeds of Trust and any deed of trust for the benefit of AgAmerica existing as of the date hereof.

2.10.6  Borrower agrees to notify Lender in writing of any default under any Borrower Lease. Lender shall have the right, but not the obligation, to cure any such default.

2.10.7  Borrower, with the understanding that Lender will rely upon the statements and representations made regarding the Borrower Leases in entering into this Agreement, hereby certify, represent, warrant and confirm to Lender, that, as of the date hereof, and except as has been disclosed to Lender in this Agreement:

2.10.8  There are no other written or oral agreements or understandings between any Borrower with respect to the Leased Premises or the Real Property Collateral; no Borrower Tenant has subleased any portion of the Real Property Collateral, and no Borrower has assigned, whether outright or by collateral assignment, all or any portion of its rights under any Borrower Lease; each Borrower Lease is in full force and effect in accordance with its terms; and a complete copy of each written Borrower Lease and all amendments and supplements thereto has been provided by the Borrower to Lender;

2.10.9  To the best of each Borrower's knowledge, no default by any Borrower in the performance of any Borrower Lease to be by them respectively performed exists on the date hereof, and no event has occurred which, after the passage of time or expiration of any notice, grace or right to cure period, would constitute a default under the Borrower Lease;

17

2.10.10 To the best of each Borrower's knowledge, no Borrower Tenant now has any claim against any other Borrower which might be setoff against past or future rents due under the Borrower Lease or which might be used as a defense to enforcement of the Borrower Lease; a

2.10.11 No rents have been prepaid under the Borrower Lease, except for the normal prepayment thereof for no more than one month in advance;

2.10.12 Lender is entitled to specific performance of the covenants, agreements and rights contained in this Section 2.10. All remedies provided at law or in equity, including the right to specific performance as herein provided, shall be cumulative; and

2.10.13 Each Borrower agrees to execute and deliver to Lender at Lender's request therefor (an in any case within five Business Days) a memorandum or memoranda summarizing the contents of this Section 2.10 in recordable form sufficient to enable Lender to obtain a title policy of insurance showing each Borrower Lease as subordinate to the Deeds of Trust, and otherwise in form and substance acceptable to Lender.

3.    POSITION REPORT

3.1    Eligible Accounts.  The Lender shall have the right, in the exercise of the Lender's commercially reasonable discretion, to determine whether Accounts are eligible for inclusion in the Position Report at any particular time (such accounts being hereinafter referred to as "Eligible Accounts"). In the event that Accounts previously included in the Position Report Certificate cease to be Eligible Accounts, Lender may, in its sole discretion, require Borrower to promptly pay to the Lender an amount sufficient to ensure that the cumulative "Current Position" stated in the then current Position Report Certificate is positive.

3.2    Eligible Growing Crops.  The Lender shall have the right, in the exercise of the Lender's commercially reasonable discretion, to determine whether crops are eligible for inclusion in the Position Report at any particular time (such eligible crops being hereinafter referred to as "Eligible Growing Crops") and to determine the value of the Eligible Growing Crops for purposes of the Position Report Certificate. In the event that crops previously included in the Position Report Certificate cease to be Eligible Growing Crops, Borrower shall promptly pay to the Lender an amount sufficient to ensure that the cumulative "Current Position" stated in the Position Report Certificate is positive. The value of Eligible Growing Crops shall be the actual costs of inputs as determined by the Lender in its sole discretion on a commercially reasonable basis.

3.3    Delivery of Position Report Certificates. Borrower shall execute and deliver to the Lender pursuant to the terms set forth in Section 7.1.3 of this Agreement, and all Line of Credit Advances on the Note shall be limited to the cumulative "Current Position" stated in the then current Position Report Certificate unless the Lender in its sole discretion elects to over-advance. If the amount outstanding under the Line of Credit exceeds the Position Report set forth in the corresponding Position Report Certificate, Borrower shall immediately (on the day of such Position Report Certificate) notify Lender and within twenty (20) days of Borrower's notice to Lender, Lender may, in its sole discretion, require Borrower to repay the amount drawn under the Line of Credit to an amount equal to or less than the "Current Position".

18

4.    CONDITIONS TO ADVANCES

Notwithstanding any other provisions to the contrary contained in this Agreement, the making of any Line of Credit Advances provided for in this Agreement shall be conditioned upon the following:

4.1    The Lender's Execution of Funding Documents.  The Lender shall have executed all necessary documents related to the Lender's funding of the Note.

4.2    Approval of the Lender's Counsel.  Legal matters, if any, relating to the Line of Credit Advances shall be satisfactory to counsel for the Lender.

4.3    Compliance.  All representations and warranties contained in this Agreement shall be true on and as of the date of the making of such Line of Credit Advances as if such representations and warranties had been made on and as of such date, and no Event of Default shall have occurred or shall exist.

4.4    Documentation.  Borrower shall have executed and/or delivered to the Lender all of the documents listed in Section 5.4 and the Position Report Certificate, setting forth the "Current Position" as of the date of this Agreement.

4.5    Other Conditions Precedent.  Borrower shall have satisfied the terms and conditions set forth in Section 2 and Section 4 of this Agreement, which require, among other things, compliance with the "Current Position".

4.6    Line of Credit Position Report.  Funding under the Line of Credit is subject to, and the extent of, there being a positive cumulative "Current Position" stated in the current Position Report Certificate.

4.7    First Lien.  No Line of Credit Advances will be made unless the Lender has a first perfected lien on the Collateral, except for the existing permitted liens securing the debt set forth in Schedule 4.7 attached hereto (the "Permitted Liens").

4.8    Inspections.  The Lender shall have access to the Collateral with or without notice and from time to time to conduct inspections of the Collateral.  The Lender may, but is under no obligation to make periodic, regular, random, and unannounced Collateral inspections.

4.9    Permits.  The Lender shall have received and accepted copies of all permits and requisite approvals of any governmental body necessary for the use of the Real Property Collateral.

4.10    Zoning.  Borrower shall have furnished evidence satisfactory to the Lender that land on which the Real Property Collateral is located is duly and validly zoned for the operations located thereon.

4.11    Collateral.  Borrower shall own all of the Collateral free and clear of all liens and encumbrances except for the Permitted Liens.

4.12    Requests for Line of Credit Advances.

19

4.12.1  Borrower shall have delivered to Lender, not later than 12:00 p.m. local time in Des Moines, Iowa, on the tenth (10th) Business Day prior to the date of the requested Line of Credit Advance, in form and substance satisfactory to Lender, a written request specifying the amount and date of the requested Line of Credit Advance and the expected use of such Line of Credit Advance.

4.12.2  Borrower shall not request more than one (1) Line of Credit Advance per week.

4.12.3  No request for a Line of Credit Advance shall be for an amount equal to or greater than $5,000,000, and no request for a Line of Credit Advance shall be or an amount less than $1,000,000.

5.    SECURITY

5.1    Security Interests and Liens.  To secure the payment and performance of the Liabilities, Borrower hereby grants to the Lender a continuing security interest in and to the following  property and interests in property of Borrower, whether now owned or existing or hereafter acquired or arising and wheresoever located:

> All Borrower's Accounts, Inventory, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Payment Intangibles, Commercial Tort Claims, Deposit Accounts, Commodity Accounts, Commodity Contracts, Investment Property, Instruments, Letters of Credit Rights, Documents, Chattel Paper, Electronic Chattel Paper, Tangible Chattel Paper, all accessions to, substitutions for, and all replacements, products, proceeds, and proceeds of proceeds of the foregoing (including, without limitation, proceeds of insurance policies insuring any of the foregoing and any other kind of proceeds coming from Borrower's crop), all rights under and payments due or to become due under any federal or state laws, rules, regulations, or programs pertaining to any of the foregoing, all books and records pertaining to any of the foregoing (including, without limitation, customer lists, credit files, computer programs, printouts and other computer materials and records), and all insurance policies insuring any of the foregoing. The Collateral includes all Real Property Collateral and all fixtures on Real Property Collateral.

> All of the Real Property Collateral, together with all licenses and permits

> Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers, all water and riparian rights, wells, ditches, reservoirs and water stock and all existing and future Improvements, structures, fixtures, and

20

replacements that may now, or at any time in the future, be part of the Real Property Collateral.

All water and water rights and water shares, whether surface or underground, tributary, non-tributary, not non-tributary, wells, well permits, ditches, ditch rights, reservoir and storage rights, water district taps, accounts and allocations appurtenant to and used in connection with the Real Property Collateral.

Together with all substitutions and replacements for and products of any of the foregoing property and together with proceeds of all of the foregoing property and, in the case of all tangible Collateral, together with all accessions and together with all accessories, attachments, parts, equipment and repairs now or hereinafter attached or affixed to or used in connection with any such goods

5.2   Endorsement by the Lender.  Borrower hereby authorizes the Lender to endorse, in Borrower's name, any item, however received by the Lender, representing payment on or other proceeds of any of the Collateral, specifically including, but not limited to all items deposited in the U.S. Bank Account and in any other deposit or sweep account with U.S. Bank.

5.3   Delivery of Warehouse Receipts.  In the event that any Inventory or Farm Products become the subject of a negotiable or non-negotiable warehouse receipt, said warehouse receipt shall be promptly delivered to the Lender with such endorsements and assignments as are necessary to vest title and possession in the Lender.

5.4   Preservation of Collateral and Perfection of Security Interests Therein.  Borrower shall execute and deliver to the Lender, concurrently with the execution of this Agreement, and at any time or times hereafter, all financing statements (including but not limited to financing statements describing the Collateral as "all assets" or "all personal property") or other documents (and pay the cost of filing or recording the same in all public offices deemed necessary by the Lender), as the Lender may request, in a form satisfactory to the Lender, to perfect and keep perfected the Lender's security interest in the Collateral granted by Borrower to the Lender and otherwise to protect and preserve the Collateral and the Lender's security interests therein, specifically including but not limited to the documents described below.  Should Borrower fail to do so, the Lender is authorized to sign or file any such financing statements. Borrower further agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement.  To perfect the Lender's security interest in any Equipment covered by certificates of title, Borrower shall ensure that all such certificates of title are properly noted or endorsed by the appropriate state officials wherever such notation or endorsement is, in the Lender's sole determination, either permitted or required as a condition to perfection. The Financing Agreements delivered to the Lender at closing shall include but not be limited to the following Financing Agreements:

5.4.1   This Agreement;

21

5.4.2  Note;

5.4.3  Deeds of Trust;

5.4.4  Guaranties:

    (a)  KJHronis Guaranty

    (b)  PJHronis Guaranty

    (c)  DAHronis Guaranty;

    (d)  The Kosta Hronis Living Trust Guaranty;

    (e)  The Peter John Hronis Living Trust Guaranty;

    (f)  The Sophia Hronis Irrevocable Trust One Guaranty;

5.4.5  Environmental Indemnity Agreement;

5.4.6  Position Report Certificate of even date herewith;

5.4.7  Financing Statement;

5.4.8  Effective Financing Statement;

5.4.9  Assignment of Indemnity;

5.4.10  Assignment of Payment;

5.4.11  U.S. Bank Deposit and Sweep Account Documentation;

5.4.12  AgAmerica Intercreditor Agreement;

5.4.13  Opinion Letter of Borrower's Counsel;

5.4.14  Officer's Certificates attaching Company Consents, Incumbencies, certified certificates of formation or incorporation, bylaws, limited liability company agreements or similar operating agreements, and certificates of good standing from the Secretary of State or similar authority from the state of formation or incorporation of each Company :

    (a)  Hronis Capital Assets;

    (b)  Hronis Capital Management;

    (c)  Hronis Citrus;

    (d)  Hronis Farming;

    (e)       Hronis Fruit Company

    (f)       Hronis;

    (g)       Hronis Land Company;

    (h)       Hronis Ranch

    (i)       Hronis Resource Management

    (j)       The Hronis Family Limited Partnership;

5.4.15 Perfection Certificates:

    (a)       Hronis Capital Assets;

    (b)       Hronis Capital Management;

    (c)       Hronis Citrus;

    (d)       Hronis Farming;

    (e)       Hronis Fruit Company;

    (f)       Hronis;

    (g)       Hronis Land Company

    (h)       Hronis Ranch;

    (i)       Hronis Resource Management;

    (j)       The Hronis Family Limited Partnership;

5.4.16 Certifications of Trust:

    (a)       The Kosta Hronis Living Trust;

    (b)       The Peter John Hronis Living Trust;

    (c)       The Sophia Hronis Irrevocable Trust One; and

5.4.17 Miscellaneous agreements to provide insurance, powers of attorney, notices of insurance requirements, errors and omissions agreements, disbursement requests and authorizations, and such other agreements and documents as the Lender may require; and

Notwithstanding the foregoing, Lender agrees that the deliverables described in Schedule 5.4 may be delivered to Lender by November 29, 2024, and Borrower's failure to do so by November 29, 2024, shall constitute a Default.

5.5     Loss of Value of Collateral.  Borrower shall immediately notify the Lender of any material loss or decrease in the value of the Collateral.

5.6     Collection of Accounts.  Borrower shall promptly collect all Accounts.  Borrower shall take all reasonable steps, including the placement of such designations on invoices as may be appropriate, to cause all Account Debtors to make all payments to the U.S. Bank Account. Upon an Event of Default, Borrower does hereby irrevocably designate, make, constitute and appoint the Lender (and all Persons designated by the Lender) as Borrower's true and lawful attorney-in-fact, with power, in Borrower's or the Lender's name, to:  (a) demand payment of Accounts; (b) enforce payment of Accounts by legal proceedings or otherwise; (c) exercise all of Borrower's rights and remedies with respect to proceedings brought to collect an Account; (d) sell or assign any Account upon such terms, for such amount and at such time or times as the Lender deems advisable; (e) settle, adjust, compromise, extend or renew any Account; (f) discharge and release any Account; (g) take control in any manner of any item of payment or proceeds of any Account; (h) prepare, file and sign Borrower's name upon any items of payment or proceeds thereof and deposit the same to the Lender's account on account of the Liabilities; (i) endorse Borrower's name upon any chattel paper, document, Instrument, invoice warehouse receipt, bill of lading, or similar document or agreement relating to any Account or any goods pertaining thereto; (j) sign Borrower's name on any verification of Accounts and notices thereof to Account Debtors; (k) prepare, file and sign Borrower's name on any proof of claim in bankruptcy or similar proceeding against any Account Debtor; (l) instruct the Lender to pay over all deposit accounts to the Lender; and (m) do all acts and things which are necessary, in the Lender's sole discretion, to fulfill Borrower's obligations under this Agreement.

5.7     Account Covenants.  Borrower shall:  (a) promptly upon Borrower's learning thereof, inform the Lender, in writing, of any material delay in Borrower's performance of any of Borrower's obligations to any Account Debtor or of any assertion of any claims, offsets or counterclaims by any Account Debtor; (b) not permit or agree to any extension, compromise or settlement or make any change or modification of any kind or nature with respect to any Account that results in an adjustment exceeding $10,000 (including, without limitation, any of the terms relating thereto) without immediately giving notice thereof to the Lender; and (c) promptly upon Borrower's learning thereof, furnish to and inform the Lender of all material adverse information relating to the financial condition of any Account Debtor if Accounts attributable to such Account Debtor aggregate in excess of $10,000 or if such information would render such Account no longer an Eligible Account.

5.8     Account Records and Verification Rights.  Borrower hereby represents to the Lender that Borrower now keeps and shall at all times hereafter keep correct and accurate records relating to the Accounts and the financial and payment records of the Account Debtors, all of which records shall be available upon demand during Borrower's usual business hours to any of the Lender's officers, employees or agents.  Any of the Lender's officers, employees or agents shall have the right at any time or times hereafter, in the Lender's name, to verify the validity,

24

amount or any other matter relating to any Accounts, by mail, telephone, electronic mail, telegraph or otherwise. Borrower shall promptly notify the Lender of any amounts due and owing from an Account Debtor in excess of $10,000 which are in dispute for any reason.

5.9 <u>Notice to Account Debtors</u>. The Lender may, in the Lender's sole discretion, at any time or times upon or after an Event of Default through the date such Event of Default may be cured, and without prior notice to Borrower, notify any or all Account Debtors that the Accounts have been assigned to the Lender and that the Lender has been granted a security interest therein. Until such Event of Default may be cured, the Lender may direct any or all Account Debtors to make all payments upon the Accounts directly to the Lender.

5.10 <u>Records And Reporting</u>. Borrower hereby represents to the Lender that Borrower now keeps and shall at all times hereafter keep correct and accurate records itemizing and describing the kind, type, quality, and quantity of Farm Products and Inventory, Borrower's cost therefor and selling price thereof and daily reductions therefrom and additions thereto, and all purchase, sale and consignment agreements, all of which records shall be available on demand during Borrower's usual business hours to any of the Lender's officers, employees or agents.

5.11 <u>Special Collateral</u>. Immediately upon Borrower's receipt thereof and upon request by the Lender, Borrower shall (except as provided for in <u>Section 5.3</u> hereof with regard to warehouse receipts) deliver or cause to be delivered to the Lender, with such endorsements and assignments as are necessary to vest title and possession in the Lender, chattel paper, Instruments, and Documents which Borrower now owns or which Borrower may at any time or times hereafter acquire. Borrower shall promptly mark all copies of such chattel paper, instruments and Documents to show that they are subject to the Lender's security interest therein.

5.12 <u>Remittance of Proceeds to the Lender</u>. In the event any proceeds of any Collateral shall come into the possession of Borrower (or any of Borrower's shareholders, directors, officers, employees, agents, managers, members, or any Persons acting for or in concert with Borrower), Borrower or such Person shall receive, as the sole and exclusive property of the Lender, and as trustee for the Lender, all monies, checks, notes, drafts and all other payments for and/or other proceeds of Collateral, and no later than the first Business Day following receipt thereof, Borrower shall remit the same (or cause the same to be remitted), in kind, to the Lender or to such agent or agents (at such agent's or agents' designated address or addresses) as are appointed by the Lender for that purpose, to be applied to the Liabilities pursuant to <u>Section 10.14</u> of this Agreement.

5.13 <u>Safekeeping of Collateral</u>. Except for conduct constituting willful misconduct, the Lender shall not be responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage to the Collateral; (c) any diminution in the value of the Collateral; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency or any other Person relating to the Collateral. All risk of loss, damage, destruction or diminution in value of the Collateral shall be borne by Borrower.

5.14 <u>Sales and Use of Collateral</u>. Except as set forth in this <u>Section 5.14</u>, Borrower shall not sell, lease, transfer or otherwise dispose of any Collateral unless the purchase price for the full value of the Collateral is paid to the Lender and applied to Borrower's Liabilities with the Lender.

25

The Collateral shall not be taken or removed from Borrower's premises, except in the case of Inventory or Farm Products for the purpose of sale, and only if the purchaser thereof pays the purchase price for the full value of the Inventory and Farm Products to the Lender for application to Borrower's Liabilities.  Upon an Event of Default, the Collateral shall not be sold or taken or removed from Borrower's premises except with the prior written consent of the Lender and upon payment of an amount equivalent to the value of the Collateral to be sold or removed, such amounts to be paid to the Lender to be applied to Borrower's Liabilities.

5.15  <u>Real Property Collateral</u>. Borrower shall pay all costs associated with the recording of the Deeds of Trust and any further modifications thereto with the appropriate authorities and shall take all other actions requested by the Lender in order to vest in the Lender a perfected lien on the Real Property Collateral described therein, subject to no other liens, claims or encumbrances, except those expressly acknowledged thereby.

5.16  <u>Title Insurance</u>. Borrower shall cooperate with the Lender to obtain delivery to the Lender of a policy of title insurance from an insurance company with a Demotech rating of "A" insuring the Lender's interest in the Real Property Collateral, which cooperation shall be deemed to include, but not by way of limitation, doing all things necessary to satisfy the requirements set forth in said title insurance commitment or added thereto by the issuer thereof (including the payment of premiums).  The Lender shall have no obligation to make any Line of Credit Advances unless and until all requirements set forth in said title insurance commitment have been satisfied. The Lender shall have the right to request such title insurance commitment and mechanic's lien insurance updates at such times as the Lender, in its sole discretion, shall deem appropriate, and shall have the right to instruct the issuer of the commitment to set forth as added requirements such things as would be necessary to eliminate added exceptions to coverage.  In the event the Lender reasonably determines that a policy of title will not be issued in accordance with said title insurance commitment by reason of Borrower's failure to cooperate as aforesaid, then the Lender shall have the right to terminate this Agreement pursuant to <u>Section 2.8</u> hereof and Borrower shall remain obligated to the Lender for all Liabilities incurred to date thereof (including without limitation, all fees and cost reimbursements provided for herein).

5.17  <u>U.S. Bank Account</u>.  Borrower shall execute and deliver to Lender all documentation to establish and maintain in good standing the U.S. Bank Account as required by Lender from time to time. Borrower shall deposit into the U.S. Bank Account all Collateral proceeds checks. Borrower shall take all reasonable steps, including the placement of such designations on invoices as may be appropriate, to cause all Account Debtors to make all payments to the U.S. Bank Account.  Borrower does hereby irrevocably designate, make, constitute and appoint the Lender (and all Persons designated by the Lender) as Borrower's true and lawful attorney-in-fact, with power, in Borrower's or the Lender's name, to endorse any checks deposited in the U.S. Bank Account and to do any and all of the following:  (a) demand payment of Accounts; (b) enforce payment of Accounts by legal proceedings or otherwise; (c) exercise all of Borrower's rights and remedies with respect to proceedings brought to collect an Account; (d) sell or assign any Account upon such terms, for such amount and at such time or times as the Lender deems advisable; (e) settle, adjust, compromise, extend or renew any Account; (f) discharge and release any Account; (g) take control in any manner of any item of payment or proceeds of any Account;

26

(h) prepare, file and sign Borrower's name upon any items of payment or proceeds thereof and deposit the same to the U.S. Bank Account on account of the Liabilities; (i) endorse Borrower's name upon any chattel paper, document, Instrument, invoice warehouse receipt, bill of lading, or similar document or agreement relating to any Account or any goods pertaining thereto; (j) sign Borrower's name on any verification of Accounts and notices thereof to Account Debtors; (k) prepare, file and sign Borrower's name on any proof of claim in bankruptcy or similar proceeding against any Account Debtor; (l) instruct the Lender to pay over all deposit accounts to the Lender; and (m) do all acts and things which are necessary, in the Lender's sole discretion, to fulfill Borrower's obligations under this Agreement.

6.    WARRANTIES

Each Borrower jointly and severally represents and warrants that as of the date of the execution of this Agreement:

6.1    Binding Effect.  This Agreement and all of the other Financing Agreements set forth the legal, valid and binding obligations of Borrower and are enforceable against Borrower in accordance with their respective terms.

6.2    Correctness of Financial Statements.  The financial statements delivered by Borrower to the Lender present fairly the financial condition of Borrower and have been prepared in accordance with generally accepted accounting principles consistently applied.  As of the date of such financial statements, and since such date, there has been no materially adverse change in the condition or operation of Borrower, nor has Borrower mortgaged, pledged or granted a security interest in or encumbered any of Borrower's assets or properties since such date.

6.3    Employee Controversies.  There is no litigation or dispute reasonably likely to lead to litigation pending or threatened between Borrower or any of Borrower's employees.

6.4    Compliance with Laws and Regulations.  Borrower is in compliance with all laws, including Environmental Laws, orders, regulations and ordinances of all federal, foreign, state and local governmental authorities relating to the business operations and the assets of Borrower and that Borrower has obtained all the necessary licenses, permits and approvals necessary to operate.

6.5    Collateral.  Borrower owns all of the Collateral free and clear of all security interests, liens, claims, and encumbrances except for the Permitted Liens. No goods held by Borrower on consignment or under sale or return contracts have been represented to be Collateral and no amounts receivable by Borrower in respect to the sale of such goods (except markups or commissions which have been fully earned by Borrower) have been represented to be Accounts. Borrower represents that all amounts in the form of ordinary trade payables which are owing to suppliers of any of the Collateral have been paid when due and that none of such suppliers has asserted any interest in the Collateral.  Borrower will furnish, at the Lender's request, the names and addresses of all Persons who deliver goods to Borrower on consignment or under sale or return contracts.

27

6.6     <u>Account Warranties</u>.  Borrower warrants and represents to the Lender that:  (a) except as disclosed to the Lender from time to time in writing, all Accounts which are at any time included in the Position Report or which are reflected on Borrower's financial statements delivered to the Lender pursuant to <u>Section 6.33</u> and <u>Section 7.1</u> of this Agreement are genuine, in all respects what they purport to be, have not been reduced to any judgment, are evidenced by not more than one executed original instrument, agreement, contract or document (which, if any, has been delivered to the Lender), and represent undisputed, bona fide transactions completed in accordance with the terms and condition of any document related thereto; (ii) the Accounts have not been sold or pledged to any Person other than the Lender; and (iii) except as disclosed to the Lender from time to time in writing, Borrower has no knowledge of any fact or circumstance which would impair the validity or collectability of any of the Accounts.

6.7     <u>Location of Assets</u>.  The principal residence and mailing address of Borrower is located in Kern County, California. As of the execution of this Agreement, the books and records of Borrower, and all of Borrower's Chattel Paper and records of account are located at the offices of Borrower.  If any change in such location shall occur, Borrower shall promptly notify the Lender of such change.

6.8     <u>Inventory and Farm Product Warranties</u>.  Borrower warrants and represents to the Lender that:  (a) except for goods covered by Documents which have been delivered to the Lender, and except as promptly disclosed to the Lender from time to time in writing, all Farm Products and Inventory are located on the premises described in <u>Section 7.15</u> of this Agreement or are in transit; and (b) except as promptly disclosed to the Lender from time to time in writing, all Farm Products and Inventory shall be of good and merchantable quality, free from any defects which might affect the market value of such Farm Products and Inventory.

6.9     <u>Solvency</u>.  Borrower is solvent, able to pay Borrower's debts generally as such debts mature, and has capital sufficient to carry on Borrower's business and all businesses in which Borrower is about to engage. The saleable value of Borrower's Total Assets at a fair valuation, and at a present fair saleable value, is greater than the amount of Borrower's total obligations to all Persons.  Borrower will not be rendered insolvent by the execution or delivery of this Agreement or of any of the other Financing Agreements or by the transactions contemplated hereunder or thereunder.

6.10     <u>Tax Liabilities</u>.  Borrower has filed all federal, state and local tax reports and returns required by any law or regulation to be filed by Borrower and has either duly paid all taxes, duties and charges indicated to be due on the basis of such returns and reports or has made adequate provision for the payment thereof, and the assessment of any material amount of additional taxes in excess of those paid and reported is not reasonably expected.  The reserves for taxes reflected on Borrower's balance sheet are adequate in amount for the payment of all Liabilities for all taxes (whether or not disputed) of Borrower accrued through the date of such balance sheet. There are no material unresolved questions or claims concerning any tax liability of Borrower.

6.11     <u>Pension Reform Act</u>.  No events, including without limitation, any "Reportable Event" or "Prohibited Transactions," as those terms are defined in the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time (herein, including

28

any and all such amendments, called "ERISA"), have occurred in connection with any defined benefit pension plan (herein called "Pension Plan") of Borrower which might constitute grounds for the termination of any such Pension Plan by the Pension Benefit Guaranty Corporation or for the appointment by the appropriate United States District Court of a trustee to administer any such Pension Plan. All of Borrower's Pension Plans meet, as of the date of the execution hereof, the minimum funding standards of section 302 of ERISA.

6.12    Indebtedness and Producer Payables. Except (a) for the loan from the Lender contemplated by this Agreement; and (b) as disclosed on the financial statements and reports identified in Section 6.2 of this Agreement, Borrower and Guarantor have no other indebtedness, contingent obligations or Liabilities, outstanding bonds, letters of credit or acceptances to any other Person or loan commitments from any other Person. Borrower's and Guarantor's Producer Payables are not past due.

6.13    Margin Security. Borrower does not own any margin security and none of the Advances hereunder shall be used for the purpose of purchasing or carrying any margin securities or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase any margin securities or for any other purpose not permitted by Regulations U or G of the Board of Governors of the Federal Reserve System.

6.14    Other Corporate or Fictitious Names. Borrower has not, during the preceding five (5) years, been known by or used any other corporate, fictitious or trade names.

6.15    Affiliates. Borrower has no Affiliates, other than those Persons disclosed below:

Stephanie Hronis
Laurie Hronis
Marcie Hronis
Adoniah Hronis
Kostandino Hronis
Peter Nicholas Hronis
Priscilla Hronis

6.16    Survival of Warranties. All representations and warranties contained in this Agreement or any of the other Financing Agreements shall survive the execution and delivery of this Agreement and shall be true from the date of this Agreement until the Liabilities shall be paid in full and the Lender shall cease to be committed to make Line of Credit Advances under this Agreement.

6.17    Related Party Transactions. No current or former Affiliate, joint venturer, officer, manager, member, or employee of Borrower, is presently, or since the inception of the Borrower has been, directly or indirectly through his, her or its affiliation with any other person, a party to any transaction with the Borrower providing for the furnishing of services by or to, or rental of real or personal property from or to, or otherwise requiring cash payments to or by any such person.

6.18    ERISA Plans and Contracts.

29

6.18.1  Without the Lender's prior written consent, Borrower  will not be a party to (or ever maintained or was a party to) any "employee welfare benefit plan," as defined in section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or any other written, unwritten, formal or informal plan or agreement involving direct or indirect compensation, other than workers' compensation, unemployment compensation and other government programs, under which the Borrower has any present or future obligation or liability. Borrower does not maintain and is not a party to (or ever maintained or was a party to) any "employee pension benefit plan," as defined in section 3(2) or ERISA, and Borrower does not contribute to (or has ever contributed to) any "multi-employer plan," as defined in section 3(37) of ERISA.

6.18.2  There is no contract, agreement, plan or arrangement covering any employee or former employee of Borrower that, individually or collectively, could give rise to the payment of any amount that would not be deductible by reason of section 280G of the Internal Revenue Code.

6.18.3  Upon demand, Borrower will provide a list of each employment, severance or other similar contract, arrangement or policy (written or oral) providing for insurance coverage (including any self-insured arrangements), non-statutory workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, deferred compensation, profit-sharing, bonuses, stock options, stock appreciation or other forms of incentive compensation or post-retirement insurance, compensation or benefits entered into, by Borrower.

6.19    Compliance:  Licenses, Permits.

6.19.1  Borrower shall have complied with and will comply in all respects with the federal, state, local or foreign laws, ordinances, regulations or orders applicable to the businesses and operations of Borrower. Borrower has all federal, state, local and foreign governmental licenses and permits which are required for the conduct of the business as presently or previously conducted and as planed to be conducted, which licenses and permits are in full force and effect, and no violations are outstanding or uncured with respect to any such licenses or permits and no proceeding is pending or, to the best knowledge of Borrower threatened to revoke or limit any thereof.

6.19.2  Borrower is not, and will not be under its business plan, in violation of any applicable Environmental Laws and no condition or event has occurred which, with notice or the passage of time or both, would constitute a violation of any Environmental Laws.

6.19.3  Borrower is in possession of all Environmental Permits required under all applicable Environmental Laws for the conduct and operation of the business and is and will at all times be in compliance with all of the requirements and limitations included in such Environmental Permits.

6.19.4  Borrower is not and will not be responsible, or potentially responsible, for the remediation or cost of remediation of wastes, substances or materials at, on or beneath any

facilities or at, on or beneath the Real Property Collateral any land adjacent thereto or used in connection therewith.

6.19.5  Borrower is not and will not be the subject of federal, state, local or private litigation or proceedings involving a demand for damages or other potential liability with respect to violations of Environmental Laws.

6.19.6  Borrower is not and will not be liable, directly or indirectly, in connection with any release of hazardous substance into the environment in violation of Environmental Laws, nor do there currently exist any facts upon which a finding of such liability could be based.

6.19.7  Borrower has and will comply with the filing and reporting requirements under all applicable Environmental Laws and has maintained all required data, documentation and records under all applicable Environmental Laws.

6.20    Hazardous Substances.  Borrower represents and warrants that: (a) during the course of Borrower's business, there has been and will be no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Waste or substance by any person on, under, or about any property used in connection with Borrower's business; (b) Borrower has no knowledge of, or reason to believe that there has been or will be, (i) any use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any Hazardous Waste or substance by any occupants of any of Borrower's property or the Real Property Collateral, or (ii) any actual or threatened litigation or claims of any kind by any person relating to such matters; (c) neither Borrower nor any tenant, contractor, agent or other user of any of Borrower's property or the Real Property Collateral shall use, generate, manufacture, store, treat, dispose of, or release any Hazardous Waste or substance on, under, or about the Real Property Collateral and Borrower's property; and (d) all activities on, around or pertaining to the Real Property Collateral and Borrower's property shall be conducted in compliance with all Environmental Laws.  Borrower authorizes the Lender and its agents to enter upon Borrower's property to make such inspections and tests as the Lender may deem appropriate to determine Borrower's compliance of the Real Property Collateral with this Section 6.20.  Any inspections or tests made by the Lender shall be for the Lender's purposes only and shall not be construed to create any responsibility or liability on the part of the Lender to Borrower or to any other person.  The representations and warranties contained herein are based on Borrower's due diligence in investigating the Real Property Collateral and Borrower's property for Hazardous Waste and compliance with all Environmental Laws.  Borrower hereby (a) releases and waives any future claims against the Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any Environmental Laws, and (b) agrees to indemnify and hold harmless the Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which the Lender may directly or indirectly sustain or suffer resulting from Borrower's failure to comply with all Environmental Laws or from a breach of this Section 6.20 of this Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to or after Borrower's ownership or interest in the Real Property Collateral and Borrower's property, whether or not the same was or should have been known to Borrower.  The provisions of this Section 6.20 of this Agreement, including the obligation to indemnify, shall survive the payment of the indebtedness and the satisfaction of this Agreement and shall not be affected by the Lender's

31

acquisition of any interest in any of the Real Property Collateral and Borrower's property, whether by foreclosure or otherwise.

6.21    Affiliate Transactions.    Except for prior transactions already disclosed to the Lender, no current or former Affiliate, stockholder, director, officer, partner or employee of Borrower or Guarantor, is presently, or since the inception of the Borrower or Guarantor has been, directly or indirectly through his, her or its affiliation with any other Person, a party to any transaction with the Borrower or the Guarantor providing for the furnishing of services by or to, or rental of real or personal property from or to, or otherwise requiring cash payments to or by any such person unless the Lender has consented thereto in writing.

6.22    Compliance with Laws and Regulations.    Borrower is in compliance with all laws, including Environmental Laws, orders, regulations and ordinances of all federal, foreign, state and local governmental authorities relating to the business operations and the assets of Borrower and that Borrower has obtained all the necessary licenses, permits and approvals necessary to operate Borrower's business.

6.23    USA Patriot Act Notification.    The following notification is provided to Borrower pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318:

> IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product.  What this means for Borrower:  When Borrower opens an account, if Borrower is an individual, the Lender will ask for Borrower's name, taxpayer identification number, residential address, date of birth, and other information that will allow the Lender to identify Borrower and, if Borrower is not an individual, the Lender will ask for Borrower's name, taxpayer identification number, business address, and other information that will allow the Lender to identify Borrower.  The Lender may also ask, if Borrower is an individual, to see Borrower's driver's license or other identifying documents and, if Borrower is not an individual, to see Borrower's legal organizational documents or other identifying documents.

6.24    Borrower Existence and Interests Properly Issued.

6.24.1   Hronis Capital Assets is a limited partnership duly organized and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of Hronis Capital

32

Asset's partnership interests have been properly issued, and the issuance of such partnership interests have not violated any articles of organization, partnership agreement, registration agreement or subscription agreement pertaining to Hronis Capital Assets. All the outstanding partnership interests which Hronis Capital Assets has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and "Blue Sky" laws. Hronis Capital Assets has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.24.2 Hronis Capital Management is a limited liability company duly organized and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of Hronis Capital Management's membership interests have been properly issued, and the issuance of such membership interests has not violated any articles of organization, operating agreement, registration agreement or subscription agreement pertaining to Hronis Capital Management. All the outstanding membership interests which Hronis Capital Management has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and "Blue Sky" laws. Hronis Capital Management has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.24.3 Hronis Citrus is a limited liability company duly organized and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of Hronis Citrus's membership interests have been properly issued, and the issuance of such membership interests has not violated any articles of organization, operating agreement, registration agreement or subscription agreement pertaining to Hronis Citrus. All the outstanding membership interests which Hronis Citrus has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and "Blue Sky" laws. Hronis Citrus has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.24.4 Hronis Farming is a limited partnership duly organized and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of Hronis Farming's

partnership interests have been properly issued, and the issuance of such partnership interests has not violated any articles of organization, partnership agreement, registration agreement or subscription agreement pertaining to Hronis Farming. All the outstanding partnership interests which Hronis Farming has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and "Blue Sky" laws.  Hronis Farming has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.24.5  Hronis is a corporation duly organized and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary.  All of Hronis's shares have been properly issued, and the issuance of such shares have not violated any articles of organization, bylaws, registration agreement or subscription agreement pertaining to Hrnois. All the outstanding membership interests which Hronis  has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and "Blue Sky" laws.  Hronis has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.24.6  Hronis Land Company is a general partnership duly organized and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of Hronis Land Company's partnership interests have been properly issued, and the issuance of such partnership interests have not violated any articles of organization, partnership agreement, registration agreement or subscription agreement pertaining to Hronis Land Company. All the outstanding partnership interests which Hronis Land Company has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and "Blue Sky" laws.  Hronis Land Company has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.24.7 Hronis Ranch is a limited liability company duly organized and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of Hronis Ranch's membership interests have been properly issued, and the issuance of such membership

interests have not violated any articles of organization, operating agreement, registration agreement or subscription agreement pertaining to Hronis Ranch. All the outstanding membership interests which Hronis Ranch has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and "Blue Sky" laws. Hronis Ranch has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.24.8 The Hronis Family Limited Partnership is a limited partnership duly organized and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of The Hronis Family Limited Partnership's partnership interests have been properly issued, and the issuance of such partnership interests have not violated any articles of organization, partnership agreement, registration agreement or subscription agreement pertaining to Hronis Farming. All the outstanding partnership interests which The Hronis Family Limited Partnership has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and "Blue Sky" laws. The Hronis Family Limited Partnership has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.25    <u>Borrower and Guarantor Authority</u>.  The execution and delivery by Borrower and Guarantor of this Agreement and all of the other Financing Agreements and the performance of Borrower's and Guarantor's obligations hereunder and thereunder:  (a) are within Borrower's and Guarantor's powers; (b) are duly authorized by Borrower's and Guarantor's members, managers, partners, officers, and shareholders, as applicable; (c) are not in contravention of any law or laws, or the terms of Borrower's or Guarantor's Articles of Organization, Operating Agreement, Bylaws, Partnership Agreement, as applicable, or of any indenture, agreement or undertaking to which any Borrower is a party or by which any Borrower or any of Borrower's or any Guarantor or any of Guarantor's property, property is bound; (d) do not require any governmental consent, registration or approval not already obtained; (e) do not contravene any contractual or governmental restriction binding upon any Borrower or any Guarantor; and (f) will not, except as contemplated or permitted by this Agreement, result in the imposition of any lien, charge, security interest or encumbrance upon any property of any Borrower or of any Guarantor under any existing indenture, mortgage, deed of trust, loan or credit agreement or other material agreement or instrument to which any Borrower or any Guarantor is a party or by which any Borrower or any Guarantor or any of Borrower's property or Guarantor's property may be bound or affected.

6.26    Management and Equity Interests.   All Borrower's managers, members, partners, officers, and shareholders, as applicable, and the amount and percentage of equity interests are as set forth below:

6.26.1  Hronis Capital Assets:

GENERAL PARTNERS:

Hronis Capital Management, LLC

LIMITED PARTNERS:

| Limited Partners | Percentage Interest |
|---|---|
| Kosta James Hronis | 50% |
| Peter John Hronis | 50% |
| Total | 100% |

6.26.2  Hronis Capital Management:

MANAGER:

Kosta James Hronis

MEMBERS:

| Members | Percentage Interest |
|---|---|
| Kosta James Hronis | 50% |
| Peter John Hronis | 50% |
| Total | 100% |

6.26.3  Hronis Citrus:

MANAGER:

Hronis Capital Management, LLC

MEMBERS:

| Members | Percentage Interest |
|---|---|
| Kosta James Hronis | 8% |

36

| | |
|---|---|
| Peter John Hronis | 8% |
| Hronis Trust for Demetrius A. Hronis | 14% |
| Hronis Trust for Haily L. Hronis | 14% |
| Hronis Trust for Antonia S. Hronis | 14% |
| Hronis Trust for Chase J. Hronis | 14% |
| Hronis Trust for Paige Hronis | 14% |
| Hronis Trust for Peter N. Hronis | 14% |
| Total | 100% |

6.26.4  Hronis Farming:

<u>GENERAL PARTNERS</u>:

Hronis Capital Management, LLC

<u>LIMITED PARTNERS</u>:

| <u>Limited Partners</u> | <u>Percentage Interest</u> |
|---|---|
| Kosta James Hronis | 50% |
| Peter John Hronis | 50% |
| Total | 100% |

6.26.5  Hronis Fruit Company:

<u>MANAGERS</u>:

Kosta James Hronis
Peter John Hronis
Peter Nickolas Hronis
Demetrius Albert Hronis

<u>MEMBER</u>:

| <u>Members</u> | <u>Percentage Interest</u> |
|---|---|
| Kosta James Hronis | 25% |
| Peter John Hronis | 25% |
| Peter Nickolas Hronis | 25% |
| Demetrius Albert Hronis | 25% |
| Total | 100% |

6.26.6  Hronis:

<u>OFFICERS</u>:

Kosta James Hronis, President
Peter John Hronis, Secretary

## SHAREHOLDERS:

| Shareholders | Percentage Interest |
| --- | --- |
| Kosta James Hronis | 50% |
| Peter John Hronis | 50% |
| Total | 100% |

6.26.6  Hronis Land Company

## PARTNERS:

| Partners | Percentage Interest |
| --- | --- |
| Kosta James Hronis | 50% |
| Peter John Hronis | 50% |
| Total | 100% |

6.26.7  Hronis Ranch:

## MANAGERS:

Kosta James Hronis
Peter John Hronis
Demetrius Albert Hronis

## MEMBER:

| Members | Percentage Interest |
| --- | --- |
| Demetrius Albert Hronis | 100% |
| Total | 100% |

6.26.8  Hronis Resource Management, LLC

## MANAGER:

Kosta James Hronis

## MEMBERS:

38

| Members | Percentage Interest |
|---|---|
| Kosta James Hronis | 50% |
| Peter John Hronis | 50% |
| Total | 100% |

6.26.9   The Hronis Family Limited Partnership

GENERAL PARTNER:

Hronis Capital Management, LLC

LIMITED PARTNERS:

| Limited Partners | Percentage Interest |
|---|---|
| Kosta James Hronis | 15.3555746% |
| Peter John Hronis | 15.3555746% |
| Sophia Hronis Revocable Trust | 60.603963% |
| Hronis Trust for Demetrius A. Hronis | 1.1546046% |
| Hronis Trust for Haily L. Hronis | 1.1546046% |
| Hronis Trust for Antonia S. Hronis | 1.1546046% |
| Hronis Trust for Chase J. Hronis | 1.1546046% |
| Hronis Trust for Paige Hronis | 1.1546046% |
| Hronis Trust for Peter N. Hronis | 1.1546046% |
| Hronis Capital Management, LLC | 1.041164% |
| Total | 100% |

6.27    Litigation and Proceedings.  No judgments are outstanding against Borrower nor are there now pending or threatened any litigation, contested claim, or governmental proceeding by or against any Borrower.

6.28    Certification.  At the sole option of Lender, and from time to time as Lender may request, Borrower shall furnish to Lender a certification by an environmental lawyer, engineer, architect, or other qualified inspector acceptable to Lender that Borrower's operations comply with all applicable statutes, ordinances, codes, regulations, Environmental Laws, and similar requirements.

6.29    Borrower's Non Reliance Upon Lender.  Borrower acknowledges and agrees that any cash flow projections prepared by Borrower and submitted to Lender and all Lender's credit decisions pertaining to this Agreement do not constitute a representation, express or implied, upon the success, feasibility, or viability of Borrower's business as an ongoing concern.

6.30    Environmental Questionnaire.   All information stated in the Environmental Questionnaire continues to be accurate in all material respects.

39

6.31    Borrower Lists.  Attached hereto are true, correct and complete lists of the following:

6.31.1  Attached hereto as Schedule 6.31.1 is a complete, accurate, true and correct list of all Borrower's Farm Products;

6.31.2  Attached hereto as Schedule 6.31.2 is a complete, accurate, true and correct list of all Borrower's Inventory;

6.31.3  Attached hereto as Schedule 6.31.3 is a complete, accurate, true and correct list of all Borrower's buyers of Borrower's Farm Products;

6.31.4  Attached hereto as Schedule 6.31.4 is a complete, accurate, true and correct list of all Borrower's supplier list;

6.31.5  Attached hereto as Schedule 6.31.5 is a complete, accurate, true and correct list of all Borrower's litigation;

6.31.6  Attached hereto as Schedule 6.31.6 is a complete list of all Counties in which Borrower keeps any and all Farm Products and Inventory.

6.32    Financial Statements.  Attached hereto as Schedule 6.32 is Borrower's October 31, 2023 Financial Statements which Borrower represents and warrants are complete and true and correct in all material respects.

7.    AFFIRMATIVE COVENANTS

Each Borrower jointly and severally covenants and agrees that so long as any Liabilities remain outstanding, and (even if there shall be no Liabilities outstanding) so long as the Lender remains committed to make Line of Credit Advances under this Agreement:

7.1    Financial Statements and Other Reportings.  Except as otherwise expressly provided for in this Agreement, Borrower shall keep proper books of record and account in which full and true entries will be made of all dealings and transactions of or in relation to the business and affairs of Borrower in accordance with generally accepted accounting principles consistently applied.  Borrower shall cause to be furnished to the Lender, and in a form acceptable to the Lender, such information as the Lender may reasonably request, including, without limitation, the following:

7.1.1    (a) as soon as available and in any event no later than one hundred twenty (120) days after the end of each fiscal year the financial statements of each Borrower, reviewed by independent certified public accountants selected by such Borrower and acceptable to Lender (such statements to include a balance sheet and cash flow statement for the year just ended, an income statement for such year, and a statement of contingent liabilities for such year); (b) as soon as available and in any event no later than one hundred twenty (120) days after the end of each fiscal year, the separate personal financial statements of each Guarantor, in form and substance satisfactory to Lender; and (c) copies of all tax returns filed by Borrower and Guarantor no later

than thirty (30) days of the filing or mailing of such returns (including, if any extension is filed thereon, a copy of such extension no later than ninety (90) days after the end of the applicable fiscal year or calendar year, as applicable, and a copy of the corresponding tax return no later than October 15th of the year in which such extension was filed). Borrower shall certify and supply a compliance certificate with each financial statement provided. Additionally, Borrower shall and shall cause each Guarantor to:

7.1.2    Borrower shall as soon as available and in any event within thirty (30) days after the end of each month, reports setting forth in comparative form the changes in the financial condition of the Borrower from the preceding month (which such reports shall expressly include, without limitation, any variances from Borrower's projected monthly budget), all in reasonable detail and satisfactory in scope to the Lender;

7.1.3    by the twentieth (20th) day of each month, Borrower shall provide a Position Report Certificate as of the last day of the preceding month, which such Position Report Certificate will be provided by email transmission and United States mail;

7.1.4    at Lender's request, Borrower shall provide to Lender a current report of all Farm Products located on the Real Property Collateral;

7.1.5    Borrower shall provide to Lender such additional information, reports, financial statements, or documentation relating to Borrower or the Collateral as Lender may from time to time reasonably request, which information shall be provided as soon as reasonably practicable and in any event by no later than thirty  (30) days after Lender's request;

7.1.6    by the sixtieth (60th) day of each fiscal year, Borrower shall supply to Lender with proof acceptable to Lender that all real and personal property taxes have been paid or are being contested;

7.1.7    upon Lender's request, Borrower shall provide Lender with such evidence as Lender reasonably requires establishing that Borrower has fully executed bona fide agreements to provide such operating loans as may be required to continue operation of Borrower's farming operations substantially in accordance with Borrower's past practices; and

7.1.8    Borrower shall notify Lender of any material adverse financial change in its financial condition promptly upon the occurrence of such change.

7.2    Third-Party Financial Consultant. Lender may hire one or more third-party financial consultants (including, without limitation, Kander LLC) acceptable to Lender (one hundred percent (100%) of the costs and expenses incurred by Lender in connection therewith shall be reimbursed by Borrower), which such third-party financial consultant shall monitor Borrower's financial performance, and which such third-party financial consultant shall have access to all financial statements, reports and other documents set forth in Section 7.1 of this Agreement , all Position Report Certificates of Borrower and all other documents required to be delivered or disclosed pursuant to this Agreement.

41

7.3 <u>Conduct of Business</u>. Except as contemplated by this Agreement, Borrower shall: (a) maintain Borrower's joint venture existence and maintain in full force and effect all licenses, bonds, franchises, leases, patents, contracts and other rights necessary or desirable to the profitable conduct of Borrower's business; (b) continue in, and limit Borrower's operations to, the same general line of business as that presently conducted by Borrower; (c) comply with all Environmental Laws and with all applicable laws and regulations of any federal, state or local governmental authority; and (d) keep and conduct Borrower's business separate and apart from the business of Borrower's Affiliates and any related party.

7.4 <u>Maintenance of Properties</u>. Borrower shall keep the Real Property Collateral and Borrower's leaseholds, equipment and other fixed assets in good condition, repair and working order, normal wear and tear excepted, and shall not allow Borrower's chief place of business or any of the Collateral to be moved from the locations set forth in <u>subsection 7.15</u> hereof (or to be placed on consignment) without the written consent of the Lender or except in accordance with <u>subsection 5.14</u>. Borrower shall keep the Farm Products and Inventory in good and merchantable condition and shall, as applicable, clean, feed, shelter, store, secure, refrigerate, water, medicate, fumigate, fertilize, cultivate, irrigate, prune, process and otherwise deal with the Inventory in accordance with the standards and practices adhered to generally by owners, bailees or processors, as applicable, of like properties.

7.5 <u>Notice of Suit, Adverse Change in Business, or Event of Default</u>. Borrower shall, as soon as possible, and in any event within five (5) Business Days after Borrower learns of the following, give written notice to the Lender of (a) any proceeding being instituted or threatened to be instituted by or against Borrower in any federal, state, local or foreign court or before any commission or other regulatory body (federal, state, local or foreign) for which claimed damages exceed $50,000; (b) any material adverse change in the business, assets or condition, financial or otherwise, of Borrower; and (c) the occurrence of any Event of Default (or any condition or event which, upon the giving of notice or lapse of time or both, would constitute an Event of Default).

7.6 <u>Use of Proceeds</u>. Borrower shall use Line of Credit Advances only for the purposes stated in <u>Section 2.4</u> of this Agreement and for no other purpose.

7.7 <u>Borrower's Property Insurance</u>. Borrower shall bear the full risk of loss from any cause of any nature whatsoever in respect to the Collateral. At Borrower's own cost and expense, Borrower shall keep all Collateral insured, with carriers, and in amounts acceptable to the Lender against the hazards of fire, theft, collision, hail, those covered by extended or all risk coverage insurance and such others as may be required by the Lender. Borrower shall cause to be delivered to the Lender the insurance policies therefore or proper certificates evidencing the same. Such policies shall provide, in manner satisfactory to the Lender, that any losses under such policies shall be payable first to the Lender, as the Lender's interest may appear. Each such policy shall include a provision for thirty (30) days' prior written notice to the Lender of any cancellation or expiration thereof and show the Lender as mortgagee and/or loss payee as provided in a form of loss payable endorsement in form and substance satisfactory to the Lender. In the event of any loss covered by any such policy, the carrier named in such policy is and shall be directed by Borrower to make payments for such loss to the Lender and not to Borrower. Borrower irrevocably makes, constitutes and appoints the Lender (and all officers, employees or agents designated by

42

the Lender) as Borrower's true and lawful attorney and agent-in-fact for the purpose of making, settling or adjusting claims under such policies of insurance. If payment as a result of any insurance losses shall be paid by check, draft or other instrument payable to the Lender, the Lender may endorse the name of Borrower on such check, draft or other instrument, and may do such other things as the Lender may deem advisable to reduce the same to cash. Except as limited below, all loss recoveries received by the Lender on account of any such insurance may be applied and credited by the Lender to the Liabilities. Borrower hereby assigns all such insurance coverage proceeds to the Lender as additional collateral security for the Liabilities. Any surplus of insurance proceeds in excess of the Liabilities shall be paid by the Lender to Borrower. Any deficiency reasonably determined by the Lender to exist after application of insurance proceeds to the Liabilities shall be paid by Borrower to the Lender, on demand. If Borrower fails to procure insurance as provided in this Agreement, or to keep the same in force, or fails to perform any of Borrower's other obligations hereunder, then the Lender may, at the Lender's option, and without obligation to do so, obtain such insurance and pay the premium thereon for the account of Borrower, or make whatever other payments the Lender may deem appropriate to protect the Lender's security for the Liabilities. Any such payment shall be additional Line of Credit Advances and Liabilities of Borrower to the Lender, payable on demand and secured by the Collateral.

7.8     Pension Plans. Borrower shall: (a) keep in full force and effect any and all Pension Plans which are presently in existence or may, from time to time, come into existence under ERISA, unless such Pension Plans can be terminated without material liability to Borrower in connection with such termination (as distinguished from any continuing funding obligation); (b) make contributions to all of Borrower's Pension Plans in a timely manner and in an amount sufficient to comply with the requirements of ERISA; (c) comply with all requirements of ERISA which relate to such Pension Plans; (d) notify the Lender immediately upon receipt by Borrower of any notice of the institution of any proceeding or other action which may result in the termination of any Pension Plans; and (e) acquire and maintain, when available, the contingent employer liability coverage insurance provided for under section 4023 of ERISA, such insurance to be satisfactory to the Lender in coverage and amount.

7.9     Further Actions. Borrower agrees to take such further actions, including, and without limitation, the execution and delivery of additional documents as may be reasonably necessary to carry out the terms of this Agreement and to permit the Lender to obtain, maintain, or perfect the liens contemplated by this Agreement.

7.10    Deposit Accounts. Borrower shall maintain all deposit accounts of any kind or nature at only Approved Local Banks, and Borrower shall execute and deliver to the Lender all documents and agreements as the Lender may require to obtain and maintain a perfected lien thereon.

7.11    Workers' Compensation Coverage. Upon the Lender's request, Borrower shall provide to the Lender proof of the general contractor's compliance with all applicable workers' compensation laws and regulations with regard to all work performed on the Real Property.

7.12    Fidelity and Employee Dishonesty Bond.  If requested by the Lender, Borrower shall maintain a fidelity and employee dishonesty bond in an amount not less than that requested by the Lender with an insurer acceptable to the Lender.

7.13    The Lender's Right of Entry and Inspection.  The Lender and its agents or representatives shall have at all times the right of entry and free access to the Borrower's premises and the right to copy all records, accounting books, contracts, bills, statements, vouchers, and supporting documents of Borrower relating in any way to the Borrower's business.

7.14    Actions.  The Lender shall have the right to commence, appear in, or defend any action or proceeding purporting to affect the rights, duties, or liabilities of the parties to this Agreement.  In connection with this right, the Lender may incur and pay reasonable costs and expenses, including, but not limited to, attorneys' fees, for both trial and appellate proceedings. Borrower covenants to pay the Lender to on demand all such expenses, together with interest from the date the Lender incurs the expense at the rate specified in the Note, and the Lender is authorized to make Line of Credit Advances for such purposes.

7.15    Collateral Located Only At Approved Locations.  All Farm Products and Inventory will be located on the Real Property Collateral and at the locations stated in Schedule 6.31.6. The Farm Products and Inventory may be taken from such locations only for delivery to buyers.

7.16    Indemnity.  Borrower shall indemnify and hold the Lender, its affiliates, its assignees and/or participants and any of their respective officers, directors, employees, advisors and agents (any such person, an "Indemnified Party"), harmless from any and all claims asserted against an Indemnified Party by any person, entity, or governmental body, or arising out of or in connection with (i) the Borrower's property or business, (ii) this Agreement or (iii) the use of proceeds from the Loans.  An Indemnified Party shall be entitled to appear in any action or proceeding to defend itself against such claims, and all costs, liabilities, losses or expenses incurred by an Indemnified Party in connection with such defense, including attorneys' fees, shall be paid by Borrower to such Indemnified Party.  An Indemnified Party shall, in its sole discretion, be entitled to settle or compromise any asserted claims against it, and such settlement shall be binding upon Borrower for purposes of this indemnification.  All amounts paid by an Indemnified Party under this paragraph shall be secured by the Lender's lien on the Collateral and shall be deemed additional Line of Credit Advances, and shall bear interest at the rate applicable to the Note.

7.17    Regulation U.  Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of the Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

7.18    Purchase of Materials; Conditional Sales Contracts.  No materials, equipment, fixtures, or articles of personal property placed in or incorporated into the Real Property Collateral shall be purchased or installed under any security agreement or other agreement whereby the seller reserves or purports to reserve title or the right of removal or repossession, or the right to consider

44

such items as personal property after their incorporation into the Real Property Collateral unless otherwise authorized by the Lender in writing.

7.19    The Lender's Right of Entry and Inspection.  The Lender and its agents shall have at all times the right of entry and free access to Borrowers' real property and the right to inspect the Collateral.  The Lender shall have unrestricted access to and the right to copy all records, accounting books, contracts, subcontracts, bills, statements, vouchers, and supporting documents of Borrower relating in any way to the Collateral.

7.20    Further Action.  The Borrower agrees to take such further action, including and without limitation, the execution and delivery of additional documents, as may be reasonably necessary to carry out the terms of this Agreement and to permit the Lender to  obtain, maintain, or perfect the liens contemplated by this Agreement.

7.21    No Commitment for New Loan.  Borrowers acknowledge and agree that the Lender has not committed to and has no obligation whatsoever to lend any additional money to Borrower after the date of this Agreement except as expressly stated herein.  Nothing in this Agreement shall be considered either an express or implied commitment, and nothing contained in this Agreement obligates the Lender to enter into any loan agreement or financing agreement with Borrower other than that described in this Agreement.

7.22    Consent to Loan Participation, Sale or Transfer.  Borrower agrees and consents to the Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers (each such new purchaser, a "New Lender"), whether related or unrelated to the Lender.  The Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge the Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy it may have with respect to such matters.  Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests.  Borrower further waives all rights of offset or counterclaim that it may have now or later against the Lender or against any purchaser of such a participation interest and unconditionally agrees that the Lender may solely enforce Borrower's obligation under the Loan irrespective of the participation of the Loan, and all rights under this Agreement and the Financing Agreements inure solely to the Lender.  Borrower further agrees that any New Lender shall have the same rights, benefits and protections as any Lender party to this Agreement on the Effective Date.

7.23    Deposit Accounts.  Each Borrower shall maintain all deposit accounts of any kind or nature at only the Approved Local Banks. Borrower shall execute and deliver to the Lender all Control Agreements, documents and agreements as the Lender may require to obtain and maintain a perfected lien on all Borrower's current and future deposit accounts.  Unless waived by Lender in writing Borrower will not maintain any deposit accounts at any Local Bank that will not sign a control agreement in form and substance satisfactory to Lender.

7.24    Actions.  Lender shall have the right to commence, appear in, or defend any action or proceeding purporting to affect the rights, duties, or liabilities of the parties to this Agreement.  In connection with this right, Lender may incur and pay reasonable costs and expenses, including, but not

45

limited to, attorneys' fees, for both trial and appellate proceedings.  Borrower covenants to pay Lender to on demand all such expenses, together with interest from the date Lender incurs the expense at the rate specified in the Note to which Lender posted the Advance, and Lender is authorized to make Advances for such purposes.

7.25     Title Insurance. No later than forty-five (45) days from the date of this Agreement, Borrower shall have provided to Lender an ALTA lender's extended coverage policy of title insurance (and mechanic's lien insurance if requested by the Lender) with such endorsements as the Lender may require, issued by a title insurance company acceptable to the Lender and in a form, amount, and content satisfactory to the Lender, insuring or agreeing to insure that the Deeds of Trust on the Real Property Collateral pursuant to this Agreement will be upon recordation valid first liens on the Real Property Collateral free and clear of all defects, liens, encumbrances, and exceptions except those as specifically accepted by the Lender in writing and except for deeds of trust for the benefit of AgAmerica.

7.26     Financial Covenants.

7.26.1 In the event (a) Borrower's Current Ratio is less than 1.25 to 1.0 as determined by Lender's review of the Position Report covering March 1, 2026 (required under this Agreement to be delivered to Lender by March 20, 2026), and/or (b) the Loan-to-Value Ratio is greater than sixty-five percent (65%) as of March 1, 2026, then Borrower shall pay immediately to Lender an amount equal to three percent (3%) of Borrower's total gross revenue (based on Borrower's consolidated accountant reviewed financial statements) for the three-year period beginning with  the reporting period ending on October 31, 2025.

7.26.2  No later than forty-five (45) days from the date this Agreement, Borrower shall refinance all its Debt owed to AgAmerica with Lender, provided that Lender issues a loan approval regarding the same. Nothing herein shall be construed as a promise or commitment by Lender to refinance such AgAmerica Debt. Any such refinance is expressly subject to Borrower's creditworthiness, market factors, and Lender's underwriting guidelines.

7.27     GAAP. Borrower shall maintain a standard modern system of accounting in accordance with GAAP.

8.     NEGATIVE COVENANTS

Each Borrower jointly and severally covenants and agrees that so long as any Liabilities remain outstanding and (even if there shall be no Liabilities outstanding) so long as the Lender remains committed to make Line of Credit Advances under this Agreement:

8.1     Encumbrances.  Unless the Lender agrees otherwise in writing, except for those liens, security interests and encumbrances presently in existence and reflected in Borrower's financial statements referred to in Section 6.2 of this Agreement, Borrower shall not create, incur, assume or suffer to exist any security interest, mortgage, pledge, lien, levy, assessment, attachment, seizure, writ, distress warrant, or other encumbrance of any nature whatsoever on or with regard to any of Borrower's assets (including, without limitation, the Collateral) other than:

46

(a) liens securing the payment of taxes, either not yet due or the validity of which is being contested in good faith by appropriate proceedings, and as to which Borrower shall, if appropriate under generally accepted accounting principles, have set aside on Borrower's books and records adequate reserves; (b) liens securing deposits under workmen's compensation, unemployment insurance, social security and other similar laws, or securing the performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or securing indemnity, performance or other similar bonds for the performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or securing statutory obligations or surety or appeal bonds, or securing indemnity, performance or other similar bonds in the ordinary course of Borrower's business; (c) liens and security interests in favor of the Lender; and (d) the Permitted Liens.

8.2    <u>Consolidations, Mergers or Acquisitions, Subsidiaries, Public Offering</u>.  Borrower shall not recapitalize or consolidate with, merge with, or otherwise acquire all or substantially all of the assets or properties of any other business or person and shall not create or capitalize any subsidiaries and shall not undertake any Initial Public Offering without the prior written consent of the Lender.

8.3    <u>Deposits, Investments, Advances or Loans</u>.  Borrower shall not make or permit to exist deposits, investments, advances or loans (other than loans existing on the date of the execution of this Agreement and disclosed to the Lender in writing) to Affiliates or related parties or any other Person, except investments in negotiable certificates of deposit issued by the Lender, made payable to the order of Borrower.

8.4    <u>Indebtedness</u>.  Except for those obligations and that indebtedness presently in existence and reflected in Borrower's financial statements referred to in <u>Section 6.2</u> of this Agreement, Borrower shall not, without Lender's prior written consent, incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any obligations or indebtedness, direct or indirect fixed or contingent at any time, except:  (a) the Liabilities; (b) obligations secured by liens or security interests permitted under <u>Section 8.1</u> of this Agreement; and (c) trade obligations, Producer Payables and normal accruals in the ordinary course of Borrower's business not yet due and payable. Borrower shall not permit to exist any other depository account for the receipt of prepayments of any type whatsoever.

8.5    <u>Guaranties and Other Contingent Obligations</u>.  Borrower shall not guaranty, endorse or otherwise in any way become or be responsible for obligations of any other business or person, whether by agreement to purchase the indebtedness of such business or person or through the purchase of goods, supplies or services, or maintenance of working capital or other balance sheet covenants or conditions, or by way of stock purchase, capital contribution, advance or loan for the purpose of paying or discharging any indebtedness or obligation of such business or person or otherwise.

8.6    <u>Disposition of Property</u>.  Borrower shall not without prior notice to the Lender sell, lease, transfer or otherwise dispose of any of Borrower's properties, assets or rights, to any Person in excess of $50,000 in any of Borrower's fiscal years, except in the ordinary course of Borrower's business and then only in accordance with <u>Section 5.14</u> of this Agreement.

8.7     Capital Investment Limitations.  Borrower shall not purchase, invest in or otherwise acquire real estate, equipment or other fixed assets ("Capital Expenditures"), totaling more than $750,000 per transaction or more than $750,000 in the aggregate in cost in any of Borrower's fiscal years without the prior written consent of the Lender.  For the purpose of this Section 8.7, Capital Expenditures shall include a purchase or improvement that has a useful life of more than one year, such as real property, buildings, machinery and equipment.

8.8     Loans to Affiliates or Others.  Borrower shall not make any loans to any Affiliates or to any person.

8.9     Continuity of Management.  Borrower shall not make any changes in the key employees of Borrower or in their duties without the prior written consent of the Lender.

8.10    Environmental Laws.  Borrower shall not cause or contribute to any noncompliance with all applicable Environmental Laws.

8.11    Loans, Acquisitions, Guaranties, Other Businesses.  Borrower will not (a) loan money, (b) purchase or acquire any interest in any other enterprise or entity, (c) incur any obligation as surety or guarantor other than in the ordinary course of business, or (iv) engage in any business activities substantially different than those in which Borrower is presently engaged.

8.12    Payables and Payment of Debt.  Borrower will pay all bills and payables in the ordinary course of business.

8.13    Split Financing.  Without Lender's prior written consent, Borrower shall not obtain loans for, or otherwise grant liens on, any of the Collateral from any other lender.

8.14    Managerial Fees, Compensation of Officers or Managers.  Borrower shall not pay any management or similar fees whatsoever and shall not pay the following employees' wages and compensation (including salary, bonus, management fees and incentive compensation of any type) in excess of the aggregate amount of $1,500,000 in any of Borrower's fiscal years without the prior written consent of the Lender to any of the following:

> Peter John Hronis
> Kosta James Hronis
> Demtrius Albert Hronis
> Peter Nicholas Hronis
> Affiliates expressly set forth in Section 6.15 of this Agreement

8.15    Dividends, Redemptions, Debt.  Borrower shall not directly or indirectly:  (a) redeem any of Borrower's equity interests; (b) prepay any principal, interest or other payments on or in connection with any indebtedness of Borrower other than the Note or owed to AgAmerica in the ordinary course; or (c) make any dividends, distributions or payments to any member without the Lender's prior written consent.

8.16    Issuance of Equity Interests.  Borrower shall not issue or distribute any additional equity interests without the prior written consent of the Lender.

8.17    Amendment of Corporate Governing Documents.  Borrower shall not amend any Articles of Organization or operating agreement without the prior written consent of the Lender.

8.18    Use of Corporate or Fictitious Names.  Borrower shall not use any other corporate or fictitious name.

8.19    Continuity of Consent of Management.  Borrower shall not make any changes in its management structure without the prior consent of Lender.

8.20    Environmental Laws.  Borrower shall not cause or contribute to any noncompliance with all applicable Environmental Laws.

8.21    Loans, Acquisitions, Guaranties, Other Businesses.  Borrower will not: (a) loan money or assets; (b) purchase or acquire any interest in any other enterprise or entity; (c) incur any obligation as surety or guarantor other than in the ordinary course of business; or (d) engage in any business activities substantially different than those in which Borrower is presently engaged.

9.    DEFAULT, RIGHTS AND REMEDIES OF THE LENDER

9.1    Liabilities.  Upon an Event of Default, any or all of the Liabilities may, at the option of the Lender, and without demand or notice of any kind, be declared, and thereupon shall become, immediately due and payable in full, and the Lender shall cease to be committed to make Line of Credit Advances under this Agreement.

9.2    Rights and Remedies Generally.  Upon an Event of Default, the Lender shall have, in addition to any other rights and remedies contained in this Agreement or in any of the other Financing Agreements, all of the rights and remedies of a secured party under the Code or other applicable laws, all of which rights and remedies shall be cumulative and non-exclusive, to the extent permitted by law and which rights and remedies shall include but not be limited to the right to sell the Collateral so the net proceeds therefrom can be applied to the Liabilities. In addition, upon an Event of Default the Lender shall be entitled to the appointment of a receiver for all or any portion of the Collateral, and the Lender shall be entitled to the appointment of such receiver without regard to the solvency or insolvency of Borrower and without regard to the value of the Collateral, and such receiver may be appointed by any court of competent jurisdiction upon ex parte application (notice being expressly waived hereby) and all rents, issue, income, profits, proceeds, proceeds of proceeds, and products of and from the Collateral shall be paid according to the directions of the Court for application toward the Liabilities. In addition to all such rights and remedies, the sale, lease or other disposition of the Collateral, or any part thereof, by the Lender after an Event of Default, may be for cash, credit or any combination thereof, and the Lender may purchase all or any part of the Collateral at public or private sale, and in lieu of actual payment of such purchase price, may setoff the amount of such purchase price against the Liabilities then owing. Any sales of the Collateral may involve the sale of portions of the Collateral at different times, and at different locations, and may, at the Lender's option be held at a site or sites different

49

from the site at which the Collateral (or any part thereof) is located.  Any such sales, at the Lender's option, may be in conjunction with or separate from the foreclosure of any deeds of trust and may be adjourned from time to time with or without notice.  The Lender may, in its sole discretion, cause the Collateral to remain on Borrower's premises, at Borrower's expense, pending sale or other disposition of the Collateral. The Lender shall have the right to conduct such sales on Borrower's premises, at Borrower's expense, or elsewhere, on such occasion or occasions as the Lender may see fit.  The foregoing terms of disposition shall be deemed to be commercially reasonable.

9.3     Entry Upon Premises.  Upon an Event of Default, the Lender shall have the right to enter upon the Real Property Collateral and all locations of Borrower's business at which any of the Collateral is located (or is believed to be located) without incurring any obligation to pay rent to Borrower or Borrower's landlords, or any other place or places where the Collateral is located (or is believed to be located) and kept, and remove the Collateral therefrom to the premises of the Lender or any agent of the Lender, for such time as the Lender may desire, in order to effectively collect or liquidate the Collateral, or the Lender may require Borrower to assemble the Collateral and make it available to the Lender at a place or places to be designated by the Lender.  Borrower expressly agrees that the Lender may, if necessary to gain occupancy to the Real Property Collateral and premises at which Collateral is located (or is believed to be located), without further notice to Borrower:  (a) hire Borrower's employees to assist in the loading and transportation of such Collateral; (b) utilize Borrower's equipment for use in such operation; (c) cut or otherwise temporarily move or remove any barbed wire or other fencing or similar boundary-maintenance devices; and (d) pick or otherwise render inoperative any locks on gates or doors to warehouses, barns, storage sheds, storage yards, pastures or other property not customarily habituated by people.  Borrower agrees that any such actions authorized by this Section 9.3 shall be deemed to have been authorized and not a breach of the peace.

9.4     Sale of Other Disposition of Collateral by the Lender.  Any notice required to be given by the Lender of a sale, lease or other disposition or other intended action by the Lender with respect to any of the Collateral which is deposited in the United States mail, postage prepaid and duly addressed to Borrower at the address specified in Section 10.19 of this Agreement, at least ten (10) calendar days prior to such proposed action, shall constitute fair and reasonable notice to Borrower of any such action; provided, however, that nothing herein shall require the Lender to give Borrower ten (10) days' prior notice of disposition, and nothing herein shall cause a disposition made on less than ten (10) days' notice not commercially reasonable.  The net proceeds realized by the Lender upon any such sale or other disposition, after deduction for the reasonable expense of retaking, holding, preparing for sale, selling or the like, and the reasonable attorneys' and paralegal fees and legal expenses incurred by the Lender in connection therewith, shall be applied as provided herein toward satisfaction of the Liabilities.  Borrower shall remain liable for any deficiency.  The commencement of any action, legal or equitable, or the rendering of any judgment or decree for any deficiency, shall not affect the Lender's security interest in the Collateral until the Liabilities shall have been paid in full.

9.5     Waiver of Demand.  Demand, presentment, protest and notice of nonpayment are hereby waived by Borrower. Borrower also waives the benefit of all exemption laws.

50

9.6    Waiver of Notice.  Upon an Event of Default, Borrower hereby waives all rights to notice and hearing of any kind prior to the exercise by the Lender of the Lender's rights to repossess the Collateral without judicial process or to replevy, attach or levy upon the Collateral without prior notice or hearing to the extent permitted by applicable law.

10.    MISCELLANEOUS

10.1    Timing of Payments.  For purposes of determining the outstanding balance of the Liabilities, including the computations of interest which may from time to time be owing to the Lender, the receipt by the Lender of any check or any other item of payment whether through a blocked account described in Section 5.6 of this Agreement or otherwise, shall not be treated as a payment on account of the Liabilities until such check or other item of payment is actually received by the Lender and is paid to the Lender in cash or a cash equivalent.  The credit given for any such check subsequently dishonored shall be reversed.

10.2    Attorneys' Fees and Costs.  If at any time or times hereafter the Lender employs counsel in connection with the negotiation and entering into of this Agreement or the other Financing Agreements (including the fees and costs of Magnetar Financial and its managed funds and accounts as a participant to assignee hereunder), and in connection with protecting or perfecting the Lender's security interest in the Collateral or in connection with any matters contemplated by or arising out of this Agreement, whether:  (a) to commence, defend, or intervene in any litigation or to file a petition, complaint, answer, motion or other pleading; (b) to take any other action in or with respect to any suit or proceeding (bankruptcy or otherwise); (c) to consult with officers of the Lender to advise the Lender or to draft documents for the Lender in connection with any of the foregoing or in connection with any release of the Lender's claims or security interests or any proposed extension, amendment or refinancing of the Liabilities or in connection with any proposed change in Borrower's corporate structure or existing agreements within its Members, or the proposed issuance of stock by Borrower or any proposed initial public offering by Borrower; (d) to protect, collect, lease, sell, take possession of, or liquidate any of the Collateral; or (e) to attempt to enforce or to enforce any security interest in any of the Collateral, or to enforce any rights of the Lender to collect any of the Liabilities; then in any of such events, all of the attorneys' fees arising from such services, and any expenses, costs and charges relating thereto, including, without limitation, all fees of all paralegals, legal assistants and other staff employed by such attorneys, together with interest at the Default Rate provided for in Section 2.2 of this Agreement if an Event of Default has occurred, or at the highest interest rate set forth in the Note, shall constitute additional Liabilities, payable on demand and secured by the Collateral.

10.3    Expenditures by the Lender.  In the event that Borrower shall fail to pay taxes, insurance, assessments, costs or expenses which Borrower is, under any of the terms hereof or of any of the other Financing Agreements, required to pay, or fails to keep the Collateral free from other security interests, liens or encumbrances except as permitted herein, the Lender may, in the Lender's sole discretion and without obligation to do so, make expenditures for any or all of such purposes, and the amount so expended, together with interest at the Default Rate provided for in Section 2.2 of this Agreement, shall constitute additional Liabilities, payable on demand and secured by the Collateral.

51

10.4    The Lender's Costs and Expenses as Additional Liabilities.    Borrower shall reimburse the Lender for all reasonable expenses and fees paid or incurred in connection with the documentation, negotiation and closing of the Note and other financial accommodations described in this Agreement, including, without limitation, filing and recording fees, and the reasonable fees and expenses the Lender's attorneys.    Borrower further agrees to reimburse the Lender for all reasonable expenses and fees paid or incurred in connection with the documentation of any renewal or extension of the loans, any additional financial accommodations, or any other amendments to this Agreement.    All such costs and expenses incurred by the Lender with respect to such negotiation and documentation together with interest at the highest interest rate set forth in the Note, shall constitute additional Liabilities, payable on demand and secured by the Collateral.

10.5    Claims and Taxes.    Borrower agrees to indemnify and hold the Lender harmless from and against any and all claims, demands, liabilities, losses, damages, penalties, costs, and expenses (including, without limitation, reasonable attorneys' fees) relating to or in any way arising out of the possession, use, operation or control of any of Borrower's assets.    Borrower shall pay or cause to be paid all license fees, bonding premiums and related taxes and charges, and shall pay or cause to be paid all of Borrower's real and personal property taxes, assessments and charges and all of Borrower's franchise, income, unemployment, use, excise, old age benefit, withholding, sales and other taxes and governmental charges assessed against Borrower, or payable by Borrower, at such times and in such manner as to prevent any penalty from accruing or any lien or charge from attaching to Borrower's property.

10.6    Custody and Preservation of Collateral.    The Lender shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in the Lender's possession if the Lender takes such action for that purpose as Borrower shall request in writing, but failure by the Lender to comply with any such request shall not of itself be deemed a failure to exercise reasonable care, and no failure by the Lender to preserve or protect any right with respect to such Collateral against prior parties, or to do any act with respect to the preservation of such Collateral not so requested by Borrower, shall of itself be deemed a failure to exercise reasonable care in the custody or preservation of such Collateral.

10.7    Inspection.    The Lender (by and through its officers and employees), or any person designated by the Lender in writing, shall have the right, from time to time hereafter, to call at Borrower's place or places of business (or any other place where Collateral or any information relating thereto is kept or located) without hindrance or delay, to (i) inspect, audit, check and make copies of and extracts from Borrower's books, records, journals, order, receipts and any correspondence and other data relating to Borrower's business or to any transactions between the parties to this Agreement; (ii) make such verification concerning the Collateral as the Lender may consider reasonable under the circumstances; and (iii) review operating procedures, review maintenance of property and discuss the affairs, finances and business of Borrower with Borrower's officers, employees or managers and other customers, vendors and contractors of Borrower.    Borrower shall pay, on demand, all reasonable expenses incurred by or on behalf of the Lender in making inspections under this Section 10.7, including, without limitation, travel and photocopying expenses, which expenses, at the option of the Lender shall be paid by the Lender initiated Advances pursuant to Section 2.1 of this Agreement.

52

10.8    Examination of Banking Records.  Borrower consents to the examination by the Lender, the Lender's officers, employees and agents, or any of them, whether or not there shall have occurred an Event of Default, of any and all of Borrower's banking records, wherever they may be found, and hereby directs any Person which may be in control or possession of such records (including, without limitation, any Lender, other financial institution, accountant or lawyer) to provide such records to the Lender and the Lender's officers, employees and agents, upon their request.  Such examination may be conducted by the Lender with or without notice to Borrower at the option of the Lender, any such notice being hereby waived by Borrower.

10.9    Governmental Reports.  Borrower hereby authorizes all duly constituted federal, state and municipal authorities to furnish to the Lender copies of their reports of examinations or inspections of Borrower.

10.10   Reliance by the Lender.  All covenants, agreements, representations and warranties made herein by Borrower shall, notwithstanding any investigation by the Lender, be deemed to be material to and to have been relied upon by the Lender.

10.11   Parties.  Whenever in this Agreement there is reference made to any of the parties hereto, such reference shall be deemed to include, wherever applicable, a reference to the respective successors and assigns of Borrower, Guarantor and the Lender.

10.12   Applicable Law Severability.  This Agreement shall be construed in all respect in accordance with, and governed by, the laws and decisions of the State of California.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

10.13   Judicial Reference.  Borrower and the Lender hereby agree that any controversy, dispute, or claim between the parties arising out of or relating to this Agreement shall be resolved by a reference proceeding in California in accordance with the provisions of California Code of Civil Procedure Section 638. The referee shall be a retired California state court judge selected by mutual written agreement of the parties. If the parties are unable to agree upon a referee within ten (10) calendar days after one party serves a written notice of its intent to commence a judicial reference proceeding on the other party, then the referee will be selected by the court in accordance with California Code of Civil Procedure Section 640(b). The referee shall be appointed to sit as a temporary judge, with all of the powers of a temporary judge, as authorized by law, and upon selection should take and subscribe to the oath of office as provided for in Rule 244 of the California Rules of Court (or any subsequently enacted rule). The referee shall determine the way the reference proceeding is conducted including the time and place of all hearings, the order of presentation of evidence, and all other questions that arise with respect to the course of the reference proceeding. The referee shall render a written statement of decision and shall conduct the proceedings in accordance with the California Code of Civil Procedure, the California Rules of Court, and the California Evidence Code, except as otherwise specifically agreed by the parties and approved by the referee. The referee's statement of decision shall set forth findings of fact and

conclusions of law. The referee's decision shall be entered as a judgment in the court in accordance with the provisions of California Code of Civil Procedure Sections 644 and 645 and shall be appealable in accordance with California law. If the enabling legislation which provides for appointment of a referee is repealed (and no successor statute is enacted), any dispute between the parties that would otherwise be determined by the reference procedure herein described will be resolved and determined by arbitration. The arbitration will be conducted by a retired California state court judge, in accordance with the California Arbitration Act and the California Code of Civil Procedure Sections 1280 through 1294.2 (as amended from time to time).

10.14    <u>Application of Payments Waiver</u>.    Notwithstanding any contrary provision contained in this Agreement or in any of the other Financing Agreements, Borrower irrevocably waives the right to direct the application of any and all payments at any time or times hereafter received by the Lender from Borrower or with respect to any of the Collateral, and Borrower does hereby irrevocably agree that the Lender shall have the continuing exclusive right to apply and reapply any and all payments received at any time or times hereafter, whether with respect to the Collateral or otherwise, against the Liabilities, in such manner as the Lender may deem advisable, notwithstanding any entry by the Lender upon any of the Lender's books and records.

10.15    <u>Marshalling:  Payments Set Aside</u>.    The Lender shall be under no obligation to marshal any assets in favor of Borrower or against or in payment of any or all of the Liabilities. To the extent that Borrower makes a payment or payments to the Lender or the Lender receives any payment or proceeds of the Collateral for Borrower's benefit or enforces the Lender's security interests or exercises the Lender's rights of setoff, and such payment or payments or the proceeds of such Collateral, enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

10.16    <u>Section Titles</u>.    The section titles contained in this Agreement shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties.

10.17    <u>Continuing Effect</u>.    This Agreement, the Lender's security interests in the Collateral, and all of the other Financing Agreements shall continue in full force and effect so long as any Liabilities shall be owed to the Lender and (even if there shall be no Liabilities outstanding) so long as the Lender remains committed to make Advances under this Agreement.

10.18    <u>No Waiver</u>.    The Lender's failure, at any time or times hereafter, to require strict performance by Borrower of any provision of this Agreement shall not waive, affect or diminish any right of the Lender thereafter to demand strict compliance and performance therewith.  Any suspension or waiver by the Lender of any Event of Default under this Agreement or any of the other Financing Agreements, shall not suspend, waive or affect any other Event of Default under this Agreement or any of the other Financing Agreements, whether the same is prior or subsequent thereto and whether of the same or of a different kind or character.  None of the undertakings,

54

agreements, warranties, covenants and representations of Borrower contained in this Agreement or any of the other Financing Agreements and no Event of Default under this Agreement or any of the other Financing Agreements, shall be deemed to have been suspended or waived by the Lender unless such suspension or waiver is in writing signed by an officer of the Lender, and directed to Borrower specifying such suspension or waiver.  If the Lender shall have waived a requirement of this Agreement or of one or more of the Financing Agreements on one or more occasions, such waiver shall not be construed by Borrower as the Lender's express or implicit waiver of such requirement or rights of the Lender on a future occasion, and Borrower agrees that it will not employ or utilize any estoppel defense or claim in the event the Lender seeks to enforce any of its rights under this Agreement or under the Financing Agreements.  The Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by the Lender.  No delay or omission on the part of the Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by the Lender of a provision of this Agreement shall not prejudice or constitute a waiver of the Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement.  No prior waiver by the Lender, nor any course of dealing between the Lender and Borrower, or between the Lender, or between the Lender and any Person who contracts or deals with Borrower shall constitute a waiver of any of the Lender's rights or of any obligations of Borrower or of any of Borrower's contractors as to any future transactions.  Whenever the consent of the Lender is required under this Agreement, the granting of such consent by the Lender in any instance shall not constitute continuing consent in subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of the Lender.

10.19   Notices.  Except as otherwise expressly provided herein, any notice required or desired to be served, given or delivered pursuant to this Agreement shall be in writing, and shall be deemed to have been validly served, given or delivered three (3) Business Days after deposit in the United States mails, with proper postage prepaid, addressed to the party to be notified as follows:

10.19.1 If to the Lender:

Conterra Agricultural Capital, LLC
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266

With copies to:

Email: legal@conterraag.com

10.19.2 If to the Borrower:

Hronis Capital Assets, LP
10443 Hronis Road
Delano, CA 93215

55

Hronis Capital Management, LLC
10443 Hronis Road
Delano, CA 93215

Hronis Citrus, LLC
10443 Hronis Road
Delano, CA 93215

Hronis Farming, LP
10443 Hronis Road
Delano, CA 93215

Hronis Fruit Company
10443 Hronis Road
Delano, CA 93215

Hronis, Inc.
10443 Hronis Road
Delano, CA 93215

Hronis Land Company
10443 Hronis Road
Delano, CA 93215

Hronis Ranch, LLC
10443 Hronis Road
Delano, CA 93215

Hronis Resource Management, LLC
10443 Hronis Road
Delano, CA 93215

The Hronis Family Limited Partnership
10443 Hronis Road
Delano, CA 93215

With a copy to:

peter.hronis@hronis.net;
mark.dedonato@hronis.net; and
alex.bryant@hronis.net

or to such other address as each party designates to the other in the manner herein prescribed.

56

10.20  Maximum Interest.  No agreements, conditions, provisions or stipulations contained in this Agreement or in any of the other Financing Agreements, or any Event of Default, or any exercise by the Lender of the right to accelerate the payment of the maturity of principal and interest, or to exercise any option whatsoever, contained in this Agreement or any of the other Financing Agreements, or the arising of any contingency whatsoever, shall entitle the Lender to collect, in any event, interest exceeding the maximum authorized by law, and in no event shall Borrower be obligated to pay interest exceeding such rate, and all agreements, conditions or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel Borrower to pay a rate of interest exceeding the maximum allowed by law, shall be without binding force or effect, at law or in equity, to the extent only of the excess of interest over such maximum interest allowed by law.  In the event any interest is charged in excess of the maximum allowed by law ("Excess"), Borrower acknowledges and stipulates that any such charge shall be the result of an accidental and bona fide error, and such Excess shall be, first, applied to reduce the principal of any Liabilities due, and, second returned to Borrower, it being the intention of the parties hereto not to enter at any time into a usurious or otherwise illegal relationship. Borrower and the Lender both recognize that, with fluctuations in the variable rate of interest on the Lines of Credit, such an unintentional result could inadvertently occur.  By the execution of this Agreement, Borrower covenants that: (a) the credit or return of any Excess shall constitute the acceptance by Borrower of such Excess; and (b) Borrower shall not seek to pursue any other remedy, legal or equitable, against the Lender based, in whole or in part, upon the charging or receiving of any interest in excess of the maximum authorized by law.  For the purpose of determining whether or not any Excess has been contracted for, charged or received by the Lender, all interest at any time contracted for, charged or received by the Lender in connection with Liabilities shall be amortized, prorated, allocated and spread in equal parts during the entire term of this Agreement.

10.21  Additional Advances.  All fees, charges, expenses, costs, expenditures, obligations, liabilities, losses, penalties and damages incurred or suffered by the Lender and for which Borrower is bound to indemnify or reimburse the Lender under this Agreement shall, at the option of the Lender be paid by the Lender initiated Line of Credit Advances.

10.22  Right of Setoff.  Borrower grants to the Lender a contractual possessory security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to the Lender all Borrower's right, title and interest in and to, Borrower's accounts with the Lender (whether checking, savings, or some other account), including without limitation all accounts held jointly with someone else and all accounts Borrower may open in the future, excluding, however, all IRA, Keogh, and trust accounts.  Borrower authorizes the Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Liabilities against any and all such accounts.

10.23  No Partnership.  Nothing in this Agreement shall be construed to constitute the creation of a partnership or joint venture between the Lender and Borrower or any contractor.  This Agreement does not create a contractual relationship with and shall not be construed to benefit or bind the Lender in any way with or create any contractual duties by the Lender to any contractor, subcontractor, material-man, laborer, or any other person.

10.24    Authority to File Notices.    Borrower authorizes, appoints, and designates the Lender as its attorney-in-fact to file for record any financing statement, Food Security Act notice, or other notice that the Lender deems necessary to protect its interest under this Agreement. This power shall be deemed coupled with an interest and shall be irrevocable while any sum or performance remains due and owing under any of the Financing Agreements.

10.25    Exhibits and Schedules.    All exhibits and schedules attached hereto are incorporated herein by this reference.

10.26    Counterparts.    This Agreement and any of the Financing Agreements may be executed in counterparts.

10.27    Release.    Borrower and Borrower's officers, directors, members, managers, agents, employees, representatives, successors, and assigns and participants do hereby completely and unconditionally release and forever discharge the Lender and its successors and assigns, and its officers, directors, agents, employees, and representatives from any and all claims, demands, actions, causes of action, costs, expenses, damages, or liabilities of whatever kind or nature, direct, indirect, third-party, or derivative, known or unknown, absolute or contingent, now existing or hereafter arising, which are based directly or indirectly upon facts, events, transactions, or occurrences directly or indirectly involving or relating to any and all matters by, between, and among the Lender and the Borrower which transpired prior to the date of this Agreement.

10.28    No Reliance.    From time to time, and possibly frequently, one or more representatives of the Lender shall inspect the Collateral and Borrower's business and may make comments or suggestions as to the management or operations of the Borrower's business. Borrower acknowledges and agrees that it is solely Borrower's decision to accept or disregard any such comments or suggestions of Lender's representatives. Borrower further acknowledges and agrees that the consequence of following or disregarding such comments and suggestions shall be born solely by Borrower. The purpose of this provision is to obtain Borrower's acknowledgement and agreement that in the event Borrower's operation fails Borrower shall not and cannot contend that such failure is in consequence to any discussions, comments or suggestions between Borrower and Lender concerning Borrower's commercial farming business.

10.29    Agreement to Govern and Control. In the event of any conflict or ambiguity between the terms of this Agreement and the terms of the other Financing Agreements, the terms of this Agreement shall govern and control.

[Remainder of Page Intentionally Blank]

58

**LENDER:**

CONTERRA AGRICULTURAL CAPITAL, LLC,
an Iowa limited liability company

By: _____
Paul Erickson
Its:  CEO

**BORROWER:**

**HRONIS CAPITAL ASSET, LP**, a California
limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC,
a California limited liability company
Its: General Partner

By: _____
Kosta Hronis
Its:    Manager

**HRONIS CAPITAL MANAGEMENT, LLC**, a
California limited liability company

By: _____
Kosta Hronis
Its:    Manager

**HRONIS CITRUS, LLC**, a California limited
liability company

By: HRONIS CAPITAL MANAGEMENT, LLC,
a California limited liability company
Its: Manager

By: _____
Kosta Hronis
Its:    Manager

**HRONIS FARMING, LP**, a California limited
partnership

By: HRONIS CAPITAL MANAGEMENT, LLC,
a California limited liability company
Its: General Partner

By: _____
Kosta Hronis
Its:    Manager

[Signature Page to Loan and Security Agreement]

**HRONIS FRUIT COMPANY LLC**, a
California limited liability company

By: _____
Peter John Hronis
Its:    Member

By: _____
Kosta James Hronis
Its:    Member

By: _____
Peter Nickolas Hronis
Its:    Member

By: _____
Demetri Albert Hronis
Its:    Member

**HRONIS, INC.**, a California corporation

By: _____
Kosta Hronis
Its:    President

By: _____
Peter J. Hronis
Its:    Secretary

**HRONIS LAND COMPANY**, a California
partnership

By: _____
Kosta Hronis
Its:    Partner

By: _____
Peter Hronis
Its:    Partner

[Signature Page to Loan and Security Agreement]

**HRONIS RANCH, LLC**, a California limited
liability company

By: _____
Demetri Hronis
Its:    Sole Member

**HRONIS RESOURCE MANAGEMENT,
LLC**, a California limited liability company

By: _____
Kosta Hronis
Its:    Manager

**THE HRONIS FAMILY LIMITED
PARTNERSHIP**, a California limited
partnership

By: HRONIS CAPITAL MANAGEMENT, LLC,
a California limited liability company
Its: General Partner

By: _____
Kosta Hronis
Its:    Manager

**GUARANTOR:**

_____
PETER JOHN HRONIS, individually

_____
KOSTA JAMES HRONIS, individually

_____
DEMETRIUS ALBERT HRONIS, individually

[Signature Page to Loan and Security Agreement]

KOSTA HRONIS, TRUSTEE, OF THE KOSTA
HRONIS LIVING TRUST DATED FEBRUARY
12, 2014, AND ANY AMENDMENTS
THERETO

PETER JOHN HRONIS, TRUSTEE, OF THE
PETER JOHN HRONIS LIVING TRUST
DATED FEBRUARY 28, 2006, AND ANY
AMENDMENTS THERETO

KOSTA HRONIS, TRUSTEE OF THE SOPHIA
HRONIS IRREVOCABLE TRUST ONE
DATED DECEMBER 27, 2012

PETER J. HRONIS, TRUSTEE OF THE
SOPHIA HRONIS IRREVOCABLE TRUST
ONE DATED DECEMBER 27, 2012

[Signature Page to Loan and Security Agreement]

_____
KOSTA HRONIS, TRUSTEE, OF THE KOSTA
HRONIS LIVING TRUST DATED FEBRUARY
12, 2014, AND ANY AMENDMENTS
THERETO

_____
PETER JOHN HRONIS, TRUSTEE, OF THE
PETER JOHN HRONIS LIVING TRUST
DATED FEBRUARY 28, 2006, AND ANY
AMENDMENTS THERETO

_____
KOSTA HRONIS, TRUSTEE OF THE SOPHIA
HRONIS IRREVOCABLE TRUST ONE
DATED DECEMBER 27, 2012

_____
PETER J. HRONIS, TRUSTEE OF THE
SOPHIA HRONIS IRREVOCABLE TRUST
ONE DATED DECEMBER 27, 2012

[Signature Page to Loan and Security Agreement]

## Exhibit A

## Position Report Certificate

| Position Report | Consolidation | Eliminations | [Date] Hronis Inc Consolidated | [Date] Hronis Fruit Company | | Comments: | | |
|---|---|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | | | |
| Cash, cash equivalents, and restricted cash: | $ - | | $ - | $ - | | | | |
| Eligible Accounts receivable: | $ - | | $ - | $ - | | | | |
| Finished Inventories - Grapes: | $ - | | $ - | $ - | | | | |
| Finished Inventories - Citrus: | $ - | | $ - | $ - | | | | |
| Cash Investment Growing Crops - Unfinished Inventory: | $ - | | $ - | $ - | | | | |
| Related Parties: | $ - | | $ - | $ - | | | | |
| Other: | $ - | | $ - | $ - | | | | |
| *Total* | *$ -* | | *$ -* | *$ -* | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **Current Liabilities** | | | | | | | | |
| Operating Loan Outstanding | $ - | | $ - | $ - | | | | |
| AP | $ - | | $ - | $ - | | | | |
| AP - Past Due | $ - | | $ - | $ - | | | | |
| Brokerage Payable | $ - | | $ - | | | | | |
| Grower Payable | $ - | | $ - | $ - | | | | |
| Accrued interest | $ - | | $ - | | | | | |
| MCA Debt: | $ - | | $ - | $ - | | | | |
| Related Party Payables: | $ - | | $ - | $ - | | | | |
| Other: | $ - | | $ - | $ - | | | | |
| *Total* | *$ -* | | *$ -* | *$ -* | | | | |
| | | | | | | | | |
| **Current Position (Deficit)** | *$ -* | | *$ -* | *$ -* | | | | |
| **Current Ratio** | *#DIV/0!* | | *#DIV/0!* | *#DIV/0!* | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | The undersigned hereby certifies that (i) assets reflected herein are owned by the borrower free and clear of any liens, claims, or reservations of title, except those in favor of Conterra Asset Management, (ii) all information contained in the Position Report and its supporting documents are true, correct and complete in all respects as of the date of this certificate, and (iii) that the undersigned is authorized to execute this certificate. | | | | | |
| | | | | | | | | |
| Prepared By: | | | | | | | | |
| Signature: | x | | | | | | | |
| Title | | | | | | | | |
| Date Prepared: | | | | | | | | |

Schedule 1.1(a)

Real Property Collateral No. 1

(Attached)

<u>Schedule 1.1(a)</u>

**Real Property Collateral No. 1**

**THE LAND REFERRED TO HEREIN BELOW IS SITUATED UNINCORPORATED AREA OF TULARE, COUNTY OF TULARE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:**

**TRACT A**

**PARCEL 1: APN: 318-010-002**

The Southwest quarter of the Northwest quarter of Section 26, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom the rights or interest in said land conveyed to the County of Tulare, by deed recorded December 8, 1908 in Book 9, Page 282 of Rights of Way, which deed conveys a strip of land to be used as a public highway over the West 25 feet of the Northwest quarter of said Section 26.

Also Excepting therefrom an undivided one-half of all oil, gas and other hydrocarbon substances in and under said real property and the right to remove the same, as reserved by F.C. Drumm and Dona Mabel Drumm, husband and wife, in deed recorded December 27, 1956 in Book 1965, Page 56 as Document No. 38535 of Official Records.

Also Excepting therefrom an undivided one-fourth of all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved by Lee W. Halverstadt and Dorothy W. Halverstadt, husband and wife, in deed recorded June 30, 1993 as Document No. 93-046030 of Official Records.

Also Excepting therefrom an undivided one-fourth of all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved by Betty Lou Halverstadt, in deed recorded June 30, 1993 as Document No. 93-046031 of Official Records.

**PARCEL 2: APN: 318-020-005**

Lots 1 and 8 of Earlimart Colony Lands, in Section 26, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded March 16, 1908 in Book 8, Page 26 of Maps, in the office of the County Recorder of said County.

Excepting therefrom an undivided one-fourth of all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved by Lee W. Halverstadt and Dorothy W. Halverstadt, husband and wife, in deed recorded June 30, 1993 as Document No. 93-046030 of Official Records.

Also Excepting therefrom an undivided one-fourth of all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved by Betty Lou Halverstadt, in deed recorded June 30, 1993 as Document No. 93-046031 of Official Records.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

**PARCEL 3: APN: 318-020-016**

Parcel 2 of Lot Line Adjustment No. PLA 93-028, in the unincorporated area, County of Tulare, State of California, according to the decision of the Planning and Development Director of the County of Tulare approving Lot Line Adjustment Map No. PLA 93-028, recorded July 29, 1993 as Document No. 93-52969 of Official Records, in the office of the County Recorder of said County, and is described as follows:

Lots 7 and 10 of Earlimart Colony Lands, in Section 26, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded March 16, 1908 in Book 8, Page 26 of Maps, in the office of the County Recorder of said County.

Excepting therefrom the South 200.00 feet of the East 325.00 feet of said Lot 7.

**PARCEL 4: APN: 318-020-011**

A right of way over the South 18 feet of the East three-quarters (3/4) of Lot 2 of Earlimart Colony Lands, in Section 26, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded March 16, 1908 in Book 8, Page 26 of Maps, in the office of the County Recorder of said County.

Parcel 4 is shown for conveyance purposes only, no insurance is hereby offered.

**PARCEL 5: APN: 318-340-001**

The West half of the Northwest quarter of Section 36, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom the South 30 feet thereof, as conveyed to the County of Tulare in deed recorded September 13, 1954 in Book 1777, Page 7 as Document No. 27099 of Official Records.

Also Excepting therefrom the North 40 feet thereof, as conveyed to the County of Tulare, in deed recorded October 25, 1961, in Book 2295, Page 19 as Document No. 33391 of Official Records.

Also Excepting therefrom an undivided one-half interest in all oil, gas and minerals in and under said land, together with the right of the grantor, its successors and assigns, and legal representatives at all times to enter on the above described lands and take all the usual necessary or convenient means to bore wells, make excavations and to remove all the oil, gas and minerals found thereon and herein reserved, as reserved by Bank of America National Trust and Savings Association, a national banking association, in deed recorded December 7, 1934 in Book 600, Page 271 of Official Records.

**PARCEL 6: APN: 318-340-004**

The West 30 acres of the Northeast quarter of the Northwest quarter of Section 36, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom the North 40 feet thereof, as conveyed to the County of Tulare, in deeds recorded July 19, 1961 in Book 2276, Page 418 as Document No. 22864 of Official Records, and July 27, 1961 in Book 2278, Page 184 as Document No. 23847 of Official Records.

Also Excepting therefrom, all gas, oil and other hydrocarbon substances and minerals, together with a reasonable right of ingress and egress to develop and extract the same, as excepted in the Executor's Deed executed by Burnell G. Forgey, as executor of the will of Genevieve Forgey Robinson, deceased, recorded May 4, 1964 in Book 2503, Page 391 as Document No. 16086 of Official Records.

### PARCEL 7: APN: 319-010-008

The Southwest quarter of the Northeast quarter of Section 22, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

### PARCEL 8: APN: 319-010-009

The Northwest quarter of the Northeast quarter Section 22, Township 23, South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half of all oil gas and other hydrocarbon substances within or underlying said land, as reserved by James W. Clark and Mamie S. Clark, husband and wife, as joint tenants, in deed recorded May 17, 1955 in Book 1835, Page 166 as Document No. 17695 of Official Records.

### PARCEL 9: APN: 319-010-010

The East half of the Northeast quarter of Section 22, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom the right, title and interest in and to that portion of said land, described as "that portion
thereof acquired by the United States of America for the Friant-Kern Canal", as disclosed by deeds recorded January 29, 1997 as Document Nos. 97-005601 and 97-005602 of Official Records.

Also Excepting therefrom from the Northeast quarter of the Northeast quarter of said Section 22, one-half interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder, together with, all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property and also the right to drill for, produce and use water from the said real property in connection with its drilling or mining operations thereof, subject to the terms and conditions contained therein, all as reserved by Capitol Company in deed recorded June 19, 1943 in Book 1034, Page 389 of Official Records.

### PARCEL 10: APN: 319-110-009

The East half of the Northwest quarter; and the Southwest quarter of the Northwest quarter of Section 10, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

Excepting therefrom an undivided one-half interest in and to all oil, and/or natural gas underlying said land, together with, the right of ingress and egress to, from said property as may or shall be reasonable or necessary to utilize this exception and reservation and/or to enjoy the benefits thereof and/or to enable exploration for and/or production of such oil and/or natural gas, as reserved by Jim Christiansen in the deed recorded January 29, 1945 in Book 1109, Page 480 of Official Records.

### PARCEL 11: APN: 319-120-010

The Northwest quarter of the Southeast quarter of Section 15, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom as to an undivided one-half interest in and to all oil, gas and minerals in, on or under said property, together with incidental rights, as reserved by Maud Louise Hilliard, also known as Maude Louisa Hilliard, in deed recorded June 20, 1955 in Book 1842, Page 160 as Document No. 21480 of Official Records.

### PARCEL 12: APN: 319-120-011

The Northeast quarter of the Southeast quarter of Section 15, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom the East 40 feet thereof as conveyed to the County of Tulare, in deed recorded July 9, 1954 in Book 1764, Page 369 as Document No. 20675 of Official Records.

Also Excepting therefrom an undivided one-half interest in all minerals, oil, gas, petroleum and other hydrocarbon substances within and underlying said land, as reserved by Gordon R. Todd and Opal R. Todd, husband and wife, in deed recorded April 28, 1978 in Book 3526, Page 962 as Document No. 24201 of Official Records.

### PARCEL 13: APN: 319-120-012

The Southeast quarter of the Southeast quarter of Section 15, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom that portion thereof conveyed to the United States of America For Friant-Kern Canal purposes, in deed recorded March 31, 1948 in Book 1294, Page 596 of Official Records.

Also Excepting therefrom that portion thereof conveyed to the United States of America for Friant Kern Canal purposes, in deed recorded November 16, 1949 in Book 1399, Page 310 of Official Records.

Also Excepting therefrom the East 40 feet thereof as conveyed to the County of Tulare, in deed recorded August 6, 1954 in Book 1770, Page 115 as Document No. 23456 of Official Records.

Also Excepting therefrom that portion thereof conveyed to Saucelito Irrigation District, in deed recorded October 28, 1960 in Book 2223, Page 109 as Document No. 31972 of Official Records.

Also Excepting therefrom an undivided 5% of all minerals, oil, gas, gasoline or other hydrocarbon substances on, in and under said land as granted by Carrie M. Broaded to George D. Broaded, in the Mineral Deed recorded March 14, 1955 in Book 1819, Page 123 as Document No. 9544 of Official Records.

**PARCEL 14: APN: 319-120-014**

The Southwest quarter of the Southeast quarter Section 15, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half interest in all minerals, oil, gas petroleum and other hydrocarbon substances within or underlying said land, as reserved by George W. Wiseman, in deed recorded October 30, 1952 in Book 1629, Page 110 as Document No. 29418 of Official Records.

Also Excepting therefrom an undivided one-quarter interest in all minerals, oil, gas, petroleum and other hydrocarbon substances within and underlying said land, as reserved by Henry L. Lubking and August M. Lubking, husband and wife, in deed recorded April 28, 1978 in Book 3526, Page 959 as Document No. 24199 of Official Records.

**PARCEL 15: APN: 319-130-007, 012 and 013**
PART 1:

That portion of fractional Section 1, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof, lying West of the Westerly line of the Friant-Kern Canal right of way as granted to the United States of America, by deed recorded April 12, 1948 in Book 1289, Page 154 of Official Records.

Excepting therefrom that portion thereof granted to Saucelito Irrigation District, by deed recorded May 27, 1960 in Book 2197, Page 637 as Document No. 17083 of Official Records, described as follows:

Beginning, at the intersection of the Friant-Kern Canal center line and the South line of said Section 1;
thence, North 89° 42' West for a distance of 160.8 feet;
thence, North 33° 15' East for a distance of 48.9 feet to the true point of beginning;
thence, North 33° 15' East for a distance of 125.0 feet;
thence, North 56° 45' West for a distance of 50.0 feet;
thence, South 33° 15' West for a distance of 159.6 feet;
thence, North 88° 36' East for a distance of 60.8 feet to the true point of beginning.

Also Excepting the rights or interest conveyed to the County of Tulare, in deed recorded September 24, 1948 in Book 1311, Page 180 of Official Records, which deed conveys the North 40 feet of said land for the purpose of a public highway.

Also Excepting therefrom that portion thereof described as follows:

Beginning at a point in the South line of said Section 1, distant 699.60 feet East of the Southwest corner thereof, said point being the Southwest corner of the parcel of land conveyed to the United States of America for the Friant-Kern Canal right of way by deed recorded April 12, 1948 in Book 1289, Page 154 of Official Records;
thence, North 00° 18' East 25 feet;

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

thence, North 88° 36' East 540.9 feet;
thence, North 33° 15' East 183.52 feet to the true point of beginning of the parcel herein to be described;
thence, North 02° 22' East 2,457.75 feet to a point in the North line of the South half of said Section 1;
thence, South 89° 31' 30" East, along said last mentioned North line, 1,542.83 feet to a point in the Easterly line of Parcel "A" of the land conveyed to George S. Maze and wife by deed recorded July 9, 1959 in Book 2135, Page 196 as Document No. 22184 of Official Records;
thence, along said Easterly line South 33° 41' West 1977.96 feet to an angle point therein;
thence, South 26° 44' West 125.9 feet;
thence, South 33° 15' West 900 feet;
thence, North 02° 22' East 68.19 feet to the true point of beginning.

Also Excepting that portion thereof described as follows:

Beginning, at a point in Southerly boundary of said Section 1, distant therealong South 89° 42' East 699.6 feet from the Southwest corner of said Section 1;

thence, along said Southerly boundary North 89° 42' West 525.0 feet;
thence, leaving said Southerly boundary North 00° 18' East 25.0 feet to a point in the Northerly boundary of the county road right of way;
thence, North 89° 29' East 1005 feet to a point in the Northwesterly boundary a certain tract of land as conveyed to the United States of America by deed recorded in Book 1289 Page 154, of Official Records, said point also being the most Southwesterly corner of that certain tract of land as conveyed to the Saucelito Irrigation District by deed dated February 5, 1960, and recorded May 27, 1960 in Book 2197, Page 637 as Document No. 17083 of Official Records;
thence, along said Northwesterly boundary as follows:
South 88° 36' West 480.1 feet;
thence, South 00° 18' West 25.0 feet to the point of beginning.

Also Excepting therefrom an undivided one-half interest in and to all oils, gas, petroleum, casinghead gas or other hydrocarbon substances, together with minerals or either or all of them situated and being or to be found or discovered in, on or under or above any portion of the above described real property, together with, the right on behalf of C.L. Crow and Mildred B. Crow, his wife, their successors, heirs or assigns, to enter into, upon, or about and above the above described real property for the purpose of exploring, drilling, mining, storing or removing the same or any part thereof from the above described real property, as reserved by C.L. Crow and Mildred B. Crow, his wife, in deed to George S. Maze and Sheila S. Maze, his wife, as community property, recorded October 3, 1956 in Book 1951, Page 24 as Document No. 30786 of Official Records, and being the same undivided one-half interest in and to said substances, as reserved by C.L. Crow and Mildred B. Crow, his wife, in the Agreement of Sale dated January 4, 1952, recorded January 17, 1952 in Book 1563, Page 289 as Document No. 1591 of Official Records.

Also Excepting therefrom an undivided one-fourth interest in and to all oil, gas, petroleum, casinghead gas or other hydrocarbon substances together with, minerals or either or all of them situated and being or to be found or discovered in, on or under or above any portion of the above described real property, together with, the right on behalf of Dean A. Pearce and Verda Lee Pearce, his wife, their successors, heirs or assigns, to enter into, upon, about and above, the above described real property, for the purposes of exploring, drilling, mining, storing or removing the same or any part thereof, from the above described real property, all as reserved by Dean A. Pearce and Verda Lee Pearce, in deed recorded October 3, 1956 in Book 1951, Page 24 as Document No. 30786 of Official Records.

Also Excepting from the South 30 acres, lying West of the Friant-Kern Canal right of way in said Section 1, all oils, gas, petroleum, casinghead gas or other hydrocarbon substances, together with, minerals or either or all of them, situated and being or to be found or discovered in, on or under a portion of the above described real property, together with, rights incidental to the development thereof, as reserved by George S. Maze and Sheila S. Maze, his wife, in the instrument entitled Declaration of Trust (deed), recorded March 1, 1957 in Book 1979, Page 720 as Document No. 7226 of Official Records.

Excepting from all of said land, except the South 30 acres thereof, seventy-five percent of the minerals, such minerals to include but not be limited to oil, gas, casinghead gas, associated hydrocarbons, coal, lignite, sulphur, phosphate, lead, zinc, copper, iron ore and other metallic ores, sodium, salt, uranium, thorium, molybdenum, vanadium, geothermal energy, titanium and other fissionable materials, gold, silver (and other precious metals), bauxite, limestone and other stones, gypsum and other minerals (sand, gravel and clay being the only exceptions) now owned or hereafter acquired by party of the first part in, on or under the real property, together with, full rights of ingress and egress and use of the surface to the extent reasonably necessary for the purpose of exploring, drilling, mining (including, to the extent reasonable in the circumstances, open pit and strip mining), developing, producing, storing, removing, treating and transporting said materials, all as reserved by The Travelers Insurance Company, in Quit Claim Deed recorded November 28, 1988 in Book 4774, Page 156, as Document No. 74413 of Official Records.

PART 2:

A strip of land lying adjacent to the Friant-Kern Canal in fractional Section 1, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof, being a portion of the 44.7 acre parcel of land described in the deed to the United States of America recorded April 12, 1948 in Book 1289, Page 154 of Official Records, said portion being described as Parcel "A" in the deed executed by the United States of America, recorded July 9, 1959 in Book 2135, Page 196 as Document No. 22184 of Official Records, described as follows:

Beginning, at a point in the Northwesterly boundary of said 44.7 acre parcel distant South 60° 23' West 45.8 feet from a point in the Easterly boundary of said Section 1, that is distant therealong South 00° 23' West 157.3 feet from the Northeast corner of said Section 1;
thence, from said point of beginning entering said 44.7 acre parcel South 67.1 feet;
thence, South 60° 38' West 746.8 feet;
thence, South 55° 17' West 329.8 feet;
thence, South 46° 00' West 819.8 feet;
thence, North 74° 36' West 69.5 feet;
thence, South 45° 39' West 70.0 feet;
thence, South 15° 24' East 69.5 feet;
thence, South 44° 49' West 342.5 feet;
thence, South 39° 41' West 228.7 feet;
thence, South 33° 41' West 2855.2 feet;
thence, South 26° 44' West 125.9 feet;
thence, South 33° 15' West 900.0 feet;
thence, North 56° 45' West 35.0 feet to the Northwesterly boundary of said 44.7 acre parcel;
thence, along said Northwesterly boundary as follows:

North 33° 15' East 1400.0 feet;
thence, North 34° 12' East 600.1 feet;

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

thence, North 32° 32' East 800.0 feet;
thence, North 33° 36' East 1080.3 feet;
thence, North 42° 08' East 235.1 feet;
thence, North 34° 09' East 1053.6 feet;
thence, South 44° 21' East 195.0 feet;
thence, North 45° 39' East 302.7 feet;
thence, North 58° 02' East 906.7 feet;
thence, North 60° 23' East 180.0 feet to the point of beginning,

Excepting therefrom that portion thereof described as follows:

Beginning at a point in the South line of said Section 1, distant 699.60 feet East of the Southwest corner thereof, said point being the Southwest corner of the parcel of land conveyed to the United States of America for the Friant-Kern Canal right of way by deed recorded April 12, 1948 in Book 1289, Page 154 of Official Records;
thence, North 00° 18" East 25 feet;
thence, North 88° 36' East 540.9 feet;
thence, North 33° 15' East 183.52 feet to the true point of beginning of the parcel herein to be described;
thence, North 02° 22' East 2,457.75 feet to a point in the North line of the South half of said Section 1;
thence, South 89° 31' 30" East, along said last mentioned North line 1,542.83 feet to a point in the Easterly line of Parcel "A" of the land conveyed to George S. Maze and wife by deed recorded July 9, 1959 in Book 2135, Page 196 as Document No. 22184 of Official Records;
thence, along said Easterly line South 33° 41' West 1,977.96 feet to an angle point therein;
thence, South 26° 44' West 125.9 feet;
thence, South 33° 15' West 900 feet;
thence, North 02° 22' East 68.19 feet to the true point of beginning.

Also Excepting therefrom seventy-five percent of the minerals, such minerals to include but not be limited to oil, gas, casinghead gas, associated hydrocarbons, coal, lignite, sulphur, phosphate, lead, zinc, copper, iron ore and other metallic ores, sodium, salt, uranium, thorium, molybdenum, vanadium, geothermal energy, titanium and other fissionable materials, gold, silver (and other precious metals), bauxite, limestone and other stones, gypsum and other minerals (sand, gravel and clay being the only exceptions) now owned or hereafter acquired by party of the first part in, on or under the real property, together with, full rights of ingress and egress and use of the surface to the extent reasonably necessary for the purpose of exploring, drilling, mining (including, to the extent reasonable in the circumstances, open pit and strip mining), developing, producing, storing, removing, treating and transporting said materials, all as reserved by The Travelers Insurance Company, in the Quit Claim Deed recorded November 28, 1988 in Book 4774, Page 156 as Document No. 74413 of Official Records.

PART 3:

That portion of the South half of fractional Section 1, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof, created in the deed recorded February 17, 1972 in Book 3017, Page 342 as Document No. 6826 of Official Records, described as follows:

Beginning at a point in the South line of said Section 1, distant 699.60 feet East of the Southwest corner thereof, said point being the Southwest corner of the parcel of land conveyed to the United States of America, for the Friant-Kern Canal right of way by deed recorded April 12, 1948 in Book 1289, Page 154 of Official Records;

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

thence, North 00° 18' East 25 feet;
thence, North 88° 36' East 540.9 feet;
thence, North 33° 15' East 183.52 feet to the true point of beginning of the parcel herein to be described;
thence, North 02° 22' East 2457.75 feet to a point in the North line of the South half of said Section 1;
thence, South 89° 31' 30" East, along said last mentioned North line, 1542.83 feet to a point in the Easterly line of Parcel "A" of the land conveyed to George S. Maze and wife, by deed recorded July 9, 1959 in Book 2135, Page 196 as Document No. 22184 of Official Records;
thence, along said Easterly line, South 33° 41' West 1977.96 feet to an angle point therein;
thence, South 26° 44' West 125.9 feet;
thence, South 33° 15' West 900 feet;
thence, North 02° 22' East 68.19 feet to the true point of beginning.

Also Excepting therefrom an undivided one-half interest in and to all oils, gas, petroleum, casinghead gas or other hydrocarbon substances, together with minerals or either or all of them situated and being or to be found or discovered in, on or under or above any portion of the above described real property, together with, the right on behalf of C.L. Crow and Mildred B. Crow, his wife, their successors, heirs or assigns, to enter into, upon, or about and above the above described real property for the purpose of exploring, drilling, mining, storing or removing the same or any part thereof from the above described real property, as reserved by C.L. Crow and Mildred B. Crow, his wife, in deed to George S. Maze and Sheila S. Maze, his wife, as community property, recorded October 3, 1956 in Book 1951, Page 24 as Document No. 30786 of Official Records, and being the same undivided one-half interest in and to said substances, as reserved by C.L. Crow and Mildred B. Crow, his wife, in the Agreement of Sale dated January 4, 1952, recorded January 17, 1952 in Book 1563, Page 289 as Document No. 1591 of Official Records.

Also Excepting therefrom all oil, gas and other hydrocarbon substances and minerals lying in, upon or under, or which may be produced, save or sold from real property, with the right of reasonable ingress and egress and all rights necessary and incidental to drilling for and removing such oil, gas and other hydrocarbon substances and minerals therefrom, and subject to all reservations of oil, gas and other hydrocarbon substances and minerals heretofore made by grantor's predecessors in title, all as reserved by S.A. Camp Ginning Company, a California corporation in the deed recorded January 16, 1970 in Book 2876, Page 391 as Document No. 1730 of Official Records.

### PARCEL 16: APN: 338-080-015

The Northwest quarter of Section 30, Township 24 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, to the Official Plat thereof.

Excepting therefrom that portion of the Northwest quarter of said Section 30 described as follows:

Beginning, at the Southwest corner of said Northwest quarter;
thence, East, along the South line of said Northwest quarter, a distance of 2654.66 feet, more or less, to the Southeast corner of said Northwest quarter;
thence, North, along the East line of said Northwest quarter, a distance of 35.0 feet;
thence, Westerly parallel to the South line of the Northwest quarter, a distance of 21.7 feet;
thence, Northerly parallel to the East line of the Northwest quarter, a distance of 4.0 feet;
thence, West 2632.96 feet, more or less, to a point on the West line of said Northwest quarter, said point being 40.0 feet North of the Southwest corner of said Northwest quarter;
thence, South 40.0 feet to the point of beginning.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

## PARCEL 17: APN: 338-080-014

Lots 6 and 8 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded June 8, 1914 in Book 15, Page 6 of Maps, in the office of the County Recorder of said County.

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

## PARCEL 18: APN: 338-080-037

Lots 2 and 4 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded June 8, 1914 in Book 15, Page 6 of Maps, in the office of the County Recorder of said County, together with, that portion of the Northwest quarter of Section 30, Township 24 South, Range 26 East, Mount Diablo Base and Meridian, in the County of Tulare, State of California, according to the Official Plat thereof described as follows:

Beginning, at the Southwest corner of said Northwest quarter;
thence, East, along the South line of said Northwest quarter, a distance of 2654.66 feet, more or less, to the Southeast corner of said Northwest quarter;
thence, North, along the East line of said Northwest quarter, a distance of 35.0 feet;
thence, Westerly parallel to the South line of the Northwest quarter, a distance of 21.7 feet;
thence, Northerly parallel to the East line of the Northwest quarter, a distance of 4.0 feet;
thence, West 2632.96 feet, more or less, to a point on the West line of said Northwest quarter, said point being 40.0 feet North of the Southwest corner of said Northwest quarter;
thence, South 40.0 feet to the point of beginning,

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons

in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for

any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

**PARCEL 19: APN: 338-080-038**

Lots 1 and 3 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded June 8, 1914 in Book 15, Page 6 of Maps, in the office of the County Recorder of said County.

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

Also Excepting therefrom an undivided one-fourth interest of the fifty percent defined therein in all oil, gas, minerals and other hydrocarbon substances in, upon or under Lots 1 and 3 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, or any portion thereof and the right to prospect for the same and to drill for and to produce and take away the same together with the night at all times to enter upon said lands for the abovementioned purposes with due regard to the use of the same by the grantees, their heirs, successors or assigns, as reserved by Kosta James Hronis, a married man as his sole and separate property, and Peter John Hronis, a married man as his sole and separate property, formerly as joint tenants now as tenants in common, in Quitclaim Deed recorded November 7, 2016 as Document No. 2016-0070603 of Official Records.

Also Excepting therefrom an undivided one-fourth interest of the fifty percent defined therein in all oil, gas, minerals and other hydrocarbon substances in, upon or under Lots 1 and 3 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, or any portion thereof and the right to prospect for the same and to drill for and to produce and take away the same together with the night at all times to enter upon said lands for the abovementioned purposes with due regard to the use of the same by the grantees, their heirs, successors or assigns, as reserved by Hronis Capital Management, LLC, in Quitclaim Deed recorded November 7, 2016 as Document No. 2016-0070604 of Official Records.

**PARCEL 20: APN: 338-080-039**

Lots 5 and 7 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded June 8, 1914 in Book 15, Page 6 of Maps, in the office of the County Recorder of said County.

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for

any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

### PARCEL 21A: INTENTIONALLY DELETED

### PARCEL 21B: INTENTIONALLY DELETED

### PARCEL 21C: INTENTIONALLY DELETED

### PARCEL 22: APN: 339-140-002

The Northwest quarter of the Northwest quarter of the Northwest quarter of Section 27, and that portion of the North half of Section 27, Township 24 South, Range 27 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof, described as follows:

Beginning at the Northeast corner of the Northwest quarter of the Northwest quarter of the Northwest quarter of said Section 27; thence, South along the East line of the West half of the West half of the Northwest quarter of said Section 27, 1390.4 feet;
thence, East parallel with the North line of said Section 27, 2978.45 feet;
thence, North 1390.4 feet to the North line of said Section 27;
thence, West along said North line, 990 feet to the Northeast corner of the Northwest quarter of said Section 27;
thence, continuing West along said North line 1988 45 feet to the place of beginning.

Excepting therefrom the West 55 feet of the Northwest quarter of the Northwest quarter of the Northwest quarter, as conveyed to the State of California, in deed recorded April 28, 1945 in Book 1121, Page 248 of Official Records.

Also Excepting therefrom all oil, gas, minerals, geothermal and other hydrocarbon substances in and under said land, as reserved by Treecrop Company, a limited partnership in the deed recorded April 27, 1979 in Book 3647,Page 97 as Document No. 24614 of Official Records.

### PARCEL 23-54: INTENTIONALLY DELETED.

### TRACT B

### THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA, COUNTY OF TULARE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

### PARCEL 1-29: INTENTIONALLY DELETED

### PARCEL 30: APN: 320-200-074-000:

PARCEL 1 OF PARCEL MAP NO. PPM 14-050, IN THE UNINCORPORATED AREA OF THE COUNTY OF TULARE, STATE OF CALIFORNIA ACCORDING TO RESOLUTION 9058,

RECORDED MAY 5, 2015, AS DOCUMENT NO. 2015-0023758, OF OFFICIAL RECORDS, AND DESCRIBED AS FOLLOWS:

THAT PORTION OF THE SOUTHWEST QUARTER OF FRACTIONAL SECTION 2, TOWNSHIP 23 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING, AT THE SOUTHEAST CORNER OF THE WEST HALF OF THE WEST HALF OF SAID SOUTHWEST QUARTER;
THENCE, NORTH 0°32'10" EAST 1272.30 FEET ALONG THE EAST LINE OF SAID WEST HALF OF THE WEST HALF OF SAID SOUTHWEST QUARTER;
THENCE, SOUTH 89°22'59" EAST 969.20 FEET;
THENCE, SOUTH 00°29'44" WEST 1268.10 FEET TO THE SOUTH LINE OF SAID SOUTHWEST QUARTER;
THENCE, SOUTH 89°37'52" EAST 970.10 FEET TO THE POINT OF BEGINNING.

**PARCEL 31: INTENTIONALLY DELETED**

**PARCEL 32: INTENTIONALLY DELETED**


**TRACT C**

**THE LAND REFERRED TO HEREIN BELOW IS SITUATED UNINCORPORATED AREA OF TULARE, COUNTY OF TULARE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:**

**PARCEL 1-7: INTENTIONALLY DELETED**

**PARCEL 8: APN: 320-230-033-000:**

PARCEL 1 OF RECORD OF SURVEYS OF LOTS 88 AND 97 OF TERRA BELLA LANDS, SUBDIVISION NO. 5, IN THE UNINCORPORATED AREA OF THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF RECORDED JANUARY 26, 1960, IN BOOK 9, PAGE 55 OF LICENSED SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. SAID TERRA BELLA LANDS, SUBDIVISION NO. 5 RECORDED IN VOLUME 8, PAGE 15 OF MAPS.

**PARCEL 9: APN: 320-230-082-000:**

PARCEL 1 OF LOT LINE ADJUSTMENT MAP NO. PLA 10-015, IN THE UNINCORPORATED AREA OF THE COUNTY OF TULARE, STATE OF CALIFORNIA ACCORDING TO THE INSTRUMENT RECORDED DECEMBER 1, 2011, AS DOCUMENT NO. 2011-0074944, OF OFFICIAL RECORDS, DESCRIBED AS FOLLOWS:

PARCEL 2 OF PARCEL MAP NO. 2539 PER MAP RECORDED IN BOOK 26, PAGE 40 OF PARCEL MAPS IN THE OFFICE OF THE COUNTY RECORDER, COUNTY OF TULARE, STATE OF CALIFORNIA AND PARCEL 3 OF RECORD OF SURVEY PER MAP RECORDED IN BOOK 9,

PAGE 55 OF LICENSED SURVEYS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM, THE SOUTH 167.00 FEET OF SAID PARCEL 3

**PARCEL 10A: APN: 339-110-007 PORTION**

THE SOUTH 40 ACRES OF THE SOUTHWEST QUARTER; AND THE WEST 990 FEET OF THE SOUTH 40 ACRES OF THE SOUTHEAST QUARTER OF SAID SECTION 22, TOWNSHIP 24 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE WEST 55 FEET THEREOF, AS CONVEYED TO THE STATE OF CALIFORNIA, IN DEED RECORDED APRIL 28, 1945 IN BOOK 1121, PAGE 248 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS, MINERALS, GEOTHERMAL AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY TREECROP COMPANY, A LIMITED PARTNERSHIP IN THE DEED RECORDED APRIL 27, 1979 IN BOOK 3647, PAGE 97 AS DOCUMENT NO. 24614 OF OFFICIAL RECORDS.

**PARCEL 10B: APN: 339-110-007 PORTION**

LOTS 20, 27, 28, AND 37 OF G.A. HART'S SUBDIVISION NO 1, IN THE UNINCORPORATED AREA, COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF RECORDED JULY 3, 1912 IN BOOK 12, PAGE 1 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THE WEST 30 FEET OF SAID LOTS 20, 28, AND 37, AS CONVEYED TO THE STATE OF CALIFORNIA, IN THE FINAL ORDER OF CONDEMNATION, RECORDED JUNE 21, 1945 IN BOOK 1128, PAGE 103 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS, MINERALS, GEOTHERMAL AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY TREECROP COMPANY, A LIMITED PARTNERSHIP IN THE DEED RECORDED APRIL 27, 1979 IN BOOK 3647, PAGE 97 AS DOCUMENT NO. 24614 OF OFFICIAL RECORDS.

**PARCEL 10C: APN: 339-110-007 PORTION**

THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 22, TOWNSHIP 24 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE WEST 55 FEET THEREOF, AS CONVEYED TO THE STATE OF CALIFORNIA, IN THE FINAL ORDER OF CONDEMNATION, RECORDED JUNE 21, 1945 IN BOOK 1128, PAGE 103 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS, MINERALS, GEOTHERMAL AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY TREECROP COMPANY, A LIMITED PARTNERSHIP IN THE DEED RECORDED APRIL 27, 1979 IN BOOK 3647, PAGE 97 AS DOCUMENT NO. 24614 OF OFFICIAL RECORDS.

**PARCEL 11: APN: 339-140-002**

THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SECTION 27, AND THAT PORTION OF THE NORTH HALF OF SECTION 27, TOWNSHIP 24 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 27; THENCE, SOUTH ALONG THE EAST LINE OF THE WEST HALF OF THE WEST HALF OF THE NORTHWEST QUARTER OF SAID SECTION 27, 1390.4 FEET; THENCE, EAST PARALLEL WITH THE NORTH LINE OF SAID SECTION 27, 2978.45 FEET; THENCE, NORTH 1390.4 FEET TO THE NORTH LINE OF SAID SECTION 27; THENCE, WEST ALONG SAID NORTH LINE, 990 FEET TO THE NORTHEAST CORNER OF THE NORTHWEST QUARTER OF SAID SECTION 27; THENCE, CONTINUING WEST ALONG SAID NORTH LINE 1988 45 FEET TO THE PLACE OF BEGINNING.

EXCEPTING THEREFROM THE WEST 55 FEET OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER, AS CONVEYED TO THE STATE OF CALIFORNIA, IN DEED RECORDED APRIL 28, 1945 IN BOOK 1121, PAGE 248 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS, MINERALS, GEOTHERMAL AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY TREECROP COMPANY, A LIMITED PARTNERSHIP IN THE DEED RECORDED APRIL 27, 1979 IN BOOK 3647, PAGE 97 AS DOCUMENT NO. 24614 OF OFFICIAL RECORDS.

Schedule 1.1(b)

Real Property Collateral No. 2

(Attached)

**Schedule 1.1(b)**

=

**Real Property Collateral No. 2**

**THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA OF KERN, COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:**

**TRACT A**

**PARCEL 1-22: INTENTIONALLY DELETED.**

**PARCEL 23: APN: 049-020-06-01**

The West half of the Northwest quarter of fractional Section 3, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half of all oil, gas, hydrocarbons, and other mineral rights, as reserved by L.R. Billings, as Executor of the Will of Elmer W. Harris, deceased, in deed recorded November 5, 1958 in Book 3031, Page 64 as Document No. 61974 of Official Records.

Also Excepting therefrom an undivided one-fourth of all the oil, gas, hydrocarbons and other minerals, as reserved by Elva Dau Say who acquired title as Elva Dau, in deed recorded December 29, 1977 in Book 5078, Page 557 as Document No. 60741 of Official Records.

**PARCEL 24: APN: 049-020-18**

The East half of Section 4, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom the South 2377.00 feet thereof.

Also Excepting therefrom all that portion lying within the land described in Parcel One in the deed to The United States of America, recorded June 29, 1950 in Book 1689, Page 374 as Document No. 26906 of Official Records, described as follows:

Beginning, at the North quarter corner of said Section 4 and running thence along the Northerly boundary of said Section 4, South 89° 58' East 354.8 feet;
thence, leaving said boundary and running South 00° 03' East 1546.7 feet;
thence, South 01° 23' West 1000.3 feet;
thence, South 00° 31' West 1000.1 feet;
thence, South 01° 52' West 600.3 feet;
thence, South 00° 26' West 600.00 feet;
thence, South 03° 41' West 536.1 feet;
thence, South 00° 03' East 33.7 feet to a point in the Southerly boundary of said Section 4, distant there along South 89° 57' East 258.3 feet from the South quarter corner of said Section 4; thence running along said Southerly boundary North 89° 57' West 258.3 feet to the South quarter corner of said Section 4;

thence, running along the West boundary of the East half of said Section 4 North 00° West 5315.3 feet to the point of beginning.

Also Excepting therefrom all oil, gas and minerals in said land, and the right to drill for, mine and remove the same, together with such rights to the use of the surface and rights of ingress and egress as may be necessary to drill for, mine and remove the same, as reserved by Di Giorgio Fruit Corporation, a Delaware corporation, in deed recorded March 31, 1944 in Book 1187, Page 109 of Official Records.

## PARCEL 25: APN: 049-020-19

The South 2377.00 feet of the East half of Section 4, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom all that portion lying within the land described in Parcel One and Parcel Two, in deed to The United States of America, recorded June 29, 1950 in Book 1689, Page 374 as Document No. 26906 of Official Records, described as follows:

"Parcel One":
Beginning at the North quarter corner of said Section 4 and running thence along the Northerly boundary of said Section 4, South 89° 58' East 354.8 feet;
thence, leaving said boundary and running South 00° 03' East 1546.7 feet;
thence, South 01° 23' West 1000.3 feet;
thence, South 00° 31' West 1000.1 feet;
thence, South 01° 52' West 600.3 feet;
thence, South 00° 26' West 600.00 feet;
thence, South 03° 41' West 536.1 feet;
thence, South 00° 03' East 33.7 feet to a point in the Southerly boundary of said Section 4, distant there along South 89° 57' East 258.3 feet from the South quarter corner of said Section 4; thence running along said Southerly boundary North 89° 57' West 258.3 feet to the South quarter corner of said Section 4; thence, running along the West boundary of the East half of said Section 4 North 00° West 5315.3 feet to the point of beginning.

"Parcel Two":
Beginning at a point in the Southerly boundary of said Section 4, distant there along South 89° 57' East 258.3 feet from the South quarter corner of said Section 4;
thence, running along the Easterly boundary of said Parcel 1 North 00° 03' West 33.7 feet;
thence, leaving said boundary and running South 89° 32' East 513.0 feet;
thence, South 00° 03' West 30.0 feet to a point in the Southerly boundary of said Section 4 distant therealong South 89° 57' East 771.3 feet from the South quarter corner of said Section 4;
thence, running along said Southerly boundary North 89° 57' West 513.0 feet to the point of beginning

Also Excepting therefrom all oil, gas and minerals in said land, and the right to drill for, mine and remove the same, together with such rights to the use of the surface and rights of ingress and egress as may be necessary to drill for, mine and remove the same, as reserved by Di Giorgio Fruit Corporation, a Delaware corporation, in deed recorded March 31, 1944 in Book 1187, Page 109 of Official Records.

## PARCEL 26: APN: 049-240-01-01

The Northwest quarter of the Northwest quarter of Section 15, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half of all oil, gas, gasoline, casinghead gas and/or other hydrocarbon substances and/or minerals in and under said land, as reserved by Charles O. LaRue and Violet LaRue, husband and wife, in deed recorded December 19, 1941 in Book 1073, Page 426 of Official Records.

**PARCEL 27: APN: 049-240-02-01**

The Northeast quarter of the Northwest quarter of Section 15, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half of all oil, gas and minerals in and under said land, as excepted by W.J. Wallace and Company, a corporation, in deed recorded December 2, 1941 in Book 1065, Page 212 of Official Records, and as ratified and confirmed by the deed recorded April 27, 1942 in Book 1082, Page 256 of Official Records.

PARCEL 28A: APN: 050-130-06 PORTION

Lots 5 and 8 of Hollywood Tract, in the unincorporated area, County of Kern, State of California, according to the map thereof recorded June 12, 1909 in Book 1, Page 113, of Maps, in the office of the County Recorder of said County.

Excepting therefrom that portion of said Lot 5, described as follows:
Beginning at the Northeast corner of said Lot 5;
thence, South along the East line of said Lot 5, a distance of 533 feet and the true point of beginning of this description;
thence, West at right angles to the East line, a distance of 130 feet;
thence, South and parallel to the East line of said Lot 5, a distance of 115 feet;
thence, East to the East line of said Lot 5;
thence, North along the East line of said Lot 5, a distance of 115 feet and the true point of beginning.

Also Excepting therefrom an undivided one-half of all minerals, oil, gas and other hydrocarbon substances within or underlying said land, as excepted by Philip Stone Briggs and Gertie Leona Briggs, husband and wife, in deed recorded February 9, 1966 in Book 3917, Page 488 as Document No. 07052 of Official Records.

**PARCEL 28B: APN: 050-130-06 portion**

That portion of Lot 5 of Hollywood Tract, in the unincorporated, County of Kern, State of California, according to the map thereof recorded June 12, 1909 in Book 1, Page 113, of Maps, in the office of the County Recorder of said County, described as follows:

Beginning at the Northeast corner of said Lot 5;
thence, South along the East line of said Lot 5, a distance of 533 feet and the true point of beginning of this description;
thence, West at right angles to the East line, a distance of 130 feet;

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

thence, South and parallel to the East line of said Lot 5, a distance of 115 feet;
thence, East to the East line of said Lot 5;
thence, North along the East line of said Lot 5, a distance of 115 feet and the true point of beginning.

Excepting therefrom an undivided one-half of all minerals, oil, gas and other hydrocarbon substances within or underlying said land, as excepted in the deed executed by Philip Stone Briggs and Gertie Leona Briggs, husband and wife, recorded February 9, 1966, in Book 3917, Page 490 as Document No. 07053 of Official Records.

### PARCEL 29: APN: 051-110-29

The Northeast quarter of Section 21, Township 25 South, Range 27 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half of all minerals and mineral rights of every kind and character (except water and water rights) now known to exist or hereafter discovered, including without limiting the generality of the foregoing oil, gas and rights thereto, together with the sole, exclusive and perpetual right to explore for, remove and dispose of said minerals by any means or methods suitable to grantor, its successors and assigns, but without entering upon or using the surface of said land herein described or any portion of the subsurface within 500 feet of the surface of said land, as reserved by Ernest Gaillard, Jr. and Mignonne Nash Gaillard, husband and wife, as joint tenants, in deed recorded December 31, 1981 in Book 5428, Page 1002 as Document No. 063620 of Official Records.

### PARCEL 30: INTENTIONALLY DELETED

### PARCEL 31: INTENTIONALLY DELETED

### PARCEL 32: APN: 178-190-04

The North half of the Southeast quarter of Section 26, Township 30 South, Range 29 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom, an undivided two-twenty-fifths (2/25ths) of all minerals, mineral deposits, oil, gas, natural gases, and any other hydrocarbon substances, in, to, being and lying under said land, as conveyed to H.E. Schmidt, in deed recorded April 17, 1937, in Book 715, Page 374 of Official Records.

Also Excepting therefrom all minerals, mineral deposits, oil, gas, natural gases and other hydrocarbon substances in, to, being and lying under said land, as reserved by Violante Weichelt, Trustor and Trustee under that Declaration of Trust dated April 17, 1968, in the deed recorded September 22, 1976 in Book 4979, Page 1657 as Document No. 23989 of Official Records.

### PARCEL 33: APN: 189-390-08, 09, 10, 11 & 12

Parcels 8, 9, 10, 11, and 12 of Parcel Map No. 6680, in the unincorporated area, County of Kern, State of California, according to the map recorded May 20, 1983 in Book 29, Pages 123 & 124 of Parcel Maps, in the office of the County Recorder of said County.

Excepting therefrom an undivided one-half interest in all oil, gas and other hydrocarbon substances and all other minerals and related substances contained within or underlying said land, lying below a plane 500 feet below and parallel to the surface thereof, grantor shall have no right to enter upon the surface or the area lying between the surface and the plane 500 feet below, or any part thereof, in connection with prospecting for or exploitation of said reserved minerals or for any other purpose, as reserved by Di Giorgio Corporation, a Delaware corporation, formerly Di Giorgio Fruit Corporation, a corporation, successor to Earl Fruit Company, in deed recorded April 16, 1969 in Book 4268, Page 148 as Document No. 25261 of Official Records.

Also Excepting therefrom the undivided interest(s) in and to all oil, gas, minerals and other hydrocarbon substances and mineral rights and interest, as reserved and conveyed in the deed executed by R. and B. Ranches, a partnership and Roberts Farms, Inc., in deed recorded January 13, 1978 in Book 5082, Page 396 as Document No. 3760 of Official Records.

**PARCEL 34: APN: 193-120-04-01**

The Southeast quarter of Section 25, Township 31 South, Range 29 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom 29.86112% of 100% of all oil, mineral, gas and other hydrocarbon substances thereunder, as reserved unto the heirs or devisees of Harold Evans Woodworth, in the Co-Executors' Deed recorded March 21, 1972 in Book 4654, Page 927 as Document No. 25139 of Official Records.

Also Excepting therefrom 20.13888% of 100% of all oil, mineral, gas and other hydrocarbon substances thereunder, as reserved by Mamie Barlow Woodworth and Bank of America National Trust and Savings Association, a national banking association, as co-executors of the estate of Julia L. Barlow, deceased, in the Co-Executors' Deed recorded March 21, 1972 in Book 4654, Page 930 as Document No. 25140 of Official Records.

**PARCEL 35: INTENTIONALLY DELETED**

**PARCEL 36: APN: 050-010-01**

The West half of the Northwest quarter of Section 23, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California according to the Official Plat thereof.

**PARCEL 37: APN: 050-030-25**

Lot 'A' of Lot Line Adjustment No. 61-08, recorded March 31, 2010 as Document No. 0210042563 of Official Records, being a portion of the North half of Section 23, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, being more particularly described as follows:

All that portion of Parcel 3 of Document No. 0197071338 of Official Records, together with Document No. 0200034167 of Official Records, recorded in the office of the Kern County Recorder.

Excepting therefrom the following described portion:

Commencing at the Southeast corner of said Document No. 0200034167 of Official Records; thence Westerly along the South line of said document and the South line of the North half of said section, North 89° 34' 54" West a distance of 227.65 feet; thence parallel to the East line of said document and the centerline of Southern Pacific Railroad, North 27° 23' 30" East a distance of 1073.38 feet; thence South 89° 34' 54" East parallel to the South line of said document and the North line of said North half, a distance of 227.65 feet to the East line of said document and the centerline of Southern Pacific Railroad; thence South 27° 23' 30" West along the Easterly line of said document and the centerline of said railroad, a distance of 1073.38 feet to the Southeast corner of said document and the true point of beginning.

Excepting from that portion of said land lying Westerly of the line which is parallel to and distant 220 feet measured at right angles, Westerly from the centerline of the Southern Pacific Railroad, one-fourth of all the oil, gas and other hydrocarbon substances in, upon or under said premises or any portion thereof and the right of the grantor, his heirs, successors and assigns, the right to enter upon said premises for the above mentioned purposes from time to time with due regard to the use of the same by grantee, as reserved by William C. McCowan, a single man, in deed recorded March 4, 1949 in Book 1595, Page 221 of Official Records, and by correction deed recorded September 8, 1950 in Book 1726, Page 234 as Document No. 37383 of Official Records.

Excepting from that portion of said land lying Easterly of the line which is parallel to and distant 220 feet measured at right angles, Westerly from the centerline of the Southern Pacific Railroad, all minerals and all mineral rights of every kind and character now known to exist or hereafter discovered underlying the property, including, without limiting the generality of the foregoing, oil and gas and rights thereto, together with the sole, exclusive and perpetual right to explore for, remove and dispose of said minerals by any means or methods suitable to grantor, its successors and assigns, but without entering upon or using the surface of the property, and in such manner as not to damage the surface of the property, or to interfere with the use thereof by grantee, its successors or assigns, as reserved by Union Pacific Railroad Company, a Delaware corporation, grantor, formerly known as Southern Pacific Transportation Company, a Delaware corporation, in the quitclaim deed recorded March 24, 2000 as Document No. 0200034167 of Official Records.

### PARCEL 38: APN: 050-110-07

The East half of the Northeast quarter of Section 22, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom all the oil, gas and other hydrocarbon substances lying in, upon, or under said land or which may be produced or sold therefrom together with, the right of egress or ingress and all other rights and privileges necessary to explore for and produce oil, gas, or other hydrocarbon substances from said land, as reserved by Alex F. Kochergen and Anna Kochergen, his wife, in deed recorded January 30, 1945 in Book 1229, Page 163 of Official Records.

Also Excepting therefrom such portions as are included in public roads as reserved in the deed from Title Guarantee and Trust Company, recorded August 1, 1940 in Book 943, Pages 261 & 262 of Official Records.

### PARCEL 39: APN: 050-130-12

The West half of the Northeast quarter of Section 20, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-third interest in and to all oil, mineral, gas and other hydrocarbon substances below a depth of 500 feet under said land, without the right of surface entry, as excepted and reserved by Millicent L. d'Usseau, as Administratrix with will annexed of the estate of Marcella Mullaney Weiner, deceased, in deed recorded August 27, 1973 in Book 4801, Page 975 as Document No. 15303 of Official Records.

Also Excepting therefrom an undivided one-sixth interest in and to all oil, mineral, gas and other hydrocarbon substances below a depth of 500 feet under said land, without the right of surface entry, as reserved by Marie Hitchcock, who acquired title as Marie E. Mullaney, in deed recorded August 27, 1973 in Book 4801, Page 977 as Document No. 15304 of Official Records.

Also Excepting therefrom all remaining oil, gas, hydrocarbon and other minerals in and under said land and which may be produced therefrom, together with the right to enter upon said land for the above mentioned purposes from time to time with due regard to the use of the same by grantee, as reserved by Francis Christian Tudor, a married man who acquired title showing no marital status, in deed recorded January 2, 2008 as Document No. 0208000071 of Official Records.

## PARCEL 40: APN: 050-130-13

The Northwest quarter of the Northeast quarter of the Northeast quarter of Section 20, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom all remaining oil, gas, hydrocarbon and other minerals in and under said land and which may be produced therefrom, together with the right to enter upon said land for the above mentioned purposes from time to time with due regard to the use of the same by grantee, as reserved by Francis Christian Tudor, a married man who acquired title showing no marital status, in deed recorded January 2, 2008 as Document No. 0208000071 of Official Records.

## PARCEL 41: APN: 050-130-14

The Northeast quarter of the Northeast quarter of the Northeast quarter of Section 20, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half interest in all oil, gas, minerals and other hydrocarbon substances within or underlying said land as reserved by Central Farms, a California corporation in the deed recorded May 22, 1973, in Book 4786, Page 580 as Document No. 37160 of Official Records.

Also Excepting therefrom all remaining oil, gas, hydrocarbon and other minerals in and under said land and which may be produced therefrom, together with the right to enter upon said land for the above mentioned purposes from time to time with due regard to the use of the same by grantee, as reserved by Francis Christian Tudor, a married man who acquired title showing no marital status, in deed recorded January 2, 2008 as Document No. 0208000071 of Official Records.

## PARCEL 42: APN: 050-130-15

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

The Southwest quarter of the Northeast quarter of the Northeast quarter of Section 20, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half interest in all oil, gas, minerals and other hydrocarbon substances within or underlying said land as reserved by Central Farms, a California corporation in the deed recorded May 22, 1973, in Book 4786, Page 580 as Document No. 37160 of Official Records.

Also Excepting therefrom all remaining oil, gas, hydrocarbon and other minerals in and under said land and which may be produced therefrom, together with the right to enter upon said land for the above mentioned purposes from time to time with due regard to the use of the same by grantee, as reserved by Francis Christian Tudor, a married man who acquired title showing no marital status, in deed recorded January 2, 2008 as Document No. 0208000071 of Official Records.

## PARCEL 43: APN: 050-130-16

The Southeast quarter of the Northeast quarter of the Northeast quarter and the Southeast quarter of the Northeast quarter of Section 20, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom the East 25 feet thereof reserved for road purposes.

Also Excepting therefrom an undivided one-half of all oil, gas, minerals and other hydrocarbon substances, in, upon or under said premises or any portion thereof and the right to prospect for the same and to drill for and to produce and take away the same and likewise reserving unto him and to his heirs, successors and assigns the right to enter upon said premises for the abovementioned purposes from time to time with due regard to the use of the same by the grantee, as reserved by Earl K. Thomas Enterprises, a co-partnership in the deed recorded April 16, 1963 in Book 3597, Page 335 as Document No. 24579 of Official Records.

Also Excepting therefrom an undivided one-fourth of all oil, gas, minerals and other hydrocarbon substances, in, upon or under said premises or any portion thereof and the right to prospect for the same and to drill for and to produce and take away the same and likewise reserving unto them and to their heirs, successors and assigns the right to enter upon said premises for the above mentioned purposes from time to time with due regard to the use of the same by the grantee, as reserved by D. George Billings and Maryann Billings, husband and wife, D. George Billings aka D. Billings in deed recorded April 24, 1973 in Book 4781, Page 1562 as Document No. 29358 of Official Records.

Also Excepting therefrom all remaining oil, gas, hydrocarbon and other minerals in and under said land and which may be produced therefrom, together with the right to enter upon said land for the above mentioned purposes from time to time with due regard to the use of the same by grantee, as reserved by Francis Christian Tudor, a married man who acquired title showing no marital status, in deed recorded January 2, 2008 as Document No. 0208000071 of Official Records.

## PARCEL 44: APN: 049-032-04

The South half of the Northeast quarter of the Northeast quarter of Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

Excepting therefrom that portion described as follows:

Commencing at the Northwest corner of the South half of the Northeast quarter of the Northeast quarter of said Section 5; thence South along the West line of the South half of the Northeast quarter of the Northeast quarter a distance of 679.0 feet to the southwest corner of the Northeast quarter of the Northeast quarter; thence East 10.0 feet along the South line of the Northeast quarter of the Northeast quarter; thence North parallel to the West line of the South half of the Northeast quarter of the Northeast quarter a distance of 679.0 feet to a point on the North line of the South half of the Northeast quarter of the Northeast quarter; thence 10.0 feet West to the point of beginning.

Also Excepting therefrom an undivided one-half of all oil, gas, minerals and other hydrocarbon substances, in, upon or under said premises or any portion thereof and the right to prospect for the same and to drill for and to produce and take away the same and likewise reserving unto her and to her heirs, successors and assigns the right to enter upon said premises for the above mentioned purposes as reserved by Irene Stradley Nevis, a widow in deed recorded April 3, 1967 in Book 4040, Page 45 as Document No. 16850 of Official Records.

### PARCEL 45:

An easement for a water line over that portion of the North half of the Northeast quarter of the Northeast quarter of Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, as shown on the Miscellaneous Survey Plat of said Section 5 by A.E. Stegeman dated January 21 and 22, 1913 on file in the Kern County Surveyor's Office, lying 5 feet on each side of the following described centerline; commencing at the Northeast corner of said section; thence West along the North line of said Section 5, a distance of 645.12 feet; thence South, at right angles, to said North line, a distance of 46.72 feet to the true point of beginning; thence North 00° 05' 37" East, a distance of 27.08 feet; thence South 87° 47' 44" East, a distance of 258.04 feet; thence South 01° 39' 23" East, a distance of 642.63 feet; thence 89°43' 55" East, a distance of 263.50 feet; thence South 00° 01° East, a distance of 3.4 feet, more or less, to the South line of said North half.

Excepting that portion lying within the North 30 feet of said section.

### PARCEL 46:

An undivided 1/3 interest in an easement for a well site over that portion of the North half of the Northeast quarter of the Northeast quarter of Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, as shown on the Miscellaneous Survey Plat of said Section 5 by A.E. Stegeman, dated January 21 and 22, 1913 on file in the Kern County Surveyor's Office, being more particularly described as follows:

Commencing at the Northeast corner of said Section 5; thence West, along the North line of said Section 5, a distance of 645.12 feet; thence South, at right angles, to said North line, a distance of 30.00 feet to the true point of beginning; thence East a distance of 25.00 feet; thence South a distance of 50.00 feet; thence West a distance of 50.00 feet; thence North a distance of 50.00 feet to a point on the South right of way line of road, as shown on said survey plat; thence East, along said South right of way line, a distance of 25.00 feet to the true point of beginning.

### PARCEL 47: APN 049-032-02

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

That portion of the Northeast quarter of Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, more particularly described as follows:

The Northwest quarter of the Northeast quarter of said Section 5;
excepting therefrom;
beginning at the Northeast corner of the Northwest quarter of the Northeast quarter of said Section 5;
(1) thence West along the North line of said Section 5, a distance of 10.0 feet;
(2) thence South parallel with the East line of said Northwest quarter of the Northeast quarter, a distance of 1358.0 feet to the South line of said Northwest quarter of the Northeast quarter;
(3) thence East along said South line, a distance of 10.0 feet to the Southeast corner of said Northwest quarter of the Northeast quarter;
(4) thence North along the East line of said Northwest quarter of the Northeast quarter, a distance of 1358.0 feet to the point of beginning.

The above described exception being that portion of land described in the grant deed recorded September 25, 1962 in Book 3531, Page 349 as Document No. 56451 of Official Records, in the office of the Kern County Recorder, lying within the Northwest quarter of the Northeast quarter of said Section 5.

Pursuant to Certificate of Compliance No. 2490, recorded September 13, 2011 as Document No. 000211119204 of Official Records.

### PARCEL 48: APN 049-032-08

The North half of the Southeast quarter of the Northeast quarter and the Southeast quarter of the Southeast quarter of the Northeast quarter of Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, as per the Official Plat thereof on file in the office of the Surveyor General.

Excepting therefrom that portion thereof comprised of the following described parcels:

PARCEL A:

The West 20 feet of the North half of the Southeast quarter of the Northeast quarter of said section.

PARCEL B:

That portion of the Southeast quarter of the Northeast quarter of Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, as per map thereof in the Bureau of Land Management, at the date of issuance of the Patent thereof, described as follows:

Beginning at the Southeast corner of said Southeast quarter of the Northeast quarter of Section 5; thence South 89° 49' 30" West, along the South line of said Southeast quarter of the Northeast quarter of Section 5, a distance of 660.44 feet to the Southeast corner of the Southwest quarter of the Southeast quarter of the Northeast quarter of said Section 5; thence North 00° 00' 41" East 660.24 feet to the Northeast corner of said Southwest quarter of the Southeast quarter of the Northeast quarter of said Section 5; thence South 89° 49' 14" West, along the North line of said Southwest quarter of the Southeast quarter of the Northeast quarter of said Section 5, a distance of 640.38 feet, more or less, to a point which is North 89° 49' 14"

East 20.00 feet of the Northwest corner of said Southwest quarter of the Southeast quarter of the Northeast quarter of said Section 5; thence North 00° 01' East 20 feet East of and parallel to the West line of said Southeast quarter of the Northeast quarter of Section 5, a distance of 180.30 feet; thence North 89° 47' East 1300.64 feet to a point on the East line of said Southeast quarter of the Northeast quarter of Section 5; thence South 841.44 feet, more or less, to the point of beginning, subject to rights of ways of 30 feet in width, along the East and South lines of said Southeast quarter of the Northeast quarter of Section 5.

Excepting therefrom all right, title and interest of, in and to all minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, together with the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain, and remove all structures, fixtures, improvements, pipelines and other facilities which may be necessary or useful for any of such purposes, provided that upon the exercise of any of the rights provided herein, the then owner of the surface, his heirs, assigns or successors in interest, shall be fully indemnified by the person exercising such rights for any and all damages or less resulting therefrom, as conveyed to the Earl Fruit Company in deed recorded April 3, 1962 in Book 3478, Page 616 as Document No. 20013 of Official Records.

### PARCEL 49: APN: 049-032-06 and 049-032-07

The South half of the Northwest quarter and the Southwest quarter of the Northeast quarter of Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, as per the Official Plat thereof on file in the office of the Surveyor General.

Excepting therefrom a parcel of land situated in Section 5, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, more particularly described as 10 feet wide, East and West, and 140 feet long, North and South, whose North line and East line are coincidental with the North line and the East line of the North half of the Southwest quarter of the Northeast quarter of said Section 5.

Also Excepting therefrom all right, title and interest in and to all minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, together with the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain, and remove all structures, fixtures, improvements, pipelines and other facilities which may be necessary or useful for any of such purposes, provided that upon the exercise of any of the rights provided herein, the then owner of the surface, his heirs, assigns, or successors in interest, shall be fully indemnified by the person exercising such rights for any and all damages or loss resulting therefrom, as reserved By Di Giorgio Corporation, a Delaware corporation, in deed recorded December 29, 1967 in Book 4116, Page 195 as Document No. 67741 of Official Records.

Together with that portion of County Road No. 1203, known as Bassett Avenue, as vacated by Resolution No. 2005-091, of the Board of Supervisors of the County of Kern, recorded February 14, 2018 as Document No. 218017195 of Official Records, which would further pass by operation of law.

### PARCEL 50: APN: 050-030-03

That portion of Blocks 5, 12, C, and N of Subdivision No. 1 of the Townsite of Jasmine, according to the map thereof recorded January 9, 1912 in Book 2, Page 40 of Maps, and a portion of the West half of the

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

Northeast quarter of Section 23, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, according to the Official Plat thereof, in the unincorporated area, County of Kern, State of California, described as follows:

Beginning at a point in the Easterly line of said West half of the Northeast quarter of said Section 23, lying North 00° 13' 06" West 30 feet from the Southeast corner of said West half of the Northeast quarter; thence continuing along said Easterly line of the West half of the Northeast quarter, North 00° 13' 06" West 200 feet; thence South 89° 46' 54" West 93.00 feet; thence South 28° 01' 48" west 226.37 feet to a point 30 feet Northerly of the Southerly line of said West half of the Northeast quarter; thence North 89° 57' 04" East 200.14 feet to the point of beginning.

### PARCEL 51: APN: 050-030-07-01 portion

All Lots and Blocks in Subdivision No. 1 of the Townsite of Jasmine, in the unincorporated area, County of Kern, State of California, as per map thereof recorded January 9, 1912 in Book 2, Page 40 of Maps, in the office of the County Recorder of said County, excepting therefrom the following:

(A) that portion which is included within Tract No. 2, being a Replat of Subdivision No. 1 of the Townsite of Jasmine, as per map filed November 30, 1912 in Book 2, Page 53 of Maps, in the office of the County Recorder of said County.

(B) all that portion of the West half of the Northeast quarter of Section 23, Township 25 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, described as follows:

Beginning at a point in the Easterly line of said West half, North 00° 13' 06" West 30 feet from the Southeast corner of said West half; thence continuing along said Easterly line of West half North 00° 13' 06" West 200 feet; thence South 89° 46' 54" West 93.00 feet; thence South 28° 01' 48" West 226.37 feet to a point 30 feet Northerly of the Southerly line of said West half; thence North 89° 57' 04" East 200.14 feet to the point of beginning.

Being a portion of Blocks 5, 12, C, and N as per map of Subdivision No. 1 of Townsite of Jasmine, as per map filed January 9, 1912, as conveyed by William C. McCowan to the Delano Union School District in deed dated October 20, 1948 and recorded December 22, 1948 in Book 1523, Page 274 of Official Records.

Also Excepting therefrom, that portion thereof which lies within Block 28 in the Subdivision No. 1 of the Townsite of Jasmine, as per map thereof recorded January 9, 1912 in Book 2, Page 40 of Maps, Kern County Records.

Also Excepting therefrom an undivided one-fourth of all the oil, gas and other hydrocarbon substances in, upon or under said premises or any portion thereof and the right to prospect to the same and to drill for and to produce and take away the same and the right to enter upon said premises for the above mentioned purposes from time to time with due regard to the use of the same as excepted by Nick Bozanich, Sr., in deed recorded arch 22, 1966 in Book 3930, Page 406 as Document No. 15533 of Official Records.

Also Excepting therefrom an undivided one-fourth of all the oil, gas and other hydrocarbon substances in, upon or under said premises or any portion thereof and the right to prospect and to drill for and to produce and take away the same and the right to enter upon said premises for the above mentioned purposes from

time to time with due regard to the use of the same, as excepted Peter Bozanich, et al, in deed recorded March 22, 1966 in Book 3930, Page 410 as Document No. 15535 of Official Records.

## PARCEL 52: APN: 050-030-07-01 portion

All Lots and Blocks in Tract No. 2, being a Replat of Subdivision No. 1 of the Townsite of Jasmine, as per map filed November 30, 1912 in Book 2, Page 53 of Maps, in the office of the County Recorder of said County.

Excepting therefrom Lot 6 in Block 9 thereof.

Also Excepting therefrom an undivided one-fourth of all the oil, gas and other hydrocarbon substances in, upon or under said premises or any portion thereof and the right to prospect to the same and to drill for and to produce and take away the same and the right to enter upon said premises for the above mentioned purposes from time to time with due regard to the use of the same as excepted by Nick Bozanich, Sr., in deed recorded arch 22, 1966 in Book 3930, Page 406 as Document No. 15533 of Official Records.

Also Excepting therefrom an undivided one-fourth of all the oil, gas and other hydrocarbon substances in, upon or under said premises or any portion thereof and the right to prospect and to drill for and to produce and take away the same and the right to enter upon said premises for the above mentioned purposes from time to time with due regard to the use of the same, as excepted Peter Bozanich, et al, in deed recorded March 22, 1966 in Book 3930, Page 410 as Document No. 15535 of Official Records.

## PARCEL 53: APN: 060-160-15-01

The East half of fractional Section 4, Township 26 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, according to the Official Plat thereof, lying West of the West line of that certain strip of land heretofore conveyed to Stockton and Tulare Railroad Company, a corporation, by deed recorded April 12, 1888 in Book 25, Page 414 of Deeds, and by deed recorded May 2, 1888 in Book 25, Page 406 of Deeds.

Excepting therefrom an undivided one-half of all gas, oil and other hydrocarbon substances in, upon or under said premises, as reserved by Emily S. Mansfield in deed recorded August 31, 1944 in Book 1212, Page 212 of Official Records.

Also Excepting therefrom an undivided one-fourth interest in and to all oil, gas, hydrocarbons and all other minerals of every kind and character, in, under and that may be produced from said land, as reserved by A. Perelli-Minetti & Sons, a corporation, in deed recorded February 7, 1950 in Book 1662, Page 95 as Document No. 5313 of Official Records.

Also Excepting therefrom an undivided one-half interest in the remaining interest in the oil, gas or other hydrocarbon substances lying in, upon or under said land, as reserved by A. Shrier & Sons Company, et al, in deed recorded March 24, 1961 in Book 3362, Page 663 as Document No. 18235 of Official Records.

Also Excepting therefrom all remaining interest in all oil, gas, minerals, hydrocarbon and hydrocarbon substances within and underlying said land or that may be produced therefrom, as excepted and reserved by S.A. Camp Ginning Company in deed recorded July 7, 1972 in Book 4696, Page 221 as Document No. 01026 of Official Records.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

**PARCEL 54: APN: 060-160-68**

Those portions of that 100 foot wide railroad located in the East half of Section 4 and the Northwest quarter of the Northwest quarter of Section 3, both in Township 26 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Kern, State of California, as per the Official Plat thereof, the centerline of said 100 foot parcel is described as follows:

PARCEL A:

Commencing at a point in the centerline of the Stockton and Tulare Company's Railway with the North line of said Section 3; thence Southwesterly along said centerline to a point that intersects the West line of said Section 3, as conveyed by deed recorded February 1, 1888 in Book 23, Page 39 of Deeds.

PARCEL B:

Commencing at a point in the centerline of the Stockton and Tulare Company's Railway with the East line of the Northeast quarter of said Section 4; thence Southwesterly along said centerline to a point that intersects the South line of said Northeast quarter of Section 4, as conveyed by deed recorded May 2, 1888 in Book 25, Page 406 of Deeds.

PARCEL C:

Commencing at a point in the centerline of the Stockton and Tulare Company's Railway with the North line of the Southeast quarter of said Section 4; thence Southwesterly along said centerline to a point that intersects the South line of said Southeast quarter of Section 4, as conveyed by deed recorded April 12, 1888 in Book 24, Page 414 of Deeds.

Excepting therefrom all minerals and all mineral rights of every kind as reserved by Union Pacific Railroad Company in Quitclaim Deed recorded June 26, 2001 as Document No. 0201088428 of Official Records.

**TRACT B**

**PARCEL 1: APN: 049-032-01-00**

THE NORTH HALF OF THE NORTHWEST QUARTER OF FRACTIONAL SECTION 5, TOWNSHIP 25 SOUTH, RANGE 26 EAST MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM, THE WEST 30 FEET; THE NORTH 30 FEET; AND THE EAST 25 FEET, HERETOFORE RESERVED FOR ROAD PURPOSES IN THE DEED FILED ON JUNE 23, 1939, AS CERTIFICATE NO. 67, MEMORIAL NO. 280, IN VOLUME 1, PAGE 134 IN THE TORRENS SYSTEM.

ALSO EXCEPTING THEREFROM, THE NORTH 30 FEET OF SAID LAND, AS CONVEYED TO THE COUNTY OF KERN FOR PUBLIC USE, BY FINAL JUDGMENT IN EMINENT DOMAIN RECORDED JULY 12, 1971, IN BOOK 4547, PAGE 872 OF OFFICIAL RECORDS, AS DOCUMENT NO. 02538.

ALSO EXCEPTING THEREFROM, ONE-HALF OF ALL OIL, GAS AND MINERALS IN AND UNDER SAID LAND AS CONVEYED TO CALIFORNIA LANDS, INC., A CORPORATION, IN THE DEED RECORDED JANUARY 31, 1935, IN BOOK 560, PAGES 307 & 308 OF OFFICIAL RECORDS, AS DOCUMENT NO. 2228.

ALSO EXCEPTING THEREFROM, 25% OF ALL OIL, GAS AND MINERALS IN AND UNDER SAID LAND AS RESERVED BY ISABELL HANEMIAN, IN THE DEED FILED ON JANUARY 24, 1952, AS MEMORIAL NO. 608 IN OF TORRENS SYSTEM.

ALSO EXCEPTING THEREFROM, 25% OF ALL OIL, GAS AND MINERALS IN AND UNDER SAID LAND AS RESERVED BY ALMA MAY HOFER, A WIDOW, IN THE DEED RECORDED JANUARY 3, 1977, IN BOOK 4999, PAGE 1616 OF OFFICIAL RECORDS, AS DOCUMENT NO. 00110.

**PARCEL 2: APN: 049-040-03-00 AND 049-040-004-00**

LOTS 65, 72, 73, 74, 79 AND 80 OF CENTRAL CALIFORNIA FARMS COMPANY SUBDIVISION NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED APRIL 3, 1912, IN BOOK 2, PAGE 45 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

TOGETHER WITH, THAT PORTION OF COUNTY ROAD NO. 1203 KNOWN AS BASSETT AVENUE, AS ABANDONED BY RESOLUTION NO. 2005-091, RECORDED MARCH 15, 2018, AS DOCUMENT NO. 218017195, OF OFFICIAL RECORDS, WHICH WOULD PASS BY OPERATION OF LAW.

EXCEPTING THEREFROM, ALL OF GRANTORS RIGHT TITLE AND INTEREST IN AND TO ALL OF THE MINERALS, METALS, METALLIFEROUS SUBSTANCES, OIL, GAS AND OTHER HYDROCARBONS IN AND UNDER SAID LAND, TOGETHER WITH, THE RIGHT AT ALL TIMES TO ENTER UPON SAID LAND AND TO EXPLORE, DRILL, MINE, PRODUCE, PROCESS, STORE, MARKET AND REMOVE SUCH MINERALS, METALS, METALLIFEROUS SUBSTANCES, OIL, GAS AND OTHER HYDROCARBONS, AND THEREON TO CONDUCT ALL OPERATIONS AND TO ERECT, MAINTAIN AND REMOVE ALL STRUCTURES, FIXTURES, IMPROVEMENTS, PIPE LINES AND OTHER FACILITIES WHICH MAY BE NECESSARY OR USEFUL FOR ANY OF SUCH PURPOSES, SUBJECT TO THE TERMS AND CONDITIONS CONTAINED THEREIN, AS CONVEYED TO EARL FRUIT COMPANY, A CALIFORNIA CORPORATION, IN THE QUITCLAIM DEED RECORDED APRIL 3, 1962, IN BOOK 3478, PAGE 616 OF OFFICIAL RECORDS, AS DOCUMENT NO. 20013.

**PARCEL 3: APN: 049-040-05-00**

LOTS 75, 76, 77 AND 78 OF CENTRAL CALIFORNIA FARMS COMPANY SUBDIVISION NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED APRIL 3, 1912, IN BOOK 2, PAGE 45 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM, ONE-HALF OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN, UPON OR UNDER SAID PREMISES OR ANY PORTION THEREOF AND THE RIGHT TO PROSPECT FOR THE SAME AND TO DRILL FOR AND TO PRODUCE AND TAKE AWAY THE SAME AND LIKEWISE RESERVING UNTO THEM AND TO

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

THEIR HEIRS, SUCCESSORS AND ASSIGNS THE RIGHT TO ENTER UPON SAID PREMISES FOR THE ABOVE MENTIONED PURPOSES FROM TIME TO TIME WITH DUE REGARD TO THE USE OF THE SAME BY GRANTEE, ALL AS RESERVED BY E. L. WILLIAMS RANCHES, INC., A CALIFORNIA CORPORATION, IN THE DEED RECORDED JANUARY 16, 1990, BOOK 6335, PAGE 1658 OF OFFICIAL RECORDS, AS DOCUMENT NO. 005955.

**PARCEL 4: APN: 049-110-11-00**

LOT 16 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

**PARCEL 5: APN: 049-110-12-00**

LOT 15 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

EXCEPTING THEREFROM, A LIFE ESTATE IN AND TO AN UNDIVIDED ONE-HALF INTEREST IN ALL MINERALS, INCLUDING OIL AND GAS AND OTHER HYDROCARBONS UNDERLYING SAID LAND, AS RESERVED BY ETHEL MAY ROGERS, IN THE DEED RECORDED JANUARY 26, 1966, IN BOOK 3913, PAGE 565 OF OFFICIAL RECORDS, AS DOCUMENT NO. 04337.

**PARCEL 6: APN: 049-110-13-00**

LOT 24 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

**PARCEL 7A: APN: 049-110-16-01**

LOTS 22 AND 23 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

EXCEPTING FROM SAID LOT 22, ONE-HALF ACRE IN THE FORM OF A SQUARE IN THE NORTHEAST CORNER OF SAID LOT 22.

**PARCEL 8: APN: 049-110-18-00**

LOT 29 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

TOGETHER WITH, THAT PORTION OF HRONIS STREET, AS ABANDONED BY RESOLUTION NO. 810497, RECORDED MAY 18, 1981, IN BOOK 5375, PAGE 733 OF OFFICIAL RECORDS, AS DOCUMENT NO. 050848, OF OFFICIAL RECORDS, WHICH WOULD PASS BY OPERATION OF LAW.

EXCEPTING THEREFROM, A PARCEL OF LAND IN SECTION 9, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO BASE MERIDIAN, HAVING AN AREA OF 4.4 ACRES, MORE OR LESS, AND BEING ALL THAT PART OF LOT 29, RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, AS SHOWN ON THE OFFICIAL MAP THEREOF, RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF SAID KERN COUNTY ON FEBRUARY 18, 1911 IN BOOK 2, PAGE 17 OF MAPS, AS CONVEYED TO THE UNITED STATES OF AMERICA IN THE DEED RECORDED NOVEMBER 23, 1949 IN BOOK 1653, PAGE 243 OF OFFICIAL RECORDS, AS DOCUMENT NO. 41617, LYING ON THE LEFT OR EASTERLY AND SOUTHERLY SIDE OF A LINE DESCRIBED AS FOLLOWS:

BEGINNING, AT A POINT IN THE NORTHERLY BOUNDARY OF SAID LOT 29 THAT IS DISTANT ALONG SAID NORTHERLY BOUNDARY NORTH 89 DEGREES 58' WEST 272.8 FEET FROM THE NORTHEAST CORNER OF SAID LOT 29; THENCE, RUNNING SOUTH 0 DEGREES 43' WEST 622.0 FEET TO A POINT THAT IS DISTANT NORTH 0 DEGREES 43' EAST, 8.1 FEET FROM THE SOUTHERLY BOUNDARY OF SAID LOT 29; THENCE, SOUTH 88 DEGREES 08' WEST 245.7 FEET TO A POINT IN THE SOUTHERLY BOUNDARY OF SAID LOT 29, THAT IS DISTANT ALONG SAID SOUTHERLY BOUNDARY NORTH 89 DEGREES 59' WEST, 525.1 FEET FROM THE SOUTHEAST CORNER OF SAID LOT 29.

ALSO EXCEPTING THEREFROM, ONE-HALF OF ALL OIL, GAS AND MINERAL RIGHTS IN, UPON OR UNDER SAID PREMISES INCLUDING ONE-HALF OF ANY AND ALL ROYALTIES, BONUSES, RENTALS OR ADVANCE PAYMENTS MADE OR GIVEN FOR A LEASE FOR THE RIGHT TO DRILL OR PROSPECT FOR OIL, GAS OR OTHER MINERALS UPON SAID PROPERTY, AS RESERVED BY RICHGROVE LAND COMPANY, IN THE DEED RECORDED FEBRUARY 13, 1941, IN BOOK 1014, PAGE 16 OF OFFICIAL RECORDS, AS DOCUMENT NO. 4262.

ALSO EXCEPTING THEREFROM, ONE-HALF OF ALL OIL, GAS MINERALS AND OTHER HYDROCARBON SUBSTANCES, IN, UPON OR UNDER SAID PREMISES OR ANY PORTION THEREOF AND THE RIGHT TO PROSPECT FOR THE SAME AND TO DRILL FOR AND TO PRODUCE AND TAKE AWAY THE SAME AND LIKEWISE RESERVING UNTO HER AND TO HER HEIRS, SUCCESSORS AND ASSIGNS, THE RIGHT TO ENTER UPON SAID PREMISES FOR THE ABOVE MENTIONED PURPOSES FROM TIME TO TIME WITH DUE REGARD TO THE USE OF THE SAME BY THE GRANTEE, AS RESERVED BY CATHERINE BUTLER, IN THE DEED RECORDED DECEMBER 9, 1976, IN BOOK 4994, PAGE 1598 OF OFFICIAL RECORDS, AS DOCUMENT NO. 46689.

## PARCEL 8A:

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

**PARCEL 9: APN: 049-110-20-00**

LOT 21 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

TOGETHER WITH, THAT PORTION OF HRONIS STREET, AS ABANDONED BY RESOLUTION NO. 810497, RECORDED MAY 18, 1981, IN BOOK 5375, PAGE 733 OF OFFICIAL RECORDS, AS DOCUMENT NO. 050848, OF OFFICIAL RECORDS, WHICH WOULD PASS BY OPERATION OF LAW.

EXCEPTING THEREFROM, ALL THAT PORTION OF LOT 21 OF THE RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, AS SHOWN ON THE OFFICIAL MAP THEREOF, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAID KERN COUNTY ON FEBRUARY 18, 1911 IN BOOK 2, PAGE 17, AS CONVEYED TO THE UNITED STATES OF AMERICA IN THE DEED RECORDED JUNE 14, 1950, IN BOOK 1689, PAGE 291 OF OFFICIAL RECORDS, AS DOCUMENT NO. 24491, LYING EASTERLY OF A LINE DESCRIBED AS FOLLOWS:

BEGINNING, AT A POINT IN THE NORTHERLY BOUNDARY OF SAID LOT 21 THAT IS DISTANT ALONG SAID NORTHERLY BOUNDARY LINE NORTH 89 DEGREES 58' WEST 275.5 FEET FROM THE NORTHEAST CORNER OF SAID LOT 21; THENCE, RUNNING SOUTH 0 DEGREES 09' EAST 630.0 FEET TO A POINT IN THE SOUTHERLY BOUNDARY OF SAID LOT 21 THAT IS DISTANT ALONG SAID SOUTHERLY BOUNDARY NORTH 89 DEGREES 58' WEST 272.8 FEET FROM THE SOUTHEAST CORNER OF SAID LOT 21.

**PARCEL 9A:**

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

**PARCEL 10: APN: 049-110-23-00**

LOT 27 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

ALSO EXCEPTING THEREFROM, AN UNDIVIDED ONE-HALF INTEREST OF ALL OIL, GAS, PETROLEUM AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND OR THAT MAY BE PRODUCED AND SAVED THEREFROM, AS RESERVED BY ARTHUR LYNN HICKMAN AND VERNA A. HICKMAN, HUSBAND AND WIFE, IN THE DEED RECORDED FEBRUARY 24, 1953, IN BOOK 2043, PAGE 349 OF OFFICIAL RECORDS, AS DOCUMENT NO. 8623.

## PARCEL 10A:

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

## PARCEL 11: APN: 049-110-31-00

LOTS 17, 18, 25 AND 26 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

EXCEPTING THEREFROM, AN UNDIVIDED ONE-HALF OF ALL OIL, GAS, AND OTHER MINERALS AND MINERAL RIGHTS OF WHATEVER NATURE OR DESCRIPTION IN AND UNDER SAID LAND; AND EXPRESSLY RESERVING TO THE GRANTORS, ITS SUCCESSORS OR ASSIGNS, THE EXCLUSIVE RIGHT, IN CONJUNCTION WITH THE OWNER OR OWNERS OF THE REMAINDER OF SAID OIL, GAS, AND OTHER MINERALS AND MINERALS RIGHTS, TO PROSPECT FOR AND EXPLOIT AND TO DEVELOPMENT REMOVE THE SAID OIL, GAS, AND OTHER MINERALS FORM SAID LANDS; TOGETHER WITH, THE REASONABLE USE OF SUCH RIGHTS OF WAY AND OTHER PRIVILEGES IN AND OVER THE SURFACE OF SAID LAND AS MAY BE REASONABLY REQUIRED FOR DOING THE WORK ABOVE DESCRIBED IN A REASONABLE MANNER, ALL AS RESERVED BY RICHGROVE LAND COMPANY, IN THE DEED RECORDED JUNE 19, 1940, IN BOOK 946, PAGES 406 & 407 OF OFFICIAL RECORDS, AS DOCUMENT NO. 16099.

## PARCEL 12: APN: 049-110-32-00

LOT 19 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

EXCEPTING THEREFROM, AN UNDIVIDED ONE-HALF OF ALL OIL, GAS, AND OTHER MINERALS AND MINERAL RIGHTS OF WHATEVER NATURE OR DESCRIPTION IN AND UNDER SAID LAND; AND EXPRESSLY RESERVING TO THE GRANTORS, ITS SUCCESSORS OR ASSIGNS, THE EXCLUSIVE RIGHT, IN CONJUNCTION WITH THE OWNER OR OWNERS OF THE REMAINDER OF SAID OIL, GAS, AND OTHER MINERALS AND MINERALS RIGHTS, TO PROSPECT FOR AND EXPLOIT AND TO DEVELOPMENT REMOVE THE SAID OIL, GAS, AND OTHER MINERALS FORM SAID LANDS; TOGETHER WITH, THE REASONABLE USE OF SUCH RIGHTS OF WAY AND OTHER PRIVILEGES IN AND OVER THE SURFACE OF SAID LAND AS MAY BE REASONABLY REQUIRED FOR DOING THE WORK ABOVE DESCRIBED IN A REASONABLE MANNER, ALL AS RESERVED BY RICHGROVE LAND COMPANY, IN THE DEED RECORDED JUNE 19, 1940, IN BOOK 946, PAGES 406 & 407 OF OFFICIAL RECORDS, AS DOCUMENT NO. 16099.

## PARCEL 12A:

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

### PARCEL 13: APN: 049-110-34-00

LOTS 1, 2, 9 AND 10 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.
EXCEPTING THEREFROM, THE WELL SITE DESCRIBED AS THE NORTH 100 FEET OF THE EAST 100 FEET OF SAID LOT 2, TOGETHER WITH A PIPELINE EASEMENT ALONG THE NORTH 20 FEET OF SAID LOTS 1 AND 2, AS RESERVED BY M. CARATAN, INC., A CALIFORNIA CORPORATION, IN THE DEED RECORDED JANUARY 7, 1974, IN BOOK 4820, PAGE 72 OF OFFICIAL RECORDS, AS DOCUMENT NO. 00829.

### PARCEL 13A:

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

### PARCEL 14: APN: 049-110-22-00

LOTS 20 AND 28 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

TOGETHER WITH, THAT PORTION OF HRONIS STREET, AS ABANDONED BY RESOLUTION NO. 810497, RECORDED MAY 18, 1981, IN BOOK 5375, PAGE 733 OF OFFICIAL RECORDS, AS DOCUMENT NO. 050848, OF OFFICIAL RECORDS, WHICH WOULD PASS BY OPERATION OF LAW.

EXCEPTING THEREFROM, AN UNDIVIDED ONE-FOURTH INTEREST IN AND TO ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER OR RECOVERABLE THEREON OR THEREFROM, AS CONVEYED TO M. P. MOSESIAN, A MARRIED MAN, AS HIS SEPARATE PROPERTY, IN THE DEED OF MINERAL RIGHTS, RECORDED JUNE 7, 1962, IN BOOK 3498, PAGE 154 OF OFFICIAL RECORDS, AS DOCUMENT NO. 33413.

ALSO EXCEPTING THEREFROM, AN UNDIVIDED THREE-FOURTHS INTEREST IN AND TO ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER

OR RECOVERABLE THEREON OR THEREFROM, AS CONVEYED TO M. P. MOSESIAN, A MARRIED MAN, IN THE DEED RECORDED SEPTEMBER 16, 1963, IN BOOK 3644, PAGE 431 OF OFFICIAL RECORDS, AS DOCUMENT NO. 57868.

**PARCEL 15: APN: 049-150-03-00**

THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 7, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM, ALL OIL, GAS, MINERALS, HYDROCARBON SUBSTANCES OF ANY AND EVERY KIND WITHIN OR UNDERLYING SAID LAND AS PREVIOUSLY RESERVED OF RECORD, AS RESERVED BY BANK OF AMERICA NT&SA, AS TRUSTEE UNDER THE TERMS OF THE TESTAMENTARY TRUST ESTABLISHED IN THE WILL OF MARTIN J. GUTUNICH, DECEASED, AS TO 1/8TH INTEREST; MARTINA M. GUTUNICH, AS TO 3/16THS INTEREST; AND MARTY JOSEPHINE DISPOTO, AS TO ½ INTEREST, IN THE DEED RECORDED SEPTEMBER 21, 1982, IN BOOK 5490, PAGE 1676 OF OFFICIAL RECORDS, AS DOCUMENT NO. 030536.

**PARCEL 16: APN: 049-150-08-00**

THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM, THAT CERTAIN WATER WELL EASEMENT LOCATED ON THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, TOGETHER WITH, PUMP, MOTOR, UNDERGROUND PIPELINES WITH THE RIGHT OF INGRESS AND EGRESS THEREWITH AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

ALSO EXCEPTING THEREFROM, AN UNDIVIDED ONE-HALF INTEREST IN ALL OIL, GAS AND MINERALS IN AND UNDER SAID LAND, TOGETHER WITH, THE RIGHT OF THE GRANTOR, ITS SUCCESSORS AND ASSIGNS AND LEGAL REPRESENTATIVES AT ALL TIMES TO ENTER ON THE ABOVE DESCRIBED LANDS AND TAKE ALL THE USUAL, NECESSARY OR CONVENIENT MEANS TO BORE WALLS, MAKE EXCAVATIONS AND TO REMOVE ALL THE OIL, GAS AND MINERALS FOUND THEREON AND HEREIN RESERVED, AS RESERVED BY BANK OF AMERICA, NT & SA, IN THE DEED RECORDED DECEMBER 31, 1934, IN BOOK 554, PAGE 64 OF OFFICIAL RECORDS, AS DOCUMENT NO. 20873.

**PARCEL 17: INTENTIONALLY DELETED**

**PARCEL 18: APN: 050-220-07-01**

Hronis
Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

THE SOUTH HALF OF THE SOUTHEAST QUARTER OF SECTION 30, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM, ONE-HALF OF ALL OIL, GAS AND MINERALS AND OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING OR THAT MAY BE PRODUCED AND SAVED FROM SAID LAND, TOGETHER WITH THE RIGHT TO PROSPECT FOR, MINE AND REMOVE THE SAME, AS RESERVED BY T. A. DAVIS, ALSO KNOWN AS THOMAS ALBERT DAVIS AND INA B. DAVIS, HIS WIFE, IN THE DEED RECORDED MAY 8, 1945, IN BOOK 1252, PAGE 226 OF OFFICIAL RECORDS, AS DOCUMENT NO. 12223.

ALSO EXCEPTING THEREFROM, AN UNDIVIDED ONE-FOURTH INTEREST IN AND TO ALL OIL, GAS, PETROLEUM, AND OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY PETER G. BOUMA, IN THE DEED RECORDED JANUARY 14, 1977, IN BOOK 5001, PAGE 1552 OF OFFICIAL RECORDS, AS DOCUMENT NO. 3231.

**PARCEL 19: APN: 050-270-06-00 & 050-270-015-00**

LOT 12 AND ALL THAT PORTION OF LOT 13 LYING EAST OF THE RIGHT OF WAY OF THE SOUTHERN PACIFIC RAILROAD IN THE HILLCREST TRACT, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 14, 1911, IN BOOK 2, PAGE 16 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. SAID SOUTHERN PACIFIC RAILROAD RIGHT OF WAY BEING A STRIP OF LAND 100 FEET IN WIDTH, CREATED IN THE DEED TO STOCKTON AND TULARE RAILROAD COMPANY, RECORDED MAY 19, 1988, IN BOOK 27, PAGES 41, 42 & 43 OF DEEDS, AND SUBSEQUENTLY SHOWN ON THE MAP OF SAID TRACT.

EXCEPTING THEREFROM, THE RIGHTS OR INTEREST CONVEYED TO THE COUNTY OF KERN, IN ALL THAT PORTION OF LOT 13, LYING WITHIN THE RELINQUISHED PORTION OF SUPERSEDED HIGHWAY, DESCRIBED IN THE INSTRUMENT RECORDED JANUARY 10, 1948, IN BOOK 1341, PAGE 446 OF OFFICIAL RECORDS, AS DOCUMENT NO. 1184.

**PARCEL 20: APN: 050-270-14-00**

ALL THAT PORTION OF LOT 5, LYING EAST OF THE RIGHT OF WAY OF THE SOUTHERN PACIFIC RAILROAD IN THE HILLCREST TRACT, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 14, 1911, IN BOOK 2, PAGE 16 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. SAID SOUTHERN PACIFIC RAILROAD RIGHT OF WAY BEING A STRIP OF LAND 100 FEET IN WIDTH, CREATED IN THE DEED TO STOCKTON AND TULARE RAILROAD COMPANY, RECORDED MAY 19, 1988, IN BOOK 27, PAGES 41, 42 & 43 OF DEEDS, AND SUBSEQUENTLY SHOWN ON THE MAP OF SAID TRACT.

EXCEPTING THEREFROM, ALL OF THE PETROLEUM, GAS, ASPHALTUM AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR UNDERLYING OR THAT MAY BE PRODUCED FROM THE PROPERTY ABOVE DESCRIBED, AS RESERVED BY LILLIAM H. BEARDSLEY, A WIDOW, STEPHEN T. CLIFFORD, A SINGLE MAN, AND LINDA M. CLIFFORD, A SINGLE WOMAN, IN

THE DEED RECORDED DECEMBER 31, 1963, IN BOOK 3676, PAGE 677 OF OFFICIAL RECORDS, AS DOCUMENT NO. 80736.

**PARCEL 21: APN: 049-110-25-00**

A PARCEL OF LAND IN THE NORTHEAST QUARTER OF SECTION 9, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE OFFICIAL PLAT THEREOF, BEING A PORTION OF THE 5.6-ACRE PARCEL OF LAND DESCRIBED IN THE DEED TO THE UNITED STATES OF AMERICA, DATED MAY 13, 1949, AND RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY ON JULY 10, 1950 IN BOOK 1712 OF OFFICIAL RECORDS AT PAGE155, AND A PORTION OF THE 10.0-ACRE PARCEL OF LAND DESCRIBED AS TRACT 1 OF PARCEL ONE IN SCHEDULE "A" OF THE DECREE ON DECLARATION OF TAKING DATED JANUARY 3, 1950, IN AN ACTION ENTITLED UNITED STATES OF AMERICA, PLAINTIFF, VS. 303.3-ACRES OF LAND, MORE OR LESS, IN THE COUNTY OF KERN, STATE OF CALIFORNIA, MARIN CURATEN, ALSO KNOWN AS M. CURATEN, ET AL., DEFENDANTS IN THE UNITED STATES DISTRICT COURT IN AND FOR THE SOUTHERN DISTRICT OF CALIFORNIA, NORTHERN DIVISION, CIVIL NO. 894-ND; A CERTIFIED COPY OF SAID DECREE WAS RECORDED IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY ON JANUARY 11, 1950 IN BOOK 1648 OF OFFICIAL RECORDS AT PAGE 325 AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTH QUARTER CORNER OF SAID SECTION 9;

THENCE, ALONG THE NORTHERLY BOUNDARY OF SAID 5.8-ACRE PARCEL, WHICH IS IN THE NORTHERLY BOUNDARY OF THE NE 1/4 OF SAID SECTION 9, SOUTH 89° 57' EAST 28.6 FEET;

THENCE, ENTERING SAID 5.8-ACRE PARCEL SOUTH 6° 17' EAST 230.7 FEET;

THENCE, SOUTH 23° 49' EAST 184.4 FEET;

THENCE, SOUTH 29° 52' EAST 302.5 FEET TO THE BOUNDARY COMMON TO SAID 5.8-ACRE PARCEL AND SAID 10.0 ACRE PARCEL;

THENCE, ENTERING SAID 10.0-ACRE PARCEL SOUTH 29° 52' EAST 106.7 FEET;

THENCE, SOUTH 22° 47' EAST 131.3 FEET;

THENCE, SOUTH 08° 38' EAST 130.2 FEET;

THENCE, SOUTH 00° 06' WEST 317.8 FEET TO THE SOUTHERLY BOUNDARY OF SAID 10.0-ACRE PARCEL;

THENCE, ALONG SAID SOUTHERLY BOUNDARY NORTH 89° 58' WEST 403.8 FEET TO THE WESTERLY BOUNDARY OF SAID 10.0-ACRE PARCEL;

THENCE, ALONG THE WESTERLY BOUNDARY OF SAID 10.0-ACRE PARCEL, WHICH IS IN THE WESTERLY BOUNDARY OF THE NORTHEAST QUARTER OF SAID SECTION 9, NORTH

0° 05' EAST 660.1 FEET TO THE BOUNDARY COMMON TO SAID 5.8-ACRE PARCEL AND SAID 10.0-ACRE PARCEL;

THENCE, LEAVING SAID COMMON BOUNDARY AND RUNNING ALONG THE WESTERLY BOUNDARY OF SAID 5.8-ACRE PARCEL, WHICH IS IN THE WESTERLY BOUNDARY OF THE NORTHEAST QUARTER OF SAID SECTION 9, NORTH 0° 05' EAST 660.0 FEET TO THE POINT OF BEGINNING.

SAID PARCEL OF LAND IS A PORTION OF LOTS 5 AND 13 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY, TOGETHER WITH, THAT PORTION OF HRONIS STREET, AS ABANDONED BY RESOLUTION NO. 810497, RECORDED MAY 18, 1981, IN BOOK 5375, PAGE 733 OF OFFICIAL RECORDS, AS DOCUMENT NO. 050848, OF OFFICIAL RECORDS, WHICH WOULD PASS BY OPERATION OF LAW.

EXCEPTING FROM, THAT PORTION LYING WITHIN LOT 13, AN UNDIVIDED ONE-HALF INTEREST IN AND TO ALL OIL, GAS, PETROLEUM AND OTHER HYDROCARBON AND OTHER SUBSTANCES WITHIN OR UNDERLYING SAID LAND, AS RESERVED BY HENRY RAY ALLEN AND ELLA REBECCA ALLEN, HIS WIFE, IN THE DEED RECORDED APRIL 11, 1944 IN BOOK 117, PAGE 436 OF OFFICIAL RECORDS, AS DOCUMENT NO. 8646.

EXCEPTING FROM, THAT PORTION LYING WITHIN LOT 5, THE OIL, GAS AND OTHER HYDROCARBONACEOUS SUBSTANCES THEREIN OR THEREUNDER, PROVIDED, HOWEVER, THAT NO DIGGING OR DRILLING FOR EXPLORATION OR EXTRACTION OF SUCH OIL, GAS, OR HYDROCARBONACEOUS SUBSTANCES SHALL EVER BE CONDUCTED WITHIN THE BOUNDARIES OF SAID LAND, AS RESERVED BY PETE B. PERICH, A WIDOW, IN THE DEED RECORDED JULY 10, 1950, IN BOOK 1712, PAGE 155 OF OFFICIAL RECORDS, AS DOCUMENT NO. 28296.

ALSO EXCEPTING FROM, THAT PORTION LYING WITHIN LOT 13, ALL THE RIGHTS RESERVED BY THE UNITED STATES OF AMERICA, IN THE DEED RECORDED APRIL 26, 1962, IN BOOK 3486, PAGE 333 OF OFFICIAL RECORDS, AS DOCUMENT NO. 25305.

**PARCEL 22: INTENTIONALLY DELETED**

**PARCEL 23: INTENTIONALLY DELETED**

**PARCEL 23A: INTENTIONALLY DELETED**

**PARCEL 24: INTENTIONALLY DELETED**

**PARCEL 25: APN: 049-110-49-00**

LOT 12 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO.1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THE SOUTHERLY 50 FEET OF THE EASTERLY 50 FEET THEREOF.

ALSO EXCEPTING THEREFROM 3/4THS OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS THEREIN AND THEREUNDER, TOGETHER WITH ALL EASEMENTS AND RIGHTS NECESSARY OR CONVENIENT FOR THE PRODUCTION, STORAGE AND TRANSPORTATION THEREOF AND EXPLORATION AND TESTING OF THE SAID REAL PROPERTY, AND ALSO THE RIGHT TO DRILL FOR, PRODUCE AND USE WATER FROM SAID PROPERTY IN CONNECTION WITH ITS DRILLING OR MINING OPERATIONS THEREIN, AS RESERVED BY CALIFORNIA LANDS INC., A CALIFORNIA CORPORATION, IN DEED DATED JUNE 8,1938 AND RECORDED JULY 2, 1938 IN BOOK 809, PAGE 91 OF OFFICIAL RECORDS, AS DOCUMENT NO. 15579.

**PARCEL 25A:**

AN APPURTENANT EASEMENT FOR INGRESS, EGRESS AND ROAD PURPOSES OVER THE EAST 20 FEET OF LOT 4 OF SAID RICHGROVE LAND COMPANY'S COLONY TRACT NO.1, AS DISCLOSED IN DOCUMENT RECORDED DECEMBER 30, 1991, IN BOOK 6613, PAGE 583 OF OFFICIAL RECORDS.

**PARCEL 25B:**

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

**PARCEL 26: APN: 049-110-29-01 AND 049-110-29-02**

THE SOUTHERLY 50 FEET OF THE EASTERLY 50 FEET OF LOT 12 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO.1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER MAP RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**PARCEL 27: INTENTIONALLY DELETED**

**PARCEL 27A:**

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

**PARCEL 28: APN: 050-270-07-00**

ALL THAT PORTION OF LOT 20 LYING WEST OF THE RIGHT OF WAY OF THE SOUTHERN PACIFIC RAILROAD IN THE HILLCREST TRACT, IN THE UNINCORPORATED AREA OF THE

COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 14, 1911, IN BOOK 2, PAGE 16 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. SAID SOUTHERN PACIFIC RAILROAD RIGHT OF WAY BEING A STRIP OF LAND 100 FEET IN WIDTH, CREATED IN THE DEED TO STOCKTON AND TULARE RAILROAD COMPANY, RECORDED MAY 19, 1988, IN BOOK 27, PAGES 41, 42 & 43 OF DEEDS, AND SUBSEQUENTLY SHOWN ON THE MAP OF SAID TRACT.

EXCEPTING THEREFROM, ALL OF THE PETROLEUM, GAS, ASPHALTUM AND OTHER HYDROCARBONS AND OTHER MINERALS, WHETHER SIMILAR TO THOSE HEREIN SPECIFIED OR NOT, WITHIN OR UNDERLYING, OR THAT MAY BE PRODUCED FROM SAID LAND, AS RESERVED BY LILLIAN H. BEARDSLEY, A WIDOW, STEPHEN T. CLIFFORD, A SINGLE MAN, AND LINDA M. CLIFFORD, A SINGLE WOMAN, IN THE DEED RECORDED DECEMBER 31, 1963, IN BOOK 3676, PAGE 677 OF OFFICIAL RECORDS, AS DOCUMENT NO. 80736.

### PARCEL 29: INTENTIONALLY DELETED

### PARCEL 30-32: INTENTIONALLY DELETED

### TRACT C

**THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA OF KERN, COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:**

### PARCEL 1: APN: 049-020-06-01

THE WEST HALF OF THE NORTHWEST QUARTER OF FRACTIONAL SECTION 3, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED ONE-HALF OF ALL OIL, GAS, HYDROCARBONS, AND OTHER MINERAL RIGHTS, AS RESERVED BY L.R. BILLINGS, AS EXECUTOR OF THE WILL OF ELMER W. HARRIS, DECEASED, IN DEED RECORDED NOVEMBER 5, 1958 IN BOOK 3031, PAGE 64 AS DOCUMENT NO. 61974 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM AN UNDIVIDED ONE-FOURTH OF ALL THE OIL, GAS, HYDROCARBONS AND OTHER MINERALS, AS RESERVED BY ELVA DAU SAY WHO ACQUIRED TITLE AS ELVA DAU, IN DEED RECORDED DECEMBER 29, 1977 IN BOOK 5078, PAGE 557 AS DOCUMENT NO. 60741 OF OFFICIAL RECORDS.

### PARCEL 2: APN: 049-250-01-00

LOTS 65 AND 73 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

### PARCEL 3: APN: 049-250-02-00

LOT 66 AND THE NORTH HALF OF LOT 74 OF RICHGROVE LAND COMPANY'S COLONY TRACT NO. 1, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA ACCORDING TO THE MAP THEREOF RECORDED FEBRUARY 18, 1911, IN BOOK 2, PAGE 17 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

EXCEPTING THEREFROM, ONE-HALF OF ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN, UPON OR UNDER SAID PREMISES OR ANY PORTION THEREOF, AND THE RIGHT TO PROSPECT FOR THE SAME AND TO DRILL FOR AND TO PRODUCE AND TAKE AWAY THE SAME, AND LIKEWISE RESERVING UNTO HER AND TO HER HEIRS, SUCCESSORS, AND ASSIGNS, THE RIGHT TO ENTER UPON SAID PREMISES FOR THE ABOVEMENTIONED PURPOSES FROM TIME TO TIME WITH DUE REGARD TO THE USE OF THE SAME BY THE GRANTEE, ALL AS RESERVED BY IDA BELL COLING, A WIDOW, IN THE DEED RECORDED MARCH 1, 1946, IN BOOK 1310, PAGE 17 OF OFFICIAL RECORDS, AS DOCUMENT NO. 8380.

## PARCEL 3A:

A PERPETUAL EASEMENT OF INGRESS AND EGRESS AND TO CONVEY WATER THROUGH THE UNDERGROUND PIPELINE OVER THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 25 SOUTH, RANGE 26 EAST, MOUNT DIABLO MERIDIAN, AS DISCLOSED IN THE DOCUMENT ENTITLED EASEMENT AND WATER SHARE AGREEMENT, RECORDED MARCH 6, 1992, IN BOOK 6641, PAGE 0809 OF OFFICIAL RECORDS, AS DOCUMENT NO. 031040.

## PARCEL 4: APN: 051-110-29

THE NORTHEAST QUARTER OF SECTION 21, TOWNSHIP 25 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED ONE-HALF OF ALL MINERALS AND MINERAL RIGHTS OF EVERY KIND AND CHARACTER (EXCEPT WATER AND WATER RIGHTS) NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, INCLUDING WITHOUT LIMITING THE GENERALITY OF THE FOREGOING OIL, GAS AND RIGHTS THERETO, TOGETHER WITH THE SOLE, EXCLUSIVE AND PERPETUAL RIGHT TO EXPLORE FOR, REMOVE AND DISPOSE OF SAID MINERALS BY ANY MEANS OR METHODS SUITABLE TO GRANTOR, ITS SUCCESSORS AND ASSIGNS, BUT WITHOUT ENTERING UPON OR USING THE SURFACE OF SAID LAND HEREIN DESCRIBED OR ANY PORTION OF THE SUBSURFACE WITHIN 500 FEET OF THE SURFACE OF SAID LAND, AS RESERVED BY ERNEST GAILLARD, JR. AND MIGNONNE NASH GAILLARD, HUSBAND AND WIFE, AS JOINT TENANTS, IN DEED RECORDED DECEMBER 31, 1981 IN BOOK 5428, PAGE 1002 AS DOCUMENT NO. 063620 OF OFFICIAL RECORDS.

## PARCEL 5: APN: 051-110-28 & 051-110-30

THE NORTHWEST QUARTER OF SECTION 21, TOWNSHIP 25 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED ONE-HALF OF ALL MINERALS AND MINERAL RIGHTS OF EVERY KIND AND CHARACTER (EXCEPT WATER AND WATER RIGHTS) NOW KNOWN TO EXIST OR HEREAFTER DISCOVERED, INCLUDING WITHOUT LIMITING THE GENERALITY OF THE FOREGOING OIL, GAS AND RIGHTS THERETO, TOGETHER WITH THE SOLE, EXCLUSIVE AND PERPETUAL RIGHT TO EXPLORE FOR, REMOVE AND DISPOSE OF SAID MINERALS BY ANY MEANS OR METHODS SUITABLE TO GRANTOR, ITS SUCCESSORS AND ASSIGNS, BUT WITHOUT ENTERING UPON OR USING THE SURFACE OF SAID LAND HEREIN DESCRIBED OR ANY PORTION OF THE SUBSURFACE WITHIN 500 FEET OF THE SURFACE OF SAID LAND, AS RESERVED BY ERNEST GAILLARD, JR. AND MIGNONNE NASH GAILLARD, HUSBAND AND WIFE, AS JOINT TENANTS, IN DEED RECORDED DECEMBER 31, 1981 IN BOOK 5428, PAGE 1002 AS DOCUMENT NO. 063620 OF OFFICIAL RECORDS.

## PARCEL 6: APN: 177-010-06-01

THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER; AND THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF FRACTIONAL SECTION 2, TOWNSHIP 30 SOUTH, RANGE 29 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL MINERALS OF EVERY KIND AND NATURE WHATSOEVER INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PETROLEUM, OIL, ASPHALTUM, GAS AND ALL OTHER HYDROCARBON SUBSTANCES, CARBON DIOXIDE, NITROGEN, SULFUR DIOXIDE, HELIUM, AND ALL OTHER NATURAL GASES, TOGETHER WITH THE EXCLUSIVE RIGHT TO PROSPECT, BORE, DRILL FOR AND PRODUCE ANY OR ALL OF SUCH MINERALS EITHER BY MEANS OF FACILITIES LOCATED ON SAID LAND OR LOCATED ON ADJOINING OR NEARBY LANDS; AND FURTHER RESERVING UNTO GRANTOR, ITS SUCCESSORS AND ASSIGNS, THE EXCLUSIVE EASEMENTS AND RIGHT TO BORE OR DRILL IN AND THROUGH SAID ABOVE-DESCRIBED PROPERTY TO EXPLORE FOR AND EXTRACT PETROLEUM, OIL, ASPHALTUM, GAS, AND OTHER HYDROCARBON SUBSTANCES, NITROGEN, CARBON DIOXIDE, SULFUR DIOXIDE, HELIUM AND ALL OTHER NATURAL GASES AND MINERALS OF EVERY KIND AND NATURE WHATSOEVER FROM ADJOINING OR NEARBY LANDS, GRANTOR ALSO RESERVES THE RIGHT TO DRILL FOR, DEVELOP, AND USE SUCH WATER ON SAID ABOVE-DESCRIBED PROPERTY AS GRANTOR MAY REQUIRE FOR ITS DRILLING AND/OR PRODUCING OPERATIONS ONLY, ALL AS RESERVED BY SOCONY MOBIL OIL CO., INC., A NEW YORK CORPORATION, SUCCESSOR IN INTEREST TO GENERAL PETROLEUM CORPORATION, IN DEED RECORDED AUGUST 8, 1962 IN BOOK 3517, PAGE 213 AS DOCUMENT NO. 46382 OF OFFICIAL RECORDS.

## PARCEL 7: APN: 503-010-16

THAT PORTION OF THE RANCHO EL TEJON, IN THE UNINCORPORATED AREA, COUNTY OF KERN, STATE OF CALIFORNIA, PATENTED BY THE UNITED STATES OF AMERICA TO JOSE ANTONIO AGUIRRE AND IGNACIO DEL VALLE, BY PATENT RECORDED IN BOOK 2, PAGE 24 OF PATENTS, IN OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL C-16, AS SHOWN ON THE RECORD OF SURVEY MAP RECORDED JULY 5, 1968 IN BOOK 9, PAGE 146 OF RECORD OF SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, BEING A PORTION OF LOT 37 OF SAID RANCHO EL TEJON, IN SECTION 10, TOWNSHIP 31 SOUTH, RANGE 30 EAST MOUNT DIABLO BASE AND MERIDIAN, AS MORE PARTICULARLY SHOWN ON SAID RECORD OF SURVEY MAP.

EXCEPTING THEREFROM THE EASTERLY 330 FEET OF THE NORTH HALF OF SAID PARCEL C-16.

ALSO EXCEPTING THEREFROM THOSE PORTIONS, IF ANY, WITHIN THE FEE SIMPLE PARCELS TAKEN BY FINAL DECREE OF CONDEMNATION, A CERTIFIED COPY OF WHICH WAS RECORDED FEBRUARY 24, 1970 IN BOOK 4369, PAGE 405 AS DOCUMENT NO. 09844 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS AND MINERAL RIGHTS, AS RESERVED BY TEJON RANCH CO., IN DEED RECORDED OCTOBER 30, 1970 IN BOOK 4453, PAGE 438 AS DOCUMENT NO. 67431 OF OFFICIAL RECORDS. A QUITCLAIM DEED RECORDED OCTOBER 30, 1970 IN BOOK 4453, PAGE 502 AS DOCUMENT NO. 67445 OF OFFICIAL RECORDS, EXECUTED BY TEJON RANCH CO., A CALIFORNIA CORPORATION, DOES REMISE, RELEASE AND FOREVER QUITCLAIM TO CHARLES N. HEIN, JR., ET AL, ALL RIGHT TO THE USE OF THE SURFACE OF SAID LAND OR ANY OTHER PORTION THEREOF ABOVE A DEPTH OF 500 FEET FROM THE SURFACE THEREOF, FOR THE PURPOSE OF DRILLING FOR OR DEVELOPING ANY OIL, GAS, MINERALS, OR OTHER HYDROCARBON SUBSTANCES WITHIN OR UNDERLYING SAID LAND, PROVIDED, HOWEVER, THAT GRANTORS HEREIN, THEIR HEIRS OR ASSIGNS SHALL HAVE THE RIGHT TO DEVELOP SUCH SUBSTANCES BY SLANT DRILLING FROM LOCATIONS ON ADJACENT LANDS AT DEPTHS OF MORE THAN 500 FEET OR FROM EASEMENTS FOR DRILLING SITES ON THE SURFACE OF THE ABOVE REAL PROPERTY. SAID DRILLING SITES ARE MORE PARTICULARLY DESCRIBED IN AN EASEMENT DEED RECORDED OCTOBER 30, 1970 IN BOOK 4453, PAGE 474 AS DOCUMENT NO. 67439 OF OFFICIAL RECORDS.

**PARCEL 8-11: INTENTIONALLY DELETED**

Schedule 4.7

Permitted Liens

(Attached)

| | Estimated Balance: | Loan Parties | UCC-1 | Filing State | Description | Purpose |
|---|---|---|---|---|---|---|
| Global Merchant Cash Inc - Wall Street Funding | $ 1,430,721 | Hronis, Inc | U240064385426 | CA | All Assets | MCA- Working Capital |
| True Business Funding | $ 615,214 | Hronis, Inc.; Kosta James Hronis; Peter John Hronis | | CA | Future Receipts | MCA- Working Capital |
| | | Hronis, Inc.; Kosta James Hronis; Peter John Hronis; Fruit Royale; Hronis Capital Management LLC; Hronis Fruit Company LLC; Hronis Racing LLC; Hronis Ranch LLC; International Fruit Company Inc; Shamrock Transport LLC; The Peter | | | | |
| Pinnacle Business Loan | $ 615,214 | Hronis Company LLC | | CA | Blanket Security Interest | MCA- Working Capital |
| | | Hronis Fruit Company LLC; International Fruit Company, Inc.; Hronis Citrus, LLC; Hronis Racing, LLC; The Peter Hronis Company LLC; Hronis Ranch, LLC; Shamrock Transport, LLC; Hronis Capital Management, LLC; Hronis, Inc; Fruit | | | | |
| Webfunder | $ 887,500 | Royale, Inc. | U240062279227 | CA | Receipts, Accounts, and Proceeds | MCA- Working Capital |
| Square Advance | $ 1,440,000 | Hronis Fruit Company LLC | U240069694133 | CA | All Assets | MCA- Working Capital |
| | | Hronis Fruit Company LLC; Peter J Hronis; Kosta J Hronis; International Fruit Company, Inc.; Hronis Citrus, LLC; Hronis Racing, LLC; The Peter Hronis Company LLC; Hronis Ranch, LLC; Shamrock Transport, LLC; Hronis Capital Management, LLC; | | | | |
| Union Funding | $ 528,062 | Fruit Royale, Inc.; Hronis, Inc. International Fruit Company, Inc.; Peter John Hronis; Kosta James Hronis; Hronis Farming, LP; Hronis | | CA | Blanket Security Interest | MCA- Working Capital |
| Global Merchant Cash Inc - Wall Street Funding | $ 689,764 | Citrus, LLC; Hronis, Inc. | | CA | Blanket Security Interest | MCA- Working Capital |
| | | Fruit Royale, Inc.; Peter J Hronis; Kosta J Hronis; Hornis Fruit Company LLC; International Fruit Company, Inc.; Hronis Racing, LLC; Shamrock Transport, LLC; Hronis Capital | | | | |
| Webfunder | $ 497,000 | Management, LLC; Hronis, Inc. | U240063691626 | CA | All Assets | MCA- Working Capital |
| | | Hronis Fruit Company LLC; International Fruit Company, Inc.; Hronis Citrus, LLC; Hronis Racing, LLC; The Peter Hronis Company LLC; Hronis Ranch, LLC; Shamrock Transport, LLC; Hronis Capital Management, LLC; Hronis, Inc; Fruit | | | | |
| Oakwood | $ 1,488,000 | Royale, Inc. | U240069696835 | CA | All Assets | MCA- Working Capital |
| | | Hronis Inc.; Pete Hronis; Kosta Hronis; International Fruit Company Inc; Fruit Royale Inc; Hronis Fruit | | | | |
| Essentia Funding | $ 496,664 | Company LLC; Hronis Racing LLC | | CA | Blanket Security Interest | MCA- Working Capital |
| | | Hronis Inc.; Pete Hronis; Kosta Hronis; International Fruit Company Inc; Fruit Royale Inc; Hronis Fruit | | | | |
| Essentia Funding | $ 496,664 | Company LLC; Hronis Racing LLC | | CA | Blanket Security Interest | MCA- Working Capital |
| | | Hronis Inc.; Pete Hronis; Kosta Hronis; International Fruit Company Inc; Fruit Royale Inc; Hronis Fruit | | | | |
| Essentia Funding | $ 496,664 | Company LLC; Hronis Racing LLC | | CA | Blanket Security Interest | MCA- Working Capital |

| | Estimated Balance: | Loan Parties | UCC-1 | Filing State | Description | Purpose |
|---|---|---|---|---|---|---|
| Wynwood Capital | $ 813,450 | Hronis Fruit Company LLC; Peter John Hronis; Kosta James Hronis; International Fruite Company, Inc.; Hronis, Inc.; Hronis Citrus, LLC; Hronis Racing, LLC; The Peter Hronis Company LLC; Central California Orange Growers Cooperative; California Grape Growers Cooperative; Hronis Ranch, LLC; Shamrock Transport, LLC; Hronis Capital Assets,LP; The Hronis Family Limited Partnership; Del Mar Thoroughbred Club; Fruit Royale, Inc; Hronis Resource Management, LLC; Hronis Farming, LP; The Kosta Hronis Company LLC; Hronis Capital Management, LLC | | CA | Blanket Security Interest | MCA- Working Capital |
| Union Funding | $ 781,000 | Hronis Fruit Company LLC; Peter J Hronis; Kosta J Hronis; International Fruit Company, Inc.; Hronis Citrus, LLC; Hronis Racing, LLC; The Peter Hronis Company LLC; Hronis Ranch, LLC; Shamrock Transport, LLC; Hronis Capital Management, LLC; Fruit Royale, Inc.; Hronis, Inc. | | CA | Blanket Security Interest | MCA- Working Capital |
| F&G | $ 427,656 | International Fruit Company, Inc.; Peter John Hronis | NA | NA | Unsecured | Personal Loan- Working Capital |
| AgAmerica | $ 20,000,000 | Hronis Ranch, LLC; The Hronis Family Limited Partnership; Hronis Land Company; Hronis Citrus, LLC; Hronis Capital Assets, LP; Peter John Hronis; Kosta James Hronis | U240000216816 | CA | DOT on real property and Fixture Filing | Real estate term loan |
| AgAmerica | $ 50,000,000 | Hronis Ranch, LLC; The Hronis Family Limited Partnership; Hronis Land Company; Hronis Citrus, LLC; Hronis Capital Assets, LP; Peter John Hronis; Kosta James Hronis | U240000216816 | CA | DOT on real property and Fixture Filing | Real estate term loan |
| Equipment Loans | $ 1,480,484 | | | | | |
| Deere & Company | | Hronis, Inc; Kosta James Hronis | U220163267527 | CA | Specific Equipment | Equipment Purchase |
| Deere & Company | | Hronis, Inc; Kosta James Hronis | U230023490529 | CA | Specific Equipment | Equipment Purchase |

Schedule 5.4

Post-Closing Deliverables

1.      Real Estate Deliverables.

A. Borrower shall have delivered to the Lender of a policy of title insurance from an insurance company with a Demotech rating of "A" insuring the Lender's interest in the Real Property Collateral, which cooperation shall be deemed to include, but not by way of limitation, doing all things necessary to satisfy the requirements set forth in said title insurance commitment or added thereto by the issuer thereof (including the payment of premiums).

B. Borrower shall have delivered to the Lender a filled-in copy of the Environmental Questionnaire, which shall indicate that no environmental hazards are present on the Real Property Collateral.

C. Borrower shall have delivered a certificate from any of its senior officers certifying as to compliance with the requirements of Section 6.4 of this Agreement.

2.      Account Control Agreements. The Lender shall have received an Account Control Agreements over the U.S. Bank Account, duly executed by, in addition to the applicable Borrower, the applicable financial institution.

<u>Schedule 6.31.1</u>

<u>List of Borrower's Farm Products</u>

As of October 28, 2024:

Grapes on the Vine: Approximately 482,183 Finished Cases

Citrus on Trees: Approximately 40,000 Bins

Schedule 6.31.2

List of Borrower's Inventory

As of October 28, 2024:

577,166 Cases of Table Grapes in Hronis Cold Storage located at 10443 Hronis Road, Delano California 93215

Schedule 6.31.3

List of Borrower's Buyers of Borrower's Farm Products

AG-MART ENTERPRISES
2478 MITCHELL AVE.
CLOVIS, CA 93611-5918

ALDI – FREDERICK
8751 GAS HOUSE PIKE
FREDERICK, MD 21701

ALDI – SAXONBURG
6000 NORTH NOAH DR.
SAXONBURG, PA 16056

BAYSHORE PRODUCE LLC
PO BOX 531110
MIAMI, FL 33153-1110

CHENAIL FRUITS ET LEGUMES
340 BELLARMIN
MONTREAL, PQ, CANADA H2P-1G5

C.H. ROBINSON CO./CHICAGO BRANCH NO. 009
1200 INTL PKWY, STE 150
WOODRIDGE, IL 60517-5125

CLASS PRODUCE GROUP LLC
PO BOX 2003
JESSUP, MD 20797-2003

COSTCO WHOLESALE
999 LAKE DR.
ISSAQUAH, WA 98027-8990

CROWN JEWELS PRODUCE COMPANY
PO BOX 25430
FRESNO, CA 93729-5430

CUSTOM PRODUCE
PO BOX 977
KINGSBURG, CA 93631

D.L.J. PRODUCE INC.
2201 N LAKEWOOD BLVD
STE D, #1881
LONG BEACH, CA 90815

FOOD LION LLC
PO BOX 519
DIST ACCTS PAYABLE DEPT.
SALISBURY, NC 28145-0519

FRESH ADVANCEMENTS INC.
333 ONT FOOD TERM. 165 THE QUEENSWAY
TORONTO, ON, CAN M8Y 1H8

FRESH TASTE PRODUCE
343-345 ONT FOOD TERM. 165 THE QUEENSWAY
TORONTO, ON, CAN M8Y 1H8

MAC EDWARDS PRODUCE & CO. INC.
PO BOX 661688
MIAMI, FL 33266-1688

METRO INC.
1600 MONTEE MASSON
LAVAL, QC H7E 4P2

METRO ONTARIO INC.
11701 BOUL ALBERT HUDON
MONREAL QC H16 3K6

METRO RICHELIEU INC.
11701 BOUL ALBERT HUDON
MONTREAL QC H1G 3K6

PIGGLY WIGGLY ALABAMA DIST CO INC
PO BOX 2400
BESSEMER, AL 35021-2400

ROBINSON FRESH / MONTEREY
100 WILSON RD., STE 200
MONTEREY, CA 93940-7885

ROBINSON FRESH/PHILADELPHIA
4 ECHELON PLAZA, 201 LAUREL RD.
5TH FLOOR
VOORHEES, NJ 08043

TRADER JOE'S COMPANY
PO BOX 5049
MONROVIA, CA 91017

VESTA FOODSERVICE
13527 ORDEN DR – ORG STATE REG 59202
SANTA FE SPRINGS, CA 90670

WAL-MART STORES, INC.
702 S. W. EIGHTH STREET
BENTONVILLE, AR 72716

WAL-MART INT'L ACCOUNTING
ATTN: ACCOUNTS PAYABLE
1301 SE 10TH STREET
BENTONVILLE, AR 72716-0655

WESCOTT AGRI PROD/HONEYBEAR MKTG
28085 COUNTY RD 25
ELGIN, MN 55932

ZAN FRUITS LLC
4200 TRUXTUN AVE, STE 300
BAKERSFIELD, CA 93309

KING FRESH PRODUCE
4731 AVENUE 400
DINUBA, CA 93618

Schedule 6.31.4

List of Borrower's Suppliers

| 1100 |
| --- |
| A & P DIESEL ELECTRIC INC. |
| **1102** |
| JOHNSON CONTROLS SECURITY SOLUTIONS |
| **1114** |
| AGPACK TRUCKING, INC. |
| **1140** |
| LINDE GAS & EQUIPMENT INC. |
| **1142** |
| GREG'S PETROLEUM SERVICE, INC. |
| **1143** |
| JIM'S SUPPLY CO., INC. |
| **1144** |
| MAXCO SUPPLY INC |
| **1162** |
| S & S SPRAYERS, LLC |
| **1172** |
| COMPLIANCE HR LLC |
| **1202** |
| FRUIT ROYALE, INC. |
| **1203** |
| FOUR STAR SALES, INC. |
| **1205** |
| DANDREA PRODUCE, LLC |
| **1206** |
| CROWN JEWELS PRODUCE COMPANY |
| **1305** |
| PACIFIC TIRE SERVICE |
| **1310** |
| GRAINGER |
| **1317** |
| KERN MACHINERY, INC. |
| **1320** |
| AT&T |
| **1323** |
| FEDEX |
| **1326** |
| FASTENAL COMPANY |
| **1327** |
| COMMUNICATION ENTERPRISES |
| **1335** |
| S.A. CAMP |

| |
|---|
| **1337** |
| MORTON AND BROWN PLUMBING, INC. |
| **1339** |
| PG&E |
| **1340** |
| PACIFIC TIRE #6 |
| **1341** |
| APPLIED TECHNOLOGY GROUP, INC. |
| **1343** |
| S.S.J.M.U.D. |
| **1346** |
| KERN-TULARE WATER DISTRICT |
| **1347** |
| SPARKLE UNIFORM & LINEN SVC |
| **1348** |
| GOLDEN VALLEY ORCHARD SUPPLY, INC. |
| **1354** |
| OFFICE DEPOT BUSINESS CREDIT |
| **1356** |
| SEVIER'S AUTO SUPPLY |
| **1358** |
| SEQUOIA PAINT ENTERPRISE |
| **1359** |
| BAKERSFIELD COUNTRY CLUB |
| **1364** |
| SAUCELITO IRRIGATION DISTRICT |
| **1365** |
| ARVIN-EDISON WATER STORAGE DISTRICT |
| **1367** |
| SPARKLETTS |
| **1369** |
| SO. CALIFORNIA EDISON |
| **1370** |
| BUTTONWILLOW WAREHOUSE CO. INC. |
| **1371** |
| HELENA AGRI-ENTERPRISES, LLC |
| **1372** |
| DELANO PROPANE |
| **1382** |
| SOCALGAS |
| **1384** |
| DELANO-EARLIMART IRRIGATION DISTRICT |
| **1387** |
| SIERRA VALLEY AG SUPPLY |
| **1391** |
| MCMASTER-CARR |
| **1395** |
| SECURITAS SECURITY SERVICES USA, INC. |

| |
|---|
| **1400** |
| SAN JOAQUIN PAINT & GLASS INC. |
| **1402** |
| DELANO CHEVROLET BUICK GMC |
| **1404** |
| DACO FARM SUPPLY INC. |
| **1406** |
| PACIFIC IRRIGATION INC |
| **1407** |
| NUTRIEN AG SOLUTIONS, INC. (DELANO) |
| **1408** |
| C & B INSURANCE SERVICES, INC. |
| **1409** |
| C & H FENCE & PATIO, INC. |
| **1420** |
| SUNBELT RENTALS |
| **1421** |
| HOME DEPOT CREDIT SERVICES |
| **1424** |
| VERIZON WIRELESS |
| **1426** |
| SENSITECH INC. |
| **1427** |
| CLARK PEST CONTROL |
| **1434** |
| VALLEY TECH AGRICULTURAL SERVICES |
| **1443** |
| INDUSTRIAL REFRIGERATION SERVICE CO, INC |
| **1444** |
| ID TECHNOLOGY, LLC |
| **1445** |
| BEAULIEU MOBILE SERVICE |
| **1447** |
| HERC RENTALS |
| **1449** |
| UNWIRED BROADBAND, INC. |
| **1455** |
| KERN PRINT SERVICES |
| **1459** |
| SIGN MASTER |
| **1463** |
| GIBBS INT'L TRUCK CENTERS |
| **1467** |
| DOUBLE EAGLE PRODUCE AND TRANSPORTATION |
| **1481** |
| SNOWDEN ENTERPRISES, INC. |
| **1500** |
| B & B SURPLUS INC. |

| |
|---|
| **1504** |
| JORDAN KAUFMAN - KCTTC |
| **1511** |
| CALIFORNIA TABLE GRAPE COMMISSION |
| **1525** |
| BR CONSULTING, LLC |
| **1535** |
| SC CONSULTING LLC |
| **1536** |
| CHEP USA |
| **1537** |
| VERITIV OPERATING COMPANY |
| **1538** |
| CARGO DATA CORPORATION |
| **1539** |
| AIR TECHS |
| **1543** |
| RICH ENVIRONMENTAL SERVICE |
| **1548** |
| MADLAND TOYOTA-LIFT, INC. |
| **1552** |
| CASHIER - STANDARDIZATION 41101 |
| **1554** |
| LAMONT SANITATION, INC. |
| **1557** |
| STANDARD PLUMBING SUPPLY CO. |
| **1562** |
| HUNSAKER AND SON, INC. |
| **1566** |
| QUINN COMPANY |
| **1601** |
| BEST WEIGH SCALE COMPANY, INC. |
| **1637** |
| FAMOUS SOFTWARE LLC |
| **1640** |
| BILL'S FAST LUBE & SMOG |
| **1709** |
| TERRA BELLA IRRIGATION DISTRICT |
| **1728** |
| ALLIED PACKAGING CORPORATION |
| **1733** |
| ARROW BEARINGS & DRIVES |
| **1756** |
| PELTZER FARM MANAGEMENT, INC. |
| **1789** |
| SIERRA VISTA AG SERVICES LLC |
| **1795** |
| AG WATER CHEMICAL |

| |
|---|
| **1812** |
| AG IPM CONSULTANTS, INC. |
| **1822** |
| MENTORS MOVING AND STORAGE |
| **1824** |
| MOLICA, SHELLEY |
| **1870** |
| CALPINE CONTAINERS, INC. |
| **1883** |
| DIRECT AG SALES INC. |
| **1911** |
| FRUIT GROWERS SUPPLY CO. |
| **1923** |
| GUERO TIRE SERVICE |
| **1939** |
| BARNES WELDING SUPPLY |
| **1953** |
| CARQUEST OF ARVIN |
| **1954** |
| SUNRIDGE NURSERIES, INC. |
| **1958** |
| VAMCO LTD., INC. |
| **1964** |
| EXPRESS BODYWORKS INC. |
| **1967** |
| LAUREL AG & WATER, LLC |
| **1968** |
| BERCHTOLD EQUIPMENT COMPANY |
| **1975** |
| SUNRISE TOOL SUPPLIES LLC |
| **2006** |
| MCCROMETER, INC. |
| **2007** |
| 99 STEEL SPECIALTIES WELDING & FABRICATI |
| **2017** |
| ULINE |
| **2039** |
| ZAG TECHNICAL SERVICES, INC. |
| **2055** |
| PACE ANALYTICAL SERVICES LLC |
| **2069** |
| WOLTERS KLUWER |
| **2072** |
| CUSTOM LABEL & DECAL, LLC |
| **2085** |
| CASTERLINE AG CONSULTING, LLC |
| **2095** |
| BEHR TRANSPORT INC. |

| |
|---|
| **2101** |
| VALLEY TECH AG CONSULTING |
| **2103** |
| FLS SUPPLY |
| **2106** |
| WILDLIFE MANAGEMENT TECHNIQUES |
| **2109** |
| TD AUTO FINANCE |
| **2137** |
| GIUMARRA VINEYARDS CORP. |
| **2169** |
| T & T TRUCK & CRANE SERVICE |
| **2188** |
| AGPACK, INC. |
| **2231** |
| WILLIAMS SCOTSMAN, INC. |
| **2241** |
| NORTH KERN WATER STORAGE DISTRICT |
| **2281** |
| KRF - LLC |
| **2285** |
| MLT SOIL SUPPLEMENTS INC. |
| **2322** |
| SIMPLOT GROWER SOLUTIONS |
| **2325** |
| HORTAU |
| **2339** |
| TOM MURRAY ENTERPRISES INC |
| **2355** |
| MCEWEN NURSERY |
| **2382** |
| INLAND WATER TECHNOLOGY, INC. |
| **2385** |
| DISTINCT CUSTOM APPERAL LP |
| **2387** |
| BAKERSFIELD ICE |
| **2391** |
| XEROX FINANCIAL SERVICES |
| **2393** |
| WONDERFUL LABORATORIES LLC |
| **2395** |
| JACK GRIGGS, INC. |
| **2410** |
| INTERSTATE BILLING SERVICE, INC. |
| **2507** |
| HUNSAKER, JUDITH PATRICIA |
| **2544** |
| SOUTH VALLEY COMPANIES, INC. |

| |
|---|
| **2546** |
| INTERNATIONAL FRUIT COMPANY INC. |
| **2746** |
| NUTRIEN AG SOLUTIONS, INC. (HANFORD) |
| **2748** |
| CIG |
| **2756** |
| TRINITY SAFETY COMPANY |
| **2792** |
| CAL-EDISON FARM EXCHANGE |
| **2797** |
| LOBO'S PACKAGING SOLUTIONS |
| **2798** |
| LMG LOGISTICS LLC |
| **2804** |
| EXECUTIVE HOUSEKEEPER |
| **2807** |
| CHAVEZ, MARYANN |
| **2808** |
| NU POOLS |
| **2828** |
| QAI, INC. |
| **2844** |
| VOLM COMPANIES, INC. |
| **2899** |
| O'REILLY AUTOMOTIVE, INC. |
| **2900** |
| CRANE'S WASTE OIL, INC. |
| **2915** |
| RLH FIRE PROTECTION |
| **2917** |
| KIMBER PALLETS & FIREWOOD, INC. |
| **2925** |
| BRIX PROCURE |
| **2947** |
| THE MARCOM GROUP |
| **2977** |
| GM FINANCIAL LEASING |
| **3035** |
| INSEASON AG INNOVATIONS, LLC |
| **3037** |
| RINCON CONSULTANTS, INC. |
| **3090** |
| UPS |
| **3167** |
| COMMODORE TRANSPORTATION LLC |
| **3185** |
| GUARDIAN HARVEST INC. |

| |
|---|
| **3187** |
| C & P SANITARY SUPPLY |
| **3194** |
| SAFE FOOD ALLIANCE |
| **3237** |
| WQS FOOD VERIFICATION LLC |
| **3257** |
| BRETT MCCOWAN FARMS, INC |
| **3289** |
| DSG LOGISTICS LLC |
| **3297** |
| BELTRAN, JENNIFER L. |
| **3311** |
| SUNVIEW MARKETING INTERNATIONAL |
| **3355** |
| HOMEGROWN ORGANIC FARMS |
| **3525** |
| CENTRAL VALLEY RATERS INC. |
| **3571** |
| CENTRAL VALLEY ELECTRIC |
| **3583** |
| TURNUPSEED ELECTRIC SERVICE, INC. |
| **3629** |
| ROBINHOOD LOGISTICS INC |
| **3703** |
| MH TRUCK BROKERAGE LLC |
| **3723** |
| CARGO SOLUTIONS |
| **3755** |
| VALLEY AUTOMATION SOLUTION INC. |
| **3811** |
| OPENHAUL LOGISTICS LLC |
| **3831** |
| MOREL CONSULTING |
| **3841** |
| INTERNATIONAL FRESH PRODUCE ASSOCIATION |
| **3843** |
| JJ's DISTRIBUTING |
| **3889** |
| TNG TRADE & LOGISTICS LLC |
| **3917** |
| NORTH AMERICA LOGISTICS LLC |
| **3923** |
| SUNKIST GROWERS INC |
| **3931** |
| SAN JOAQUIN PRODUCE SALES INC |
| **3937** |
| PROUD EXPRESS INC |

| | |
|---|---|
| **3963** | |
| STEADFAST SHIPPING INC | |
| **3967** | |
| WE ARE FLAVOR HUNTERS INC | |
| **3975** | |
| PREFERRED WAREHOUSE MANAGEMENT LLC | |

Schedule 6.31.5

List of Borrower's Litigation

None

<u>Schedule 6.31.6</u>

<u>List of Counties in which Borrower Keeps any Farm Products and/or Inventory</u>

Kern County, California
Tulare County, California

Schedule 6.32

Financial Statements

(Omitted)

# EXHIBIT 2

  
B3155-1137 10/29/2024 2:58 PM Received by California Secretary of State



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

| For Office Use Only |
| :---: |
| **-FILED-** |
| File No.: U240083964841 |
| Date Filed: 10/29/2024 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071<br>GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| HRONIS CAPITAL ASSETS, LP | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS CAPITAL MANAGEMENT, LLC | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS CITRUS, LLC | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS FARMING, LP | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS, INC. | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS LAND COMPANY | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS RANCH, LLC | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| THE HRONIS FAMILY LIMITED PARTNERSHIP | 10443 HRONIS ROAD<br>DELANO, CA 93215 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| CONTERRA AGRICULTURAL CAPITAL, LLC | 5465 MILLS CIVIC PARKWAY<br>STE 201<br>WEST DES MOINES, IA 50266 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
All Assets.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:

101398658

B3155-1138 10/29/2024 2:58 PM Received by California Secretary of State

# EXHIBIT 3



June 27, 2025

**VIA EMAIL ONLY**

Hronis Inc., et al.
10443 Hronis Road
Delano, CA 93215
Attention: Peter John Hronis
peter.hronis@hronis.net

> RE:    Letter Agreement
>           Loan No. PA2000: October 29, 2024, Revolving Line of Credit in the amount of note

Dear Mr. Hronis:

Reference is hereby made to that certain Loan and Security Agreement dated as of October 29, 2024 (the "***Loan Agreement***"), by and among Hronis Capital Assets, LP ("***Hronis Capital Assets***"), Hronis Capital Management, LLC ("***Hronis Capital Management***"), Hronis Citrus, LLC ("***Hronis Citrus***"), Hronis Farming, LP ("***Hronis Farming***"), Hronis Fruit Company LLC ("***Hronis Fruit Company***"), Hronis, Inc. ("***Hronis, Inc.***"), Hronis Land Company ("***Hronis Land Company***"), Hronis Ranch, LLC ("***Hronis Ranch***") Hronis Resource Management, LLC ("***Hronis Resource Management***"), The Hronis Family Limited Partnership ("***The Hronis Family Limited Partnership***" and, together with Hronis Capital Assets, Hronis Capital Management, Hronis Citrus, Hronis Farming, Hronis Fruit Company, Hronis, Hronis Land Company, Hronis Ranch, and Hronis Resource Management are collectively referred to herein as the "***Borrowers***"), Peter John Hronis ("***PJHronis***"), Kosta James Hronis ("***KJHronis***"), Demetrius Albert Hronis ("***DAHronis***"), The Kosta Hronis Living Trust Dated February 12, 2014 ("***The Kosta Hronis Living Trust***"), The Peter John Hronis Living Trust Dated February 28, 2006 ("***The Peter John Hronis Living Trust***"), Kosta Hronis and Peter J. Hronis, Trustees of the Sophia Hronis Irrevocable Trust One Dated December 27, 2012 ("***The Sophia Hronis Irrevocable Trust One***" and together with PJHronis, KJHronis, DAHronis, The Kosta Hronis Living Trust, and The Peter John Hronis Living Trust are collectively referred to herein as the "***Guarantors***"), Conterra Agricultural Capital, LLC (the "***Lender***" and together with the Borrowers and the Guarantors, collectively, the "***Parties***"), and Shamrock Transport, LLC, a California limited liability company ("***Shamrock***"), and Hronis Racing, LLC, a California limited liability company ("***Hronis Racing***" and together with Shamrock are collectively referred to herein as "***Additional Parties***"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Loan Agreement.

The purpose of this correspondence (this "***Letter Agreement***"), which shall be effective as of June 27, 2025 (the "***Effective Date***"), is to provide the terms under which Lender will agree to a limited waiver for additional draws pursuant to the mutually agreed upon budget and draw procedures and schedule attached as Exhibit 1 (the "***Budget***") whereby the Lender will continue to lend and the Borrowers will continue to utilize Lender's funds in an amount up to the amount of $85,850,000.00 ("the Additional Advance") which shall be deployed up through August 31, 2025 as specified further below. The Budget constitutes, based on the representations of Borrowers and the financial information provided by Borrowers, the necessary expenses required

by Borrowers to operate their business and maintain and harvest the 2025 crop which constitutes Lender's collateral under the Loan Agreement and related October 29, 2024, Promissory Note in the amount of up to $55,000,000.00 (the "***Note***"). The Note, the Loan Agreement, and all other documents and instruments evidencing or securing the Loan and any amendments, restatements, and supplements are collectively referred to herein as the "***Loan Documents***".  This Letter Agreement is entered into by Conterra Holdings, LLC, an Iowa limited liability company d/b/a Conterra Ag Capital (the "***Agent***"), as agent and loan servicer for Lender. Borrowers further acknowledge (i) the prior letter agreement dated October 21, 2024, regarding the deposit of funds from Collateral sales pending designation of a U.S. Bank Account; and (ii) the prior letter agreement dated April 9, 2025, in which Lender provided a limited one-time waiver for one or more additional draws of funds in the amount up to $6,000,000.00 under the Loan Agreement and related October 29, 2024, Promissory Note in the amount of up to $55,000,000.00. Except as specifically stated in this Letter Agreement, the obligations under these prior letter agreements remain in full force and effect.

Borrowers acknowledge Section 2.1.1 of the Loan Agreement, which provides, in part, that

> Notwithstanding any other provision of this Agreement, nothing in this Agreement shall be interpreted as a promise by Lender to make any Line of Credit Advances. Lender may refuse to make a requested Line of Credit Advance at any time and for any reason, whether arising before, on, or after the date of this Agreement, whether or not Borrower is in compliance with the covenants contained in this Agreement, and whether or not an Event of Default has occurred, or for no reason at all. Lender may in its sole discretion elect to make any requested Line of Credit Advances, whether in the requested amount or a lower amount, may reject such request in its entirety, or may condition its willingness to make such requested Line of Credit Advances on one or more conditions, including but not limited to such amendments to this Agreement and the other Financing Agreements, as Lender, in its sole discretion, deems appropriate.

Borrowers agree and understand that, except as specifically stated in this Letter Agreement, this Letter Agreement does not modify the Loan Agreement to create any obligation for Lender to make an advance to Borrowers. Rather, this Letter Agreement sets forth the terms and conditions required of Borrowers to induce Lender to agree to waive use restrictions under the Note and Loan Agreement, and to increase the amount available under the Note.

Borrowers hereby acknowledge and agree that one or more continuing Defaults and Events of Default have occurred under the Loan Agreement, including, without limitation, a Default as defined under Section 1.1 of the Loan Agreement (w) as a result of Borrowers failing to promptly notify Lender of any condition or event which constitutes (or which upon the giving of notice or lapse of time or both would constitute) a Default under Section 1.1 of the Loan Agreement, (x) as a result of Borrowers failing or neglecting to perform, keep or observe the covenants, conditions, representations, promises and agreements contained in Sections 3, 4, 5, 6, 7, and 8 of the Loan Agreement, (y) as a result of warranties and representations made by or on behalf of any Borrower or Guarantor to the Lender being untrue and/or incorrect in any material respect , and (z) as a result of Lender's deeming itself insecure or that the prospect for

repayment of the Liabilities and obligations under the Financing Agreements is impaired (collectively, the "***Specified Defaults***"). The fact that any such other Defaults or Events of Default are not specified herein shall not be construed as a waiver thereof or a waiver of the right to exercise any rights and remedies with respect thereto. The parties hereto acknowledge and agree that each Specified Default constitutes an Event of Default under the Loan Agreement that has occurred and is continuing, and that, notwithstanding anything in the Loan Agreement or in any other of the Loan Documents to the contrary, no grace period otherwise provided for in the Loan Agreement shall be required in connection with such events or occurrences to constitute Events of Default thereunder. Further, no such grace period shall be available to Borrowers for any Defaults or Events of Default previously occurring or hereafter occurring (whether for the Specified Defaults or otherwise).

Notwithstanding the Specified Defaults, Lender is agreeable, as a one-time accommodation, to provide a limited waiver from the use restrictions under the Note and Loan Agreement, and to increase the availability under the Note in an amount up to $85,850,000.00, such increase for use in the operations of Borrowers' business and maintenance and harvesting of the 2025 crop, up to and including August 31, 2025, (the "***Advance***"), subject to Borrowers agreeing to and performing all the following:

1.  As additional consideration to Lender for entering into this Letter Agreement, Borrowers shall, on the date of this Letter Agreement, pay the sum of $850,000 to Lender, which shall be made through an immediate increase in the principal balance of the Note in the same amount, and which shall be repaid under the terms of the Note. By their signatures to this Letter Agreement, Guarantors hereby agree and consent to this increase in the principal balance of Note.

2.  No later than the Effective Date, the Borrowers shall hire a Chief Restructuring Officer (the "CRO") acceptable to the Lender, and such engagement shall continue until: (i) the full satisfaction of all amounts due to Lender under the Loan Documents; or (ii) the Parties mutually agree that the CRO is not required. The Borrowers shall timely pay all fees and expenses of the CRO. In hiring the CRO, Borrowers shall purchase or include as a named insured on existing insurance (including Directors & Officers, EPLI & Fiduciary Liability policies, as deemed necessary by the CRO). Unless otherwise agreed to in a writing signed by Lender, the terms of the engagement of the CRO shall include the following:

    a.  The CRO and Borrowers will form a management committee, which shall meet no less than once a week, and in which all material aspects of the business of the Borrowers shall be discussed. The Borrowers will not undertake any material decision for the business of Borrowers without first raising it with the management committee. Detailed minutes shall be taken of each meeting and shall be preserved no fewer than two years after the termination of the engagement of the CRO;

    b.  The CRO shall have unfettered access to: (i) all books, records, officers, and employees, of Borrowers, (ii) all files, accounts, websites, and software used by Borrowers, and (iii) all professionals, vendors, or companies hired by Borrowers. Borrowers shall arrange to provide the CRO this same access to Grapeco Farm Management, Inc.;

    c.  The CRO will have full and sole responsibility regarding borrowing of funds by Borrowers, including requesting Advances under this Letter Agreement

and the Loan Agreement;

d.  The CRO shall have full and final authority over all bookkeeping, accounting, and financial reporting of the Borrowers, and Borrowers shall fully cooperate in assisting CRO with these tasks;

e.  Borrowers shall not enter into any transaction outside the ordinary course of business without (i) receiving prior approval of the CRO for the transaction; and (ii) notifying Lender no earlier than three business days before the transaction is entered into, unless exigency requires shorter notice;

f.  Borrowers shall not make payments to any vendor, officer, employee, lender, or other party without obtaining prior approval of the payment by the CRO. The CRO shall approve the payment if it complies with the Budget. If the payment does not comply with the budget, the CRO may approve the payment if it deems it necessary to maintain and harvest the 2025 crop, but shall provide the Lender at least three business days' notice of the proposed payment, unless demonstrated exigency requires shorter notice;

g.  The CRO shall confirm that Borrowers comply with the requirements of Section 5.6 of the Loan Agreement requiring that all account debtors of Borrowers make all payments to the U.S. Bank Account (as defined in the Loan Agreement). Borrowers shall not move or transfer funds out of the U.S. Bank Account except to make payments pursuant to Section 2.f, and any such transfer shall be approved in advance by CRO.

h.  The Borrowers, under the direction of the CRO, will provide the Parties with such weekly cash actual to actual to budget and variance reports by no later than Thursday at 5:00 pm PDT in the week immediately following the week such reports are attributed;

i.  The CRO and Lender may negotiate revisions to the Budget from time-to-time as necessary to account for variances and unanticipated changes, however Lender is under no obligation to agree to any modification of the Budget and reserves the right to reject any proposed modification in Lender's sole discretion. Such Budget will include CRO costs and expenses pursuant to the CRO rights and obligations contained herein;

j.  The Borrowers and CRO shall provide a certification regarding available funds to meet Budget requirements as follows:

    i.  On the 20th day of each month, or the next business day if the 20th day falls on a weekend or holiday, the CRO and Borrowers shall jointly provide a certification to Lender that Borrowers have available funds to meet the requirements of the Budget for the following month. For purposes of this section, the term "available funds" shall include only the following: (i) cash or other liquid assets on hand, less expenses to be paid up to the end of the month; (ii) projected revenue, with all data used to project revenue to be created by or confirmed by CRO; (iii) draw amounts available to Borrowers under the Note and Loan Agreement, as modified by this Letter Agreement or any

subsequent amendment or modification to the Loan Agreement; and (iv) any additional source of funds not included in the budget, including additional loans or equity contributions made to Borrowers, so long as the CRO has determined with reasonable certainty that such funds will be available for the use of Borrowers to make all payments required under the Budget and that obtaining those funds will not, in the opinion of counsel retained by CRO or Borrowers, cause a breach of any agreement to which Borrowers are a party.

ii. If the CRO or Borrowers determine that they cannot jointly make the certification required under this paragraph, then the CRO shall, on the 20th day of each month, or the next business day if the 20th day falls on a weekend or holiday, provide a written statement to Lender setting forth that the CRO and Borrowers cannot make the required certification and setting forth the projected funds available for the following month. The making of a statement that the certification pursuant to section 2.i.i, cannot be made, or if such certification is not timely made (with time being of the essence), shall constitute an immediate material breach of this Letter Agreement and an Event of Default under the Loan Documents.

k. The CRO shall have the full and final power and authority to enter into, on behalf of Borrowers and in consultation with Borrowers' owners, a sale of some or all assets of the Borrowers, in transactions outside the ordinary course of business. The CRO may undertake, in consultation with Borrowers, any marketing or brokering process the CRO deems necessary to effect a sale, and may hire any professionals, consultants, or other parties necessary to broker and/or market the assets of Borrowers. Borrowers shall cooperate in any brokering, marketing or sale process. Any proceeds of a sale shall be paid to Lender and applied to the balance of the Note;

l. The CRO shall sell the Aircraft, as defined below, with all haste;

m. The CRO is authorized to disclose and discuss with Lender all matters that may be inquired by Lender and shall prepare and provide to Lender such reports as Lender may reasonably request from time to time, at the expense of Borrowers. However, the Lender shall not have any authority, express or implied, to control or direct the CRO;

n. If the CRO determines that: (i) the Borrowers will lack funds to operate the business and maintain and harvest the 2025 crop and that Borrowers will be unable to secure additional financing or funds necessary to do so; or (ii) the Borrowers and CRO are unable to jointly and timely provide the certification of available funds required by section 2.i.i, then CRO and Borrowers shall immediately and jointly, and in good faith, prepare a liquidation plan for Borrowers in which they will timely sell all assets of Borrowers. The liquidation plan may include a bankruptcy petition under Title 11 of the United States Code, stipulation to appointment of a receiver in a Court located in California, an assignment for the benefit of creditors, or other insolvency proceeding. To the extent any such insolvency proceeding occurs, Borrowers consent to the CRO acting as the receiver,

trustee, assignee, or other outside fiduciary role of the insolvent Borrowers;

o.   Any other mutually agreed commercially reasonable terms necessary to protect repayment of Lender on the Note and the Advance; and

p.   Each of Borrowers shall take all necessary steps to provide the CRO the full authority required by this Section 1 through passing all resolutions, and as deemed necessary by the Borrower's governing documents, bylaws, or similar governing documents of each respective Borrower.

3.   Shamrock shall grant the CRO all necessary authority for the CRO to market and sell the aircraft described as: 2007 CESSNA 525B (Citation CJ3) Aircraft with an FAA Registration Number of N1SPG (Serial Number 525B-0140) (the "Aircraft"). All proceeds of the sale shall be used to pay down the balance of the Note.

4.   Borrowers shall, no later than February 28, 2026, satisfy all obligations owed to Lender under the Note and the Loan Documents through a sale, refinance, or other transaction. Borrowers further agree that if this deadline is not met, Borrowers shall immediately liquidate consistent with section 2.n. This deadline may be extended by the mutual written agreement of Lender and Borrowers. Nothing in this section shall be construed as a waiver or forbearance of Lender's rights under the Loan Agreement. Rather, this section shall constitute an additional remedy available to Lender.

5.   Borrowers agree to cooperate in any and all additional documentation determined by Lender, in Lender's sole discretion, necessary to effectuate the terms of this Letter Agreement, to appoint a CRO as set forth in section 1 above by the Effective Date, and to amend the terms of the Loan Documents to include the terms of this Letter Agreement. Borrowers shall provide all corporate resolutions, bylaws, or other governing documents necessary to approve any sale or other act that the CRO is approved to perform under section 1 of this Letter Agreement, and by entering into this Letter Agreement, Borrowers confirm that they have authority to provide such governance documents. Borrowers further agree that any failure on the part of Borrowers to timely cooperate in entering into any and all additional documentation required by this Letter Agreement, in Lender's sole discretion, shall constitute a Default or Event of Default under the Loan Agreement and subject Borrowers to applicable default interest under the Note effective as of the date of this Letter Agreement.

6.   In addition to and not in lieu of Borrowers' expense payment obligations under Section 10 of the Loan Agreement, Borrowers agree to pay any and all costs and expenses, including attorneys' fees and costs, incurred by Lender and/or Agent in connection with this Letter Agreement, the Advance, any prior letter agreement, the appointment of a CRO as set forth in section 1, above, and any required modification to the Loan Documents, which sums may be added to the principal amount of the Loan and will bear interest as set forth in the Note and Loan Documents.

7.   Borrowers shall deliver to Agent executed counterparts of this Letter Agreement prior to, and as a condition of, Agent processing the Request for Funds and Lender funding the Advance.

The failure by Borrowers to perform their obligations set forth in this Letter Agreement as and when due shall constitute an immediate Default or Event of Default under the Loan Agreement. Borrowers agree that, in the event of any material breach of this Letter Agreement, or if Borrowers and CRO fail to timely provide the certification of available funds required by section 2.i.i,, then Borrowers shall fully cooperate with, and will not dispute, Lender's exercising of its remedies under the Loan Agreement, including any additional remedies as provided for under this Letter Agreement. Borrowers shall cooperate and assist Lender in exercising its remedies, including providing all information to Lender necessary for Borrowers to exercise their rights under section 9-607(a)(1) of the Uniform Commercial Code.

Borrowers acknowledge and agree that as of the date of June 26, 2025 and prior to any Advance by Lender under this Letter Agreement, the current outstanding principal balance of the Loan is $66,340,949.34, and the current amount of accrued interest is $791,761.86. Borrowers further acknowledge and agree: (x) that any Advance under this Letter Agreement exceeds the current face value of the Note;(y) that Borrowers shall repay all amounts extended through any Advance in accordance with the terms of the Note; and (z) Borrowers will execute a modification or modifications to the Note, along with any other Loan Documents reasonably required by Lender, reflecting the increase(s) in the amount of the Loan due to any Advance(s) and for repayment of the Advance(s) under this and all prior Letter Agreements. Guarantors and Additional Parties agree to also sign any modification of any guaranty or other required documents consistent with the Loan Documents.

In further consideration of Lender's execution of this Letter Agreement, Borrowers, Guarantors, and Additional Parties, on behalf of themselves and their successors, assigns, parents, subsidiaries, affiliates, officers, directors, employees, agents (**"Releasors"**) hereby forever, fully, unconditionally and irrevocably waive and release Lender, Agent, and its successors, assigns, parents, subsidiaries, affiliates, officers, directors, employees, attorneys, and agents (collectively, the "**Releasees**") from any and all claims, liabilities, obligations, debts, causes of action (whether at law or in equity or otherwise), defenses, counterclaims, setoffs, of any kind, whether known or unknown, whether liquidated or unliquidated, matured or unmatured, fixed or contingent, directly or indirectly arising out of, connected with, resulting from, or related to any act or omission by any Lender or any other Releasee with respect to the Loan Agreement and any collateral, on or before the date of this Agreement (collectively, the "**Claims**"). Borrowers further agree that Borrowers shall not commence, institute, or prosecute any lawsuit, action, or other proceeding, whether judicial, administrative, or otherwise, to collect or enforce any Claim.

Subject to the terms above, Releasors, after consultation with their own counsel, or the opportunity to do so, shall have, and shall be deemed to have, waived and relinquished, to the fullest extent permitted by law, any and all provisions, rights, and benefits of any federal, state or foreign law, rule or common-law doctrine that is similar, comparable, equivalent, or identical to, or which has the effect of, Section 1542 of the Civil Code of the State of California ("Section 1542"), which provides as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

Releasors each hereby represent and warrant no additional approval, consent, authorization, or other action by, or notice to any Person (including, without limitation, any members, managers, boards of managers, or partners of any of the Borrowers or Guarantors, or

**5465 Mills Civic Parkway, Suite 201 | West Des Moines, IA 50266 | (855) 381-3451**

any other securityholder of or lender to Borrowers), is necessary or required in connection with the Advance, except any such approvals, consents, authorizations that have been obtained, actions taken or notices given, as applicable, prior to entry into this Letter Agreement.

Such Advance shall not constitute: (i) a waiver, modification or other amendment of the terms of the Loan Documents or of Borrowers' payment, performance or any other obligations set forth therein (including, without limitation, the obligations specified in any prior letter agreement(s) with Lender and in this Letter Agreement); (ii) a consent by Lender to any other pending request which Borrowers have made of Lender; (iii) any agreement by Lender to make further advances, it being understood and agreed that any such further advances shall only be made in Lender's sole discretion (notwithstanding any provision in any prior letter agreement(s) with the Lender, the Loan Agreement or any other agreement or instrument to the contrary); (iv) a cure or waiver of any Defaults or Events of Default that may exist as of the date hereof under the Loan Documents (including, without limitation, the Specified Defaults) or a forbearance from Lender's exercise of remedies pursuant to the same; (v) a waiver of any rights or remedies that Lender may have under the Loan Documents, at law or in equity; or (vi) a course of conduct obligating Lender to act in a similar fashion in the future.

Lender reserves all rights with respect to all obligations under the Loan Agreement, the Note and the other Loan Documents, including principal, interest, and any fees and expenses thereunder incurred or accruing. Lender further reserves the right to take such action as it deems necessary and advisable to recover payment in full of such obligations, including, without limitation, foreclosure of the liens and security interests arising under the Loan Documents and exercising its other rights and remedies permitted under the Loan Documents and under applicable law or in equity. Failure to exercise any of such remedies shall not constitute a waiver of any Defaults or Events of Default (including any Specified Defaults) or of Lender's right to exercise such remedies at a future date.

Nothing contained in this Letter Agreement or in any prior letter agreement(s) with the Lender is intended to or shall be construed as: (a) a waiver, release, modification or forbearance of any of the rights, remedies, privileges and powers of Lender against Borrowers, Guarantors, Additional Parties, or any other Person or any assets securing the obligations under the Loan Documents or a waiver of any Defaults or Events of Default, whether specified herein or otherwise, (b) a course of dealing in variance with the terms and provisions of the Loan Agreement or any other of the Loan Documents, or (c) a consent to any departure by Borrowers or any other Loan Party from the express provisions of the Loan Agreement or any other of the Loan Documents. Lender shall not by virtue of any action or omission, including the acceptance of any payment under the Loan Agreement or the other Loan Documents, be deemed to have altered or prejudiced any remedies, powers, rights, or privileges under the Loan Agreement or any other of the Loan Documents in connection with the Specified Defaults or any other Default or Event of Default.

Notwithstanding any prior or contemporaneous discussions or understandings with respect to a forbearance, waiver or extension by Lender, whether express or implied, oral or written, Lender does not have any obligation to waive or forbear from enforcing its rights and remedies with respect to, any Default or any Event of Default (including, without limitation, the Specified Defaults), nor shall any such discussions or understandings be construed as an undertaking of Lender, Agent or any other agent of Lender to continue such discussions or enter into any such forbearance or waiver, nor shall this Letter Agreement be construed as an agreement to forbear on Lender's rights under the Loan Documents. Lender has not waived the Specified Defaults or any other Defaults or Events of Default that may exist. Any forbearance, waiver or extension must be in writing and agreed to, executed and delivered in accordance with the provisions of the Loan Agreement.

Docusign Envelope ID: 50F2117C-B642-4E4E-8087-196B5130F002

Loan No. PA2000
Letter Agreement
June 27, 2025

Neither this Letter Agreement nor any prior letter agreement(s) shall, by implication or otherwise, limit, impair, constitute a waiver of, or affect the rights and remedies of Lender under any provision of the Loan Agreement or any other of the Loan Documents, and all of the provisions of the Loan Agreement and the other Loan Documents shall remain in full force and effect except as expressly modified herein and by any prior letter agreement(s) entered into by the Parties and Additional Parties. None of Lender's failure to require strict performance by Borrowers or any other Loan Party, or any Additional Parties, of any provision of any of the Loan Documents, Lender's failure to exercise, or delay in exercising, any remedy, power, right or privilege under any of the Loan Documents or the election by Lender to exercise any particular remedy, power, right or privilege under any of the Loan Documents shall operate as a waiver thereof or waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith. Although Borrowers, Guarantors, and the Additional Parties have been informed of the matters set forth herein, Lender does not have any obligation to provide Borrowers notice of the matters set forth herein, nor shall the provision of such notice herein to Borrowers be construed as an agreement to inform Borrowers or any other Person of such matters or any other matters in the future.

Thank you for your prompt attention to this matter. Should you have any questions or concerns regarding the foregoing, you may contact us by mail at Conterra Ag Capital, 5465 Mills Civic Parkway, Suite 201, West Des Moines, Iowa 50266, by phone at (855) 381-3451, or by email at servicing@conterraag.com. If you agree to the terms outlined in this Letter Agreement, please return an executed copy of this Letter Agreement by email.

Sincerely,

**Conterra Ag Capital**

By: _____
Its: President and CEO _____

**\*\*\* SIGNATURES ON NEXT PAGE \*\*\***

Docusign Envelope ID: 3A32C097-9699-4E5D-B882-3AB3D86D91EA

**Accepted and Agreed to as of the Effective Date of the Letter Agreement:**

**BORROWERS:**

**HRONIS CAPITAL ASSETS, LP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

By: _Kosta Hronis_
Kosta Hronis
Its: Manager

**HRONIS CAPITAL MANAGEMENT, LLC**, a California limited liability company

By: _Kosta Hronis_
Kosta Hronis
Its: Manager

**HRONIS CITRUS, LLC**, a California limited liability company

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: Manager

By: _Kosta Hronis_
Kosta Hronis
Its: Manager

**HRONIS FARMING, LP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

By: _Kosta Hronis_
Kosta Hronis
Its: Manager

55779498.1
394631-00002

**HRONIS FRUIT COMPANY LLC**, a California limited liability company

By: _Peter J. Hronis_

Peter John Hronis

Its: Member


By: _____

Kosta James Hronis

Its: Member


By: _____

Peter Nickolas Hronis

Its: Member


By: _____

Demetri Albert Hronis

Its: Member



**HRONIS, INC.**, a California corporation


By: _____

Kosta Hronis

Its: President

By: _Peter J. Hronis_

Peter J. Hronis

Its: Secretary



**HRONIS LAND COMPANY**, a California partnership


By: _____

Kosta Hronis

Its: Partner

By: _Peter J. Hronis_

Peter Hronis

Its: Partner

55779498.1
394631-00002

Docusign Envelope ID: 3A32C097-9699-4E5D-B882-3AB3D86D91EA

**HRONIS FRUIT COMPANY LLC**, a California limited liability company

By: _____
Peter John Hronis
Its: Member

By: _kosta Hronis_____
Kosta James Hronis
Its: Member

By: _____
Peter Nickolas Hronis
Its: Member

By: _____
Demetri Albert Hronis
Its: Member

**HRONIS, INC.**, a California corporation

By: _kosta Hronis_____
Kosta Hronis
Its: President

By: _____
Peter J. Hronis
Its: Secretary

**HRONIS LAND COMPANY**, a California partnership

By: _kosta Hronis_____
Kosta Hronis
Its: Partner

By: _____
Peter Hronis
Its: Partner

55779498.1
394631-00002

Docusign Envelope ID: 6E469D9B-DD88-4B01-8A43-12E9244D8533

**HRONIS FRUIT COMPANY LLC**, a California limited liability company


By: _____
Peter John Hronis
Its: Member

By: _____
Kosta James Hronis
Its: Member

By: _Peter N. Hronis_____
Peter Nickolas Hronis
Its: Member

By: _____
Demetri Albert Hronis
Its: Member


**HRONIS, INC.**, a California corporation


By: _____
Kosta Hronis
Its: President

By: _____
Peter J. Hronis
Its: Secretary


**HRONIS LAND COMPANY**, a California partnership


By: _____
Kosta Hronis
Its: Partner

By: _____
Peter Hronis
Its: Partner

55779498.1
394631-00002

**HRONIS FRUIT COMPANY LLC**, a California limited liability company

By: _____
Peter John Hronis
Its: Member

By: _____
Kosta James Hronis
Its: Member

By: _____
Peter Nickolas Hronis
Its: Member

By: *Demetri A. Hronis* _____
Demetri Albert Hronis
Its: Member

**HRONIS, INC.**, a California corporation

By: _____
Kosta Hronis
Its: President

By: _____
Peter J. Hronis
Its: Secretary

**HRONIS LAND COMPANY**, a California partnership

By: _____
Kosta Hronis
Its: Partner

By: _____
Peter Hronis
Its: Partner

55779498.1
394631-00002

Docusign Envelope ID: 4872302C-D73C-4137-84C8-F0FA5EC0AE55

**HRONIS RANCH, LLC**, a California limited liability company

By: _Demetri A. Hronis_
Demetri Hronis
Its: Sole Member

**HRONIS RESOURCE MANAGEMENT, LLC**, a California limited liability company

By: _____
Kosta Hronis
Its: Manager

**THE HRONIS FAMILY LIMITED PARTNERSHIP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

By: _____
Kosta Hronis
Its: Manager

**GUARANTORS:**

_____
**PETER JOHN HRONIS, individually**

_____
**KOSTA JAMES HRONIS, individually**

_Demetri A. Hronis_
**DEMETRIUS ALBERT HRONIS, individually**

_____
**KOSTA HRONIS, TRUSTEE, OF THE KOSTA HRONIS LIVING TRUST DATED FEBRUARY 12, 2014, AND ANY AMENDMENTS THERETO**

_____
**PETER JOHN HRONIS, TRUSTEE, OF THE PETER JOHN HRONIS LIVING TRUST DATED FEBRUARY 28, 2006, AND ANY AMENDMENTS THERETO**

55779498.1
394631-00002

**HRONIS RANCH, LLC**, a California limited liability company

By: _____
Demetri Hronis
Its: Sole Member

**HRONIS RESOURCE MANAGEMENT, LLC**, a California limited liability company

By: _Kosta Hronis_____
Kosta Hronis
Its: Manager

**THE HRONIS FAMILY LIMITED PARTNERSHIP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

By: _Kosta Hronis_____
Kosta Hronis
Its: Manager

**GUARANTORS:**

_____
**PETER JOHN HRONIS, individually**

_Kosta Hronis_
**KOSTA JAMES HRONIS, individually**

_____
**DEMETRIUS ALBERT HRONIS, individually**

_____
**KOSTA HRONIS, TRUSTEE, OF THE KOSTA HRONIS LIVING TRUST DATED FEBRUARY 12, 2014, AND ANY AMENDMENTS THERETO**

_____
**PETER JOHN HRONIS, TRUSTEE, OF THE PETER JOHN HRONIS LIVING TRUST DATED FEBRUARY 28, 2006, AND ANY AMENDMENTS THERETO**

55779498.1
394631-00002

**HRONIS RANCH, LLC**, a California limited liability company

By: _____
Demetri Hronis
Its: Sole Member

**HRONIS RESOURCE MANAGEMENT, LLC**, a California limited liability company

By: _____
Kosta Hronis
Its: Manager

**THE HRONIS FAMILY LIMITED PARTNERSHIP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

By: _____
Kosta Hronis
Its: Manager

**GUARANTORS:**

Signed by:

*Peter J. Hronis*

6795D87F109E4FC...

**PETER JOHN HRONIS, individually**

_____

**KOSTA JAMES HRONIS, individually**

_____

**DEMETRIUS ALBERT HRONIS, individually**

_____

**KOSTA HRONIS, TRUSTEE, OF THE KOSTA HRONIS LIVING TRUST DATED FEBRUARY 12, 2014, AND ANY AMENDMENTS THERETO**

Signed by:

*Peter J. Hronis*

...795D87F109E4FC...

**PETER JOHN HRONIS, TRUSTEE, OF THE PETER JOHN HRONIS LIVING TRUST DATED FEBRUARY 28, 2006, AND ANY AMENDMENTS THERETO**

55779498.1
394631-00002

Docusign Envelope ID: 3A32C097-9699-4E5D-B882-3AB3D86D91EA

Signed by:

*Kosta Hronis*

B0B5BE792041418...

**KOSTA HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012**

_____

**PETER J. HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012**

**ADDITIONAL PARTIES:**

**SHAMROCK TRANSPORT, LLC,** a California limited liability company

By: _____
    PETER J. HRONIS
    Its Manager

Signed by:

By: *Kosta Hronis*
    KOSTA HRONIS
    B0B5BE792041418...
    Its Manager

By: _____
    MARK DEDONATO
    Its Manager

**HRONIS RACING, LLC,** a California limited liability company

By: _____
    PETER HRONIS
    Its Member

Signed by:

By: *Kosta Hronis*
    KOSTA HRONIS
    B0B5BE792041418...
    Its Member

55779498.1
394631-00002

**HRONIS RANCH, LLC**, a California limited liability company

By: _____
Demetri Hronis
Its: Sole Member

**HRONIS RESOURCE MANAGEMENT, LLC**, a California limited liability company

By: _____
Kosta Hronis
Its: Manager

**THE HRONIS FAMILY LIMITED PARTNERSHIP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

By: _____
Kosta Hronis
Its: Manager

**GUARANTORS:**

_____
**PETER JOHN HRONIS, individually**

_____
**KOSTA JAMES HRONIS, individually**

_____
**DEMETRIUS ALBERT HRONIS, individually**

Signed by:

*kosta Hronis*

B0B5BE702041418...
**KOSTA HRONIS, TRUSTEE, OF THE KOSTA HRONIS LIVING TRUST DATED FEBRUARY 12, 2014, AND ANY AMENDMENTS THERETO**

_____
**PETER JOHN HRONIS, TRUSTEE, OF THE PETER JOHN HRONIS LIVING TRUST DATED FEBRUARY 28, 2006, AND ANY AMENDMENTS THERETO**

55779498.1
394631-00002

_____

**KOSTA HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012**

Signed by:

*Peter J. Hronis*

_____

**PETER J. HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012**

**ADDITIONAL PARTIES:**

**SHAMROCK TRANSPORT, LLC,** a California limited liability company

Signed by:

By: *Peter J. Hronis*
    PETER J. HRONIS
    Its Manager

By: _____
    KOSTA HRONIS
    Its Manager

By: _____
    MARK DEDONATO
    Its Manager

**HRONIS RACING, LLC,** a California limited liability company

Signed by:

By: *Peter J. Hronis*
    PETER HRONIS
    Its Member

By: _____
    KOSTA HRONIS
    Its Member

55779498.1
394631-00002

**KOSTA HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012**

**PETER J. HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012**

**ADDITIONAL PARTIES:**

**SHAMROCK TRANSPORT, LLC,** a California limited liability company

By: _____
    PETER J. HRONIS
    Its Manager

By: _____
    KOSTA HRONIS
    Its Manager

By: _____*Mark DeDonato*_____
    MARK DEDONATO
    Its Manager

**HRONIS RACING, LLC,** a California limited liability company
By: _____
    PETER HRONIS
    Its Member

By: _____
    KOSTA HRONIS
    Its Member

55779498.1
394631-00002

# EXHIBITS OMITTED

# EXHIBIT 4

# OFFER SUMMARY – REVENUE BASED FINANCING

| | | |
|---|---|---|
| **Funding Provided** | $13,453,570.20 | This is how much funding DLP FUNDING LLC will provide.  Due to deductions or payments to others, the total funds that will be provided to you directly is $12,780,891.69.<br><br>For more information on what amounts will be deducted, please review the attached document "Itemization of Amount Financed." |
| **Estimated Annual Percentage Rate (APR)** | 214.88% | APR is the estimated cost of your financing expressed as a yearly rate. APR incorporates the amount and timing of the funding you receive, fees you pay, and the periodic payments you make. This calculation assumes your estimated average monthly income through sales of goods and services will be $20,955,667.00.  Since your actual income may vary from our estimate, your effective APR may also vary.<br><br>APR is not an interest rate. The cost of this financing is based upon fees charged by DLP FUNDING LLC rather than interest that accrues over time. |
| **Finance Charge** | $6,117,137.25 | This is the dollar cost of your financing.<br><br>Your finance charge will not increase if you take longer to pay off what you owe. |
| **Estimated Total Payment Amount** | $19,507,676.79 | This is the total dollar amount of payments we estimate you will make under the contract. |
| **Estimated Monthly Cost** | $4,016,286.54 | Although you do not make payments on a monthly basis, this is our calculation of your average monthly cost based upon the payment amounts disclosed below. |
| **Estimated Payment** | **$191,251.74 per day** | |
| **Payment Terms** | We based your present daily payment of $191,251.74 upon our estimate of 19.25% of your total income, based upon average monthly income  of $20,955,667.00  for the last 4 month. Since we cannot predict the exact dollar amount of sales revenue your business will collect in the future, your payment is "estimated"<br>How you can change the payment amount. You have the right to obtain a lower payment amount if your sales revenue decreases. For more details on your right to change the payment amount, see Section 1.4 of your contract.<br><br>How we collect your payments. We will debit your business bank account. | |
| **Estimated Term** | 152 Calendar Days | Based on assumptions we made about your income, this is our estimate of how long it will take to collect amounts due to us under your contract. |
| **Prepayment** | If you pay off the financing faster than required, you still must pay all or a portion | |

| | of the finance charge, up to $6,054,106.59 based upon our estimates. |
| | If you pay off the financing faster than required, you will not be required to pay additional fees. |

**Applicable law requires this information to be provided to you to help you make an informed decision. By signing below, you are confirming that you received this information.**

*PETE HRONIS*                                                    11/14/2025

_____                    _____
Recipient Signature                                                  Date

| ITEMIZATION OF AMOUNT FINANCED | |
|---|---|
| 1. Amount Given Directly to You | $12,780,891.69 |
| 2. Amount paid on your behalf to third parties  (Sum of below) | $0.00 |
| 3. Amount Paid on Your Account with Us. | $0.00 |
| 4. Amount Provided to You or on Your Behalf (1 + 2 + 3+5) | $13,453,570.20 |
| 5. Prepaid finance Charges: Underwriting Fee & Origination Fee. | $672,678.51 |
| 6. Amount Financed (4 minus 5) | $12,780,891.69 |

**DLP FUNDING**

DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484

Page | 1                                                                                                    DLP FUNDING

# MERCHANT AND SECURITY AGREEMENT

This Merchant and Security Agreement (hereinafter referred to as the "Agreement") is made as of  11/14/2025  between DLP FUNDING LLC ("DLP FUNDING") and the merchant listed below (the "Merchant").

## MERCHANT INFORMATION

Merchant's Legal Name:   HRONIS FRUIT COMPANY AND ENTITIES APPEARING ON EXHIBIT "B"

D/B/A:   HRONIS FRUIT COMPANY                             State of Incorporation / Organization:   CA

Type of entity:  Limited Liability Company

Business Address:   10443 Hronis Road            City:  Delano            State:  CA        Zip:  93215-9556

Mailing Address:   10443 Hronis Road            City:  Delano            State:  CA        Zip:  93215-9556

Merchant Email:   pete.hronis@hronis.net                    Merchant Phone:   661-725-6411

| Average Monthly Revenue | Purchase Price: | Purchased Amount: | Purchased Percent: |
|---|---|---|---|
| $20,955,667.00 | $13,453,570.20 | $19,507,676.79 | 19.25% |

**Payment Frequency: Daily  Remittance: $191,251.74**

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to DLP FUNDING (making DLP FUNDING the absolute owner) in consideration of the "Purchase Price" specified above, the Purchased Percentage of all of Merchant's Future Receipts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Future Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment deposited into Merchants Account(s)), for the payments to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the "Purchased Amount" has been delivered by or on behalf of Merchant to DLP FUNDING.

Merchant is selling a portion of a future revenue stream to DLP FUNDING at a discount, not borrowing money from DLP FUNDING, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by DLP FUNDING. The Remittance is a good faith estimate of Purchased Percentage multiplied by revenues of Merchant. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement.

DLP FUNDING is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and DLP FUNDING assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give DLP FUNDING a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and Guarantor are only guaranteeing their performance of the terms of this Merchant and Security Agreement and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5. DLP FUNDING will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to and pre-approved by DLP FUNDING (the "Account"), into which Merchant and/or Merchant's customers shall remit the Future Receipts from each Transaction, until such time as DLP FUNDING receives payment in full of the Purchased Amount. Merchant hereby authorizes DLP FUNDING to ACH debit the initial Remittance from the Account on the agreed upon Payment Frequency. A daily basis means any day that is not a United States banking holiday. DLP FUNDING payment of the Purchase Price shall be deemed the acceptance and performance by DLP FUNDING of this Agreement. Merchant understands that it is responsible for ensuring that the initial Remittance to be debited by DLP FUNDING remains in the Account and will be held responsible for any fees incurred by DLP FUNDING resulting from a rejected ACH attempt or an Event of Default. DLP FUNDING is not responsible for any overdrafts or rejected transactions that may result from DLP FUNDING ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between DLP FUNDING and Merchant, upon the occurrence of an Event of Default of the Merchant Agreement the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A and is incorporated by reference into this Agreement.

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS" AND THE "SECURITY AGREEMENT AND GUARANTY" HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

Merchant 1 Initial(s):  *PH*        Merchant 2 Initial(s):  *KJH*        Guarantor 1 Initial(s):  *PH*        Guarantor 2 Initial(s):  *KJH*

**DLP**

FUNDING

DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484

Page | 2                                                                                         DLP FUNDING

**FOR THE MERCHANT(#1)**    By: _____PETER JOHN HRONIS, Owner_____    _PETE HRONIS_____

(Print Name and Title)                          (Signature)

**FOR THE MERCHANT(#2)**    By: _____KOSTA JAMES HRONIS, Owner_____    _Kosta James Hronis_____

(Print Name and Title)                          (Signature)

**BY OWNER (#1)**    By: _____PETER JOHN HRONIS, Owner_____    _PETE HRONIS_____

(Print Name and Title)                          (Signature)

**BY OWNER (#2)**    By: _____KOSTA JAMES HRONIS, Owner_____    _Kosta James Hronis_____

(Print Name and Title)                          (Signature)

Merchant 1 Initial(s): _PH_          Merchant 2 Initial(s): _KJH_          Guarantor 1 Initial(s): _PH_          Guarantor 2 Initial(s): _KJH_

**DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484**

Page | 3                                                                                                    DLP FUNDING

## ADDITIONAL TERMS AND CONDITIONS OF MERCHANT AGREEMENT

### TERMS OF ENROLLMENT IN PROGRAM

I.1    **Merchant Deposit Agreement and Processor.** Merchant shall: (A) execute an agreement acceptable to DLP FUNDING with a Bank acceptable to DLP FUNDING to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to DLP FUNDING with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Future Receipts into the Account. Merchant shall provide DLP FUNDING and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes DLP FUNDING and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to DLP FUNDING for the receipts as specified herein and to pay such amounts to DLP FUNDING. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by DLP FUNDING or not. This additional authorization is not a waiver of DLP FUNDING's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which DLP FUNDING did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of DLP FUNDING.  Failure to supply the above-mentioned passwords, log-in, and/or information to verify Merchant's receivables, receipts, deposits and withdrawals into and from the Account shall constitute a breach of this Agreement.

I.2    **Term of Agreement. This Agreement has no term.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by DLP FUNDING as per the conditions of this Agreement.  The above-described "Payment Frequency" is solely upon estimation based upon Merchant's representations.

I.3    **Future Purchase of Increments**. Subject to the terms of this Agreement, DLP FUNDING offers to purchase additional Receipts in the "Increments" stated in on the addendum of this Agreement, if any. DLP FUNDING reserves the right to delay or rescind the offer to purchase any Increment or any additional Receipts, in its sole and absolute discretion.

I.4    **Reconciliation.** The Remittance is intended by Seller to represent the Purchased Percentage of Seller's Average Monthly Revenue. As long as an Event of Default, or breach of this Agreement, has not occurred, Merchant may request a retroactive reconciliation of the Remittance amount (for the purposes of this paragraph "Remittance Amount" shall be defined as all payments made by Merchant to DLP FUNDING after DLP FUNDING remitted the Purchase Price to Merchant). All requests hereunder must be in writing to Menucha@dlpfunding.com. Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable reports, for the requested month and the preceding month. DLP FUNDING retains the right to request additional documentation such as additional bank login or DecisionLogic access to view Merchant's accounts. It is the sole responsibility of Merchant to send the complete bank statements and written request for a reconciliation to DLP FUNDING. Merchant's failure to timely send the written reconciliation request, with all required information, shall constitute Merchant's waiver of any right to the reconciliation of the Future Receipts during the preceding calendar month. Such reconciliation, if applicable and after reasonable verification by DLP FUNDING, must be performed by DLP FUNDING within five (5) Business Days following its receipt of Merchant's request and receipt of requested documentation by DLP FUNDING, for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by DLP FUNDING  shall equal the Purchased Percentage of the Future Receipts that Merchant collected from the date of this Agreement up to and including the date of the reconciliation request. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with DLP FUNDING's right and ability to debit Merchant's Account while the Request is pending or to unilaterally modify the initial Remittance amount, in any method other than the ones listed in this Agreement. MERCHANT RECOGNIZES AND AGREES THAT IT IS ITS SOLE RESPONSIBILITY TO MAKE A RECONCILIATION REQUEST, AND THAT, IN THE EVENT THAT MERCHANT FAILS TO MAKE A RECONCILIATION REQUEST AS SET FORTH IN THIS SECTION, MERCHANT WAIVES ANY ARGUMENT THAT THE REMITTANCE EXCEEDED THE PURCHASED PERCENTAGE OF MERCHANT'S AVERAGE MONTHLY REVENUE FOR THAT PERIOD.

I.5    **DLP FUNDING May Request Changes to the Remittance**. After 30-days following a reconciliation requested by the Merchant, DLP FUNDING may require Merchant to provide information, including bank statements, to evaluate whether the Remittance should again be adjusted to more closely reflect the Merchant's actual Future Receipts times the Purchased Percentage. Failure to provide such information within five (5) business days will be a breach of this agreement.

I.6    **Financial Condition.** Merchant and Guarantor(s) (as defined) authorize DLP FUNDING and its agents to investigate their financial responsibility and history, and will provide to DLP FUNDING any authorizations, bank and/or financial statements, tax returns, etc., as DLP FUNDING deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. This Agreement will be deemed as acceptable as an authorization for release of financial and credit information. DLP FUNDING is authorized to update such information and financial and credit profiles from time to time as it deems appropriate and Merchant and Guarantor(s) are required to provide requested financial information within five (5) days from such request.

I.7    **Transactional History.** Merchant authorizes all of its banks, brokers and processors to provide DLP FUNDING with Merchant's banking, brokerage and/or processing history to determine qualification or continuation. Merchant shall provide DLP FUNDING with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five (5) days after a request from DLP FUNDING. Merchant's failure to comply with any such document request shall be deemed a default under this Agreement.

I.8    **Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by DLP FUNDING for monies owed to DLP FUNDING from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by DLP FUNDING.

I.9    **No Liability.** In no event will DLP FUNDING be liable for any claims asserted by Merchant or Guarantor(s) under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s) having occurred in Merchant's regular course of business

I.10   **Reliance on Terms.** Section 1.01, 1.06, 1.07, 1.08 and 2.04 of this Agreement are agreed to for the benefit of Merchant, DLP FUNDING, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

I.11   **Sale of Receipts.** Merchant and DLP FUNDING agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as, a loan from DLP FUNDING to Merchant. Merchant agrees that the Purchase Price is in

Merchant 1 Initial(s): _DH_        Merchant 2 Initial(s): _KJH_        Guarantor 1 Initial(s): _DH_        Guarantor 2 Initial(s): _KJH_



DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484

Page | 4                                                                                                                                                       DLP FUNDING

exchange for the Future Receipts pursuant to this Agreement, and that it equals the fair market value of such Future Receipts. DLP FUNDING has purchased and shall own all the Future Receipts described in this Agreement up to the full Purchased Amount as the Future Receipts are created. Payments made to DLP FUNDING in respect to the full amount of the Future Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. DLP FUNDING and Merchant are mutually entering this Agreement with the explicate intent that this agreement does not constitute a loan and does not include any terms which can be interpreted as a loan and/or containing interest at any rate.  DLP FUNDING explicitly asserts that DLP FUNDING does not have any usurious intent as this Agreement is a Merchant Cash Advance, and not a loan. Merchant acknowledges that no such usurious intent is present.

I.12    **Power of Attorney.** For the pendency of this Agreement, which has no set term, Merchant appoints DLP FUNDING as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to DLP FUNDING from Processor, or in the case of a violation by Merchant of Section 1 or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to DLP FUNDING; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s) personal information to verify the existence of an account and obtain account balances; (vi) to file any claims or take any action or institute any proceeding which DLP FUNDING may deem necessary for the collection of any of the unpaid Purchased Amount from the collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by Merchant.

I.13    **Protections Against Default.** The following Protections 1 through 5 may be invoked by DLP FUNDING immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the DLP FUNDING electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any manner that is adverse to DLP FUNDING; (c) Merchant changes the electronic check processor through which the Future Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of DLP FUNDING, and (ii) the written agreement of any DLP FUNDING or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to DLP FUNDING; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide DLP FUNDING with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five (5) days after a request from DLP FUNDING, or; (g) Merchant breaches any terms of this Agreement, including but not limited to any of the Events of Default contained in Section 3.1 herein. **These protections are in addition to any other remedies available to DLP FUNDING at law, in equity or otherwise pursuant to this Agreement.**

> **Protection 1.**        The full Purchased Amount, less any amount already remitted, plus all fees (including reasonable attorney fees) due under this Agreement and the attached Security Agreement become payable upon Merchant's breach.
> **Protection 2.**        DLP FUNDING may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).
> **Protection 3.**        DLP FUNDING may enforce its security interest in the collateral.
> **Protection 4.**        DLP FUNDING may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if DLP FUNDING recovers a Judgment against Merchant, Merchant shall be liable for all of DLP FUNDING's costs of the lawsuit, including but not limited to all reasonable attorney fees, court costs, and prejudgment interest from the date of default at the rate of 16% per annum.
> **Protection 5.**        DLP FUNDING may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to DLP FUNDING.

I.14    **Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes DLP FUNDING to disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that DLP FUNDING obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against DLP FUNDING or any of its affiliates relating to any (i) investigation undertaken by or on behalf of DLP FUNDING as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

I.15    **Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by DLP FUNDING, including this Agreement and any other DLP FUNDING documents (collectively, "Confidential Information") are proprietary and confidential information of DLP FUNDING. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of DLP FUNDING to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles DLP FUNDING to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without a Bond or Security.

I.16    **Publicity.** Merchant and each of Merchant's Owner(s) and all Guarantor(s) hereto all hereby authorizes DLP FUNDING to use its, his or her name in listings of clients and in advertising and marketing materials.

I.17    **D/B/A's.** Merchant hereby acknowledges and agrees that DLP FUNDING may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between DLP FUNDING and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

I.18    **Sharing of Information.** Merchant hereby authorizes DLP FUNDING to share information regarding Merchant's performance under this Agreement with third parties.

I.19    **Electronic Transactions Authorization.** The parties agree that all business between one another shall be conducted by electronic means and adopt the provisions of the New York Electronic Signatures and Records Act ("ESRA") as set forth in N.Y. STT. Law. Section 301 through §309 inclusive. Each document that is subject to or provided in furtherance of this Agreement, all documents provided in furtherance thereof, as amended, modified or supplemented from time to time that a party has sent to the other by electronic means or the Merchant has clicked to approve to adopt this Agreement shall be intended as and

Merchant 1 Initial(s):  *PH*        Merchant 2 Initial(s):  *KJH*        Guarantor 1 Initial(s):  *PH*        Guarantor 2 Initial(s):  *KJH*

**DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484**

constitute an original and deemed to contain a valid signature for all purposes acknowledging and consenting to the terms of the agreement applicable thereto. In furtherance of the above, Merchant hereby authorizes DLP FUNDING to regard the Merchant's printed name or electronic approval for any document, agreement, assignment schedules or invoices as the equivalent of a manual signature by one of Merchant's authorized officers or agents. DLP FUNDING may rely upon, and assume the authenticity of, any such electronic approval, and any material applicable to such approval as the duly confirmed, authorized and approved signature of the Merchant by the person approving same, shall constitute an "authenticated" record for all purposes (including, without limitation, the UCC) and shall satisfy the requirements of any applicable statute of frauds. Merchant is not required to agree to conduct business pursuant to ESRA and the purchase of Future Receipts in furtherance of this Agreement is not conditioned upon Merchant agreeing to conduct business in accordance with the ESRA. Merchant has the option to request paper copies of any electronic records upon written request to DLP FUNDING. Merchant may terminate this Electronic Transactions Authorization by providing DLP FUNDING with not less than ten (10) days written notice in conformity with this Agreement.

I.20    **Monitoring, Recording, and Solicitations.** Merchant authorizes DLP FUNDING, its affiliates, agents and independent contractors to contact Merchant at any telephone number Merchant provides to DLP FUNDING or from which Merchant places a call to DLP FUNDING, or any telephone number where DLP FUNDING believes it may reach Merchant, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Merchant incurs charges for receiving such communications. Merchant also agrees that DLP FUNDING, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Merchant. Merchant expressly consents to conduct business by electronic means.

## II.    REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents, warrants and covenants that, as of this date and during the term of this Agreement:

II.1    **Financial Condition and Financial Information.** Merchant's and Guarantor(s) bank and financial statements, copies of which have been furnished to DLP FUNDING, and future statements which will be furnished hereafter at the discretion of DLP FUNDING, fairly and accurately represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s) have a continuing, affirmative obligation to advise DLP FUNDING of any material adverse change in their financial condition, operation or ownership. DLP FUNDING may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to DLP FUNDING within five (5) business days after request from DLP FUNDING. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

II.2    **Governmental Approvals.** Merchant has, and continues to, represent that Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

II.3    **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

II.4    **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without DLP FUNDING's prior written consent. Any such changes shall be a material breach of this Agreement.

II.5    **Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and DLP FUNDING, nor shall Merchant change any of its places of business without prior written consent by DLP FUNDING.  Merchant acknowledges that the changing of their name and or location does not obviate Merchant's obligations under this Agreement.

II.6    **Daily Batch Out.** If applicable, Merchant will batch out receipts with the Processor on a daily basis.

II.7    **Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from DLP FUNDING to Merchant, execute, acknowledge and deliver to DLP FUNDING and/or to any other person, firm or corporation specified by DLP FUNDING, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

II.8    **No Bankruptcy or Pending Litigation.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six (6) months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Merchant warrants that there are no pending lawsuits and/or claims against Merchant.

II.9    **Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of DLP FUNDING.

II.10   **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes. Merchant shall conduct its business consistent with past business practice and shall use the Purchase Price consistent with past business practice, whether the funding of such Purchase Price occurs contemporaneous with the execution of this Agreement or anytime time thereafter.

II.11   **Defaults under Other Contracts.** Merchant represents that Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with any other person or entity.

II.12   **Good Faith.** Merchant and Guarantors hereby affirm that Merchant is receiving the Purchase Price and selling DLP FUNDING the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business.

II.13   **No Sale of Future Receivables.** Merchant has not entered into any other agreement for the sale of Future Receipts and/or cash advance agreement except as disclosed to DLP FUNDING in writing, shall not enter into any other Future Receipts and/or cash advance agreement, and has not accepted and shall not accept any other cash advance absent DLP FUNDING's advance written consent.

II.14   **Authority to Sign.** The person who signed this Agreement on behalf of Seller was authorized by Seller to sign this Agreement on behalf of Seller.

Merchant 1 Initial(s): _PH_        Merchant 2 Initial(s): _KJH_        Guarantor 1 Initial(s): _PH_        Guarantor 2 Initial(s): _KJH_

**FUNDING**

DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877‑378‑0484

Page | 6                                                                                                               DLP FUNDING

### I.    EVENTS OF DEFAULT AND REMEDIES

I.1    **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:
(a)    Merchant or Guarantor shall violate any term or covenant in this Agreement;
(b)    Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;
(c)    The sending of notice of termination by Merchant or verbally notifying DLP FUNDING of its intent to breach this Agreement;
(d)    Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;
(e)    Merchant's bank returns a code of NSF three (3) or more consecutive times and Merchant fails to respond to any inquiry by DLP FUNDING;
(f)    Merchant shall transfer or sell all or substantially all of its assets;
(g)    Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;
(h)    Merchant shall use multiple depository accounts without the prior written consent of DLP FUNDING;
(i)    Merchant shall enter into any financing agreements with any other party including but not limited to: loans, merchant cash advances, receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party, without prior written consent of DLP FUNDING;
(j)    Merchant shall change its depositing account without the prior written consent of DLP FUNDING;
(k)    Merchant shall close its depositing account used for Remittance without the prior written consent of DLP FUNDING;
(l)    Merchant's bank returns a code other than NSF preventing DLP FUNDING from the Remittance; or
(m)    Merchant shall default under any of the terms, covenants and conditions of any other agreement with DLP FUNDING.

I.2    **Limited Personal Guaranty.** In the Event of a Default, DLP FUNDING will enforce its rights against the Guarantor(s) of this transaction. Said Guarantor(s) will be jointly and severally liable to DLP FUNDING for all of DLP FUNDING's losses and damages, in addition to all costs and expenses and legal fees associated with such enforcement.  The Guarantor(s) is only as liable to DLP FUNDING as Merchant is.

I.3    **Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4 hereof, DLP FUNDING may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder or any other legal or equitable right or remedy, and enforcing the Security Agreement contained herein. All rights, powers and remedies of DLP FUNDING in connection with this Agreement may be exercised at any time by DLP FUNDING after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

I.4    **Costs.** Merchant shall pay to DLP FUNDING all reasonable costs associated with (a) an Event or Default; (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof; and (c) the enforcement of DLP FUNDING's remedies set forth in this Agreement, including but not limited to court costs and attorney fees.

I.5    **Required Notifications.** Merchant is required to give DLP FUNDING written notice within twenty‑four (24) hours of any filing under Title 11 of the United States Code. Merchant is required to give DLP FUNDING seven (7) days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

### II.    MISCELLANEOUS

II.1    **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by DLP FUNDING.

II.2    **Assignment.** DLP FUNDING may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

II.3    **Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement.

II.4    **Waiver Remedies.** No failure on the part of DLP FUNDING to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right.  The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

II.5    **Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, DLP FUNDING and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of DLP FUNDING, which consent may be withheld in DLP FUNDING's sole discretion. DLP FUNDING reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if DLP FUNDING so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by DLP FUNDING to transfer such proceeding to an Acceptable Forum.

II.6    **Service of Process by Mail and/or Email.**  Merchant hereby irrevocably waives personal service of any summons, complaint or other process and agrees that the service thereof may be made by email to the email address listed on page one (1) of this Agreement (or any other email address provided by Merchant to DLP FUNDING), or by certified mail, registered mail or by a recognized overnight delivery service (such as FedEx overnight mail or UPS overnight mail) or by First Class mail directed to it at the address listed on page one (1) of this Agreement. Merchant agrees that such service of process shall be deemed served on the day such summons, complaint or other process is placed in a depository under the exclusive custody and control of the United States Postal Service or other mailing service provider such as FedEx or UPS, using one of the methods listed above (such as certified mail, registered mail, First Class mail, or a recognized overnight delivery service, or in the event such service of process is effected via email, on the date such email is  sent to Merchant, and that no additional notice or mailings shall be required before a judgment by default is sought or entered.  Nothing in this Agreement shall affect the right of any party to this Agreement to serve process in any other manner permitted by law or pursuant to the New York Civil Practice Laws and Rules.

Merchant 1 Initial(s):         Merchant 2 Initial(s):         Guarantor 1 Initial(s):         Guarantor 2 Initial(s):



DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484
Page | 7                                                                                                        DLP FUNDING

II.7    **Survival.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

II.8    **Interpretation.** All Parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorney guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

II.9    **Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

II.10   **Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and DLP FUNDING and supersede all prior agreements and understandings relating to the subject matter hereof.

II.11   **JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

II.12   **CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (a) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (b) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

II.13   **Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Merchant 1 Initial(s):  _DH_          Merchant 2 Initial(s):  _KJH_          Guarantor 1 Initial(s):  _DH_          Guarantor 2 Initial(s):  _KJH_



DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484

Page | 8                                                                                                                                                          DLP FUNDING

## SECURITY AGREEMENT AND GUARANTY

Merchant's Legal Name:    HRONIS FRUIT COMPANY AND ENTITIES APPEARING ON EXHIBIT "B"                        Federal Tax ID: ▇▇▇▇▇▇▇

D/B/A: HRONIS FRUIT COMPANY

Business Address: 10443 Hronis Road                          City: Delano                          State: CA                          Zip: 93215-9556

**Additional Guarantor(s):**

ENTITIES APPEARING ON EXHIBIT B

## SECURITY AGREEMENT

**Security Interest**

This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant and Guarantor(s) grant(s) to DLP FUNDING a security interest in and lien upon all of their present and future: (a) accounts (the "Accounts Collateral"), accounts receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s); (b) all proceeds, as that term is defined in Article 9 of the UCC; (c) funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds; (d) present and future Electronic Check Transactions; and (e) any amount which may be due to DLP FUNDING under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). The security interest in Account Collateral shall be effective immediately. The Security interest in Secured Assets other than Accounts Collateral shall be effective automatically upon the occurrence of an Event of Default. Merchant agrees to provide other security to DLP FUNDING upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover DLP FUNDING's entitlements under this Agreement, DLP FUNDING is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of DLP FUNDING's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, DLP FUNDING or an affiliate of DLP FUNDING. DLP FUNDING is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder. This security interest may be exercised by DLP FUNDING without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. DLP FUNDING shall have the right to notify account debtors at any time. Pursuant to Article 9 of the UCC, as amended from time to time, DLP FUNDING has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, DLP FUNDING will have all rights afforded under the UCC, any other applicable law and in equity. Merchant will obtain from DLP FUNDING written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) agree(s) that this is a contract of recoupment and DLP FUNDING is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by DLP FUNDING. Merchant and Guarantor(s) agree(s) to execute and deliver to DLP FUNDING such instruments and documents DLP FUNDING may reasonably request to perfect and confirm the lien, security interest and right of set-off set forth in this Agreement. DLP FUNDING is authorized to execute all such instruments and documents in Merchant's and Guarantor(s) name. Merchant and Guarantor(s) each acknowledge and agree that any security interest granted to DLP FUNDING under any other agreement between Merchant or Guarantor(s) and DLP FUNDING (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s) each agrees to execute any documents or take any action in connection with this Agreement as DLP FUNDING deems necessary to perfect or maintain DLP FUNDING's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s) each hereby authorizes DLP FUNDING to file any financing statements deemed necessary by DLP FUNDING to perfect or maintain DLP FUNDING's security interest. Merchant and Guarantor(s) shall be liable for, and DLP FUNDING may charge and collect, all costs and expenses, including but not limited to attorney fees, which may be incurred by DLP FUNDING in protecting, preserving and enforcing DLP FUNDING's security interest and rights.

In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to DLP FUNDING for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due DLP FUNDING under this Agreement. With respect to any such entity, DLP FUNDING shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. DLP FUNDING shall be held harmless by Merchant and each Owner/Guarantor and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. DLP FUNDING shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of DLP FUNDING's rights, including without limitation, DLP FUNDING's right to collect all accounts, and to notify any payment card processor or creditor of such entity that DLP FUNDING has such rights in such entity's assets. Merchant also agrees that, at the DLP FUNDING's discretion, DLP FUNDING may choose to amend any existing financing statement to include any such newly formed entity as debtor.

**Negative Pledge**

Merchant and Guarantor(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Remedies**

Upon any Event of Default, DLP FUNDING may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to DLP FUNDING, whether by acceleration or otherwise.

Merchant 1 Initial(s): _DH_          Merchant 2 Initial(s): _KJH_          Guarantor 1 Initial(s): _DH_          Guarantor 2 Initial(s): _KJH_

**DLP**

**F U N D I N G**

DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484

Page | 9                                                                                                                          DLP FUNDING

## GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

As an additional inducement for DLP FUNDING to enter into this Agreement, the undersigned Guarantor(s) hereby provides DLP FUNDING with this Guaranty. Guarantor(s) will not be personally liable for any amount due under this Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of this Agreement. Each Guarantor shall be jointly and severally liable for all amounts owed to DLP FUNDING in the Event of Default. Guarantor(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, and covenants made by Merchant in this Agreement as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, DLP FUNDING may seek recovery from Guarantors for all of DLP FUNDING's losses and damages by enforcement of DLP FUNDING's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral DLP FUNDING may hold pursuant to this Agreement or any other guaranty. DLP FUNDING does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) DLP FUNDING's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to DLP FUNDING. In addition, DLP FUNDING may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to DLP FUNDING; (ii) release Merchant from its obligations to DLP FUNDING; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to DLP FUNDING under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity; and (v) He/She specifically and irrevocably consents to the terms of Section 4.06 of the Merchant and Security Agreement, namely the section entitled 4.06 Service of Process by Mail and/or Email

Merchant 1 Initial(s):   *PH*          Merchant 2 Initial(s): *KJH*          Guarantor 1 Initial(s):   *PH*          Guarantor 2 Initial(s): *KJH*

**DLP FUNDING**

DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484

Page | 10                                                                                                    DLP FUNDING

|  |  |  |
|---|---|---|
| **FOR THE MERCHANT (#1)** | **PETER JOHN HRONIS, Owner**<br>By:_____<br>(Print Name and Title)<br>SSN# ▓▓▓▓▓▓▓▓ | *PETE HRONIS*<br>(Signature)<br><br>Driver's License: N8982499 |
| **FOR THE MERCHANT (#2)** | **KOSTA JAMES HRONIS, Owner**<br>By:_____<br>(Print Name and Title)<br>SSN# ▓▓▓▓▓▓▓▓ | *Kosta James Hronis*<br>(Signature)<br><br>Driver's License: N5142204 |
| **BY OWNER (#1)** | **PETER JOHN HRONIS, Owner**<br>By:_____<br>(Print Name and Title)<br>SSN# ▓▓▓▓▓▓▓▓ | *PETE HRONIS*<br>(Signature)<br><br>Driver's License: N8982499 |
| **BY OWNER (#2)** | **KOSTA JAMES HRONIS, Owner**<br>By:_____<br>(Print Name and Title)<br>SSN# ▓▓▓▓▓▓▓▓ | *Kosta James Hronis*<br>(Signature)<br><br>Driver's License: N5142204 |
| **FOR THE GUARANTOR(S) (#1)** | **PETER JOHN HRONIS, Owner**<br>By:_____<br>(Print Name and Title)<br>SSN# ▓▓▓▓▓▓▓▓<br>E-Mail:  pete.hronis@hronis.net<br>Address: 10443 Hronis Road, Delano, CA 93215 | *PETE HRONIS*<br>(Signature)<br><br>Driver's License: N8982499 |
| **FOR THE GUARANTOR(S) (#2)** | **KOSTA JAMES HRONIS, Owner**<br>By:_____<br>(Print Name and Title)<br>SSN# ▓▓▓▓▓▓▓▓<br>E-Mail:  kosta.hronis@hronis.net<br>Address: 10443 Hronis Road, Delano, CA 93215 | *Kosta James Hronis*<br>(Signature)<br><br>Driver's License: N5142204 |

Merchant 1 Initial(s): *PH*          Merchant 2 Initial(s): *KJH*          Guarantor 1 Initial(s): *PH*          Guarantor 2 Initial(s): *KJH*

**DLP FUNDING**

DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484

Page | 11                                                                                                                    DLP FUNDING

## APPENDIX A - FEE STRUCTURE:

**A.**  Underwriting Fee $0.00 to cover underwriting and related expenses.

**B.**  Origination Fee $63,030.66 to cover cost of Origination and ACH Setup.

**C.**  NSF Fee (Standard) $50.00 (each)

**D.**  Default Fee $5,000, or 10% of the outstanding Purchased Amount at the time of Default, whichever is greater.

**E.**  Rejected ACH $100.00 per occurrence in the event that a Merchant directs the Merchant Bank Account to reject DLP FUNDING's debit ACH.

**F.**  Blocked ACH $1,000.00 per occurrence.

**G.**  Bank Change Fee $25.00 When Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system.

**H.**  Wire Fee – Each Merchant shall receive their funding electronically to their designated bank account and will be charged $25.00 for a Fed Wire.

**I.**  UCC Filing Fee – $100.00 to cover the cost of filing UCC-1 Financing Statement in connection with the Agreement.

J.  Stacking Fee – In the event that the Merchant enters into any cash advance or any loan agreement that relates to or involves the Receipts with any person or entity other than DLP FUNDING LLC during any portion of the effective period of this Agreement, then: Merchant shall pay to DLP FUNDING LLC a "Stacking" fee equal to $5,000.00 or 10% of that portion of the Purchased Amount that has not been paid to DLP FUNDING LLC, whichever amount is greater.

Merchant 1 Initial(s): _PH_          Merchant 2 Initial(s): _KJH_          Guarantor 1 Initial(s): _PH_          Guarantor 2 Initial(s): _KJH_

**DLP FUNDING**

DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484

Page | 12                                                                                                    DLP FUNDING

**AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS) PAYMENTS WILL APPEAR ON YOUR BANK STATEMENTS AS "DLP FUNDING".**

HRONIS FRUIT COMPANY AND ENTITIES APPEARING ON EXHIBIT "B" ("Merchant") hereby authorizes DLP FUNDING LLC ("DLP FUNDING") to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other payments due to DLP FUNDING from Merchant under the terms of the Merchant and Security Agreement (the "Agreement") entered into between Merchant and DLP FUNDING, as it may be amended, supplemented or replaced from time to time. Merchant also authorizes DLP FUNDING to initiate additional entries (debits and credits) to correct any erroneous transfers. In addition, if an Event of Default (as defined in the Agreement) occurs, Merchant authorizes DLP FUNDING to debit any and all accounts controlled by Merchant or controlled by any entity with the same Federal Tax Identification Number as Merchant up to the total amount, including but not limited to, all fees and charges, due to DLP FUNDING from Merchant under the terms of the Agreement. Merchant agrees to be bound by the rules and operating guidelines of NACHA and represents and warrants that the designated account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes. Merchant authorizes DLP FUNDING to contact Merchant's financial institution to obtain available funds information and/or to verify any information Merchant has provided about the designated checking account and to correct any missing, erroneous or out-of-date information. Merchant understands and agrees that any revocation or attempted revocation of this Authorization will constitute an Event of Default under the Agreement. In the event that Merchant closes the designated checking account, or the designated checking account has insufficient funds for any ACH transaction under this Authorization, Merchant authorizes DLP FUNDING to contact Merchant's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Merchant with Merchant's financial institution, and to initiate ACH transactions under this Authorization to such additional account(s). To the extent necessary, Merchant grants DLP FUNDING a limited Power of Attorney to take action in Merchant's name to facilitate this authorization.

DLP FUNDING is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).

This Authorization Agreement is to remain in full force and effect until DLP FUNDING has received written notification from Merchant at the address set forth below at least five (5) banking days prior of its termination to afford DLP FUNDING a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

Transfer Funds To/From:

Name of Bank: JPMORGAN CHASE
ABA Transit/Routing #: ▮▮▮▮▮▮▮▮
Checking Account #: ▮▮▮▮▮▮▮▮

This authorization is to remain in full force and effect until all amounts due to DLP FUNDING under the Agreement have been paid in full, in such time and in such manner as to afford DLP FUNDING a reasonable opportunity to act on it.

Merchant Information:

Merchant's Name:  HRONIS FRUIT COMPANY AND ENTITIES APPEARING ON EXHIBIT "B"

Signature of Authorized Representative: *PETE HRONIS*

Print Name: PETER JOHN HRONIS
Title: Owner
Merchant's Tax ID: ▮▮▮▮▮▮▮
Date: 11/14/2025

**[Attached Voided Check Here]**

Merchant 1 Initial(s): *PH*          Merchant 2 Initial(s): *KJH*          Guarantor 1 Initial(s): *PH*          Guarantor 2 Initial(s): *KJH*

**DLP**

FUNDING

DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484

Page | 13                                                                                                      DLP FUNDING

Please note that prior to funding your account, our underwriting department needs to see the most recent balance and activity information in real-time as a fraud countermeasure and in order to ensure the health of your business aligns with the terms of your offer. For your convenience, we have three secure options for you to choose from to complete this step.

**Please provide information required for read-only access\* to your business account.**

| | |
|---|---|
| Bank Portal Website: | 1 |
| Username: | 1 |
| Password: | 11 |
| Security Question 1: | 1 |
| Security Answer 1: | 1 |
| Security Question 2: | 1 |
| Security Answer 2: | 1 |
| Security Question 3: | 1 |
| Security Answer 3: | 1 |

Any other information necessary to access your account:          11

\*Read only access can be easily arranged by calling your Bank, allowing our Underwriters to view account information without being able to transfer, debit or otherwise access funds.

Merchant 1 Initial(s): _PH_          Merchant 2 Initial(s): _KJH_          Guarantor 1 Initial(s): _PH_          Guarantor 2 Initial(s): _KJH_

DLP FUNDING LLC 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484

# EXHIBIT B

### LIST OF ADDITIONAL ENTITIES INCLUDED IN THE DEFINITION OF THE TERM "MERCHANT" THAT HAVE SOLD FUTURE RECEIPTS AND DLP FUNDING LLC A BLANKET SECURITY INTEREST

BUSINESS LEGAL NAME: HRONIS RANCH, LLC
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:
BUSINESS LEGAL NAME: HRONIS CITRUS, LLC
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:
BUSINESS LEGAL NAME: CALIFORNIA GRAPE GROWERS COOPERATIVE
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:
BUSINESS LEGAL NAME: INTERNATIONAL FRUIT COMPANY, INC.
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:
BUSINESS LEGAL NAME: CENTRAL CALIFORNIA ORANGE GROWERS COOPERATIVE
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:
BUSINESS LEGAL NAME: SHAMROCK TRANSPORT, LLC
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:
BUSINESS LEGAL NAME: HRONIS, INC., A CALIFORNIA CORPORATION
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:
BUSINESS LEGAL NAME: THE PETER HRONIS COMPANY LLC
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:

DLP FUNDING may file a UCC-1 financing statement with the appropriate secretary of states(s) reflecting a blanket security interest in the assets of the above-listed entities.

### ACKNOWLEDGED AND AGREED ON BEHALF OF THE FORGOING ENTITIES:

Signature: _____
Name: PETER JOHN HRONIS
Date: 11/14/2025

Signature: _____
Name: KOSTA JAMES HRONIS
Date: 11/14/2025

**ADDENDUM**
**PAYMENT OF PURCHASE PRICE VIA INSTALLMENTS**

This is an Addendum dated <u>11/14/2025</u> to the Agreement dated <u>11/14/2025</u> ("Agreement") between DLP FUNDING LLC ("DLP FUNDING") and <u>HRONIS FRUIT COMPANY</u> ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

**I. Schedule of Payments.** Merchant agrees that DLP FUNDING shall purchase Receivables from Merchant in installments instead of a single payment.

The schedule below ("Payment Schedule"), agreed to and informed by Merchant, lists the date on or after which DLP FUNDING will pay Merchant(s), the amount that will be paid in installment, the net amount being paid to or on behalf of Merchant after deduction of applicable fees, and the corresponding amount of Receivables purchased by the payment. The first disbursement within the Payment Schedule shall begin two (2) business days after this Addendum is accepted by DLP FUNDING, with the next disbursement(s) to follow a weekly schedule.

No payment to DLP FUNDING hereunder is intended to be a repurchase of Receivables by Merchant, nor shall any such payment be construed as a repurchase of Receivables by Merchant.

## Payment Schedule

| Disbursement | Payment Amount | Net Funds Provided | Receivables Purchased |
|:---:|:---:|:---:|:---:|
| 1 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |
| 2 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |
| 3 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |
| 4 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |
| 5 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |
| 6 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |

1

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT FOR PAYMENT OF PURCHASE PRICE IN INSTALLMENTS

| | | | |
|---|---|---|---|
| 7 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |
| 8 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |
| 9 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |
| 10 | $558,439.66 | $530,584.00 | $809,737.51 |
| 11 | $553,703.42 | $526,084.00 | $802,869.96 |
| 12 | $206,290.00 | $196,000.00 | $299,120.50 |
| 13 | $138,930.00 | $132,000.00 | $201,448.50 |
| 14 | $138,930.00 | $132,000.00 | $201,448.50 |
| 15 | $138,930.00 | $132,000.00 | $201,448.50 |
| 16 | $138,930.00 | $132,000.00 | $201,448.50 |
| 17 | $138,930.00 | $132,000.00 | $201,448.50 |
| 18 | $99,987.50 | $95,000.00 | $144,981.88 |

**II. Deductions.** DLP FUNDING may collect the fee listed in the Agreement in installments by deducting from each payment to Merchant in the Payment Schedule an amount equal to the total amount of the fee divided by the number of installments to be paid in the Payment Schedule. Unless the parties agree otherwise in writing, if Merchant instructs DLP FUNDING, in proper form and substance, that any part of the Purchase Price be paid to a person or entity other than Merchant(s) (other than deductions for payment of fees referenced

2

# ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT
## FOR PAYMENT OF PURCHASE PRICE IN INSTALLMENTS

in this section), then that amount will be paid in as few installments as possible and from the earliest payment(s) made by DLP FUNDING.

**III. Cancellation of Payments.** DLP FUNDING elects not to make a payment under the Payment Schedule if: (1) an Event of Default has been considered to have taken place under the Agreement; (2) the Agreement has been terminated; or (3) any Merchant states in writing its inability to pay its debts, makes a general assignment for the benefit of creditors, institutes or has instituted against it any proceeding seeking to adjudicate any Merchant bankrupt or insolvent, or seeks reorganization, arrangement, adjustment, or composition of itself or its debts.

**IV. Merchant Opt-out**.  Merchant may Opt-out of receiving funds from DLP FUNDING via Instalment Agreement with a three (3) business day notice given by Merchant to directly DLP FUNDING.  Merchant's selection of opting out does not obviate merchant from Merchant's responsibilities and obligations under the Agreement.

**V. Default**.  Should a Default occur, the amount owed to DLP FUNDING shall be that of the agreed-upon value of the Receivables Purchased up-to and including the last date of disbursement from DLP FUNDING to Merchant, less any payments already made.

**VI. Redefinitions of Terms**. The term "Purchase Price" as it is used in the Agreement refers to the sum of all payments that have been made by DLP FUNDING under the Agreement. The term "Receivables Purchased Amount" as it is used in the Agreement refers to all Receivables that have been paid for by DLP FUNDING under the Agreement.

**VII. Reconciliation**. Should Merchant wish to reconcile their payment to DLP FUNDING **OR** disbursement from DLP FUNDING to Merchant, Merchant must follow the process, as described within the Agreement and DLP FUNDING must engage in reconciliation.

**FOR THE MERCHANT/OWNER (#1)**

By: _____  _____  _____
         PETER JOHN HRONIS             Owner
         (Print Name)            (Print Title)       (Signature)

**FOR THE MERCHANT/OWNER (#2)**

By: _____  _____  _____
         KOSTA JAMES HRONIS             Owner
         (Print Name)             (Print Title)       (Signature)

**FOR DLP FUNDING**

By: _____ _____ _____

3

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT
## FOR PAYMENT OF PURCHASE PRICE IN INSTALLMENTS

(Print Name)                    (Print Title)                    (Signature)

4

# EXHIBIT 5



**Bernie Kornberg**
Partner
bernie.kornberg@millernash.com
562.247.7622 (direct)

January 2, 2026

**VIA EMAIL**

Aimee S. Willig
Bush Kornfeld LLP
601 Union St., Suite 5000
Seattle, WA 98101
awillig@bskd.com

Subject:        Hronis Farms
                Notification and Request to Collect Under Commercial Code § 9607(a)(1)

Dear Ms. Willig:

This law firm represents Conterra Agricultural Capital, LLC ("Conterra"). Conterra is the lender on a loan (the "Loan") given to Hronis Capital Assets, LP, Hronis Capital Management, LLC, Hronis Citrus, LLC, Hronis Farming, LP, Hronis, Inc., Hronis Land Company, Hronis Ranch, LLC, and The Hronis Family Limited Partnership (collectively, "Hronis Farms"). The Loan is secured by a perfected, first-position security interest in, among other things, the accounts of Hronis Farms. Enclosed please find a copy of Conterra's filed financing statement which describes its interest in the collateral of Hronis Farms.

Hronis Farms has informed Conterra that your client, Costco Wholesale, is one of Hronis Farms' account debtors, as defined by section 9102 of the Commercial Code, and that Hronis Farms has a right to payment from you. Hronis Farms has further informed us that it has provided a junior interest in its accounts to certain merchant cash advance lenders, including DLP Funding, LLC, who have asserted their own claims to the accounts of Hronis Farms. Any claims by these merchant cash advance lenders, or any other party, are junior to the first position claim of Conterra.

The Hronis Farms entities are in default of their payment obligations to Conterra. In accordance with the statutory provisions of the Commercial Code section 9607, Conterra is authorized to notify you to pay directly to Conterra the amounts you owe to any of the Hronis Farms entities.



Aimee S. Willig
January 2, 2026
Page 2

You are thus hereby notified that you must remit any and all amounts owing to any of the Hronis Farms entities directly to Conterra as set forth below.

Pursuant to the terms of the Loan, Hronis Farms was to direct all payments from its customers to be paid to the depository account held by U.S. Bank National Association, Account No. ********1093.  If you were previously making payments to Hronis Farms at this bank account, you should continue to make payments to this account.

Alternatively, you may send payment directly to Conterra at:

Conterra Agricultural Capital, LLC
5465 Mills Civic Pkwy, Ste 201
West Des Moines, IA 50266

To avoid the risk of confusion, please provide me with direct notice regarding any payments made and manner in which they are tendered.  If you previously have made payments to Hronis Farms to a different account than the U.S. Bank Account notated above, please provide information regarding the amount and dates of these payments. If you have any questions, please contact me at (562) 247-7622 or at bernie.kornberg@millernash.com.

Thank you for your prompt attention to this matter.

Respectfully,

Bernie Kornberg

cc:    Jacob Weinstein - jacob@weinsteinllp.com
       Zev Shechtman - zev.shechtman@saul.com

4934-1456-3461.1

MILLERNASH.COM





**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U240083964841 |
| Date Filed: 10/29/2024 |

Submitter Information:

| | |
| --- | --- |
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| HRONIS CAPITAL ASSETS, LP | 10443 HRONIS ROAD DELANO, CA 93215 |
| HRONIS CAPITAL MANAGEMENT, LLC | 10443 HRONIS ROAD DELANO, CA 93215 |
| HRONIS CITRUS, LLC | 10443 HRONIS ROAD DELANO, CA 93215 |
| HRONIS FARMING, LP | 10443 HRONIS ROAD DELANO, CA 93215 |
| HRONIS, INC. | 10443 HRONIS ROAD DELANO, CA 93215 |
| HRONIS LAND COMPANY | 10443 HRONIS ROAD DELANO, CA 93215 |
| HRONIS RANCH, LLC | 10443 HRONIS ROAD DELANO, CA 93215 |
| THE HRONIS FAMILY LIMITED PARTNERSHIP | 10443 HRONIS ROAD DELANO, CA 93215 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| CONTERRA AGRICULTURAL CAPITAL, LLC | 5465 MILLS CIVIC PARKWAY STE 201 WEST DES MOINES, IA 50266 |

Indicate how documentation of Collateral is provided:
  Entered as Text

Description:
  All Assets.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
  Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:

101398658

B3155-1138 10/29/2024 2:58 PM Received by California Secretary of State

# EXHIBIT 6



**Bernie Kornberg**
Partner
bernie.kornberg@millernash.com
562.247.7622 (direct)

January 2, 2026

**VIA EMAIL**
**VIA FED EX OVERNIGHT**

Walmart Inc.                                    Rachel Brand
c/o CT Corporation System           Executive Vice President of Global
330 N Brand Blvd.                          Governance, Chief Legal Officer and
Suite 700                                         Corporate Secretary
Glendale, CA                                    Walmart, Inc.
VendorGarnTPS@walmart.com    1 Customer Dr.
                                                          Bentonville, AR 72716

Subject:        Hronis Farms
                     Notification and Request to Collect Under Commercial Code § 9607(a)(1)

To Whom it May Concern:

This law firm represents Conterra Agricultural Capital, LLC ("Conterra"). Conterra is the lender on a loan (the "Loan") given to Hronis Capital Assets, LP, Hronis Capital Management, LLC, Hronis Citrus, LLC, Hronis Farming, LP, Hronis, Inc., Hronis Land Company, Hronis Ranch, LLC, and The Hronis Family Limited Partnership (collectively, "Hronis Farms"). The Loan is secured by a perfected, first-position security interest in, among other things, the accounts of Hronis Farms. Enclosed please find a copy of Conterra's filed financing statement which describes its interest in the collateral of Hronis Farms.

Hronis Farms has informed Conterra that your client, Walmart, Inc., and or its subsidiaries and affiliates, are Hronis Farms' account debtors, as defined by section 9102 of the Commercial Code, and that Hronis Farms has a right to payment from you. Hronis Farms has further informed us that it has provided a junior interest in its accounts to certain merchant cash advance lenders, including DLP Funding, LLC, who have asserted their own claims to the accounts of Hronis Farms. Any claims by these merchant cash advance lenders, or any other party, are junior to the first position claim of Conterra.

The Hronis Farms entities are in default of their payment obligations to Conterra. In accordance with the statutory provisions of the Commercial Code section 9607, Conterra is authorized to



Walmart Inc.
January 2, 2026
Page 2

notify you to pay directly to Conterra the amounts you owe to any of the Hronis Farms entities. You are thus hereby notified that you must remit any and all amounts owing to any of the Hronis Farms entities directly to Conterra as set forth below.

Pursuant to the terms of the Loan, Hronis Farms was to direct all payments from its customers to be paid to the depository account held by U.S. Bank National Association, Account No. ********1093.  If you were previously making payments to Hronis Farms at this bank account, you should continue to make payments to this account.

Alternatively, you may send payment directly to Conterra at:

Conterra Agricultural Capital, LLC
5465 Mills Civic Pkwy, Ste 201
West Des Moines, IA 50266

To avoid the risk of confusion, please provide me with direct notice regarding any payments made and manner in which they are tendered.  If you previously have made payments to Hronis Farms to a different account than the U.S. Bank Account notated above, please provide information regarding the amount and dates of these payments. If you have any questions, please contact me at (562) 247-7622 or at bernie.kornberg@millernash.com.

Thank you for your prompt attention to this matter.

Respectfully,

Bernie Kornberg

cc:     Jacob Weinstein - jacob@weinsteinllp.com
        Zev Shechtman - zev.shechtman@saul.com

4932-3094-0549.1





**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

For Office Use Only

**-FILED-**

File No.: U240083964841

Date Filed: 10/29/2024

Submitter Information:

| | |
|---|---|
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071 GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| HRONIS CAPITAL ASSETS, LP | 10443 HRONIS ROAD DELANO, CA 93215 |
| HRONIS CAPITAL MANAGEMENT, LLC | 10443 HRONIS ROAD DELANO, CA 93215 |
| HRONIS CITRUS, LLC | 10443 HRONIS ROAD DELANO, CA 93215 |
| HRONIS FARMING, LP | 10443 HRONIS ROAD DELANO, CA 93215 |
| HRONIS, INC. | 10443 HRONIS ROAD DELANO, CA 93215 |
| HRONIS LAND COMPANY | 10443 HRONIS ROAD DELANO, CA 93215 |
| HRONIS RANCH, LLC | 10443 HRONIS ROAD DELANO, CA 93215 |
| THE HRONIS FAMILY LIMITED PARTNERSHIP | 10443 HRONIS ROAD DELANO, CA 93215 |

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| CONTERRA AGRICULTURAL CAPITAL, LLC | 5465 MILLS CIVIC PARKWAY STE 201 WEST DES MOINES, IA 50266 |

Indicate how documentation of Collateral is provided:
  Entered as Text

Description:
  All Assets.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
  Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:

B3155-1137 10/29/2024 2:58 PM Received by California Secretary of State

101398658

B3155-1138 10/29/2024 2:58 PM Received by California Secretary of State

# EXHIBIT 7



**Bernie Kornberg**
Partner
bernie.kornberg@millernash.com
562.247.7622 (direct)

January 5, 2026

**VIA EMAIL AND FEDEX OVERNIGHT**

Jacob Z. Weinstein
The Law Office of Jacob Z. Weinstein PLLC
420 Central Avenue
Suite 301
Cedarhurst, NY 15516
jacob@weinsteinllp.com

Subject:      DLF Funding, LLC
              Demand to Cease and Desist and for an Accounting

Dear Mr. Weinstein:

This law firm represents Conterra Agricultural Capital, LLC ("Conterra"). Conterra is the lender on a loan (the "Conterra Loan") given to Hronis Capital Assets, LP, Hronis Capital Management, LLC, Hronis Citrus, LLC, Hronis Farming, LP, Hronis, Inc., Hronis Land Company, Hronis Ranch, LLC, and The Hronis Family Limited Partnership (collectively, the "Conterra Borrowers"). The Loan is secured by a perfected, first-position security interest in, among other things, the accounts of the Conterra Borrowers. Attached to this letter is a copy of the Loan and Security Agreement dated October 29, 2024 (the "Conterra Loan Agreement"), and the UCC-1 Financing Statement, filed with the California Secretary of State on October 29, 2024 (the "Conterra Financing Statement"), which reflect this duly perfected first position security interest.

Conterra has learned of the existence of a Merchant and Security Agreement dated November 14, 2025 (the "MSA") between your client, DLP Funding, LLC ("DLP"), on one hand, and Hronis Fruit Company, Hronis Ranch, LLC, Hronis Citrus, LLC, California Grape Gowers Cooperative, International Fruit Company, Inc., Central California Orange Growers Cooperative, Shamrock Transport, LLC, Hronis, Inc., and the Peter Hronis Company, LLC (collectively, the "DLP Borrowers").  Under the MSA, DLP agreed to fund a total of $13,453,570.20 to the DLP Borrowers, to be paid out under the schedule set forth in the MSA. These funds are, under the MSA, to be repaid through the assignment of the accounts of the DLP Borrowers to DLP. Conterra has been informed by Hronis Farms that at least $2,452,229 has been advanced by DLP under the MSA.



Jacob Z. Weinstein
January 5, 2026
Page 2

Conterra has learned that DLP served notices on certain account debtors of the Conterra Borrowers. These notices purport to require these account debtors to pay over all accounts directly to DLP. Conterra is aware of notices having been sent to Costco Wholesale ("Costco") and Walmart, Inc. ("Walmart"). This has caused Costco and Walmart to hold funds owed to the Hronis Borrowers. Those payments were, pursuant to the Conterra Loan Agreement, scheduled to be paid to a depository account controlled by Conterra, and if made would have resulted in payment on the Conterra Loan.

This diversion of payments to DLP violates Conterra's rights in the accounts of the Conterra Borrowers. Conterra's security interest in the accounts precedes that of DLP and has priority. Cal. Com. Code § 9322(a). The security interest in the accounts equally transfers to the proceeds of the accounts upon payment. Cal. Com. Code § 9315(a). Accordingly, Conterra's security interest in the accounts and their proceeds is superior to any interest of DLP. *First Bethany Bank & Tr., N.A. v. Arvest United Bank*, 2003 OK 64, ¶ 14 ("Because First Bethany perfected its security interests in the two accounts receivable first, it is entitled to the proceeds thereof which are held by Arvest").

The acts of DLP constitute conversion of Conterra's collateral. S*ee Imperial NH3 v. Cent. Valley Feed Yards, Inc.*, 70 Cal. App. 3d 513, 520 (Cal. Ct. App. 1977). Conterra is informed that Costco is holding $1,175,692.01 and Walmart is holding approximately $4,700,000. The damages incurred from the loss of use of these funds are directly attributable to DLP. Further, to the extent DLP has actually received funds on accounts paid to Conterra, Conterra has been harmed by the misappropriation of the funds at issue. Finally, Conterra is entitled to recovery of its attorneys' fees under the tort of another doctrine. *Sooy v. Peter*, 220 Cal. App. 3d 1305, 1310 (Cal. Ct. App. 1990).

Similarly, the Conterra Loan Agreement expressly provides that "Borrower shall not sell, lease, transfer or otherwise dispose of any Collateral unless the purchase price for the full value of the Collateral is paid to the Lender."  Conterra Loan Agreement § 5.14. DLP had knowledge of the existence of this term either through its due diligence, or simply through the knowledge that this is a standard term of loan agreements. Therefore, the acts of DLP constitute interference with the Conterra Loan Agreement. *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 56 (1998) ("knows that the interference is certain or substantially certain to occur as a result of his action").

Jacob Z. Weinstein
January 5, 2026
Page 3

Demand is therefore made that DLP, no later than January 9, 2025, shall (i) account to Conterra as to all account debtors to whom DLP has made demand for payment on the MSA; (ii) send notices to each of those account debtors, including Costco and Watmart, in which DLP states that it makes no claim to the accounts; and (iii) account for and return to Conterra all payments made on the MSA. Should DLP not do so by this deadline, Conterra shall bring legal action to enjoin further transfers to DLP and to recover Conterra's damages, as set forth above.

Respectfully,

Bernie Kornberg

cc:      Zev Shechtman - zev.shechtman@saul.com

4903-7521-7798.1

# EXHIBITS OMITTED

# EXHIBIT 8

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Alexandra Valles-Guerrero
Deputy Clerk
12/4/25 11:19 AM

MILLER NASH LLP
Bernie Kornberg, Bar No. 252006
bernie.kornberg@millernash.com
340 Golden Shore, Suite 450
Long Beach, California 90802
Telephone:     562.435.8002
Facsimile:     562.435.7967

Attorneys for Plaintiff
Conterra Agricultural Capital, LLC

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF KERN

CONTERRA AGRICULTURAL CAPITAL, LLC, an Iowa Limited Liability Company,

Plaintiff,

v.

HRONIS CAPITAL ASSETS, LP, a California Limited Partnership; HRONIS CAPITAL MANAGEMENT, LLC, a California Limited Liability Company; HRONIS CITRUS, LLC, a California Limited Liability Company; HRONIS FARMING, LP, a California Limited Partnership; HRONIS FRUIT COMPANY LLC, a California Limited Liability Company; HRONIS, INC., a California corporation; HRONIS LAND COMPANY, a California general partnership; HRONIS RANCH, LLC, a California Limited Liability Company; HRONIS RESOURCE MANAGEMENT, LLC, a California Limited Liability Company; THE HRONIS FAMILY LIMITED PARTNERSHIP, a California Limited Partnership; PETER JOHN HRONIS, an individual; KOSTA JAMES HRONIS, an individual; DEMETRIUS ALBERT HRONIS, an individual; KOSTA HRONIS In His Capacity As Trustee Of THE KOSTA HRONIS LIVING TRUST DATED FEBRUARY 12, 2014; PETER JOHN HRONIS, in his capacity as Trustee of THE PETER JOHN HRONIS LIVING TRUST DATED FEBRUARY 28, 2006; KOSTA HRONIS AND PETER J. HRONIS, in their capacity as Trustees of the SOPHIA HRONIS

Case No. 25CUB00833

**COMPLAINT FOR:**

**(1) APPOINTMENT OF A RECEIVER;**

**(2) JUDICIAL FORECLOSURE OF THE REAL PROPERTY COLLATERAL;**

**(3) BREACH OF LOAN DOCUMENTS / DEFICIENCY JUDGMENT**

**(4) JUDICIAL FORECLOSURE OF THE PASADENA PROPERTY;**

**(5) JUDICIAL FORECLOSURE OF THE DANA POINT PROPERTY;**

**(6) BREACH OF GUARANTEES / DEFICIENCY JUDGMENT; AND**

**(7) REPLEVIN AND FORECLOSURE ON PERSONAL PROPERTY COLLATERAL AND ADDITIONAL PERSONAL PROPERTY COLLATERAL**

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

COMPLAINT
4929-0852-8761.2

IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012; HRONIS RACING, LLC, a California Limited Liability Company; SHAMROCK TRANSPORT, LLC, a California Limited Liability Company; STEPHANIE HRONIS, an individual; LAURIE  HRONIS, an individual; and DOES 1-10, inclusive.

Defendants.

Conterra Agricultural Capital, LLC, an Iowa Limited Liability Company ("Conterra") alleges as follows:

## PARTIES

1.      Plaintiff Conterra is an Iowa limited liability company authorized to do business in the State of California. Conterra's principal place of business is located in West Des Moines, IA.

2.      Defendant Hronis Capital Assets, LP, is a California limited partnership organized under the laws of California.

3.      Defendant Hronis Capital Management, LLC, is a California limited liability company with a principal place of business in Kern County, California.

4.      Defendant Hronis Citrus, LLC, is a California limited liability company with a principal place of business in Kern County, California.

5.      Defendant Hronis Farming, LP, is a California limited partnership organized under the laws of California with a principal place of business in Kern County, California.

6.      Defendant Hronis Fruit Company LLC, is a California limited liability company with a principal place of business in Kern County, California.

7.      Defendant Hronis, Inc., is a corporation organized under the laws of California with a principal place of business in Kern County, California.

8.      Defendant Hronis Land Company, a California general partnership, whose principal place of business is in Kern County.

9.      Defendant Hronis Ranch, LLC, is a California limited liability company with a principal place of business in Kern County, California.

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 2 -

COMPLAINT
4929-0852-8761.2

10.    Hronis Resource Management, LLC, is a California limited liability company with a principal place of business in Kern County, California.

11.    The Hronis Family Limited Partnership is a limited partnership organized under the laws of California with a principal place of business in Kern County, California.

12.    Collectively, Hronis Capital Assets, LP, Hronis Capital Management, LLC, Hronis Citrus, LLC, Hronis Farming, LP, Hronis Fruit Company LLC, Hronis, Inc., Hronis Land Company, Hronis Ranch, LLC, Hronis Resource Management, LLC, and Hronis Family Limited Partnership are the "Borrowers".

13.    Defendant Peter John Hronis is an individual residing in and doing business in Kern County, California.

14.    Defendant Kosta James Hronis is an individual residing in and doing business in Kern County, California.

15.    Defendant Demetrius Albert Hronis is an individual residing in and doing business in Kern County, California.

16.    Defendant The Kosta Hronis Living Trust Dated February 12, 2014 is a trust organized under the laws of California. Defendant Kosta Hronis is trustee of this trust and is also named in this capacity.

17.    Defendant The Peter John Hronis Living Trust Dated February 28, 2006 is a trust organized under the laws of California. Defendant Peter John Hronis is trustee of this trust and is additionally named in this capacity.

18.    Defendants The Sophia Hronis Irrevocable Trust One Dated December 27, 2012 is a trust organized under the laws of California. Defendant Peter John Hronis and Kosta Hronis are trustees of this trust and are additionally named in this capacity.

19.    Collectively, defendants Peter John Hronis, Kosta James Hronis, Demetrius Albert Hronis, The Kosta Hronis Living Trust Dated February 12, 2014, The Peter John Hronis Living Trust Dated February 28, 2006, and the Sophia Hronis Irrevocable Trust One Dated December 27, 2012 are the "Guarantors".

20.    Defendant Hronis Racing, LLC, a California limited liability company with a

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 3 -

COMPLAINT
4929-0852-8761.2

principal place of business in Kern County, California.

21.     Defendant Shamrock Transport, LLC, a California limited liability company with a principal place of business in Kern County, California.

22.     Collectively, Hronis Racing, LLC and Shamrock Transport, LLC are the "Additional Parties".

23.     Defendant Stephanie Hronis is an individual who, on information and belief, resides in Kern County, California.

24.     Defendant Laurie Hronis is an individual who, on information and belief, resides in Kern County, California.

25.     Conterra is ignorant of the true names and capacities of defendants sued herein as Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. Conterra will amend this Complaint to allege their true names and capacities when ascertained. Conterra is informed and believes, and thereon alleges, that each of the fictitiously named defendants is responsible in some manner for the occurrences alleged herein, and that Conterra's damages as alleged herein were proximately caused by such defendants. Each reference in this Complaint to "Defendants" includes all named defendants and those sued under fictitious names.

**JUDICIAL REFERENCE PROVISION**

26.     The agreements that are the subject of this action are governed by and subject to terms therein whereby the disputes between Conterra and each or all of the Defendants are to be resolved by judicial reference in accordance with the provisions of Section 638 *et seq.* of the Code of Civil Procedure. Conterra reserves all rights to seek exigent or emergency relief from the Court in the event such relief is necessary before the appointment of a referee.

**GENERAL ALLEGATIONS**

**The Loan**

27.     Borrowers collectively operate, and partially or entirely own, a farm located in Delano, California ("Hronis Farms") which is in the business of growing agricultural crops, including but not limited to, table grapes.

28.     In 2024, Conterra agreed to finance provide Borrowers' operations, and provide

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 4 -

COMPLAINT
4929-0852-8761.2

other funds, through a line of credit with a maximum draw amount of $55 million.  This agreement was made through a careful and diligent review by Conterra of Borrower's financial condition, based on financial statements and other information provided to Conterra by Borrowers are part of underwriting.

29.     On or about October 29, 2024, Conterra made a revolving line of credit loan to the Borrowers in the amount of $55,000,000 (the "Loan"). The Loan is evidenced by that certain Loan and Security Agreement (the "Loan Agreement") attached as Exhibit A to this Complaint.

30.     To provide for repayment, the Borrowers signed a Promissory Note dated October 29, 2024 (the "Note") in favor of Conterra in the amount of $55,000,000. A copy of the Note is attached as Exhibit B to this Complaint.

31.     Borrowers agreed to repay the Note by paying all accrued interest monthly commencing on the first day of November, 2024, and continuing on the first day each month thereafter through and until October 29, 2027, at which the entire unpaid balance, including all principal, accrued interest, and other advances, and charges would be due and payable in full.

32.     In connection with the Note, the Guarantors each signed a continuing guaranty agreement (the "Guarantees") in which they agreed to unconditionally guarantee repayment of the all obligations owed by Borrowers to Conterra. A copy of the Guarantees are attached as Exhibits C – H to this Complaint.

33.     In order to secure repayment of the Note, the Loan Agreement grants Conterra certain security interests, which are collectively referred to as the "Farm Collateral".

(a)     Section 5.1 of the Loan Agreement grants Conterra a security interest in substantially all personal property of Borrowers, as specifically described in section 5.1 of the Loan Agreement (along with the personal property described in the following subparagraph, the "Personal Property Collateral"). A UCC-1 Financing Statement providing notice of this security interest was recorded with the California Secretary of State on October 29, 2024 as filing number U240083964841.

(b)     Hronis Ranch, LLC, The Hronis Family Limited Partnership, Hronis Land

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 5 -

COMPLAINT
4929-0852-8761.2

Company, Hronis Citrus, LLC, Hronis Capital Assets, LP, Peter Hronis, and Kosta Hronis (collectively, the "Trustors") executed, acknowledged, and delivered to Conterra, a Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing (the "Deed of Trust") dated October 29, 2024, securing to Conterra repayment of their obligations to Conterra through a power of sale on certain real property located in Tulare and Kern County (the "Real Property Collateral"), along with security interests in certain fixtures and personal property located on the Real Property Collateral. The Deed of Trust was recorded with the Tulare County Recorder on November 5, 2024 as Document No. 2024-0056030. The Deed of Trust was recorded with the Kern County Recorder on November 7, 2024 as Document No. 224138621. Copies of the recorded Deed of Trust are attached as Exhibit I and Exhibit J to this Complaint.

34.     To provide further security, Section 5.6 of the Loan Agreement requires that the account debtors of Borrowers deposit all payments into U.S. Bank National Association Bank Account, last four #1093 (the "U.S. Bank Account"), which is subject to a Deposit Account Control Agreement (the "DACA").

35.     To provide further security, Section 5.14 of the Loan Agreement requires that Borrowers deliver the proceeds of any sales of Farm Products or Inventory to Conterra to be applied to the Balance of the Loan.

**Borrowers Misrepresentations Regarding Their Financial Position**

36.     Shortly after giving the loan, Conterra learned that Borrowers' representations regarding their financial condition that was provided during underwriting was materially incorrect.

37.     As part of underwriting, Borrowers provided a Position Report dated October 15, 2024 (the "October 15 Position Report") to Conterra that set forth Borrowers assets and liabilities in detail.

38.     On December 3, 2024, after Borrowers had substantially drawn down on the Loan,

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 6 -

COMPLAINT
4929-0852-8761.2

Borrowers provided to Conterra a revised Position Report dated December 1, 2024 (the "December 1 Position Report"). This report showed a $20.1 million dollar decrease in assets after liabilities.

39.    After investigation, Conterra learned that $8.3 million of the account receivables reported in the October 15 Position Report had in fact been paid to Borrowers. Borrowers' explanation was that the reporting in the October 15 Position Report was due to an accounting error where the payments were not yet applied to the account receivables.

40.    The October 15 Position Report was further inflated by an overstatement of $14.22 million for the value of crops on the vine or still growing. This reduction was due to an overestimation of both the value of the crops and the actual harvest.

41.    The October 15 Position Report was further inflated by an overstatement of $3.6 million in unsold inventory, where it estimated market price was ultimately inflated.

42.    The December 1 Position report also showed other reductions in assets from the October 15 Position report.

43.    The December 1 Position report also disclosed that liability in the October 15 Position were overstated by $8.8 million as certain payables to intercompany and related parties should not have been reported.

44.    This overestimation of assets and liabilities was not a fair representation of Borrowers' financial position, but due to negligence, recklessness, or willful misrepresentation.

45.    In overestimating the assets and liabilities of Borrowers in the October 15 Position Report, Borrowers did not follow generally accepted accounting principles.

46.    Conterra relied on the financial reporting of Borrowers in agreeing to enter into the Loan.

**The April Letter Agreement**

47.    The Borrowers immediately defaulted on their obligations to Conterra under the Loan Documents. Borrowers' actual harvest produced far less return than the projections provided to Conterra. This failure to adequately manage Hronis Farms and to properly represent its financial condition resulted in Borrowers' default under numerous provisions of the Loan

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 7 -

Agreement. Further, Borrowers needed additional capital beyond the $55 million in available advances provided for under the Loan Agreement and Note.

48.     Conterra, in order to keep Hronis Farms operating so that it could complete the 2025 harvest, agreed to accommodate Borrowers by increasing the available funds by $6 million, in exchange for certain concessions and additional collateral.

49.     On or about April 9, 2025, Conterra, the Borrowers, and the Guarantors entered into a letter agreement (the "April Letter Agreement"). A copy of the April Letter Agreement is attached as Exhibit K to this Complaint.

50.     Pursuant to the April Letter Agreement, Conterra agreed to a one-time additional draw of funds in the amount of $6,000,000 under the Note and Loan Agreement (the "April Advance").

51.     In consideration for the April Advance, the Borrowers acknowledged certain events of default under the Loan Agreement and Note and that Borrowers were in default under the Loan Agreement. The Borrowers further agreed that the April Letter Agreement did not constitute a cure or forbearance of these defaults.

52.     In consideration for the April Advance, the Defendants agreed to grant Conterra a security interest in the following collateral (collectively, the "Additional Collateral"):

    (a)     A second lien on Cessna CJ3 owned by Additional Party Shamrock Transport, LLC;

    (b)     A second lien on real property located at 100 S Orange Grove Blvd #201, Pasadena, CA 91105 (the "Pasadena Property"), with title currently vested in Kosta Hronis and Stephanie Hronis;

    (c)     A second lien on real property located at 35511 Camino Capistrano, Dana Point, CA 92624 (the "Dana Point Property"), with title currently vested in Peter Hronis and Laurie Hronis;

    (d)     A lien on all horses owned by Hronis Racing, LLC or in which Additional Party Hronis Racing, LLC (or any affiliate of Additional Party Hronis Racing, LLC, Borrowers, or Guarantors) has an ownership or partnership interest

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 8 -

COMPLAINT
4929-0852-8761.2

therein; and

53.    A pledge of the membership interests of Additional Party Hronis Racing, LLC.

54.    Pursuant to the April Letter Agreement, Defendants agreed to cooperate and provide all additional documentation to Conterra to obtain and perfect a security interest in the Additional Collateral no later than April 21, 2025.

55.    Defendants failed to honor their obligation to provide the additional collateral within this deadline. While Conterra has taken steps to perfect the security interests when possible, Defendants failure to honor their obligations have put Conterra's security interests at risk or leaves them entirely unperfected.

**The June Letter Agreement**

56.    Despite receiving the April Advance, Borrowers' financial situation continued to spiral. Borrowers represented that they could not complete the 2025 harvest unless Conterra increased the draw amount to $85,000,000.

57.    Conterra was left with little choice but to agree to this request, as if the harvest was not completed, Borrowers would have no way to repay the Loan. However, in order to protect itself from the further mismanagement of Borrowers, Conterra demanded strict conditions from all Defendants.

58.    On or about June 27, 2025, Conterra, the Borrowers, and the Guarantors entered into a letter agreement (the "June Letter Agreement"). A copy of the June Letter Agreement is attached as Exhibit L to this Complaint.

59.    Pursuant to the June Letter Agreement, the Borrowers acknowledged and agreed that the obligations under the October Letter Agreement and April Letter Agreement remain in full force and effect, and that all defaults remain uncured and without forbearance.

60.    However, due to Borrowers' admitted misrepresentations made in origination of the Loan, their admitted defaults under the Note and Loan Agreement, and the continuing mismanagement of Hronis Farms, Conterra agreed to the increase only under strict conditions.

61.    Pursuant to the June Letter Agreement, Conterra required that the Borrowers agree to "a mutually agreed upon budget and draw procedures and schedule pursuant to a mutually

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 9 -

COMPLAINT
4929-0852-8761.2

agreed budget attached as Exhibit 1" to the June Letter Agreement (the "Budget").

62.     Pursuant to the June Letter Agreement, the Borrowers were obligated to hire a Chief Restructuring Officer ("CRO"), to ensure that the Borrowers comply with the conditions of the June Letter Agreement. The CRO is to remain in place until the Loan is paid in full.

63.     Pursuant to the June Letter Agreement, the terms of the engagement between Borrowers and the CRO was required to include certain terms, including:

(a)     The CRO was to have final authority over all bookkeeping, accounting, and financing reporting;

(b)     The CRO was to approve all transactions outside the ordinary course of business;

(c)     The CRO must approve all disbursements, and may only approve payments in compliance with the Budget;

(d)     The CRO must ensure that Borrowers comply with their obligation under the Loan Agreement to ensure that all payments by Borrowers' account debtors are made to the U.S. Bank Account.

(e)     The CRO must approve all transfers and payments out of the U.S. Bank Account;

(f)     Borrowers and the CRO were to jointly provide a joint certification on the 20th day of every month "that Borrowers have available funds to meet the requirements of the Budget for the following month" (the "Solvency Certification"). The Solvency Certification required the CRO to "determine[] with reasonable certainty that such funds will be available for the use of Borrowers to make all payments required under the Budget"; and

(g)     If Borrowers and the CRO are unable to make Solvency Certification, the CRO is required to "prepare a liquidation plan for Borrowers in which they will timely sell all assets of Borrowers."

64.     Borrowers further agreed in the June Letter Agreement that, if the Loan was not paid in full by February 28, 2026, to liquidate for the benefit of creditors.

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 10 -

COMPLAINT
4929-0852-8761.2

65.     Concurrently with execution of the June Letter Agreement, Conterra and the Borrowers mutually agreed upon designating Paladin Management Group, LLC as the CRO.

66.     Borrowers and CRO then entered into an agreement which obligated CRO to perform under the conditions of the June Letter Agreement assigned to it. A copy of this agreement, with amendments, is attached as Exhibit M to this Complaint.

**The Defaults**

67.     The Borrowers, Guarantors, and Additional Parties have defaulted on their obligations under the Loan Agreement, the Note, the Deed of Trust, the Guarantees, the April Letter Agreement, the June Letter Agreement, and other documents executed in connection with or related to the Note, and all modifications thereto (the "Loan Documents") as follows.

The Defaults Relating to Solvency

68.     Pursuant to Section 1.1 of the Loan Agreement, a default occurs under the Loan Documents if "any Borrower or Guarantor fails or neglects to perform, keep or observe any of the covenants, conditions, representations, promises or agreements contained in this Agreement including but not limited to Section 3, Section 4, Section 5, Section 6, Section 7, Section 8, Section 9, or Section 10 of this Agreement…"

69.     Pursuant to Section 6.2 of the Loan Agreement, the Borrowers represented and warranted that "the financial statements delivered by Borrower to the Lender present fairly the financial condition of Borrower and have been prepared in accordance with generally accepted accounting principles consistently applied."  Borrowers further represented that "there has been no materially adverse change in the condition or operation of Borrower, nor has Borrower mortgaged, pledged or granted a security interest in or encumbered any of Borrower's assets or properties since such date."

70.     Pursuant to Section 7.1 of the Loan Agreement, Borrowers agreed to continue to maintain books and records "accordance with generally accepted accounting principles consistently applied."

71.     Borrowers breached these conditions by presenting financial statements to Conterra which materially overstated the financial condition of Borrowers.

72.     Pursuant to Section 6.9 of the Loan Agreement, the Borrowers represented and warranted that Borrowers are solvent and able to pay Borrowers' debts as such debts matured.

73.     Pursuant to Section 1.1 of the Loan Agreement, a default occurs if "Lender in good faith deems itself insecure or that the prospect for repayment of the Liabilities or Borrower's obligations under the Financing Agreements is impaired."

74.     Borrowers are in default under these provisions as they are unable to pay their debts as they come due and require further advances from Conterra, beyond what was agreed in the Note and Loan Agreement.

75.     Pursuant to Section 7.5 of the Loan Agreement, the Borrowers agreed to provide Conterra with written notice of any material adverse change in the financial condition of the Borrowers and occurrence of any Event of Default.

76.     Borrowers breached this provision by failing to provide Conterra written notice of the material adverse change in their financial position.

77.     Pursuant to that certain executed April Letter Agreement, the Defendants acknowledged and agreed that under that these defaults under the Loan Agreement occurred and continue to occur.

Breach of the April Letter Agreement

78.     Pursuant to the April Letter Agreement, the Defendants agreed to grant Conterra a security interest in the Additional Collateral.

79.     Pursuant to the April Letter Agreement, the Borrowers agreed to provide additional documentation to Conterra to perfect Conterra's security interest in the Additional Collateral.

80.     Borrowers have failed to provide Conterra the additional documentation needed to perfect its security interest in the Additional Collateral.

81.     Borrowers' failure to provide Conterra with the additional documentation constitutes a breach of the April Letter Agreement.

82.     Pursuant to the April Letter Agreement, any breach of the April Letter Agreement constitutes a default under the Loan Agreement.

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 12 -

COMPLAINT
4929-0852-8761.2

Breach of the June Letter Agreement

83. Pursuant to the June Letter Agreement, Defendants agreed, in exchange for a limited waiver for additional draws, to follow the "mutually agreed upon budget and draw procedures and schedule set forth in the Budget."

84. Conterra has made all advances it agreed to provide under the Budget, with the entire additional advance agreed to under the June Letter Agreement having been delivered to Borrowers.

85. Borrowers have materially breached their obligation to make payments to Conterra under the Budget.

86. Under the Budget, Borrowers were obligated to make payments of principal and interest to Conterra starting on July 6, 2025 and with regularly scheduled payments as set forth in the Budget.

87. Borrowers failed to make the scheduled payments under the Budget.

88. Under the Budget, Borrowers were to, by November 2, 2025, tender cumulative principal payments to Conterra of $18,889,000 and interest payments of $2,849,000. Borrowers have material defaulted on this obligation, having paid only $5,226,914 to Conterra since the June Letter Agreement.

89. As a condition of entering into the June Letter Agreement, Borrowers agreed to arrange for a shareholder loan from Peter Hronis, to be drawn down as set forth in the Budget (the "Shareholder Loan"). Borrowers represented that the funds to pay the shareholder loan were readily available from a loan from a family member and could be delivered pursuant to the Budget.

90. Under the Budget, Borrowers were to receive $18,997,000 by March 1, 2026 in proceeds from the Shareholder Loan, with $7,115,000 of these proceeds to be advanced by September 21, 2025.

91. The Shareholder Loan has not been drawn down as pursuant to the Budget, further depriving Borrowers of capital to fund operations and to pay Conterra.

92. Despite Borrowers' material and substantial default under the Budget, Borrowers

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 13 -

COMPLAINT
4929-0852-8761.2

and the CRO have timely provided the Solvency Certification called for under the June Letter Agreement for each month. Copies of these Solvency Certifications are attached as Exhibit N to this Complaint.

93.    Borrowers have failed to make the monthly payments required under the Budget, despite the monthly delivery of the Solvency Certificate, leads to one of two possible conclusions. Either Borrowers have the funds to pay Conterra the sums owed under the Budget but deliberately refuse to do so, or the Borrowers and CRO are willfully making false representations in the Solvency Certification to avoid the obligation to liquidate. In either event, Borrowers actions constitute a breach of the Loan Documents.

94.    Pursuant to the June Letter Agreement, any breach of the June Letter Agreement constitutes a default under the Loan Agreement.

### Excessive Payments to Insiders

95.    Pursuant to Section 8.14 of the Loan Agreement, payments to certain insiders are limited to no more than $1.5 million per fiscal year.

96.    Based on the financial information provided by the CRO, it appears that Peter J. Hronis, Kosta Hronis, Demetrius Hronis, and Peter N. Hronis have collectively received salaries of $1,630,647.72 for the current fiscal year, which is not yet complete.

97.    This constitutes a breach of the Loan Agreement.

### Failure to Disburse Funds to the Control Account for the Benefit of Conterra

98.    Pursuant to Section 5.14 and 5.17 of the Loan Agreement, Borrowers agreed to deposit all proceeds of any collateral, including Farm Products, into the U.S. Bank Account to be applied to the Loan.

99.    On information and belief, the Borrowers have failed to abide by this obligation.

### Continued Insolvency

100.    Conterra, through its regularly scheduled meetings with the CRO, is informed that Borrowers' financial insolvency continues to worsen. Due to continued mismanagement of Hronis Farms, the expected proceeds of the crop may be $20 million less than projected in the Budget.

101.    Borrowers are hopelessly insolvent without any prospect of satisfying the Loan by the February 28, 2026 deadline set forth in the June Letter Agreement.

**Remedies Upon Defaults**

102.    The Loan Documents provide numerous remedies upon the default of the Borrowers and Guarantors, including the following.

103.    Under the Loan Agreement, Section 9.1 provides "[u]pon an Event of Default, any or all of the Liabilities may, at the option of the Lender, and without demand or notice of any kind, be declared, and thereupon shall become, immediately due and payable in full, and the Lender shall cease to be committed to make Line of Credit Advances under Agreement."

104.    Under the Loan Agreement, section 9.6 provides that upon an Event of Default, Borrowers waive all rights to notice and hearing of any kind prior to Conterra exercising its rights as to the Collateral.

105.    Under the Loan Agreement, section 10.3 provides that any amounts advanced by Conterra plus interest at the default rate provided for in the Loan Agreement shall constitute additional liabilities owed by the Borrowers.

106.    Under the Deed of Trust, section 2 provides that any future advances made and any amounts advanced and expenses incurred by Conterra under the Loan Agreement are secured under the Deed of Trust.

107.    Under section 9.2 of the Loan Agreement and Section 20 of the Deed of Trust each provides that Conterra is entitled to the appointment of a receiver upon a default by Borrowers.

108.    Under the Deed of Trust, Section 30(e) provides Conterra with the power to sell the Real Property Collateral if the outstanding amounts under the Loan are not paid.

109.    Under the Loan Agreement and Deed of Trust, Conterra is entitled to its attorneys' fees and costs in enforcing the Loan Documents upon a default.

110.    Conterra has fully performed on all contractual obligations owed to Borrowers.

111.    Performance by the Borrowers is not excused.

112.    Conterra has, through the April and June Letter Agreement, and demand letters sent on August 19, 2025 and January 23, 2025, provided notice to Defendants of these breaches.

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 15 -

COMPLAINT
4929-0852-8761.2

113.   As of November 24, 2025, the total outstanding balance on the Note was $83,020,356.27, consisting of principal in the amount of $82,035,925.17 and interest in the amount of $984,463.10.  Daily interest of $41,017.96 continues to accrue, subject to monthly interest rate adjustments.

114.   Because Borrowers failed to pay the outstanding balance, Conterra is entitled to apply the default interest rate to the amounts owed under the Note.

## FIRST CAUSE OF ACTION

### (Appointment of a Receiver)

### As to Borrowers, Guarantors, and Additional Parties

115.   Conterra incorporates by reference all prior paragraphs in this Complaint.

116.   Due to the defaults by Defendants, Conterra seeks appointment of a receiver for all purposes over Borrowers and the Farm Collateral, including, without limitation, to allow the Receiver to sell the Farm Collateral and other assets of Borrowers, manage the affairs of Borrowers until liquidated, bring claims against insiders, and attend to all other tasks required by the receivership.

117.   A receiver is necessary because (i) the Farm Collateral is in danger of being lost, removed, or materially injured as Defendants are not maintaining the collateral, lack funds to pay taxes, and due to mismanagement have cause the destruction of crop collateral (ii) the Defendants are not able to pay the necessary suppliers and vendors to maintain the crops on the Farm Collateral; (iii) Defendants are insolvent or in imminent danger of insolvency; (iv) Defendants are in default and have consented to appointment of a receiver for the Farm Collateral upon default.

## SECOND CAUSE OF ACTION

### (Judicial Foreclosure of the Real Property Collateral)

### As to the Trustors

118.   Conterra incorporates by reference all prior paragraphs in this Complaint.

119.   Conterra, by virtue of the Deed of Trust, is entitled to a judgment and decree of foreclosure on the Real Property Collateral, including a finding that the interests of Conterra in the Real Property Collateral are superior to the interests of Borrowers, Guarantors, the Additional

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 16 -

COMPLAINT
4929-0852-8761.2

Parties, and Doe Defendants 1-5.

120.    The Real Property Collateral has the legal description set forth in the Deed of Trust.

121.    Upon sale of the Real Property Collateral, Conterra seeks, as provided for in the Loan Documents and Code of Civil Procedure 726, a deficiency judgment, should any such deficiency exist.

122.    Conterra is entitled to its attorneys' fees and costs in foreclosing on the Real Property Collateral and seeking a deficiency judgment.

**THIRD CAUSE OF ACTION**

**(Breach of Loan Documents / Deficiency Judgment)**

**As to the Borrowers**

123.    Conterra incorporates by reference all prior paragraphs in this Complaint.

124.    Conterra has fully performed all obligations owed under the Loan Documents.

125.    Borrowers have defaulted on their obligations owed under the Loan Documents.

126.    Borrowers' performance under the Loan Documents is not excused.

127.    Due to the default, Conterra has accelerated all sums owed under the Note.

128.    As a result of the Borrowers' defaults, Conterra has been damaged in an amount to be proven at trial, but in no event less than $83,020,356.27, with default interest and charges accruing. Upon the judicial sale of the Real Property Collateral, Conterra seeks entry of a deficiency judgment against Borrowers for the remaining balance of the default, as provided by Code of Civil Procedure 726.

**FOURTH CAUSE OF ACTION**

**(Judicial Foreclosure of the Pasadena Property)**

**As to Kosta Hronis and Stephanie Hronis**

129.    Conterra incorporates by reference all prior paragraphs in this Complaint.

130.    Conterra, by virtue of April Letter Agreement and the other Loan Documents, is entitled to a judgment and decree of foreclosure on Pasadena Property, the legal description of which is attached to this Complaint as Exhibit O, including a finding that the interests of Conterra

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 17 -

in the Pasadena Property are superior to the interests of Borrowers, Guarantors, the Additional Parties, and Doe Defendants 6-10.

131.    Upon sale of the Pasadena Property, Conterra seeks, as provided for by Code of Civil Procedure 726, a deficiency judgment, should any such deficiency exist.

132.    Conterra is entitled to its attorneys' fees and costs in foreclosing on the Pasadena Property and seeking a deficiency judgment.

## FIFTH CAUSE OF ACTION

### (Judicial Foreclosure of the Dana Point Property)

### As to Peter Hronis and Laurie Hronis

133.    Conterra incorporates by reference all prior paragraphs in this Complaint.

134.    Conterra, by virtue of April Letter Agreement and the other Loan Documents, is entitled to a judgment and decree of foreclosure on the Dana Point Property, the legal description of which is attached to this Complaint as Exhibit P, including a finding that the interests of Conterra in the Dana Point Property are superior to the interests of all Borrowers, Guarantors, the Additional Parties, and Doe Defendants 11-15.

135.    Upon sale of the Dana Point Property, Conterra seeks, as provided for by Code of Civil Procedure 726, a deficiency judgment, should any such deficiency exist.

136.    Conterra is entitled to its attorneys' fees and costs in foreclosing on the Dana Point Property and seeking a deficiency judgment.

## SIXTH CAUSE OF ACTION

### (Breach of Guarantees / Deficiency Judgment)

### As to the Guarantors

137.    Conterra incorporates by reference all prior paragraphs in this Complaint.

138.    Each of the Guarantors signed a guarantee in which they agreed to unconditionally guarantee all payments owed under the Loan Documents.

139.    Each of the Guarantors have breached their obligations under the Guarantees by failing to tender the sums owed to Conterra under the Loan Documents.

140.    Each of the Guarantors and Additional Parties have breached their obligations

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 18 -

under the April Letter Agreement by failing to provide the additional documentation to Conterra to perfect its security interest in the Additional Collateral.

141. Conterra has fully performed all obligations owed by it under the April Letter Agreement and each guarantee.

142. The Guarantors' performance under each guarantee is not excused.

143. Pursuant to the Guarantees, the Guarantors have waived receipt of noticed and demands as to the liabilities of the Borrowers and the Guarantees.

144. As a result of the Guarantors' defaults, Conterra has been damaged in an amount to be proven at trial, but in no event less than $83,020,356.27, with default interest and charges accruing. Upon the judicial sale of the Real Property Collateral, the Dana Point Property, and the Pasadena Property, Conterra seeks entry of a deficiency judgment against Borrowers for the remaining balance of the default, as provided by Code of Civil Procedure 726.

**SEVENTH CAUSE OF ACTION**

**(Replevin and Foreclosure on Personal Property Collateral**

**and Additional Personal Property Collateral)**

**As to Defendants**

145. Conterra incorporates by reference all prior paragraphs in this Complaint.

146. Due to the Borrowers' and Guarantors' default, Conterra is entitled to a judgment for possession for foreclosure of the Personal Property Collateral.

147. Due the breach by Defendants of the April Letter Agreement, Conterra is entitled to a judgment for possession for foreclosure of certain Additional Collateral described below (the "Additional Personal Property Collateral"):

(a)   All horses owned by Additional Party Hronis Racing, LLC or in which Additional Party Hronis Racing, LLC (or any affiliate of Hronis Racing, LLC, Borrowers, or Guarantors) has an ownership or partnership interest therein; and

(b)   Membership interests of Additional Party Hronis Racing, LLC.

148. Borrowers and Guarantors remain in possession of the Personal Property Collateral and Additional Personal Property Collateral in defiance of Conterra's rights thereto.

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 19 -

COMPLAINT
4929-0852-8761.2

149.    Conterra demands that possession of the Personal Property Collateral and Additional Personal Property Collateral, and any proceeds thereof, be delivered to Conterra.

150.    The failure and refusal to deliver to Conterra the Personal Property Collateral and Additional Personal Property Collateral has damaged Conterra in an amount to be proven at trial, but in no event, no less than $83,020,356.27.

151.    Along with possession, Conterra is entitled to judgment for foreclosure of the Personal Property Collateral and Additional Personal Property Collateral, including a finding that the interests of Conterra in the Real Property Collateral are superior to the interests of Borrowers, Guarantors, the Additional Parties, and Doe Defendants 1-5, which Conterra may exercise if necessary to dispose of the respective collateral.

152.    By the terms of the Loan Documents, Conterra is entitled to its attorneys' fees and costs in recovering and foreclosing on the Personal Property Collateral and Additional Personal Property Collateral.

## PRAYER

Conterra prays for judgment as follows:

1.    For a judgment in its favor of Conterra and against the Borrowers and the Guarantors in the amount of no less than $83,020,356.27, plus all interest, fees, and costs accruing from November 1, 2025 to the date of entry of judgment;

2.    For a judgment appointing a receiver to take possession of the Farm Collateral, to operate Borrowers and the Farm Collateral, to collect the rents and proceeds of Borrowers and the Farm Collateral, and to sell the assets of Borrowers and the Farm Collateral;

3.    For a judgment and decree of foreclosure on the Deed of Trust against the Real Property Collateral, and for a deficiency judgment after foreclosure;

4.    For a judgment and decree of foreclosure on the Deed of Trust against the Pasadena Property, and for a deficiency judgment after foreclosure;

5.    For a judgment and decree of foreclosure on the Deed of Trust against the Dana Point Property, and for a deficiency judgment after foreclosure;

6.    For a judgment of possession and foreclosure as to the Personal Property

Collateral and the Additional Personal Property Collateral;

7.    For an award of attorneys' fees and costs of suit; and

8.    For such other and further relief as this Court deems just and proper.


Dated: December 3, 2025                              MILLER NASH LLP


                                          By:  _s/Bernie Kornberg_
                                               Bernie Kornberg

                                               Attorneys for Plaintiff
                                               Conterra Agricultural Capital, LLC

MILLER NASH LLP
ATTORNEYS AT LAW
LONG BEACH

- 21 -

COMPLAINT
4929-0852-8761.2

# EXHIBITS OMITTED